# **EXHIBIT A**

Summons and Complaint

**SUMM**
Samuel Castor, Esq.
Nevada State Bar No. 11532
Switch, Ltd.
7135 S. Decatur Blvd.
Las Vegas, NV  89118

Attorney for Plaintiff

DISTRICT COURT

CLARK COUNTY, NEVADA

SWITCH, LTD., a Nevada limited liability
company,

　　　　　　　　Plaintiff(s),

　　　　　　　　-vs-

STEPHEN FAIRFAX; MTECHNOLOGY;
and DOES 1 through 10; ROE ENTITIES
11 through 20, inclusive,

　　　　　　　　Defendant(s).

CASE NO.
A-17-761382-C

DEPT. NO.  29

**SUMMONS - CIVIL**

**NOTICE!  YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU
WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.
READ THE INFORMATION BELOW.**

**TO THE DEFENDANT(S):** A civil Complaint has been filed by the Plaintiff(s) against
you for the relief set forth in the Complaint.

　　　1.　　If you intend to defend this lawsuit, within 20 days after this Summons is

　　　　　　served on you, exclusive of the day of service, you must do the following:

　　　　　　(a) File with the Clerk of this Court, whose address is shown below, a

　　　　　　　　formal written response to the Complaint in accordance with the rules

　　　　　　　　of the Court, with the appropriate filing fee.

　　　　　　(b) Serve a copy of your response upon the attorney whose name and

　　　　　　　　address is shown below.

SUMM Civil/9/15/2017

1
2  2.  Unless you respond, your default will be entered upon application of the

2      Plaintiff(s) and failure to so respond will result in a judgment of default

3      against you for the relief demanded in the Complaint, which could result in

4      the taking of money or property or other relief requested in the Complaint.

5  3.  If you intend to seek the advice of an attorney in this matter, you should do

6      so promptly so that your response may be filed on time.

7  4.  The State of Nevada, its political subdivisions, agencies, officers,

8      employees, board members, commission members and legislators each

9      have 45 days after service of this Summons within which to file an Answer

10      or other responsive pleading to the Complaint.

11

12            STEVEN D. GRIERSON
              CLERK OF COURT

13  Submitted by:

14            By:_____

15            Deputy Clerk     Date

16            Judit Angyalne-Kiss 9/15/2017
              Regional Justice Center

17            200 Lewis Avenue
            Las Vegas, NV 89155

18

19

20  **NOTE: When service is by publication, add a brief statement of the object of the**
  **action.  See Nevada Rules of Civil Procedure 4(b).**

21

22

23

24

25

26

27

28

SUMM Civil/9/15/2017

Electronically Filed
9/12/2017 4:51 PM
Steven D. Grierson
CLERK OF THE COURT

1  SAMUEL CASTOR, ESQ.
2  Nevada Bar No. 11532
   SWITCH, LTD.
3  7135 S. Decatur Blvd.
   Las Vegas, Nevada 89118
4  *Attorney for Plaintiff*

5                    **DISTRICT COURT**

6               **CLARK COUNTY, NEVADA**

7
   SWITCH, LTD. a Nevada limited liability          CASE NO.:    A-17-761382-C
8  company,
9                                                   **COMPLAINT**    Department 29
             Plaintiff,
10                                                  **JURY DEMAND**
   vs.
11
   STEPHEN FAIRFAX; MTECHNOLOGY; and
12 DOES 1 through 10; ROE ENTITIES 11
   through 20, inclusive,
13
14           Defendants.

15

16      Plaintiff Switch, Ltd. ("Switch"), by and through its counsel, alleges as follows:

17                    **NATURE OF THE ACTION**

18      Switch brings this action to stop the unlawful activities and deceptive acts of Stephen

19 Fairfax, and MTechnology (the "Defendants") for the benefit of Aligned Data Centers

20 ("Aligned") and Inertech Systems ("Inertech") to misappropriate Switch's trade secrets and

21 technologies and to tortiously interfere with certain Switch customer contracts. Mr. Fairfax

22 perfomed a holistic technical audit of Switch's data centers facilities in 2011 and again in

23 early 2015 after signing confidentiality agreements and assuring Switch that he had "no

24 interest in building and operating data centers." Despite his contractual and verbal

25 assurances, before and after auditing Switch, Mr. Fairfax provided Switch's confidential

26 information to certain direct competitors of Switch, namely Aligned and Inertech. Aligned

27 used Switch technology to construct two data centers and plans to build more. Defendants, in

28 concert, then helped Aligned, Jakob Carnemark of Aligned, and Inertech, misrepresent

Switch's misappropriated technology as Aligned's.

At the time of Mr. Fairfax's tours, he was informed that Switch's designs were patent-pending and that he would be exposed to confidential information, and trade secrets including those patent-pending designs. As a result, Switch was surprised to recently discover that Aligned has begun deploying Switch's technologies, including many patent-pending technologies and disruptive Switch inventions. Switch was also surprised to learn that Mr. Fairfax was instrumental, if not central, to the Aligned designs, despite his strict duty to maintain the confidentiality of Switch's technologies, trade secrets, and confidential information. Aligned and Defendants actively and prominently promote Mr. Fairfax's integral "blank page stage" design involvement on their respective websites.[1]  In one such video, Mr. Fairfax himself notes that his relationship with Aligned was "unique".  Mr. Fairfax emphasizes that instead of auditing the integrity of the facility, he was invited "to have a seat" at the design table, for the Aligned data center at the "blank page stage".[2]

After using Switch's technologies to design these new data centers for Aligned, thereby breaching his confidentiality obligations and misappropriating Switch's technology for Aligned's benefit, Defendants represented the technology as having originated from Aligned when Fairfax knew it originated from Switch.  Aligned announced the opening of a new facility in May of 2016, alleging similar efficiency and scalability benefits available in Switch's data center facilities; efficiencies made possible with Switch's technologies.

Switch's trade secrets and patent-pending claims will be discussed in greater detail as the matter progresses and subject to protective order and seal.  However, even the untrained eye can appreciate the mimicking of Switch's technologies when viewing Switch's now patented technology known as the Switch T-SCIF® next to Aligned's "Customer Pod".

The obvious duplication is not happenstance.

---

[1] *See* Fairfax November 15, 2015 blog post, highlighted involvement with Aligned at http://www.mtechnology.net/; *See* Aligned video promotion at https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers.
[2] *See id.*

**Switch T-SCIF**
Side View

**Aligned "Customer Pod"**
Side View





**Switch T-SCIF**
Front View

**Aligned "Customer Pod"**
Front View





**Switch T-SCIF**
Top View Showing the Heat Shield

**Aligned "Customer Pod"**
Top View Showing the Heat Shield





**Switch T-SCIF**
Side View

**Aligned "Customer Pod"**
Side View





**Switch T-SCIF**
Diagram

**Aligned "Customer Pod"**
Diagram





**Switch Data Center**
Cross-Section of Entire Facility

**Aligned Data Center**
Cross-Section of Entire Facility



**Switch Data Center**
Cross-Section of Entire Facility

**Aligned Data Center**
Cross-Section of Entire Facility





**Switch Data Center**
Cross-Sections of Entire Facility

**Aligned Data Center**
Cross-Sections of Entire Facility





**Switch Data Center**
Cross-Section of Entire Facility

**Aligned Data Center**
Cross-Section of Entire Facility

 

**Switch Data Center**
Cross-Section of Entire Facility

**Aligned Data Center**
Cross-Section of Entire Facility

 

The foregoing Aligned Data Center images are from Aligned's website and as seen in the original, except for the red labeling provided for clarity on the "Aligned Data Center - Cross-Section of Entire Facility" images.

Given Defendants' ongoing misappropriation of Switch designs to promote Aligned's services in direct competition with Switch, Switch seeks immediate and permanent injunctive relief, damages, and attorneys' fees and costs. Specifically, Switch seeks injunctive relief preventing further promotion of or design work for the Aligned facilities by Defendants. In addition, Switch seeks immediate, preliminary discovery.

## JURISDICTION

1.  This Court has jurisdiction under the Nevada Uniform Trade Secrets Act.

2.  This Court has personal jurisdiction over the Defendants as the contracts at issue were entered into in Nevada, Switch's misappropriated technology is resident to

Nevada, Defendants committed the activities giving rise to Switch's claims in the State of Nevada and such activities were directed towards harming a Nevada resident.

3.   This Court has jurisdiction over Defendant Fairfax and Defendant MTechnology pursuant to the Non-Disclosure Agreements executed by Mr. Fairfax on May 4, 2011 and August 12, 2015 respectively and his related business activities in Nevada.

