Samuel Castor, Esq.
Nevada Bar No. 11532
**SWITCH, LTD.**
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118

F. Christopher Austin, Esq.
Nevada Bar No. 6559
*caustin@weidemiller.com*
Ryan Gile, Esq.
Nevada Bar No. 8807
*rgile@weidemiller.com*
**WEIDE & MILLER, LTD.**
10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Tel: (702) 382-4804
Fax: (702) 382-4805

*Attorneys for Plaintiff* SWITCH, LTD.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD. a Nevada limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive, <br><br> Defendants. | Case No.: 2:17-cv-02651-GMN-VCF <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Switch, Ltd. ("Switch") hereby files its opposition to the Motion to Dismiss (ECF 8) ("Motion") filed by Defendants Stephen Fairfax and MTechnology ("MTech") (collectively, "Defendants").

## I.   INTRODUCTION

Switch brought this action against Defendants after learning that Defendants had advised and consulted with Aligned Data Centers, LLC ("Aligned") in the construction and operation of data centers employing and infringing Switch's proprietary technology. (ECF 1-1 ("Complaint") at p.1-2.) Defendants, having worked with Switch on behalf of a mutual client, were given

1

extraordinary access to "all of Switch's designs, including extremely sensitive trade secret information and documentation, plans, schematics, and blueprints, operational schedules, and trade secrets" (*id.* at ¶ 31) under agreements not to ever disclose the same (the "2011 NDA" and the "2015 NDA") and assurances that Defendants would not engage in the design and construction of data centers. (*Id.* at ¶¶ 28-40, Exhibits 1 and 4 (the "NDAs").)  In designing and consulting in the design of Aligned's data centers, Defendants wrongfully disclosed Switch's confidential information and trade secrets. (*Id.*)

Defendants essentially make three arguments in support of their Motion: (1) either the trade secret claims (6th, 7th claims) fail as they are entirely premised on the disclosure of information that was the subject of published patents or they must be identified with "greater specificity" (Motion at 6-10); (2) the tort claims (4th, 5th, 8th claims) are subsumed by the misappropriation of trade secrets claim (*id.* at 10-12); and (3) the breach of contract and related claims (1st, 2nd, 3rd claims) do not apply to Fairfax in his individual capacity because he only signed the NDAs on behalf of MTech (*id.* at12-14).  While Switch acknowledges that the tort claims (4th, 5th, 8th claims) are subsumed by its trade secrets claim under NRS 600A and will remove the same in a pending amendment to its Complaint, Defendants' remaining arguments are unsupported in law or by the facts of this case.

None of the trade secret claims are premised at all on the disclosure of information that was the subject of published patents.  In fact, the published patent claims were expressly excluded as a basis for any trade secret claim in the Complaint (Complaint at p.2, ¶¶16, 24, identifying "unpublished, patent-pending" information).   Additionally—and contrary to Defendants' contention—there is no legal support for the contention that trade secret claims must be plead with "specificity" or "greater specificity" (Motion at 10).  Fed.R.Civ.P. 8-9.  Misappropriation claims are not subject to the heightened pleading requirements of Rule 9 or to some novel standard of "greater specificity." *Id.*  Such claims need only put the defendant on notice of the types or categories of information claimed (*see* Fed.R.Civ.P. 8), which "notice pleading" requirement the Complaint meets and exceeds in identifying the following as trade secrets misappropriated by

Defendants:

- "Electrical and mechanical 'one-lines'" (*Complaint* at ¶11);

- "Operational routines" (*id.* at ¶19);

- "electrical designs" (*id.*);

- "hot aisle containment technology" not covered by published patents (*id.*)

- "cooling and power redundancy designs" (*id.* at ¶23);

- "trade secrets [that] have allowed Switch to provide power to all of its clients, without interruption, for over 15 years" (*id.*);

- "trade secrets [that] allow Switch to achieve a best monthly average power usage effectiveness below 1.1 PUE" (*id.* at ¶24);

- Patent pending claims that were unpublished during the pendency of the patent application process (*Id.* at ¶16);

- Methodology to "deploy up to 50 kilowatts of power per cabinet" without overheating (*id.* at ¶25-26);

- Methodology to deliver "10-times the amount of power otherwise delivered to a competitor's environment without overheating (*id.* at ¶27);

- Systems to provide "100% power delivery and steady temperature control" (*id.*);

- "all of Switch's designs" (*id.* at ¶31);

- "extremely sensitive . . . documentation, plans, schematics, and blueprints" (*id.*);

- "operational schedules" (*id.*);

- "the physical infrastructure and layout of the Switch facility" (*id.* ¶¶42, 57);

- "the cabinet layout and configuration" (*id.*);

- "novel cooling designs [not covered by published patents]" and "associated cooling systems" (*id.*);

- "the electrical configuration and pathways" (*id.*);

- "the interplay of various Switch technology and components" (*id.*);

- "operations of the data center unique to Switch" (*id.*)