4.   Venue is proper because a substantial part of the events giving rise to Switch's claims occurred in this District.

## PARTIES

5.   Switch is a Nevada limited liability company organized and existing under the laws of the State of Nevada and doing business worldwide.

6.   Switch, led by its founder, CEO, and inventor, Rob Roy, is widely known as one of the world's leading designers, builders, and operators of data centers. Switch's facilities sustainably power, cool, and protect the physical infrastructure and networks necessary to run the Internet.

7.   Switch's patent-pending and patented technologies are used by hundreds of clients. Switch's clients range from Fortune 100 entities to governmental agencies. A partial list of Switch's clients is available online at www.switch.com/clients.

8.   In addition to being well-known for its innovative technologies and confidential approach to its services, Switch is also recognized for providing military grade physical security to protect its customers and Switch's intellectual property. Visitors to Switch's facilities must first sign non-disclosure agreements and agree to comply with Switch's security protocols, including Switch's Acceptable Use Policy, which protects Switch's intellectual property and is available at www.switch.com/aup.

9.   Switch's facilities are built to the highest standards and are monitored 24/7/365 by armed security personnel. Switch's data centers are surrounded by 11-foot to 13-foot perimeter walls. The facility exterior walls are windowless and made of non-flammable, non-penetrable concrete. Prior to entering the data center's floor, entrants must

undergo a Switch security clearance. The facility itself has man-trap access control at all entrances and bio-metric scanners limit access to the data center floor. Except for carefully selected marketing materials, designed to protect Switch's trade secrets and pending patents, no one sees the interior of Switch's facilities without agreeing to comply with Switch's security and confidentiality protocols.

10. This high degree of physical security and constant presence of security personnel allows Switch to limit access to its trade secrets, patent-pending technologies, confidential designs and protocols, and to preserve the integrity of its mission critical operations that power the Internet.

11. In addition to allowing Mr. Fairfax access to the facilities, Switch provided Mr. Fairfax with access to portions of Switch's facilities and information regarding those facilities, which Switch keeps in particular confidence, such as Switch's electrical and mechanical "one-lines" which are facility specific schematics.

12. Switch is informed and believes that Defendant Stephen Fairfax was, and is, a resident of Massachusetts, and, at all times relevant to this action, was President of MTechnology and is named herein in his official capacity.

13. Switch is informed and believes that Defendant MTechnology is a Massachusetts Corporation organized and existing under the laws of the Commonwealth of Massachusetts.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Switch

14. Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

15. Switch designs, constructs, and operates the physical infrastructure that cools, powers, protects, and connects the Internet. Switch's designs have allowed Switch to become known as one of the best in the industry at building and operating data center technology ecosystems.

16. Switch actively promotes that it has many patented and patent-pending

designs.   At the time of the events at issue, Switch's now patented designs were unpublished, patent-pending applications.

17. Switch has received numerous awards for Rob Roy's inventions, including being ranked as the World's No. 1 cloud campus by industry publication *Data Center Frontier*.[3]

18. In this publication, Switch was ranked above Google, Amazon, Apple, Microsoft, Facebook, DuPont Fabros, Digital Realty, the NSA, and Equinix.

19. Central to Switch's innovative technologies are Rob Roy's inventions, operational routines, and electrical designs, including, but not limited to, Switch's hot aisle containment technology.   This technology is known throughout the industry as the Switch T-SCIF® (the "Thermal Separate Compartment in Facility" or "T-SCIF Technology").

20. Based on Switch's novel approach to data center technology, Switch has been able to operate their data centers more efficiently than their competitors and solve one of the biggest threats to data center efficiency: containing, channeling, and cooling server heat.

21. The computer servers in Switch's data centers consume many megawatts of power.   This power consumption generates large amounts of heat.   How to deal with the heat has been a long felt need in the industry and has proven to be a limiting factor in the amount of computer servers that can be placed in a data center environment.

22. The T-SCIF Technology allows for greater efficiencies and a greater density of computer server use by containing up to 100% of the heated air emitted by the servers and keeping that heated air separated from the cool air surrounding the T-SCIF.

23. Additionally, Switch's cooling and power redundancy designs and trade secrets have allowed Switch to provide power to all of its clients, *without interruption*, for over 15 years.   Although an electric utility may occasionally lose power, Switch's designs ensure that a customer will not exceed key temperature thresholds or lose power, even if

---

[3] http://datacenterfrontier.com/top-10-cloud-campuses/

the public electric utility fails.

24. Switch's patented and patent-pending technology and trade secrets allow Switch to achieve a best monthly average power usage effectiveness (an industry term often referred to as "PUE") below 1.1, a feat that is commercially unique in the colocation data center industry.

25. Switch offers competitive data center services in part because Switch's heat containment technologies allow customers to consume more power in less space. Switch's data center technologies in turn allow customers to reduce their overall data center floor space need and save on the overall cost.

26. In a traditional data center, a single server cabinet may deploy **3-5 kilowatts** of power per cabinet. However, Switch's T-SCIF technology permits its customers to deploy up to **50 kilowatts** of power per cabinet.

27. Said differently, Switch's technology enables customers to receive **10 times** the amount of power otherwise delivered in a competitor's environment without overheating the customer's computer equipment or the data center. This allows Switch to fully utilize its data center floor space and has helped customers reduce their costs for data center deployment, all while delivering 100% power delivery and steady temperature control.

## II.    Stephen Fairfax

28. On or about May 2011, Stephen Fairfax was given an in-depth tour of Switch's facilities.

29. He was also given special access to all of Switch's designs.

30. Mr. Fairfax was permitted this rare access for a very limited purpose. He had been retained by one of Switch's customers to conduct a thorough audit of the Switch technologies to provide an independent and trusted assessment of Switch's technology to a mutual customer.

31. At the insistence of both Switch's customer and Mr. Fairfax, Switch reluctantly gave MTechnology access to *all* of Switch's designs, including extremely

sensitive trade secret information and documentation, plans, schematics, and blueprints, operational schedules, and trade secrets, so that he might complete his review for the benefit of the customer.

32. Prior to granting Mr. Fairfax access to any Switch facility and the protected information, materials and environment within the data center, Mr. Fairfax was required to sign a Non-Disclosure Agreement (the "2011 NDA").[4]

33. In this NDA, Mr. Fairfax and MTechnology committed to not disclose or use any of Switch's Confidential Information (as defined in the 2011 NDA), including trade secret information. This was to ensure the information provided was sufficiently protected because someone with Mr. Fairfax's background and training could successfully copy and design a data center employing Switch's confidential information and trade secrets.

34. During his tours and audits, Mr. Fairfax was informed that he was reviewing Switch's confidential information including patent-pending technology.

35. Switch's pending patents were filed in an unpublished format, pursuant to 35 USC 181, to protect their confidential, trade secret status.

36. Following the 2011 tour and evaluation of Switch's technology, Mr. Fairfax emailed Switch to express his gratitude for the tour.

37. Mr. Fairfax specifically thanked Switch for the "very thorough tour" and the "the generous amount of time Switch's CEO spent discussing the data center, the business model, and a variety of other very interesting topics."[5]

38. In 2013, Switch's customer again asked Mr. Fairfax to tour Switch's facility and evaluate evolutions in Switch's designs. Again, Defendant Fairfax praised Switch by noting, Switch had "an interesting site... especially the cooling system."[6]

39. While seeking access, Mr. Fairfax described his 2011 audit, noting he spent

---

[4] Attached as **Exhibit 1** (the 2011 NDA).
[5] Attached as **Exhibit 2**, p. 4 (email from Defendant Fairfax to Switch, dated May 10, 2011).
[6] Attached as **Exhibit 3** (see email dated May 24, 2013 from Mr. Fairfax to Switch's customer).

1    "over 4 hours one-on-one with Rob Roy."[7]

2        40.  Mr. Fairfax acknowledged Switch was uncomfortable with the level of

3    confidential information and trade secrets Mr. Fairfax sought.  He wrote, "I tried then to

4    assure him that I have no interest in building and operating data centers" that a "PRA

5    [private risk assessment] should be informative for him as well as for you, and us." [8]

6        41.  Around August 2015, at the renewed request of the same customer to evaluate

7    new evolutions in Switch's trade secret protected and patent-pending technologies, Switch

8    again granted Mr. Fairfax unique access to Switch; this time to enable the customer to

9    contemplate licensing Switch's technology.  Again, Mr. Fairfax was required to execute a

10   Non-Disclosure Agreement (the "2015 NDA",[9] together with the 2011 NDA, the "Non-

11   Disclosure Agreements").  Again, Mr. Fairfax assured Switch he would not misappropriate

12   their technologies or trade secrets.