With regard to Defendants' breach of contract contentions, Fairfax signed the NDAs in his personal capacity and on behalf of MTech. (*See* Complaint at ¶¶29, 37.) Even should the

Court deem Fairfax's signature on the NDAs applicable only to MTech, Fairfax remains bound under the agreements as an intended beneficiary.  The NDAs require the officers and employees to be contractually bound to the same degree as the corporate entity for which they work (*see* NDAs at ¶ 3).  As such, an intended material part of the NDAs was that Fairfax would receive the information disclosed and be bound to maintain its confidentiality, making him an intended third-party beneficiary bound by the terms of the NDAs.  *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediate*s, S.A.S., 269 F.3d 187, 196 (3d Cir. 2001); *Guardian Construction Co., v. Tetra Tech Richardson, Inc.* 583 A2d 1378, 1386 (De. Super. Ct. 1990, (finding third-party beneficiaries bound if benefit confired by the agreement as a material part of the agreement's purpose).

## II.     STATEMENT OF RELEVANT FACTS

### A.     Switch Has Unique Data Center Technologies and Trade Secrets.

Data centers are the heart of the internet.  As technology has become increasingly integral to our daily lives, the need for data centers (particularly, efficient and reliable data centers) has increased, exponentially.  Central to Switch's innovative technologies are founder Rob Roy's designs. Switch's novel technology and trade secrets has allowed Switch to build and operate its data centers dramatically more cost efficiently than its competitors.   Because of these technologies, various groups have applauded Switch's data centers as superior to those built by Apple, Google, Facebook, Amazon, Microsoft, and other technology giants.[1]

Switch is a Nevada limited liability company organized and existing under the laws of the State of Nevada. Switch is a Las Vegas-based company that designs, constructs, and operates the world's most powerful telecommunication offerings, data centers and service technology ecosystems. Switch's facilities sustainably power, cool, and protect the physical infrastructure and networks necessary to run the Internet.

In addition to being well-known for its innovative technologies and confidential approach to its services, Switch is also recognized for providing military grade physical security to protect

---

[1]  See   http://www.greenpeace.org/international/en/publications/Campaign-reports/Climate-Reports/clicking-clean-2017/.  See also http://datacenterfrontier.com/top-10-cloud-campuses/.

its customers and Switch's intellectual property.  All visitors to Switch's facilities must first sign non-disclosure agreements and agree to comply with Switch's security protocols.  This high degree of physical security and constant presence of security personnel allows Switch to limit access to its trade secrets, patent-pending technologies, confidential designs and protocols, and to preserve the integrity of its mission critical operations that power the Internet.

**B.**     **Unprecedented Trade Secret Disclosures to Fairfax.**

On or about May 2011 and again on August 2015, Switch permitted Stephen Fairfax to conduct and in-depth investigation of Switch's facilities.  Switch gave Fairfax special access to Switch's confidential and trade secret information to conduct a thorough audit and assessment of Switch's technologies for the benefit of a Switch customer, eBay, who requested Fairfax perform the audit.  (*See* Mar. 30, 2011, Email chain, attached hereto as Exhibit B.)  eBay specifically requested Fairfax be given unprecedented access in order to perform a "complete fault tree analysis".  (*Id.* at 8).  To perform this analysis, Switch was asked to disclose comprehensive information regarding "both the Mech[anical] and Elec[trical] one lines" to Fairfax and his team.  (*Id.*)  The "one lines" reveal the electrical and mechanical plans and schematic for the entire data center and are known and recognized in the industry as some of the most critical trade secrets.  (Declaration of Samuel Castor, attached hereto as Exhibit A at ¶ 5.  While Switch was ultimately willing to provide the unprecedented comprehensive access requested, it was not willing to permit recording or the removal of any documents or copies of such disclosures to leave its facility.  (Exhibit A at ¶6.)  Fairfax noted that these security protocols were not a problem as he could "work from [his] memory."  (Exhibit B at 3.)

Mr. Fairfax understood that no one was permitted access to a Switch data center without first signing a nondisclosure agreement.  (*See id.* at 2.)  There was no discussion limiting this requirement to the corporate entities represented or excluding individuals.  (Exhibit A at ¶ 7-8.)  It was always expressly stated and understood by the Switch and Fairfax that Fairfax and MTech were to be bound by the NDAs.  (*Id.*)  Thus, as a necessary precondition to Switch's unprecedented disclosure of highly confidential information, Mr. Fairfax, individually and on behalf of MTech executed the 2011 NDA and the 2015 NDA (*see* NDAs), and also confirmed

5

neither would engage in the designing or building of a data center.  (Complaint, Exh. 3.)

Unbeknownst to Switch, Fairfax was hired in 2013 by Aligned, a provider of new data centers in Arizona and Phoenix, at or around the same time he reassured Switch he had "no interest in building and operating data centers."   Roughly twelve (12) months thereafter, Fairfax personally and publicly started promoting his integral involvement in designing Aligned's facilities "while the paper was literally still blank." (Complaint, fn. 11, 12.)