13       42.  During each audit, Mr. Fairfax was given the opportunity to inspect, tour, and

14   view Switch's patent-pending and trade secret technology including: (1) the physical

15   infrastructure and layout of the Switch facility, specifically the cabinet layout and

16   configuration; (2) Switch's novel cooling designs, specifically Switch's Thermal Separate

17   Compartment in Facility Hot Aisle Containment Rows (aka "T-SCIF") and associated

18   cooling systems, and the server cabinet layout and configuration, as well as other

19   technology unique to Switch and necessary to cool the data center; (3) the electrical

20   configuration and pathways; (4) the interplay of various Switch technology and

21   components; and (5) the operations of the data center unique to Switch.

22       43.  Pursuant to the Non-Disclosure Agreements, Defendants Fairfax and

23   MTechnology were not permitted to disclose any Confidential Information learned during

24   Mr. Fairfax's tour and audit or to use any Confidential Information for their benefit or the

25   benefit of others.

26

27   _____

     [7] See email dated May 24, 2013 from Mr. Fairfax to Switch's customer, attached as Exhibit 3.

28   [8] See email dated May 24, 2013 from Mr. Fairfax to Switch's customer, attached as Exhibit 3.
     [9] Attached as **Exhibit 4** (2015 NDA).

44. Switch's customer was sufficiently impressed with Mr. Fairfax's assessment such that Switch's customer signed a license to use Switch's patent-pending technologies on December 21, 2015.

45. Around that time, Defendants failed to keep their contractual commitment, and announced the opening of a new Aligned facility in Texas on November 15, 2015.

46. Shortly after announcing the new facility, Switch's customer terminated their license agreement with Switch and eventually took space within the Aligned facility in Arizona.

### III.   Aligned Data Centers

47. Aligned Data Centers is a provider of data center services in Phoenix, Arizona and in Plano, Texas.  Upon information and belief, both of these facilities were opened within the last year or so.

48. Aligned has plans to build data centers in many more locations.

49. Upon information and belief, Aligned currently has plans to purchase additional facilities.

50. Upon information and belief, Aligned has given Mr. Fairfax payment up to and including equity in Aligned's operations.

51. Upon information and belief, Aligned is the parent company of Aligned Energy.

52. In describing Aligned Data Centers, Keith Dines, Director of Aligned Data Centers, explains on the Aligned website: "We are not static, we are very dynamic, and we love to be disruptive.  If there is new technology that will improve efficiency or lower the cost to operate our data centers, we will embrace it whole-heartedly."[10]

### IV.   Relationship between Aligned Data Centers and Stephen Fairfax

53. Around or before 2015, Stephen Fairfax was introduced to Aligned by

---

[10] https://www.youtube.com/watch?v=fvlMKfZU9OI @ 2:16

12

Inertech, "one of Aligned's companies."[11]

54. Mr. Fairfax was retained by Aligned Data Centers and asked to design their data centers.

55. According to Mr. Fairfax, "Aligned was unique in that they approached us while the paper was literally still blank."[12]

56. Upon information and belief, Mr. Fairfax was involved in the design and execution of, and to this day promotes the Aligned facilities on the Aligned website as a spokesperson for Aligned.

## V.    Aligned Data Centers' Design

57. Based on the completed design of the Aligned Data Centers, it is apparent that Mr. Fairfax improperly used Switch's Confidential Information to influence the design and makeup of the Aligned Data Centers. In particular, Aligned's facilities mimic (1) Switch's physical infrastructure, cabinet layout, number, and configuration; (2) Switch's unique cooling designs, specifically Switch's Thermal Separate Compartment in Facility Hot Aisle Containment Rows (aka "T-SCIF") and associated cooling systems the plenum path, and other technology unique to Switch and necessary to cool the data center; (3) the electrical configuration; (4) the interplay of various component parts; and (5) the operations of the data center unique to Switch.

58. It should also be noted that, similar to Switch, Aligned Data Centers now claim a Power Usage Effectiveness (PUE) of 1.15 and the ability to reach per cabinet/rack KW consumption of 50 KW. But for Aligned's use of Switch's confidential information and unique designs, Aligned would be unable to achieve these PUE and per rack KW efficiencies.

## VI.    Aligned Data Center's Unauthorized Use

59. In or around July of 2017, Switch first learned of Aligned Data Center's

---

[11] https://www.youtube.com/watch?v=KZRwktOCvdo (@0:47) posted to Aligned Data Center's YouTube channel on November 4, 2015.
[12] (https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers at 1:09).

unauthorized use of Switch's designs and technology.  Switch discovered that Defendant Fairfax was involved in the design of the Aligned Data Centers in Plano, Texas and Phoenix, Arizona as well as in the associated technology from the beginning.

60.  Switch sent correspondence to the CEO of Aligned Data Centers, Mr. Andrew Schaap, on July 21, 2017.  In this correspondence, Switch expressed its curiosity regarding Aligned Data Centers' designs and extended an invitation to discuss the matter and to seek a business resolution.  A copy of the correspondence is attached hereto as **Exhibit 5**.

61.  Switch did not hear from Mr. Schaap, and has yet to hear from him.

62.  Upon further investigation of Aligned Data Center's designs and technology, it became even more clear that Mr. Fairfax misappropriated Switch's confidential information and trade secrets for the benefit of Aligned Data Centers. Following these discoveries Switch then sent a litigation hold letter to Mr. Fairfax, and the CTO of Aligned Data Centers, Jakob Carnemark on July 27, 2017, a copy of which is attached hereto as **Exhibit 6**.

63.  Switch has not yet heard from Defendant Fairfax.

64.  However, a litigation attorney for Aligned Data Center's did acknowledge that Aligned had retained Mr. Fairfax in 2013.

65.  Concerned by the lack of response from Mr. Fairfax, and the apparent misappropriation of trade secrets, clear breach of contract, and the urgent competitive forces at play, Switch found it prudent to bring the instant suit.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
**(Defendants Fairfax and MTechnology)**

66.  Switch repeats and re-alleges each and every allegation set forth in this complaint as if set forth here in full.

67.  Switch and Defendants Fairfax and MTechnology entered into the Non-Disclosure Agreements in 2011 and 2015, in which said Defendants agreed that they would only use certain Confidential Information (as defined in the Non-Disclosure Agreements)

to which said Defendants had unique access for the Purpose (as defined in the Non-Disclosure Agreements) and for no other reason.

68. Upon information and belief, Defendants Fairfax and MTechnology have used Switch's "Confidential Information" for reasons other than the "Purpose" permitted under the Non-Disclosure Agreements in breach of the terms and conditions of the Non-Disclosure Agreements, as those terms are defined therein.

69. As a direct and proximate result of said Defendants' breach of this contract, Switch has been damaged in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Defendants Fairfax and MTechnology)**

70. Switch repeats and re-alleges each and every allegation set forth in this complaint as if set forth here in full.

71. The Non-Disclosure Agreements entered into between Switch and Defendants Fairfax and MTechnology contain an implied covenant of good faith and fair dealing.

72. The unique nature of access to Switch's most sensitive confidential information was only extended after Mr. Fairfax explicitly agreed, acknowledged and covenanted not to use Switch's confidential information for the benefit of himself or others.

73. Defendants Fairfax and MTechnology have breached this implied covenant by engaging in conduct that was unfaithful to the purpose of the contract between the parties and which deliberately contravened the intent and spirit of the contract and which interfered with and denied Switch the benefits of the contract.

74. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Switch has been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Tortious Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Defendants Fairfax and MTechnology)**

75. Switch repeats and re-alleges each and every allegation set forth in this

complaint as if set forth here in full.

76. The contract entered into between Switch and Defendants Fairfax and MTechnology contains an implied covenant of good faith and fair dealing.

77. Based on the nature of the relationship between Switch and Defendants Fairfax and MTechnology at the time when the Non-Disclosure Agreements as well as the nature of the Confidential Information disclosed by Switch to said Defendants under the Non-Disclosure Agreements, there existed a close level of trust between Defendants Fairfax and MTechnology and Switch such that said Defendants enjoyed a special relationship with Switch and were in an entrusted position with respect to Confidential Information disclosed by Switch to Defendants.

78. Because of Defendants' position relative to a mutual client of Switch and Defendants and Defendants' representations that they needed access to Switch's Confidential Information for a purpose that Defendants represented would benefit Switch and assist Switch in meeting the requirements of such mutual client, among other representations, Switch placed a great deal of confidence in Defendants' representations that the Confidential Information provided would be used to benefit Switch and not to harm Switch.

79. Defendants were fully aware of the confidence Switch had placed in Defendants because of Defendants' position relative to such mutual client.