**III.      MOTION TO DISMISS SHOULD BE DENIED**

      **A.      Motion to Dismiss Legal Standard.**

Defendants motion is brought under Fed.R.Civ.P. 12(b)(6), alleging a failure to state claim for relief as the basis for dismissal.  A motion to dismiss under Fed.R.Civ.P. 12(b)(6) will only be granted if the complaint fails to "state a claim to relief that is plausible on its face." *Goodwin v. Executive Tr. Serv., LLC,* 680 F.Supp.2d 1244, 1250 (D. Nev., 2010), *citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

As is well known to this Court, in assessing the sufficiency of a claim, the Court must accept as true all well-pled factual allegations in the Complaint, and consider whether the "factual matter, accepted as true" states a facially plausible claim for relief.  *Ashcroft v. Iqbal,* 556 U.S. 662 6780 (2009).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Such factual content is sufficient if it raises "a reasonable expectation that discovery will reveal [the] evidence [alleged]".  *Twombly,* at 570.

      **B.      Defendants' Motion to Dismiss May Properly Be Viewed as a Motion for Summary Judgment Given Reliance on Attached Exhibits Asserting Matters Outside the Pleadings.**

A motion to dismiss is converted into a motion for summary judgment under Rule 56 when "matters outside the pleadings ae presented to and not excluded by the court." Fed.R.Civ.P. 12(b). Such outside matters include, depositions, affidavits, or any other written or oral evidence in support or in opposition to the pleadings, and can be triggered by "either the pleader or moving party." *Ching Luen Enterprises Co., Ltd. v. Mason*, 5F.3d 535 (9th Cir. 1993), *citing* 5A Charles

6

A. Wright & Arthur R. Miller Federal Practice and Procedure Sec. 1366 (1990).

In support of the Motion, Defendants attached the declaration of Stephen Fairfax (Exhibit 2) and the patent infringement complaint between Switch an Aligned filed in Texas (Exhibit 1). In response, Switch has also attached emails between Fairfax and Switch (Exhibit B) it believes clarify facts raised in the Motion.

To the degree the Court accepts these additional materials as requested by Defendants and provided by Switch, Defendants' Motion to Dismiss should be converted into a Motion for Summary Judgment and subject to the heightened standard of review governed by Fed.R.Civ.P. 56(c).  Under Rule 56(c), to succeed on a motion for summary judgment, the moving party must show (1) a lack of genuine issue of material fact as to the judgment sought, and (2) that a court may grant judgment as a matter of law.  *Id; Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

As set forth herein, Defendants have neither alleged nor established the absence of genuine issue of material fact as to the claims addressed, nor have they shown they are entitled to judgment as a matter of law.

**C.     Switch Sufficiently Plead Misappropriation of Trade Secrets and There is No Requirement to Plead the Same with Specificity.**

Defendants argue that either the trade secret claims  fail as they are entirely premised on the disclosure of information that was the subject of published patents or they must be identified with "greater specificity" (Motion at 6-10).   To make this argument, Defendants assume incorrectly that Switch's misappropriation of trade secrets claims are exclusively based on information set forth in published patent claims and conflate the Texas patent infringement action brought by Switch against Aligned (the "Texas Matter") with the present case.  These Complaints are not the same.  Unlike the factual pleadings of the Texas Matter, in the present case, Switch makes no allegations of disclosure of confidential information or misappropriation of trade secrets arising from patent claims published at the time of wrongful disclosure.   Rather, Switch specifically ***excludes such claims*** by noting that with regard to those facts that may ultimately raise patent infringement claims, only those disclosures of "unpublished" and "patent pending"

7

information are alleged.  (Complaint at ¶16)

Switch, as a matter of practice, kept its patents unpublished and under seal to maintain their trade secret status.  (Exhibit A at ¶9.)  This means that during the pendency of Switch's patent application and until the invention is made public upon issuance and publication of the patent, the subject matter covered by that patent is maintained as a trade secret.  Some of Switch's patents have taken as long as ten (10) years to be granted (including patent claims that are at play in this case), thereby preserving their trade secret status during the pendency of the USPTO review process.  (*Id.* at ¶10.)  Even if these patent pending trade secrets were later made public through the patent publication process, to the extent they were disclosed to Fairfax and improperly revealed by him to others, including Aligned before publication, Defendants would properly be liable for misappropriation and breach of the NDAs.

As Switch disclosed all of its technology to Defendants in connection with Defendants extraordinary requests, the information revealed included as a sub-set unpublished, patent pending information that Switch properly alleges was wrongfully disclosed to Aligned prior to the issuance and publication of the relevant patent.  There is, therefore, a genuine issue of material fact as to just what information was disclosed by Defendants and whether the disclosure occurred prior to or after the publication of any patent pending information.  Such issues of material fact require discovery and bar summary judgment.