80. As evidenced by written correspondence at the time of the dealings, Mr. Fairfax knew he enjoyed a special relationship with Switch and acknowledged, covenanted, and agreed to maintain the trust engendered by such relationship by not sharing with others or using Switch's confidential information for self-benefit or the benefit of others.

81. Defendants Fairfax and MTechnology breached this implied covenant by engaging in conduct that was unfaithful to the purpose of the contract between the parties and which deliberately contravened the intent and spirit of the contract and which interfered with and denied Switch the benefits of the contract.

82. Defendants Fairfax and MTechnology knew or should have known that they

had no reasonable basis for not complying with the duties and obligations under the contract at the time of Defendants' breach.

83. Defendants Fairfax's and MTechnology's breach of the implied covenant of good faith and fair dealing was a substantial factor in causing damage to Switch in an amount to be determined at trial.

84. Switch has been required to retain the services of a law firm to prosecute this action and is entitled to its reasonable costs and attorney's fees for the necessity of bringing this claim.

85. Based on the intentional, willful, and malicious nature of said Defendants' conduct, Switch is entitled to recover an award of exemplary or punitive damages in an amount to be proven at trial which is appropriate to punish or set an example of said Defendants and to deter such conduct in the future.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Defendants Fairfax and MTechnology)**

86. Switch repeats and re-alleges each and every allegation set forth in this complaint as if set forth here in full.

87. Switch has devoted over 10 years of time, money, and resources to develop, patent, and market Switch's T-SCIF Technology, and various trade secrets related to the same.

88. The Confidential Information disclosed to Defendants Fairfax and MTechnology related to the T-SCIF, Switch's data center designs, trade secrets, and other confidential information, and included information before various patents were obtained regarding the T-SCIF, and was not provided gratuitously to Aligned. Rather, the parties understood that any Confidential Information could not be used by said Defendants for any commercial purpose.

89. As a result of said Defendants' access to Confidential Information about Switch's T-SCIF Technology and associated trade secrets, Defendants have used such

information for their own commercial benefit to design data center infrastructure that directly competes with Switch, and to promote Mr. Fairfax's key involvement with the same.

90. By using Switch's Confidential Information and trade secrets to design data centers which copy Switch's T-SCIF Design, data center designs, trade secrets, and other confidential information, Defendants have been unjustly enriched in, and thus Switch is entitled to recover, an amount to be determined at trial.

91. Switch has been required to retain the services of a law firm to prosecute this action and is entitled to its reasonable costs and attorney's fees for the necessity of bringing this claim.

92. Based on the intentional, willful and malicious nature of Defendants' conduct, Switch is entitled to recover an award of exemplary or punitive damages in an amount to be proven at trial which is appropriate to punish or set an example of Defendants and to deter such conduct in the future.

### FIFTH CLAIM FOR RELIEF
#### Conversion
#### (Defendants Fairfax and MTechnology)

93. Switch repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

94. Defendants have wrongfully and intentionally and/or negligently converted property, including but not limited to Confidential Information about Switch's T-SCIF Technology, data center designs, trade secrets, and other confidential information, which rightfully belongs to Switch.

95. Defendants have wrongfully exerted dominion over Switch's property in derogation and defiance of Switch's rights.

96. Because of Defendants' conversion, Switch has been damaged in an amount to be determined at trial.

97. Switch has been required to retain the services of a law firm to prosecute this

action and is entitled to its reasonable costs and attorneys' fees for the necessity of bringing this claim.

98. Based on the intentional, willful, and malicious nature of Defendants' conduct, Switch is entitled to recover an award of exemplary or punitive damages in an amount to be proven at trial which is appropriate to punish or set an example of Defendants and to deter such conduct in the future.

**SIXTH CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets – The Defend Trade Secrets Act of 2016**
**18 U.S.C. § 1836, et seq.**
**(Defendants Fairfax and MTechnology)**

99. Switch repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

100. Under the Non-Disclosure Agreements, Switch provided Defendants Fairfax and MTechnology with Confidential Information, including confidential information and trade secrets relating to Switch's T-SCIF Technology, data center designs, operations, electrical pathways, and other confidential information.

101. At the time of its disclosure to Defendants Fairfax and MTechnology, the Confidential Information reflected information that has independent economic value from not being generally known to (and not being readily ascertainable by proper means by) the public or any other persons who can obtain commercial or economic value from its disclosure or use and which was the subject of reasonable efforts by Switch to maintain its secrecy.

102. Defendants Fairfax and MTechnology obtained the Confidential Information from Switch in Switch's strict trust and reliance on Defendants' duty to maintain its secrecy and/or limit its use under the terms of the Non-Disclosure Agreements.

103. Upon information and belief, Defendants Fairfax and MTechnology have intentionally and willfully disclosed and/or used the Confidential Information without the consent of Switch, including use in the designs for the Aligned Data Centers being constructed.

104. The Confidential Information, through its use by Defendants in the design and manufacture of the Aligned Data Centers, is related to Aligned services used in, or intended for use in, interstate or foreign commerce.

105. Pursuant to 18 U.S.C. § 1836(b)(3)(B), Switch is entitled to recover actual damages or profits that Defendants may have unjustly gained through use of Switch's trade secrets in an amount to be determined at trial.

106. Because Defendants willfully misappropriated Switch's trade secrets, Switch is also entitled to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) in an amount to be determined at trial.

107. Because Defendants willfully misappropriated Switch's trade secrets, Switch is also entitled to attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

108. As a direct and proximate result of Defendants' actions complained of herein, and the ongoing direct results of those actions, Switch has suffered, and unless immediately enjoined by this Court, will continue to suffer, irreparable injury and other damage to Switch's business for which Switch has no adequate remedy at law.

### SEVENTH CLAIM FOR RELIEF
### Misappropriation of Trade Secrets – N.R.S. 600A
### (Defendants Fairfax and MTechnology)

109. Switch repeats and re-alleges each and every allegation set forth in this complaint as if set forth here in full.

110. Pursuant to NRS 600A.050(1) and (2), Switch is entitled to recover actual damages, profits that Defendants may have unjustly gained through use of Switch's trade secrets, and exemplary damages, in an amount to be determined at trial.

111. Because Defendants willfully misappropriated Switch's trade secrets, Switch is also entitled to attorneys' fees pursuant to NRS 600A.060.

112. As a direct and proximate result of Defendants' actions complained of herein, and the ongoing direct results of those actions, Switch has suffered, and unless enjoined by this Court, will continue to suffer, irreparable injury and other damage to Switch's business

for which Switch has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
### Misappropriation of Licensable Commercial Properties
### (Defendants Fairfax and MTechnology)

113. Switch repeats and re-alleges each and every allegation set forth in this complaint as if set forth here in full.

114. Switch has invested significant time, effort, and money in creating and developing data center storage designs and related intellectual property associated with Switch's T-SCIF Technology (the "Commercial Properties").

115. Switch has licensed and continues to license the Commercial Properties to non-competing companies that desire to use Switch's Commercial Properties.

116. Defendants have misappropriated the Commercial Properties by using the Commercial Properties to design data centers in connection with offering competing data center services to third parties for Defendants' enrichment without appropriate compensation to Switch.

117. As a direct consequence of Defendants' conduct, Switch has been damaged in an amount to be determined at trial.

118. As a direct and proximate result of Defendants' actions complained of herein, and the ongoing direct results of those actions, Switch has suffered, and unless enjoined by this Court, will continue to suffer, irreparable injury and other damage to Switch's business for which Switch has no adequate remedy at law.

119. Switch has been required to retain the services of a law firm to prosecute this action and is entitled to its reasonable costs and attorneys' fees for the necessity of bringing this action.

120. Based on the intentional, willful and malicious nature of Defendants' conduct, Switch is entitled to recover an award of exemplary or punitive damages in an amount to be proven at trial which is appropriate to punish or set an example of Defendants and to deter such conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Switch prays for judgment against Defendants as follows:

A.      A judgment against Defendants and in favor of Switch on all claims set forth in this Complaint;

B.      A preliminary and permanent injunction enjoining Defendants, and all persons in active concert or participation with Defendants, from promoting the Aligned Data Center facilities or any other data centers which were designed using Switch's Confidential Information.

C.      A preliminary and permanent injunction enjoining Defendants, and all persons in active concert or participation with Defendants, from any further acts of misappropriation and unfair competition, including an order which prevents Defendants from designing, constructing, and/or operating any data centers using Confidential Information.

D.      An order awarding Switch compensatory and consequential damages for all claims as set forth in this Complaint.

E.      An order awarding Switch exemplary and punitive damages.

F.      An order awarding Switch its costs of suit, attorney's fees, and interest on all damages;

G.      An order granting preliminary and immediate discovery to be evaluate the nature of the breach and the damages caused by this breach.