As to Defendants' claim that Switch must identify the trade secrets claimed with "greater specificity", Defendants cite to no law or rule requiring such a novel hightended pleading requirement for misappropriation claims.  That is because there is not one.  There are no special pleading requirements for disclosures of confidential information in violation of non-disclosure agreements or for misappropriation of trade secrets.  Such claims need only comply with the notice pleading requirement of Rule 8 as defined by the Supreme Court in *Iqbal* and *Twombly*. This they do.  The Complaint pleads sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal,* 556 U.S. 662 6780 (2009), such that there is "a reasonable expectation that discovery will reveal [the] evidence [alleged]", *Twombly,* at 570.

Switch is not, therefore, required to plead trade secret misappropriation with particularity, as doing so would require the disclosure and, thereby, the loss of the trade secrets at issue.  Rather, Switch need only put Defendants on notice of the information claimed, sufficient to make a reasonable inference that if all the facts as alleged are true, as the Court is required to assume they are, is the allegation plausible, such that there is a "reasonable expectation that discovery" will flesh out the specific trade secrets at issue (presumably under a protective order).  The Complaint does just this.  As set forth in the Complaint, the confidential information and trade secrets at issue are far, far broader than the small subset that is capable of attaining patent protection. (*See* 35 U.S.C §§101, et. seq. (requirements include non-obviousness, novelty, utility, particularity, etc.) By alleging the following catagories, methodologies, and specific technologies disclosed by Switch to Defendants commencing in May of 2011, (Complaint at ¶¶ 28. 42) and by alleging Defendants disclosed the same in violation of the NDAs at least by 2013, Switch meets, if not exceeds, the notice pleading required as set forth under Rule 8 and by *Iqbal* and *Twombly*:

- "Electrical and mechanical 'one-lines'" (*Complaint* at ¶11);

- "Operational routines" (*id.* at ¶19);

- "electrical designs" (*id.*);

- "hot aisle containment technology" not covered by published patents (*id.*)

- "cooling and power redundancy designs" (*id.* at ¶23);

- "trade secrets [that] have allowed Switch to provide power to all of its clients, without interruption, for over 15 years" (*id.*);

- "trade secrets [that] allow Switch to achieve a best monthly average power usage effectiveness below 1.1 PUE" (*id.* at ¶24);

- Patent pending claims that were unpublished during the pendency of the patent application process (*Id.* at ¶16);

- Methodology to "deploy up to 50 kilowatts of power per cabinet" without overheating (*id.* at ¶25-26);

- Methodology to deliver "10-times the amount of power otherwise delivered to a competitor's environment without overheating (*id.* at ¶27);

- Systems to provide "100% power delivery and steady temperature control" (*id.*);

- "all of Switch's designs" (*id.* at ¶31);

- "extremely sensitive . . . documentation, plans, schematics, and blueprints" (*id.*);

- "operational schedules" (*id.*);

- "the physical infrastructure and layout of the Switch facility" (*id.* ¶¶42, 57);

- "the cabinet layout and configuration" (*id.*);

- "novel cooling designs [not covered by published patents]" and "associated cooling systems" (*id.*);

- "the electrical configuration and pathways" (*id.*);

- "the interplay of various Switch technology and components" (*id.*);

- "operations of the data center unique to Switch" (*id.*)

That Defendants were fully aware of the unique value of the information disclosed is evidenced by Defendants themselves.  Fairfax noted he spent "over 4 hours one-on-one with Rob Roy" (Complaint, Exh. 3) on a specific date and time in which Mr. Roy disclosed confidential and trade secret information on "the data center, the business model, and a variety of other very interesting topics" (Exhibit B at 2).  Fairfax further commented on the very information he received, exclaiming "it [Switch's data center] is an interesting site, unusual architecture, especially the cooling system" (Complaint, Exh. 3).  By so doing, Fairfax himself lays out the catagories of trade secrets Switch alleges were misappropriated and when they were disclosed to Fairfax.  Defendants can hardly allege such allegations are "vague" or "conclusory" when Plaintiff quotes Defendants to set forth the nature of the trade secrets alleged and just when they were disclosed.  This is more than adequate to establish a "plausible" claim, and Defendants arguments to the contrary fail.

> **D.**    **The Breach of Contract Claims Against Fairfax are Plausibly Based on Fairfax's Signatures to the Same, the Terms of the NDAs, and the Contemporaneous Statements of the Parties.**

Defendants do not challenge the plausibility of the breach of contract and related claims as to MTech.  They merely allege that Fairfax signed the the NDAs only on behalf of MTech.

This is not born out by either a facial review of the NDAs or by the facts, and to the extent the facts are in issue, no dismissal or summary judgment is warranted.