H.      An order awarding Switch such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff Switch hereby demands a trial by jury on all issues so triable.

DATED this **12th** day of September, 2017.

SWITCH, LTD.

SAMUEL CASTOR, ESQ.
Nevada Bar No. 11532
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118
702-333-6566
*Attorney for Plaintiff*

ANNE-MARIE BIRK, ESQ.
Nevada Bar No. 12330
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118
702-333-6566
*Attorney for Plaintiff*

23

# EXHIBIT 1

# EXHIBIT 1



## NONDISCLOSURE AGREEMENT

THIS NONDISCLOSURE AGREEMENT (this "Agreement") is entered into and effective as of the date of the last signature below (the "Effective Date"), between Switch Communications L.L.C. ("Switch") and the person or entity identified below ("Recipient").

**1. Confidential Information.** "Confidential Information" means all information disclosed or made available by Switch to Recipient, including (i) business plans, financial reports, financial data, employee data, customer lists, forecasts, strategies, and all other business information; and (ii) software or firmware code, data center designs, product designs and/or specifications, algorithms, computer programs, inventions, unpublished patent applications, manufacturing or other technical or scientific know-how, specifications, technical drawings, building plans, diagrams, schematics, technology, processes, and any other trade secrets, discoveries, ideas, concepts, know-how, techniques, materials, formulae, compositions, information, data, results, plans, surveys and/or reports of a technical nature. Confidential Information may be that of Switch or of third parties to whom Switch has an obligation to treat the disclosed information as confidential. Confidential Information also includes copies, notes, abstracts and other tangible embodiments made by Recipient that are based on or contain any of such information, as well as the existence and progress of the Purpose (described in Section 2).

**2. Purpose.** Recipient may only use the Confidential Information of Switch solely for the limited purpose of evaluating a potential business opportunity between the parties (the "Purpose").

**3. Protection of Confidential Information.** Recipient acknowledges that the Confidential Information is a valuable and unique asset of Switch and agrees to the following:

(a) Recipient: (i) will not disclose the Confidential Information to any third party; (ii) will not disclose the Confidential Information to its employees unless the employees have a need to know the Confidential Information for the Purpose and is contractually bound to maintain such Confidential Information in confidence on terms at least as restrictive as this Agreement; (iii) will use the Confidential Information solely for the Purpose and will not use it for any third party's benefit; and (iv) will use the same degree of care to protect the Confidential Information from unauthorized use or disclosure as Recipient would use to protect Recipient's own information of a similar nature, but in no event with less than reasonable care. Any failure by the employees, officers, directors, of Recipient and its affiliated companies to fulfill those confidentiality obligations assumed by them pursuant to this Section 3

will constitute a breach by Recipient of its obligations under this Agreement.

(b) Recipient's obligations under this Agreement with respect to particular information do not apply to the extent that: (i) Switch authorizes Recipient in writing to disclose such information; (ii) Recipient knows such information prior to the time of disclosure by Switch, free of any obligation to keep it confidential, as evidenced by written records; (iii) such information is or becomes generally known in the relevant industry without fault of Recipient; (iv) employees of Recipient independently develop such information without access to or use of the Confidential Information, as evidenced by written records; or (v) Recipient rightfully obtains such information from a third party who has the right to disclose it without violation of any confidentiality obligations. However, even if certain information is already known, Switch's use of such information (including the fact of Switch's use and the manner and results of use) may not be known and thus would be considered to be Confidential Information.

(c) If Recipient is subject to judicial or governmental proceedings requiring disclosure of Confidential Information, then, prior to any such disclosure, Recipient will provide Switch with reasonable prior written notice and will obtain, or provide Switch with an opportunity to obtain, a protective order or confidential treatment of the Confidential Information.

**4. Return of Confidential Information.** All Confidential Information furnished under this Agreement remains the property of Switch and will be returned to Switch or destroyed upon Switch's request including all copies thereof. Within 30 days of receiving such a request from Switch, Recipient will comply with the request and provide a written certification, signed by an officer, of such compliance.

**5. No License or Warranty.** No license under any patents, copyrights, mask work rights, trademarks or other proprietary rights is granted by Switch under this Agreement. ALL INFORMATION IS PROVIDED "AS IS", WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO A WARRANTY THAT IT IS ACCURATE OR COMPLETE OR A WARRANTY AGAINST INFRINGEMENT.

**6. No Inducement or Commitment.** Switch will determine in Switch's sole discretion the information to

be disclosed to Recipient. Neither the disclosure nor access to Confidential Information under this Agreement constitutes an inducement or commitment to enter into any business relationship. If the parties desire to pursue business opportunities together, the parties will execute separate written agreement(s).

**7. Term and Termination.** This Agreement will be effective from the Effective Date and will continue until written notice of termination is provided by either party to the other. All provisions of this Agreement relating to Confidential Information disclosed pursuant to this Agreement prior to termination will survive.

**8. Assignment and Binding Effect.** Recipient may not assign this Agreement by operation of law or otherwise without Switch's prior written consent. Any assignment in violation of this Agreement will be void. This Agreement benefits and binds the parties to this Agreement and their respective successors and permitted assigns.

**9. Jurisdiction & Venue.** This Agreement will be governed by and construed in accordance with the laws of the State of Nevada, exclusive of its choice of law principles. The state and federal courts located in Clark County, Nevada have exclusive jurisdiction and venue over any dispute arising out of or relating to this Agreement. Each party consents to the personal jurisdiction and venue of these courts.

**10. Entire Agreement.** This Agreement is the entire understanding, and supersedes any and all prior and contemporaneous agreements (oral or written), between the parties regarding this Agreement's subject matter. This Agreement will not be modified, and no provision will be waived, except in a writing signed by both parties. A party's failure to require performance will not affect the party's right to require such performance at any later time. If any part of this Agreement is unenforceable, the rest will remain in effect. This Agreement may be executed in counterparts.

**11. General.** Recipient will comply with any and all applicable export control laws, rules and regulations. Any notice under this Agreement, if sent to the party entitled to such notice at the address set forth below, will be deemed to have been provided upon receipt.

SWITCH COMMUNICATIONS GROUP L.L.C.:

By: _____

Name: _____

Title: _____

Date: _____

Address: _____

_____

Recipient:

By: _Stephen Fairfax_

Name: _STEPHEN FAIRFAX_

Title: _PRESIDENT, mTECHNOLOGY, INC._

Date: _5/4/2011_

Address: _2 CENTRAL ST_

_FRAMINGHAM, MA 01773_

08052009

# EXHIBIT 2

# EXHIBIT 2

# Re: eBay risk assessment

## Stephen Fairfax <fairfax@mtechnology.net>

Tue 5/10/2011 12:05 PM

To:Rebecca Boettcher <becks@switch.com>;

📎 1 attachment

WP-109 Reliability Analysis of the APC Symmetra MW Power System.pdf;

Rebecca,

Thank you for facilitating my tour of the very impressive Switch NAP facility.

I don't have email addresses for everyone, but I wanted to express my thanks to several people.

Missy Young gave a very thorough tour and was extremely knowledgeable and helpful.

Please convey my thanks to Rob Roy for the generous amount of time he spent discussing the data center, the business model, and a variety of other very interesting topics.  It was a genuine pleasure to meet him.

I was remiss in not complimenting Rob on the outstanding collection in his office.  I was very impressed but was so intent on our conversation that I neglected to bring up the subject.

I've attached a file that I discussed with Gabe.  It is the public version of a reliability analysis that MTech performed on the APC Symmetra MW UPS used in your data center.  I have some additional details on the study that he might find useful.  He or any of the Switch Nap staff should feel free to contact me at any time.

Best regards,

Steve Fairfax

508-788-6260 Boston office
830-448-3141 Google Voice

# EXHIBIT 3

# EXHIBIT 3

# FW: Mtech Data

Lewis, Mike <mlewis@ebay.com>

Fri 5/24/2013 1:51 PM

To:Rob Roy <robroy@switch.com>;

Cc:Missy Young <missy@switch.com>; Nelson, Dean <dean@ebay.com>; Steve Fairfax (fairfax@mtechnology.net)
<fairfax@mtechnology.net>;

Hello Rob, Based on our discussion this week regarding MTech and their reliability analysis, Steve Fairfax has listed some dates below when he can come to Las Vegas to discuss their engagement. Can you let me know if any of these will work for you? Thanks and have a great Memorial Day Weekend...

Mike Lewis
Director Mission Critical Engineering

eBay
303-956-0522 Mobile 303-688-3279 Office
mlewis@ebay.com



**From:** Stephen Fairfax [mailto:fairfax@mtechnology.net]
**Sent:** Friday, May 24, 2013 8:35 AM
**To:** Lewis, Mike
**Cc:** Monahan,James
**Subject:** Re: Mtech Data

Mike,

In June the best days for me would be Wednesday the 19th or Thursday the 20th. If those won't work I could re-arrange things to meet with Rob Roy Friday the 21st.