The 2011 NDA states that the agreement is between Switch "and the person or entity identified below ("Recipient")." (Complaint, Exhibit 1.) As is clear from a review of the 2011 NDA signature page, under the typed word "Recipient" Fairfax signs his and only his full name. (*Id.*) He then prints his and only his name thereunder and identifies his title as "President, MTechnology, Inc." (*Id.*) There is no clause or provision in the agreement identifying MTech as a recipient or as the sole and exclusive recipient. There is no clarification within or on the Agreement acknowledged and agreed to by the parties as to what Fairfax intended by signing only his name or that he was expressly excluding himself from being bound by the terms of the agreement. Absence a clear representation that the contract is signed only in the representative capacity, the agreement is binding on the individual. *See e.g. All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 991-992, 2012 U.S. Dist. LEXIS 189576, *39-43, 2012 WL 9516125 (SD Iowa, 2012) (finding individual bound by NDA under several theories, including where the contract fails to specifically identify the entity as the contracting party, and as an intended beneficiary, particularly where, as in the present case, the subject of the agreement was the protection of confidential information.)

To the contrary, at the time the 2011 NDA was signed, Switch had made it quite clear to Fairfax that no one would be permitted to tour the facility, let alone recive the extraordinary disclosures provided to Defendants, unless they signed an NDA. (Exhibit A at ¶ 7-9; Exhibit B at 2.) Switch never varied from this requirement. There was no discussion limiting this requirement to the corporate entities or excluding individuals. (Exhibit A at ¶7, 8.) It was always expressly stated and understood by Switch and Fairfax that Fairfax and MTech would both be bound by the NDA since both were visiting the data center. (*Id.*) Thus, as a necessary precondition to Switch's unprecedented disclosure of highly confidential information, Mr. Fairfax, individually and on behalf of MTech executed the 2011 NDA.

Fairfax now claims for the first time that this issue of fact is now in dispute—that he signed

only on behalf of MTech.  This does not undermine the claim, its plausibility or viability.  However, such a dispute over a material factual issues does bar dismissal or the entry of summary judgment.

The same is true as to the 2015 NDA.  That agreement too fails to specifically state that the Recipient is only MTech.  Although "MTechnlogy, Inc." is typed in above the word "Recipient", the agreement is signed only by Fairfax.  Further, the same express understanding that all persons entering Switch's data center would have to sign an NDA remained binding.  To the degree that Fairfax had decided unilaterally that this time the NDA would not apply to him, such was never conveyed to Switch nor ever consented to by Switch.  Even if so, Fairfax still would remain individually bound by the 2011 NDA, as the 2015 NDA—if only with MTech— would not then superceded and replace the 2011 NDA with Fairfax (*see* 2015 NDA, §10).  Again, and at a minimum, because the inconsistent factual allegations raised by Fairfax are material to the claim, they preclude dismissal of the breach of contract and related claims without first engaging in discovery.

In addition, because both NDAs require the officers and employees to be contractually bound to the same degree as the corporate entity for which they work (*see* NDAs at § 3), such officers and employees are deemed intended beneficiaries bound by the terms of the NDAs.  *See, All Energy, supra,* at 989-990*; Guardian Construction Co., v. Tetra Tech Richardson, Inc.* 583 A2d 1378, 1386 (Del. Super. Ct. 1990, (finding third-party beneficiaries bound if benefit confired by the agreement as a material part of the agreement's purpose).

Accordingly, the breach of contract and related claims properly and plausibly plead claims against Fairfax, and given the disputed issues of fact, there is no basis for dismissal absent further discovery.

## IV.    ALTERNATIVE REQUEST FOR LEAVE TO FILE AMENDED COMPLAINT

Should the Court find any of the claims defended herein are subject to dismissal for failure to plead requisite facts, Switch respectfully requests leave to file a curative first amended complaint.

12

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleadings only with the opposing party's consent or the court's leave" and that "the court should freely give leave when justice so requires. Fed.R.Civ.P. 15(a)(2). Though not absolute, federal district courts are directed to apply this rule with "extreme liberality." *See Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1482 (9th Cir. 1997). Absent a showing that the requested amendment would cause undue delay, prejudice to the opposing party, or be futile, the presumption is that leave to amend should be granted. *See Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003).

This case has only recently been filed, discovery has not commenced, and the opposing party will not be prejudiced by the Court's granting of leave to amend. Further, as set forth herein, the requested amendments are not without merit or futile. Accordingly, Switch respectfully requests the Court grant it leave to cure any pleading deficiencies.

## V.     CONCLUSION

For the reasons set forth herein, Switch respectfully requests the Court deny Defendant's Motion, or in the alternative, that the Court grant Switch leave to amend its Complaint.

Dated:  December 5, 2017

Respectfully Submitted,

*/s/ F. Christopher Austin*
F. Christopher Austin (NV Bar No. 6559)
caustin@weidemiller.com
Ryan Gile (NV Bar No. 8807)
rgile@weidemiller.com
**WEIDE & MILLER. LTD.**
10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Tel:  702-382-4804
Fax:  702-382-4805

*Attorneys for Plaintiff Switch, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that I am an employee of WEIDE & MILLER, LTD. and that on December

5, 2017, I served a full, true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION**

**TO DEFENDANTS' MOTION TO DISMISS** via CM-ECF to the addressees listed below:

> Marc J. Randazza, Esq.
> Ronald D. Green, Esq.
> Alex J. Shepard, Esq.
> Randazza Legal Group, PLLC
> 4035 S. El. Capitan Way
> Las Vegas, NV 89147
> 702-420-2001
> efc@randazza.com
>
> *Attorneys for Defendants STEPHEN*
> *FAIRFAX and MTECHNOLOGY*

                             */s/ James L. Morris*
                               An employee of Weide & Miller, Ltd.