I'll fly out the day or night before, plan on a full day available at Switch. I don't know if it will take that long but with the time zones I need to fly back early the next day anyway.

If those dates aren't good let me know and I'll propose dates for July.

Regards,

Steve

On Thu, May 23, 2013 at 2:48 PM, Lewis, Mike <mlewis@ebay.com> wrote:
Sounds good. Send me the dates when you get them.

Sent from my iPhone

On May 23, 2013, at 11:42 AM, "Stephen Fairfax" <fairfax@mtechnology.net> wrote:

Mike,

I'll work on some dates. I did spend over 4 hours one-on-one with Rob Roy during my initial visit. I tried then to assure him that I have no interest in building and operating data centers. It is also rather far beyond the financial reach of MTech.

It is an interesting site, unusual architecture, especially the cooling system. The PRA should be informative for him as well as for you, and us.

Perhaps I'll prepare some materials showing him how the study might benefit Switch. If we're going to publish some of the study results in IEEE conferences, perhaps I can share a high-level summary of what we've done with Rob Roy?

Regards,

Steve

# EXHIBIT 4

# EXHIBIT 4



## S U P E R N A P

### NON-DISCLOSURE AGREEMENT

THIS NONDISCLOSURE AGREEMENT (this "Agreement") is entered into and effective as of the date of the last signature below (the "Effective Date"), between Switch and the person or entity identified below ("Recipient").

**1. Confidential Information.** "Confidential Information" means all information disclosed or made available by Switch to Recipient, including (i) business plans, financial reports, financial data, employee data, customer lists, forecasts, strategies, and all other business information; and (ii) software or firmware code, data center designs, product designs and/or specifications, algorithms, computer programs, inventions, unpublished patent applications, manufacturing or other technical or scientific know-how, specifications, technical drawings, building plans, diagrams, schematics, technology, processes, and any other trade secrets, discoveries, ideas, concepts, know-how, techniques, materials, formulae, compositions, information, data, results, plans, surveys and/or reports of a technical nature. Confidential Information may be that of Switch or of third parties to whom Switch has an obligation to treat the disclosed information as confidential. Confidential Information also includes copies, notes, abstracts and other tangible embodiments made by Recipient that are based on or contain any of such information, as well as the existence and progress of the Purpose (described in Section 2).

**2. Purpose.** Recipient may only use the Confidential Information of Switch solely for the limited purpose of evaluating a potential business opportunity with Switch (the "Purpose") and for no other purpose.

**3. Protection of Confidential Information.** Recipient acknowledges that the Confidential Information is a valuable and unique asset of Switch and agrees to the following:

(a) Recipient: (i) will not disclose the Confidential Information to any third party; (ii) will not disclose the Confidential Information to its employees unless the employees have a need to know the Confidential Information for the Purpose and are contractually bound to maintain such Confidential Information in confidence on terms at least as restrictive as this Agreement; (iii) will use the Confidential Information solely for the Purpose and will not use it for any third party's benefit; and (iv) will use the same degree of care to protect the Confidential Information from unauthorized use or disclosure as Recipient would use to protect Recipient's own information of a similar nature, but in no event with less than reasonable care. Any failure by the

employees, officers, directors, of Recipient and its affiliated companies to fulfill those confidentiality obligations assumed by them pursuant to this Section 3 will constitute a breach by Recipient of its obligations under this Agreement.

(b) Recipient's obligations under this Agreement with respect to particular information does not apply to the extent that: (i) Switch authorizes Recipient in writing to disclose such information; (ii) such information is or becomes generally known in the relevant industry without fault of Recipient; or (iii) employees of Recipient independently develop such information without access to or use of the Confidential Information, as evidenced by written records. However, even if certain information is already known, Switch's use of such information (including the fact of Switch's use and the manner and results of use) may not be known and thus would be considered to be Confidential Information.

(c) If Recipient is subject to judicial or governmental proceedings requiring disclosure of Confidential Information, then, prior to any such disclosure, Recipient will provide Switch with reasonable prior written notice and will obtain, or provide Switch with an opportunity to obtain, a protective order or confidential treatment of the Confidential Information.

**4. Return of Confidential Information.** All Confidential Information furnished under this Agreement remains the property of Switch and will be returned to Switch or destroyed upon Switch's request including all copies thereof. Within 30 days after receiving such a request from Switch, Recipient will comply with the request and provide a written certification, signed by an officer, of such compliance.

**5. No License or Warranty.** No license under any patents, copyrights, trademarks or other proprietary rights is granted by Switch under this Agreement. ALL INFORMATION IS PROVIDED "AS IS", WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO A WARRANTY THAT IT IS ACCURATE OR COMPLETE OR A WARRANTY AGAINST INFRINGEMENT.

**6. No Inducement or Commitment.** Switch will determine, in Switch's sole discretion, the information to be disclosed to Recipient. Neither the disclosure nor access to Confidential Information under this Agreement constitutes an inducement or commitment to enter into any business relationship. If the parties desire to pursue business opportunities together, the parties will execute separate written agreement(s).

**7. Term and Termination.** This Agreement will be effective from the Effective Date and will continue until written notice of termination is provided by either party to the other. All provisions of this Agreement relating to Confidential Information disclosed pursuant to this Agreement prior to termination will survive.

**8. Assignment and Binding Effect.** Recipient may not assign this Agreement by operation of law or otherwise without Switch's prior written consent. Any assignment in violation of this Agreement will be void. This Agreement benefits and binds the parties to this Agreement and their respective successors and permitted assigns.

**9. Jurisdiction & Venue.** This Agreement will be governed by and construed in accordance with the laws of the State of Nevada, exclusive of its choice of law

principles. The state and federal courts located in Clark County, Nevada have exclusive jurisdiction and venue over any dispute arising out of or relating to this Agreement. Each party consents to the personal jurisdiction and venue of these courts.

**10. Entire Agreement.** This Agreement is the entire understanding, and supersedes any and all prior and contemporaneous agreements (oral or written), between the parties regarding this Agreement's subject matter. This Agreement will not be modified, and no provision will be waived, except in a writing signed by both parties. A party's failure to require performance will not affect the party's right to require such performance at any later time. If any part of this Agreement is unenforceable, the rest will remain in effect. This Agreement may be executed in counterparts.

**11. General.** Recipient will comply with any and all applicable export control laws, rules and regulations. Any notice under this Agreement, if sent to the party entitled to such notice at the address set forth below, will be deemed to have been provided upon receipt.

| SWITCH: | MTechnology, Inc. |
|---|---|
| | RECIPIENT |
| By: | By: |
| Title: EVP of Construction | Title: Stephen Fairfax, President |
| Date: 08·06·15 | Date: 08-12-2015 |
| Address: 7386 Lindell Rd, | Address: 2 Central St. |
| W, NV. 89139 | Saxonville, MA 01701 |

2
NON-DISCLOSURE AGREEMENT

# EXHIBIT 5

# EXHIBIT 5



July 21, 2017
VIA CERTIFIED FIRST CLASS US MAIL

Andrew Schaap
Chief Executive Officer
Aligned Data Centers
2800 Summit Avenue
Plano, Texas 75074

**Re:   Switch Confidential Information and Patents**

Dear Mr. Schaap:

As you are likely aware, Switch has been designing, constructing, and operating data centers since early 2000. Since Switch's inception, our founder and CEO, Rob Roy, has led our effort to innovate datacenter design and operations.  Mr. Roy's inventions have culminated in Switch's state-of-the-art data center ecosystem which utilizes Switch's 100% Hot Aisle Containment Rows, commonly known as a Thermal Separate Compartment in Facility or "T-SCIF".  The Uptime Institute has recognized the elite nature of Switch's data center technology by certifying Switch's data centers as Tier IV Gold, among other accolades. Switch was the first colocation company to achieve this certification.

Switch's technology allows customers to utilize over 1 MW of power in a single 20 cabinet cluster, adjacent to numerous other similarly dense cabinet clusters. As a result of Switch's patented hot aisle containment infrastructure, the USPTO has awarded Switch **246** patent claims with over **100** additional patent claims pending.  We filed our first patent applications in June of 2007.  I reference the following relevant subset of our patents for your convenience:

> **U.S. Pat. No. 8,072,780** - Integrated wiring system and thermal shield support apparatus for a data center;
>
> **U.S. Pat. No. 8,523,643** - Electronic equipment data center or co-location facility designs and methods of making and using the same;
>
> **U.S. Pat. No. 9,198,331** - Data Center Facility Design and Configuration; and,
>
> **U.S. Pat. No. 9,622,389** - Electronic Equipment Data Center and Server Co-Location Facility Configurations and Method of Using the Same.