# EXHIBIT "A"

# EXHIBIT "A"

1   Samuel Castor, Esq.
    Nevada Bar No. 11532
2   **SWITCH, LTD.**
    7135 S. Decatur Blvd.
3   Las Vegas, Nevada 89118

4   F. Christopher Austin, Esq.
    Nevada Bar No. 6559
5   *caustin@weidemiller.com*
    Ryan Gile, Esq.
6   Nevada Bar No. 8807
    *rgile@weidemiller.com*
7   **WEIDE & MILLER, LTD.**
    10655 Park Run Drive, Suite 100
8   Las Vegas, NV 89144
    Tel: (702) 382-4804
9   Fax: (702) 382-4805

10  *Attorneys for Plaintiff* SWITCH, LTD.

11                    **UNITED STATES DISTRICT COURT**

12                         **DISTRICT OF NEVADA**

13
    SWITCH, LTD. a Nevada limited liability        Case No.:  2:17-cv-02651-GMN-VCF
14  company,
                                                   **DECLARATION OF SAMUEL**
15              Plaintiff,                          **CASTOR IN SUPPORT OF**
                                                   **PLAINTIFF'S OPPOSITION TO**
16  vs.                                            **DEFENDANTS' MOTION TO**
                                                   **DISMISS**
17  STEPHEN FAIRFAX; MTECHNOLOGY; and
    DOES  1 through 10; ROE ENTITIES 11 through
18  20, inclusive,

19              Defendants.

20          I, Samuel Castor, declare under penalty of perjury under the laws of the United States that

21  the following is true and correct.

22          1.      I am the Executive Vice President of Policy and Deputy General Counsel for

23  Plaintiff Switch, LTD, in the above captioned matter.  I am over the age of 21, under no disability,

24  and am competent to testify to the matters contained in this declaration.  I make this declaration

25  in support of Switch's Opposition to Defendants' Motion to Dismiss ("Opposition").

26          2.      Attached as Exhibit B to the Opposition is a true and accurate copy of a 10-page

27  email chain between Switch personnel and Stephen Fairfax, dated from March 30, 2011.

28
                                              1

3.      I am informed and believe that commencing by at least as early as March of 2011, Switch customer, eBay, specifically requested Defendants be given unprecedented access in order to perform a "complete fault tree analysis" of Switch's data center technology.  (Exhibit B.)

4.      To perform this analysis, Switch was asked to disclose comprehensive information regarding Switch's mechanical and electrical "one lines".

5.      The "one lines" reveal the electrical and mechanical plans and schematic for the entire data center and are known and recognized in the data center industry as some of the most critical trade secrets a data center owns.

6.      While Switch was ultimately willing to provide the unprecedented comprehensive access requested, it was not willing to permit recording or the removal of any documents or copies of such disclosures to leave its facility.

7.      All persons and entities are required to execute non-disclosure agreements prior to entering a Switch data center.  I am informed and believe, this was fully explained to Mr. Fairfax in 2011 when he visited Switch's data center and again in 2015.

8.      I am informed and believe there was no discussion with Mr. Fairfax limiting this NDA requirement to the corporate entities represented or excluding individuals, and that it was always expressly stated and understood by Switch and Fairfax that Fairfax and MTech were to be bound by the NDAs.

9.      Switch, as a matter of practice, has kept its patents unpublished and under seal to maintain their trade secret status.  This means that during the pendency of Switch's patent application and until the invention is made public upon issuance and publication of the patent, the subject matter covered by that patent is maintained as a trade secret.

10.     Some of Switch's patents have taken as long as ten (10) years to be granted (including patent claims that are at play in this case), thereby preserving their trade secret status during the pendency of the USPTO review process.

Dated: December 5, 2017

*/s/ Sam Castor*
Samuel Castor

2

# EXHIBIT "B"

# EXHIBIT "B"

REDACTED

**From:** Rebecca Boettcher
**Sent:** Tuesday, May 10, 2011 12:43 PM
**To:** Rob Roy <rroy@switchnap.com>; Missy Young <myoung@switchnap.com>; Gabriel Herrera <gherrera@switchnap.com>
**Subject:** FW: eBay risk assessment



**From:** Stephen Fairfax [mailto:fairfax@mtechnology.net]
**Sent:** Tuesday, May 10, 2011 12:05 PM
**To:** Rebecca Boettcher
**Subject:** Re: eBay risk assessment

Rebecca,

Thank you for facilitating my tour of the very impressive Switch NAP facility.

I don't have email addresses for everyone, but I wanted to express my thanks to several people.

Missy Young gave a very thorough tour and was extremely knowledgeable and helpful.