The foregoing are just some of our utility patents.  I have also provided an executive summary of Switch's **100% Hot Aisle Containment/T-SCIF Technology** for your ease of reference.

We have an obligation to protect Switch's investment in the development of its innovative data center designs.  Part of this obligation is to investigate potential unauthorized practice of Switch's technology. Consequently, I trust you appreciate our need to evaluate whether Aligned Data Center's current facilities or advertised prototypes may read on Switch's patents.



Specifically, we are curious about the makeup of your new **"customer pod"** designs referenced in the *New York Times*, a copy of which is included with this correspondence.

We also note the various videos available on YouTube and via www.aligneddatacenters.com that show digital representations of the same "customer pods." These videos reference hot aisle containment and overhead power busways, redundant network connectivity, and client portal access as "standard" in your facility which merits discussion[1]. These videos also suggest the "customer pods" allow server rack densities of up to 50 KW. Given their appearance, we have questions as to what extent they mirror Switch's T-SCIF technology.[2]

I believe a conversation will allow us to avoid error and build a positive relationship. As such, I look forward to your response in the spirit of openness and hope for an expedient and amicable resolution.

Respectfully,

Thomas Morton
President
Switch

Enclosures

---

[1] *See* https://www.youtube.com/watch?v=FrIpEbBo37c (@1:25);
*see also* https://www.youtube.com/watch?v=jph33-iFZfE (@2:13).

[2] *See* https://www.youtube.com/watch?v=6CgcLilYEgE (@1:08 which claims up to 50 KW per rack in Dallas TX);
*see also* https://www.youtube.com/watch?v=TyKSH6iCc9c (@1:26).

COMMERCIAL REAL ESTATE    Texas Lures Data Centers, Not for Jobs but for Revenue    Subscribe

 Recent Commercial Real Estate Transactions   Recent Commercial Real Estate Transactions   Recent Commercial Real Estate Transactions   Cube's New Luxury Builds Look to Lure Wave of U.S. Tourists   Amazon to Share New Building With Homeless Shelter in Seattle  

COMMERCIAL REAL ESTATE

## Texas Lures Data Centers, Not for Jobs but for Revenue

Square Feet



A job posting positions one of a machine that computes rapid circulation, common at Aligned Data Centers in Plano, Tex. The company's data program that lets clients use only as the power they use, is expected to be a big disruptor, one of the demands of the current era.

FORT WORTH — The billionaire developer Ross Perot Jr. describes data centers as the modern equivalent of America's giant factories in the early 20th century. And here in the sprawling Dallas-Fort Worth region, they seem to be spreading as fast as springtime wildflowers.

At AllianceTexas, Mr. Perot's 18,000-acre business project in northern Fort Worth, Facebook is building what it says will be a premier data center with an investment expected to reach $1 billion. About 30 miles east, the Dallas suburb of Richardson is home to 20 data centers, and expects at least four more over the next 18 to 24 months. In neighboring Garland, RagingWire Data Centers, based in Sacramento, is in the first phase of construction on a planned million-square-foot complex.

Texas has become one of the country's leading destinations for data centers, propelled by robust economic growth in recent years, a business-friendly tax climate, abundant sources of water and dependable electricity.

Dallas-Fort Worth, the nation's fourth-most-populous metropolitan region, ranks among the nation's top five data center locations. In square footage for multitenant data centers, it ranks fourth, with 2.8 million square feet, according to 451 Research, a firm based in New York that analyzes information technology trends.

Suburban Northern Virginia, near Washington, is widely considered the nation's top data center market, and others high on the list include the greater New York-New Jersey region and the Silicon Valley-San Francisco area.

So far impervious to the boom-bust cycles in residential real estate, data

centers have been a reliable bright spot, and analysts call for continued expansion in the foreseeable future, both in the United States and in developing markets like Latin America.

"In the grand scheme of real estate, data centers are still a huge business," said Todd Bateman of the CBRE Group, a commercial real estate services company.

As long as people are tethered to computers, the Internet and smartphones, there will be an insatiable need for data centers.

The data center market across North America had "tremendous growth" in 2015, according to a report by JLL, a global real estate services firm. Multitenant data centers in the United States earned $115.5 billion in revenue last year, a 6.1 percent increase from 2014.



The boom seems to be playing out under the radar of the public, in part because data centers prefer to keep a low profile, largely for security reasons. Average citizens are most likely unaware that the large windowless buildings they pass on their morning commute might be data centers housing equipment to facilitate their computer-reliant lives.

"The general public today probably doesn't realize how they tap and touch and utilize the data center all throughout their day," said Bo Bond, a leader of JLL's data center solutions team.

State and local leaders across the country have increasingly made data centers a target of their community development strategies, often by offering tax incentives and other inducements. While data centers, with relatively small staffs, are not a big source of jobs, they contain millions of dollars of components this provide a lucrative source of tax revenue, even with abatements.

Large enterprises like Facebook often maintain their own centers, but many companies are shedding that costly and complex function to concentrate on their core business, giving rise to a continuing increase in multitenant centers that offer security and expertise to a range of clients.

Across the 13 counties in the Dallas-Fort Worth region, the governor's office says, there are at least 200 enterprise and multitenant data centers.

Richardson, Tex., whose registered trademark is Telecom Corridor, was one of the state's first municipalities to actively pursue data centers, said John Jacobs, executive vice president of the city's chamber of commerce.

**Real Estate**

Every week, get updates on residential real estate news, covering the best listings and homes.

Enter your email address | Sign Up

By subscribing, you agree to receive occasional updates and special offers for The New York Times's products and services.

"Each one of these data centers is a little gold mine ranking out wealth for the city," he said.

Its largest is Digital Realty, which sits on a 60-acre campus that was once occupied by Collins Radio, a military contractor in the early days of aerospace. Fortified by an eight-foot spiked fence, Digital Dallas, as it is known locally, is a corporate flagship with eight buildings. Four serve multiple tenants; the others each serve large single tenants. The still-growing complex will ultimately encompass 10 or 11 buildings and total more than 1.1 million square feet, said Bryan Marsh III, a vice president and portfolio manager for Digital Realty.

In Plano, one of the area's growing data center markets, Aligned Data Centers, a division of Aligned Energy, has opened a center that offers a "pay-as-you-go" program in power usage. It enables clients to sharply curtail power costs by paying only for power they use, instead of locking

into costly arrangements upfront, said Aligned Energy's chief executive, Jakob Carnemark.



Toyota Motor's data center in Plano, Texas. Two companies — Compass and Digital Realty — are planning a sprawling complex to the east of Fort Worth area.
Credit Cooper Neill for The New York Times

While much of the data center development in North Texas has been clustered in the Dallas corridor, government and business leaders on the western side of the metropolitan region have been waging an aggressive effort to lure more data centers toward Fort Worth and its surrounding communities.

At AllianceTexas, data centers have added another dimension to the development that Mr. Perot, the son of the computer magnate H. Ross Perot, started assembling more than 30 years ago in wheat fields and ranch land about 15 miles from downtown Fort Worth.

Developed by Hillwood, a company founded by the younger Mr. Perot, AllianceTexas encompasses an airport, houses more than 425 companies and has a bustling town center and upscale homes. Facebook's will be its fifth, and by far largest, data center.

Mr. Perot, 57, said the growth of data centers at Alliance struck a nostalgic chord, recalling how, as a boy, he used to collect old punch cards when his father was running Electronic Data Systems in the 1960s. "I'm one of the few kids that grew up in data centers," he said.

Now under construction, the Facebook center will consist of three 250,000-square-foot buildings. Work on the first facility is expected to be complete in June. Facebook's chief executive, Mark Zuckerberg, said in a Facebook post that the complex would be "one of the most advanced and energy-efficient data centers in the world."

Fort Worth leaders landed the Facebook deal after a 220-city competition that stretched for more than a year. Fort Worth and Tarrant County provided a total of $146.7 million in tax abatements for up to 20 years. During that time, the city, county and an area school district will receive a total of $228.5 million in additional property taxes, the Fort Worth Chamber of Commerce said.

The center will draw power from a 202-megawatt wind farm that the company is helping to build about 200 miles northwest of Fort Worth. That move plays into a trend in the industry to be more sensitive to environmental concerns since the centers draw tremendous amounts of electricity.

To appeal to Facebook, local officials promoted the availability of wind energy, a strong labor pool in technology and access to airports. And in addition to tax incentives, they pointed out a Texas law that spares larger data centers from sales taxes on equipment.