Please convey my thanks to Rob Roy for the generous amount of time he spent discussing the data center, the business model, and a variety of other very interesting topics.  It was a genuine pleasure to meet him.

I was remiss in not complimenting Rob on the outstanding collection in his office.  I was very impressed but was so intent on our conversation that I neglected to bring up the subject.

I've attached a file that I discussed with Gabe.  It is the public version of a reliability analysis that MTech performed on the APC Symmetra MW UPS used in your data center.  I have some additional details on the study that he might find useful.  He or any of the Switch Nap staff should feel free to contact me at any time.

Best regards,

Steve Fairfax

508-788-6260 Boston office
830-448-3141 Google Voice

On Thu, Apr 21, 2011 at 5:10 PM, Rebecca Boettcher <Rboettcher@switchnap.com> wrote:

Steve,


When you speak with Security let them know you are meeting with Rob Roy. I am checking on the camera/video walk-thru, hopefully will have an answer for you by COB. In the meantime attached is an NDA that we need signed prior to your visit.


Thanks,



---

**From:** Stephen Fairfax [mailto:fairfax@mtechnology.net]
**Sent:** Thursday, April 21, 2011 2:59 PM
**To:** Rebecca Boettcher
**Cc:** Lewis, Mike

**Subject:** Re: eBay risk assessment


12 PM is fine.

When I speak to security, who shall I tell them I am meeting?

May I use a camera/video on the walk-through?  It will be used only to brief my engineers when we perform the analysis.  We keep all client files on encrypted disks; once I take the file out of the camera, it will always be under encryption.

If this is a problem, I can work from my memory.  Video is better.

Regards,

Steve

On Thu, Apr 21, 2011 at 4:55 PM, Rebecca Boettcher <Rboettcher@switchnap.com> wrote:

Will 12 PM work on Monday May 9th?



**PLEASE SEE BELOW FOR SOME VERY IMPORTANT INFORMATION REGARDING YOUR VISIT TO SWITCH.**

- All guests must present a government issued photo ID to gain access to the facility.

- If you are traveling in for this meeting, **we recommend that you rent a car**, if at all possible, rather than taking a taxi. Getting a taxi at the airport or at a hotel is easy, getting one to pick you up at the SuperNAP is nearly impossible.

**The SuperNAP WILL NOT REGISTER PROPERLY on ANY internet mapping site or GPS.**

**Please see below for the directions to the SuperNAP.**

From McCarran Intl' Airport: Drive: 6.5 Miles - about 10 minutes

1.      Head north on Paradise Rd.

2.      Take the Flight Path Ave. exit

3.      Turn left at Flight Path Ave.

4.      Turn left to merge onto Paradise Rd.

5.      Take the exit onto the I-215 West

6.      Continue on the I-215 West

7.      Continue on  I-215 West towards exit 13.

8.      Take Exit 13 for Decatur Blvd.

9.      Turn Left at S. Decatur Blvd.

10.     Take your next available right to Badura turn right.

11.     Continue to Edmonds and turn left.

12.     Our facility is the 3rd building down and is gray in color.

13.     End at 7135 S. Decatur Blvd. (The SuperNAP)

Our building is 3rd and gray in color

Please drive to the front gate, marked 7-1 which is located at the far west end of the building.

Push the red button on the drive-up call box to speak with Security.

Thanks,

**Error! Filename not specified.**

---

**From:** Lewis, Mike [mailto:mlewis@ebay.com]
**Sent:** Thursday, April 21, 2011 1:25 PM
**To:** Rebecca Boettcher

**Cc:** Stephen Fairfax
**Subject:** RE: eBay risk assessment

As of right now I will not be there.

---

**From:** Rebecca Boettcher [mailto:Rboettcher@switchnap.com]
**Sent:** Thursday, April 21, 2011 2:23 PM
**To:** Lewis, Mike
**Cc:** Stephen Fairfax
**Subject:** RE: eBay risk assessment

Mike,

Steve is going to be here on May 9th will you be attending as well? I am just trying to firm up a start time, should have a time by COB today sorry for the delay.

Thanks,

**Error! Filename not specified.**

---

**From:** Lewis, Mike [mailto:mlewis@ebay.com]
**Sent:** Thursday, April 21, 2011 1:22 PM

**To:** Joe McDonald; Stephen Fairfax
**Cc:** Rebecca Boettcher; Missy Young
**Subject:** RE: eBay risk assessment

Steve, were you still planning on being in Vegas on the 9th?

---

**From:** Joe McDonald [mailto:jmcdonald@switchnap.com]
**Sent:** Wednesday, April 20, 2011 5:50 PM
**To:** Lewis, Mike
**Cc:** Rebecca Boettcher; Missy Young
**Subject:** RE: eBay risk assessment
**Importance:** High

Mike – I'm just following up on this.  Do you still want to meet on the 9th?  The calendar is filling up fast.