Fort Worth's mayor, Betsy Price, who was heavily involved in the Facebook talks, said city leaders across the region were scrambling to lure more data centers because they offer well-paying jobs, attract other high-tech enterprises and do not require a large investment on infrastructure.

"We love these guys," she said.

---

A version of this article appears in print on June 27, 2017, on Page B1 of the New York edition with the headline: Data Centers Spread. Today's Paper | Subscribe

## Square Feet

Articles about developing "twenty-first-play" square.




**Factories or Runways? Municipal Airports Face Economic Pressure**

Data centers are down on runways, keep the ruler of small municipal airports, which will also face competition with other industrial development.

**Lonely Giant of the Taipei Skyline Is Afloat in Get Some Company**

Taipei 101 is a model of a modern and ambitious Taiwan, was built in an era of abundant and bountiful time. It still helps even in even more of downtown.

**Apple Disrupts Silicon Valley With Another Eye-Catcher: Its New Home**

Apple Park, headquarters for 12,000 people, has brought tumult, frustration and higher real estate values to the surrounding area.

## More in Commercial Real Estate




Recent Commercial Real Estate Transactions

Recent Commercial Real Estate Transactions

**TRENDING**

1. Sean Spicer Resigns as White House Press Secretary. 

2. These Americans Hated the Health Law. Until the Idea of Repeal Sunk In. 

3. Trump May Turn to Anthony Scaramucci for White House Communications Post 

4. Op-Ed Contributors: If Trump Pardons, It Could Be a Crime 

5. Trump Aides, Seeking Leverage, Investigate Mueller's Investigators 

6. Trump's Fury Erodes His Relationship With Sessions, an Early Ally 

7. Foster Care as Punishment: The New Reality of 'Jane Crow' 

8. Excerpts From The Times's Interview With Trump 

9. Chester Bennington, Linkin Park Singer, Is Dead at 41

10. News Analysis: Why Women Aren't C.E.O.s, According to Women Who Almost Were 

# EXHIBIT 6

# EXHIBIT 6



July 27, 2017

**Via U.S. and Electronic Mail**

TO:   **Steve Fairfax**            TO:   **Jakob Carnemark**
      President                          Founder, CTO, Vice Chairman
      MTechnology                        Aligned Data Centers
      2 Central Street                   2800 Summit Avenue
      Saxonville, MA 01701               Plano, Texas 75074
      fairfax@mtechnology.net            jakob.carnemark@alignedenergy.com

*Re: Litigation Hold Notice – Immediate Action Required*

Dear Mr. Fairfax and Mr. Carnemark:

Please be advised that Switch is formulating and intends to pursue legal action for tort and breach of contract.  In that respect, we are writing to advise you of this pending litigation to ensure that MTechnology and Aligned Data Centers comply with their legal duty to **preserve all information** that may be discoverable in connection with such litigation.  Although Switch is still evaluating which parties and the extent to which such parties engaged in unlawful or criminal conduct, there is sufficient evidence to support our conclusion that unlawful activity did in fact occur.  As such, **THIS LETTER PUTS YOU ON NOTICE THAT A LAWSUIT IS LIKELY AND THAT YOU HAVE INFORMATION RELEVANT TO THE ACTION.**  It is imperative you take the following steps to avoid negative evidentiary ramifications.

I.    **GENERAL OBLIGATIONS**

**YOU ARE HEREBY ADVISED TO IMMEDIATELY SUSPEND ANY DOCUMENT DESTRUCTION OR DATA DESTRUCTION POLICY.**  Switch will contend that any destruction of information following receipt of this correspondence or Switch's July 21, 2017 correspondence is evidence of your culpability and misconduct.  Additionally, individual Representatives (defined below) with access to potentially discoverable information that does not fall within the scope of any document destruction policy must be advised of their obligation to preserve potentially discoverable information.  The suspension of automated and individualized document destruction is hereafter referred to as the "Litigation Hold."

You are hereby advised to immediately start the process of implementing the Litigation Hold consistent with the guidelines.  Any Data that references, relates to, or affects the following Topics *and* is in the possession of, was sent to, received by, or sent from a Representatives from **January 1, 2011** onward (the "Time Frame") is subject to the Litigation Hold.  The terms Data, Topics, and Representatives, are separately defined below.



**A. The term "Data" includes, without limitation:**

a. Memoranda,
b. Advertisements,
c. Marketing materials,
d. Blue prints,
e. Contracts,
f. Orders,
g. Agreements,
h. Email correspondence,
i. Attachments to emails,
j. Meeting agendas and minutes,
k. Instant communications,
l. SMS messages,
m. Text messages,
n. Telephone records,
o. Invoices,

p. Any records of payments or non-payment,
q. Contracts,
r. Transcripts,
s. Video footage,
t. Photographs,
u. Social media information including postings or messages,
v. Blog posts,
w. Voicemail,
x. Spreadsheets,
y. PowerPoint presentations,
z. Advertising, marketing, or promotional material, and
aa. Calendaring information.

Data also includes all information, regardless of form, nature, or format, including amendments, versions or drafts, in hard copy, stored in electronic form on network servers, time clocks, e-mail servers, workstations, home or personal computers, phones, cell phones, tablets, laptops, hand-held devices, compact disks, notebooks, journals, and hard drives.

**B. The term "Topics" includes, without limitation:**

a. The interview with Stephen Fairfax as an Aligned Data Center Spokesperson dated November 15, 2015 video available at https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers;
b. The corresponding blog post regarding the same interview dated December 2, 2015 available at https://www.aligneddatacenters.com/blog/steve-fairfax-on-reliability-focused-data-center-design;
c. The development and design of "customer pod";
d. The design of Aligned Data Centers;
e. The operation of Aligned Data Centers;
f. Switch;
g. T-SCIF;
h. HVAC;
i. Hot Aisle Containment; and
j. Stephen Fairfax and the design of the "customer pod."



**C. The term "Representatives" includes, without limitation**:

All employees, officers, representatives, agents, board members, investors, contractors, sub-consultants, vendors, auditors, advisors, affiliates, subsidiaries, parent entities, and holding companies of any individual or entity listed below:

    a.       Stephen Fairfax,
    b.       Neal Dowling,
    c.       Tim Griffin,
    d.       Yoonik Kim,
    e.       MTechnology,
    f.       Andrew Schaap,
    g.       Jakob Carnemark,
    h.       Thomas Doherty,
    i.       John Petralia,
    j.       Rajendran Avadaippan,
    k.       John Greenwod,
    l.       Tom Blair,
    m.      Kirk Offel,
    n.       Anubhav Raj,
    o.       Inertech,
    p.       Aligned Energy,
    q.       Aligned Data Centers, and
    r.       PowerSecure.

## II.    PROPOSED EXECUTION PLAN

Given the ease with which electronic records can be deleted, destroyed, discarded or overwritten, this Litigation Hold requires you to immediately issue instructions to all Representatives, and individuals engaged in records-management or information technology that have access to or manage your Data regarding the Litigation Hold.

**A. Legal Counsel**

We recommend you discuss this letter with your legal counsel, and what steps should be taken to preserve the Data of all Representatives who could be a witness. In the event any Representative directly involved in the matters at issue terminates his or her relationship with you, contact us so we may discuss the next steps, if any, that may need to be taken to preserve the electronic storage media assigned to that Representative.



**B. Instructions to Records Custodians and Witnesses**

You must promptly enlist an information technology representative with an appropriate level of knowledge concerning data storage and access within or hired by your organization to implement the Litigation Hold.

If you have a system that automates the deletion of e-mail or other electronic files, such system must be immediately suspended to the extent necessary to prevent the destruction of Data. Back-up tapes or hard drives that may contain discoverable information must be removed from routine recycling or re-writing until further notice. Each of you and the Representatives have the duty to abide by the terms of this Litigation Hold from the date of this letter until the final resolution of any dispute related to the pending litigation. Failure to promptly preserve discoverable information, whether intentional or negligent, may result in substantial sanctions and/or additional litigation, in addition to the loss of evidence that might be used in your own defense.

You must notify those Representatives who are likely to be witnesses as well as those Representatives who are custodians of records to help implement the Litigation Hold; including the category of Representatives listed in Section I.C. above. Notice to these Representatives must describe the categories of documents that need to be preserved, the Topics, the Time Frame, and the steps that the Representatives must take to implement the Litigation Hold. The notice also must inform these Representatives of the potential penalties for failing to help you fulfill your evidentiary preservation obligations.

Switch reserves the right to further refine these instructions during the investigatory process or as litigation ensues.

Govern Yourself Accordingly,

Anne-Marie Birk
Associate General Counsel
Switch, Ltd.
abirk@switch.com