**Joe McDonald CPP PSP CMAS**

**CSO**

**Switch**

702-204-0155 - c

702-444-4106 - d

702-444-4911 - SECOM

jmcdonald@switchnap.com

Board Certified Protection Professional (CPP)

Board Certified Physical Security Professional (PSP)

Certified Master AntiTerrorism Specialist (CMAS)

---

**From:** Joe McDonald
**Sent:** Tuesday, April 05, 2011 10:30 AM
**To:** 'Stephen Fairfax'; Lewis, Mike
**Cc:** Tugwell, Shawn; Price, Tom; Rivera, Ray; Lesley Dick; Rebecca Boettcher; Mike Wiley
**Subject:** RE: eBay risk assessment

Rob is good for the 9th.   Should I save the date, and what time frame are you looking?

**Joe McDonald CPP PSP CAS**

**CSO**

**Switch**

702-204-0155 - c

702-444-4106 - d

702-444-4911 - SECOM

jmcdonald@switchnap.com

Board Certified Protection Professional (CPP)

Board Certified Physical Security Professional (PSP)

Certified AntiTerrorism Specialist (CAS)

---

**From:** Stephen Fairfax [mailto:fairfax@mtechnology.net]
**Sent:** Tuesday, April 05, 2011 8:20 AM
**To:** Lewis, Mike
**Cc:** Joe McDonald; Tugwell, Shawn; Price, Tom; Rivera, Ray; Lesley Dick; Rebecca Boettcher
**Subject:** Re: eBay risk assessment


Will Monday, May 9th work?

Steve

On Tue, Apr 5, 2011 at 10:42 AM, Lewis, Mike <mlewis@ebay.com> wrote:

Copying Steve.

Steve, is there another time you can visit with Switch?  It looks like the 18th - 20th will not work.

Thanks

Mike

-----Original Message-----
From: Joe McDonald [mailto:jmcdonald@switchnap.com]
Sent: Monday, April 04, 2011 2:59 PM
To: Tugwell, Shawn
Cc: Price, Tom; Rivera, Ray; Lewis, Mike; Lesley Dick; Rebecca Boettcher
Subject: RE: eBay risk assessment

I spoke with Rob Roy and he would like to be involved.  Unfortunately, he will not be available that week.  Is there another available time?

7

Joe McDonald CPP PSP CAS
CSO
Switch
702-204-0155 - c
702-444-4106 - d
702-444-4911 - SECOM
jmcdonald@switchnap.com
Board Certified Protection Professional (CPP)
Board Certified Physical Security Professional (PSP)
Certified AntiTerrorism Specialist (CAS)


-----Original Message-----
From: Tugwell, Shawn [mailto:stugwell@ebay.com]
Sent: Sunday, April 03, 2011 4:34 PM
To: Joe McDonald
Cc: Price, Tom; Rivera, Ray; Lewis, Mike; Lesley Dick
Subject: RE: eBay risk assessment

Joe,

Our vendor, M Technology would like to come by the site in April. They are available between the 18th and
20th. They would need a tour of the facilities back end and the ability to review both the Mech and Elec one
lines. It would be best if the person providing the tour is part of your facility operations team and can answer
any questions that the Mtech team might have. Please let us know which date works best for you.

Thanks,

Shawn

-----Original Message-----
From: Lewis, Mike
Sent: Thursday, March 31, 2011 8:48 AM
To: Lesley Dick; Tugwell, Shawn
Cc: Joe McDonald; Missy Young
Subject: RE: eBay risk assessment

Thanks Lesley and Joe.  The risk assessment would be completed by a third party and would require them to
analyze your electrical and cooling systems.  From this they do a complete fault tree analysis which give you
the probabilities of the various sequences of events that would have to happen for an outage to occur.  This will
give us a objective view into the infrastructure and will give you the most probable (however unlikely) ways
that things that could go wrong.  A company called M Technology has done this in other facilities for us and has
provided valuable insight to the highest risk in our systems.

Thanks

Mike Lewis
Director Mission Critical Engineering

-----Original Message-----
From: Lesley Dick [mailto:ldick@switchnap.com]

Sent: Wednesday, March 30, 2011 10:24 PM
To: Tugwell, Shawn
Cc: Lewis, Mike; Joe McDonald; Missy Young
Subject: Re: eBay risk assessment

Shawn,

Joe McDonald will be your POC for the risk assessment and is copied above.

I am also looping in Missy so she can help coordinate a tour of the facility tomorrow.

Thanks!

~ Lesley

Senior Vice President
Facility Services
Switch
o. 702.444.4112
c. 408.307.2946
f. 866.728.5134
e. lesley@switchnap.com

Assistant - Rachel DeNeve
o. 702.267.6643
e. rachel@switchnap.com

On Mar 30, 2011, at 9:09 PM, "Tugwell, Shawn" <stugwell@ebay.com> wrote:

> Leslie,
>
> Do you have 15 mins tomorrow to discuss our risk assessment vendor completing a study of your facility. I am sure this will need Rob's blessing but we would like to get it started soon.
>
> On another note is there anytime for some of our team members to get the official tour tomorrow
>
> Thanks,
>
> Shawn
>
>