Samuel Castor, Esq.
Nevada Bar No. 11532
**SWITCH, LTD.**
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118

F. Christopher Austin, Esq.
Nevada Bar No. 6559
*caustin@weidemiller.com*
Ryan Gile, Esq.
Nevada Bar No. 8807
*rgile@weidemiller.com*
**WEIDE & MILLER, LTD.**
10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Tel: (702) 382-4804
Fax: (702) 382-4805

*Attorneys for Plaintiff* SWITCH, LTD.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SWITCH, LTD. a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-02651-GMN-VCF<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Switch, Ltd. ("Switch") hereby files its "Reply" in support of its Motion for a Preliminary Injunction (ECF 7 or "Motion").

**I.    INTRODUCTION**

Switch brought this action against Defendants after learning that Defendants had advised and consulted with Aligned Data Centers, LLC ("Aligned") in the construction and operation of data centers employing and infringing Switch's proprietary technology.  (ECF 1-1 ("Complaint") at 1-2; Castor Declaration, attached hereto as Exhibit 1, at ¶ 2.)  Defendants, having worked with Switch on behalf of a mutual client, were given extraordinary access to "all of Switch's designs,

1

including extremely sensitive trade secret information and documentation, plans, schematics, and blueprints, operational schedules, and trade secrets" (*id.* at ¶ 31) under agreements not to ever disclose the same (ECF 1-1, Exhibit 1 at 27, "2011 NDA" and Exhibit 4 at 36, "2015 NDA"; Castor Decl. at ¶ 4) and assurances that Defendants would not engage in the design and construction of data centers. (*Id.* at ¶¶ 28-40, Exhibits 1 and 4 (the "NDAs").) In designing and consulting in the design of Aligned's data centers, Defendants wrongfully disclosed Switch's confidential information and trade secrets. (*Id.*)

In opposition to the Motion, Defendants argue: (1) that Plaintiff will not likely prevail on all of the claims set forth in its Complaint, (2) that Plaintiff has not demonstrated likely irreparable harm, (3) that because Defendants believe the proposed injunction would close Defendants' business, it would disproportionately harm Defendants; and (4) that the public interest would not favor an alleged unwarranted injunction.

As set forth in Plaintiff's Opposition to Defendants Motion to Dismiss (incorporated herein), Switch is likely to prevail on the claims asserted in its Motion. (*See* ECF 16.) The Motion was "brought under Switch's claims for breach of contract, violation of the Defend Trade Secrets Act of 2016, and Misappropriation of Trade Secrets under N.R.S. 600A." (ECF 7 at 3.) In contravention of the NDAs signed by Defendants, Fairfax personally promoted Defendants "blank page stage" involvement in the design of Aligned's data centers, incorporating Plaintiff's trade secret protected technology. (*Id.*) Contrary to the allegations of Defendants, Switch does not rely on a mere presumption of irreparable harm but demonstrates the loss if its trade secrets have already caused damage to its good will and cost it customers. Finally, the balance of harms and public interest both favor Plaintiff. Switch is not trying to close Defendants' business. The requested injuction is very narrow; it "would have little or no impact on Defendants' lawful and existing business" of data center risk assessment. (*Id.* at 13.) It would merely enjoin involvement in the design of data centers and the disclosure of promotional materials touting such design services.

/ / /

2

## II. STATEMENT OF RELEVANT FACTS

### A. Switch Has Unique Data Center Technologies and Trade Secrets.

Data centers are the heart of the internet. As technology has become increasingly integral to our daily lives, the need for data centers (particularly, efficient and reliable data centers) has increased, exponentially. [1]

Switch is a Nevada limited liability company organized and existing under the laws of the State of Nevada. Switch is a Las Vegas-based company that designs, constructs, and operates the world's most powerful telecommunication offerings, data centers and service technology ecosystems. Switch's facilities sustainably power, cool, and protect the physical infrastructure and networks necessary to run the Internet.

In addition to being well-known for its innovative technologies and confidential approach to its services, Switch is also recognized for providing military grade physical security to protect its customers and Switch's intellectual property. All visitors to Switch's facilities must first sign non-disclosure agreements and agree to comply with Switch's security protocols. This high degree of physical security and constant presence of security personnel allows Switch to limit access to its trade secrets, patent-pending technologies, confidential designs and protocols, and to preserve the integrity of its mission critical operations that power the Internet.

### B. Unprecedented Trade Secret Disclosures to Fairfax.

On or about May 2011 and again on August 2015, Switch permitted Stephen Fairfax to conduct and in-depth investigation of Switch's facilities. (Castor Decl. at ¶ 3.) Switch gave Fairfax special access to Switch's confidential and trade secret information to conduct a thorough audit and assessment of Switch's technologies for the benefit of a Switch customer, eBay, who requested Fairfax perform the audit. (*See* Mar. 30, 2011, Email chain, attached as Exhibit B to ECF 16.) eBay specifically requested Fairfax be given unprecedented access in order to perform a "complete fault tree analysis". (*Id.* at 8). To perform this analysis, Switch was asked to disclose comprehensive information regarding "both the Mech[anical] and Elec[rical] one lines" to Fairfax

---

[1] See http://www.greenpeace.org/international/en/publications/Campaign-reports/Climate-Reports/clicking-clean-2017/. See also http://datacenterfrontier.com/top-10-cloud-campuses/.

3

and his team. (*Id.*) The "one lines" reveal the electrical and mechanical plans and schematic for the entire data center and are known and recognized in the industry as some of the most critical trade secrets. (Declaration of Samuel Castor, attached as Exhibit A to ECF 16 at ¶ 5). While Switch was ultimately willing to provide the unprecedented comprehensive access requested, it was not willing to permit recording or the removal of any documents or copies of such disclosures to leave its facility. (*Id.* at ¶6.) Fairfax noted that these security protocols were not a problem as he could "work from [his] memory." (*Id*, Exh. B at 3.)

Mr. Fairfax understood that no one was permitted access to a Switch data center without first signing a nondisclosure agreement. (*See id.* at 2.) There was no discussion limiting this requirement to the corporate entities represented or excluding individuals. (*Id.,* Exh. A at ¶ 7-8.) It was always expressly stated and understood by the Switch and Fairfax that Fairfax and MTech were to be bound by the NDAs. (*Id.*) Thus, as a necessary precondition to Switch's unprecedented disclosure of highly confidential information, Mr. Fairfax, individually and on behalf of MTech executed the 2011 NDA and the 2015 NDA (*see* NDAs), and also confirmed neither would engage in the designing or building of a data center. (ECF 1-1, Exh. 3.)

Unbeknownst to Switch, Fairfax was hired in 2013 by Aligned, a provider of new data centers in Arizona and Phoenix, at or around the same time he reassured Switch he had "no interest in building and operating data centers." Roughly twelve (12) months thereafter, Fairfax personally and publicly started promoting his integral involvement in designing Aligned's facilities "while the paper was literally still blank." (ECF 1-1, fn. 11, 12.)

### III. MOTION FOR PRELIMINARY INJUNCTION SHOULD BE GRANTED

As set forth in the Motion, under *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008), Plaintiff meets the traditional four- factor test for a preliminary injunciton: (i) Plaintiff is likely to succeed on the merits of the relevant claims, (ii) Plaintiff demonstrates it is likely to suffer irreparable harm, (iii) the balance of equities favor Plaintiff, and (iv) an injunction is in the public interest.

**A.     Switch is Likely to Succeed on the Merits of the Relevant Claims.**

Contrary to the representations of Defendants in their Opposition, Plaintiff clearly

4

identified the "relevant claims" in its Motion as follows: "This Motion is brought under Switch's claims for breach of contract, violation of the Defend Trade Secrets Act of 2016, and Misappropriation of Trade Secrets under N.R.S. 600A." Switch did not bring the Motion under its tort claims.

Defendants incorporated their Motion to Dismiss in support of their arguments that: (1) Plaintiff is unlikely to succeed on its misappropriation of trade secrets claims because the claims are premised on the disclosure of information that was the subject of published patents, rendering the information public and no longer a trade secret, and (2) that the breach of contract claims similarly fail for lack of a protectable trade secret and do not apply to Fairfax, as Defendants allege the NDAs were only binding on MTech.

### *1.  Switch is likely to prevail on its misappropriation claims.*

As set forth in Plaintiff's Opposition to the Motion to Dismiss, which is fully incorporated by reference herein, none of the trade secret claims are premised on the disclosure of information that was the subject of published patents. Rather, the misappropriation claims were based on the extensive and comprehensive information disclosed to Defendants, specifically including the following trade secrets:

- "Electrical and mechanical 'one-lines'" (*Complaint* at ¶11);
- "Operational routines" (*id.* at ¶19);
- "electrical designs" (*id.*);
- "hot aisle containment technology" not covered by published patents (*id.*)
- "cooling and power redundancy designs" (*id.* at ¶23);
- "trade secrets [that] have allowed Switch to provide power to all of its clients, without interruption, for over 15 years" (*id.*);
- "trade secrets [that] allow Switch to achieve a best monthly average power usage effectiveness below 1.1 PUE" (*id.* at ¶24);
- Patent pending claims that were unpublished during the pendency of the patent application process (*Id.* at ¶16);
- Methodology to "deploy up to 50 kilowatts of power per cabinet" without overheating (*id.* at ¶25-26);

5

- Methodology to deliver "10-times the amount of power otherwise delivered to a competitor's environment without overheating (*id.* at ¶27);
- Systems to provide "100% power delivery and steady temperature control" (*id.*);
- "all of Switch's designs" (*id.* at ¶31);
- "extremely sensitive . . . documentation, plans, schematics, and blueprints" (*id.*);
- "operational schedules" (*id.*);
- "the physical infrastructure and layout of the Switch facility" (*id.* ¶¶42, 57);
- "the cabinet layout and configuration" (*id.*);
- "novel cooling designs [not covered by published patents]" and "associated cooling systems" (*id.*);
- "the electrical configuration and pathways" (*id.*);
- "the interplay of various Switch technology and components" (*id.*);
- "operations of the data center unique to Switch" (*id.*)

To prevail on its misappropriation of trade secrets claims under Defend Trade Secrets Act of 2016, and NRS 600A., Plaintiff must show (i) misappropriation through use or disclosure of (2) a valuable trade secret, (3) in violation of an express or implied contract or duty not to disclose. 18 USC § 1839; NRS 600A.  Contrary to the representations of Defendants, both the federal statute and NRS 600A permit an injunction to remain in place even after a trade secret is made public "to eliminate commercial or other advantage that otherwise would be derived from the misappropriation." NRS 600A.040(1.).

As set forth in the Motion and the Complaint, Defendants were essentially given the "keys to the kingdom" at the request of a non-party client under express and implied covenants not to disclose the information revealed.  Defendants now conveniently claim that because some of the information they received has now been disclosed in published patent claims, they cannot be liable for having disclosed it earlier before it was ever in the public domain.  This argument fails for two reasons: (i) the information disclosed was far broader than small portion able to secure patent protection, and (ii) the test is not whether the information is now a trade secret but whether it was

6

a trade secret at the time of disclosure.

As to the second argument, Defendants acknowledge that Plaintiff had at least one patent pending at the time Defendants were retained by Aligned to help Aligned design its data center. Defendants argue they were not involved in the designing of the data center, but recorded videos claiming to have been involved in the design of the data center at the "blank page" stage of development. As Defendants' purported business is in auditing data centers based on an actual existing design, Defendants could not have been engaged in performing a risk assessment of a non-existant design, which would necessarily have been the case in order for them to have been involved at "literally" at the "blank page" stage of development. Defendants statement is, therefore, an admission that in contravention of their representation to Plaintiff that they would not design data centers and in violation of the NDAs, they were involved in the design of Aligned's data centers.

That Defendants disclosed Plaintiff's trade secrets is evidenced by Aligned's infringing conduct in building a data center that copies the trade secrets as well as the patent claims of Switch. That *some* of the patent claim information is now public does not relieve Defendants of their duty to maintain the trade secrets while they were confidential as well as the trade secrets that are still confidential. Defendants unlawful disclosures to Aligned permitted Aligned to build a data center based on Switch's proprietary technology—including pending patent claims--*before* such claims were public. The construction, therefore, of Aligned's infringing data center prior to the public disclosure of patent claims infringed thereby coupled with the admissions by Defendants that they were hired at the "blank page" stage to help Aligned design its data centers is enough to show a likelihood of success on the merits and warrant a preliminary injunction.

With regard to the first argument above, pending patent claims were not all that was revealed or disclosed to Defendants. They were given a comprehensive assessment of how the small subset of proprietary information protectable by patents integrated with the far, far larger set of confidential information, including the suite of Switch's proprietary technology involved in Switch's lauded data centers. That these trade secrets too were disclosed is revealed by the

7

integration of these technologies in Aligned's data centers immediately after retaining Defendants to help design such data centers. Defendants misappropriated, through disclosure to Aligned, Plaintiff's valuable trade secrets when they had both an express and an implied duty not to do so. Plaintiff is likely to prevail on the merits of its misappropriation claims.

### *2.   Switch is likely to prevail on its contract claims.*

Defendant MTech's only argument against the breach of contract claim is that it could not have breached any disclosure requirements because the information it received, having subsequently been the subject of issued Switch patent claims, no longer qualifies for trade secret protection. In other words, Defendant MTech admits is it bound by the NDAs, but wholly relies on Defendants arguments against Switch's likelihood of success on its misappropriation claims to defend itself against the breach of contract claims brought against it. Thus, as to any breach of contact defense based on whether the information disclosed in breach of the NDAs qualifies for trade secret protection, a showing by Plaintiff that it will likely succeed on the merits of its misappropriation claims automatically defeats such a breach of contract defense.

As he did in Defendants' Motion to Dismiss, Defendant Fairfax claims he is not bound by the NDAs because he claims he signed them only on behalf of MTech. In response, Plaintiff reasserts its arguments in Opposition to the Motion to Dismiss that Fairfax is bound by the NDAs, and particularly by the 2011 NDA, because (i) he signed them as the identified "Recipient," (ii) the NDA terms require any officer or employee of a company so bound to equally be bound by the NDAs, and (iii) because Fairfax was an intended beneficiary of the NDAs. (ECF 16 at 10-12.)

At a minimum Defendant MTech admits it is and remains bound by the NDAs. The same facts that support Plaintiff's claim that it will likely succeed on the merits of its misappropriation claims support its breach of contract claims. Thus, should the Court concur that Plaintiffs are likely to prevail on their claims for misappropriation of trade secrets, axiomatically, Plaintiffs will also have shown a likelihood of success as to their breach of contract claims against MTech. And, because all of the confidential information MTech received was through the person of Fairfax, any injunction against MTech engaging in data center design or disclosing such information must

8

necessarily enjoin Fairfax.

### B. Switch Has Suffered and is Likely to Continue to Suffer Irreparable Harm Warranting the Requested Injunction.

In their Opposition, Defendants rely upon this Court's holding in *V'Guara, Inc. v. Dec,* 925 F. Supp. 2d 1120 (D. Nev. 2013), and *Bartech Sys. Int'l, Inc. v. Mobile Simple Solutions, Inc.,* 2016 U.S. Dist. LEXIS 68030 at *9 (D. Nev. May 24, 2016) to correctly point out that there is no longer a presumption of irreparable harm in trade secret misappropriation cases. Plaintiff concurs.[2] Nevertheless, as held in both the *V'Guara* case and the *Bartech* matter, Plaintiff meets the showing required to demonstrate a likelihood of irreparable harm in a trade secret misappropriation case. In the *V'Guara* and the *Bartech* cases, this Court found the movant had adequately demonstrated a likelihood of irreparable injury.

V'Guara, Inc., moved for an injunction after learning that its secret formulation for a flavored vodka had been misappropriated. After declining to apply the presumption of irreparable harm to a misappropriation of trade secrets matter, the Court found as follows:

> Even without this presumption, the Court finds that Plaintiff will likely suffer irreparable harm without the requested temporary restraining order. Specifically, "[p]ublic disclosure of a trade secret destroys the information's status as a trade secret." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006). Such destruction causes irreparable harm to the trade secret owner "by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money." *Id.* (citations omitted). Such harms are unlikely to be adequately redressed by monetary damages.

*V'Guara,* at 1126. On finding that V'Guara had "invested several years and hundreds of thousands of dollars in the development, manufacturing, marketing and distribution of its Gurana [sic] Vodka", *id.*, this Court found:

> As such, Plaintiff would likely suffer irreparable injury because disclosure of Plaintiff's secret formulation would allow its

---

[2] Plaintiff accordingly acknowledges that these references to cases in support of a presumption in its Motions were in error: *EchoMail, Inc. v. Am. Express Co.,* 378 F. Supp. 2d 1, 4 (D. Mass. 2005); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 2004 WL 1497688 (D. Mass. 2004); *FMC Corp v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984); *Donald McElroy, Inc. v. Delany*, 389 N.E.2d 1300, 1308 (1st Dist. 1979). (Motion at 11.)

9

>competitors to reproduce its work without investing equal amounts of time and money.

*Id.*

Here "Switch has been designing, constructing, and operating data centers since early 2000" (ECF 1-1, Exh. 5), and has not mererly invested hundreds of thousands of dollars in the development of its suite of trade secrets, but millions. (Castor Decl. at ¶ 6-7.) Moreover, Aligned, as a direct competitor of Switch, is actively promoting as its own designs the trade secreted designs of Switch and is touting Fairfax's expertise in the construction of its data centers to attract and sell its services to potential clients of Switch. (*Id.* at ¶ 9-13.) These activities have already impacted Switch's current business negotiations with significant clients, and will continue to do so. (*Id.* at ¶ 14.)

In fact, potential Switch clients have insisted that Aligned's facility are identical to Switch's. (*Id.* at ¶ 11; *see also* Statement of Switch Facility Tour Guest, dtd. Aug. 7, 2017, attached hereto as Exhibit 2 (noting the Arizon data center, which was understood as a reference to Aligned's data center in Arizona, "looked just like Switch in its caging and cooling").), As noted in the Declaration of Switch inhouse counsel, the reference to "caging and cooling" was understood in context to be a reference to Switch's "proprietary hot aisle containment technology known as TSCIF." (Exhibit 2; *Id.* at ¶ 9-13.) As set forth herein, therefore, the disclosure of Switch's trade secrets destroys their value and causes irreparable harm to Switch "by both depriving [Switch] of the unique property interest and good will engendered thereby and by allowing [] competitors to reproduce [Switch's] work without an equivalent investment of time and money." *See e.g. V'Guara* at 1126.

Similarly, the plaintiff in the *Bartech* case alleged misappropriation of its trade secrets by defendant in the devopment of defendant's competing software product for use in managing hotel minibars. *Bartech Sys. Int'l, Inc,* at *9. Upon a showing that the defendant was "competing for Bartech's existing customers" with a product allegedly incorporating Bartech's trade secrets, "the Court accordingly [found] that Bartech [had] presented sufficient evidence to demonstrate a likelihood of irreparable harm in the form of lost customers, diminished consumer goodwill, and

10

reputational harm." *Id.* at 15.

The same is true in the instant case. While Defendants are not direct competitors of Switch, Aligned is. (Castor Decl. at ¶ Aligned is seeking the same national customers Switch solicits and is using and touting the technology it obtained from Defendants in order to do so. (Castor Decl. at ¶ 9.) Thus, in facilitating Aligned's acquisition of Plaintiff's trade secrets, Defendants, unless enjoined, are providing a direct competitor, with products incorporating Plaintiff's trade secrets, destroying their value to Switch, and diminishing Plaintiff's reputation and good will vis-à-vis competitors in the indurstry. (*Id.* at 8-14.) This too is sufficient to demonstrate a likelihood of irreparable harm.

### C. The Balance of Harms and Public Interest Favor Plaintiff.

As discussed, *infra*, Defendant's entire argument in support of its allegation that they would be harmed by the requested injunction is based on the strawman argument that the injunction would prevent Defendants from continuing to provide data center risk assessments. (ECF 12 at 17.) Not so. As expressly stated in the Motion, the injunction merely requires Defendant not to engage in data center design and not to further disclose Switch's trade secrets. Thus, far from preventing Defendants from performing risk assessment work, the injunction would restore the *status quo ante* in which that was all Defendants were doing. Defendants, therefore, are not harmed at all by the requested injunction.

Similarly, because the requested injunction is proper and comports with the public interest in preserving trade secrets for those who lawfully hold them, the public interest also favors the requested injunction.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

11

## IV. CONCLUSION

For the reasons set forth herein, Switch respectfully requests the Court grant its Motion for Preliminary Injunction.

Dated:  December 12, 2017

Respectfully Submitted,

*/s/ F. Christopher Austin*
F. Christopher Austin (NV Bar No. 6559)
**caustin@weidemiller.com**
Ryan Gile (NV Bar No. 8807)
**rgile@weidemiller.com**
**WEIDE & MILLER. LTD.**
10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Tel:  702-382-4804
Fax:  702-382-4805

*Attorneys for Plaintiff Switch, Ltd.*

12

# CERTIFICATE OF SERVICE

I hereby certify that I am an employee of WEIDE & MILLER, LTD. and that on December 13, 2017, I served a full, true and correct copy of the foregoing **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** via CM-ECF to the addressees listed below:

> Marc J. Randazza, Esq.
> Ronald D. Green, Esq.
> Alex J. Shepard, Esq.
> Randazza Legal Group, PLLC
> 4035 S. El. Capitan Way
> Las Vegas, NV 89147
> 702-420-2001
> efc@randazza.com
>
> *Attorneys for Defendants STEPHEN FAIRFAX and MTECHNOLOGY*

                                         */s/ F. Christopher Austin*
                                         An employee of Weide & Miller, Ltd.

# EXHIBIT 1

# EXHIBIT 1

Samuel Castor, Esq.
Nevada Bar No. 11532
**SWITCH, LTD.**
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118

F. Christopher Austin, Esq.
Nevada Bar No. 6559
*caustin@weidemiller.com*
Ryan Gile, Esq.
Nevada Bar No. 8807
*rgile@weidemiller.com*
**WEIDE & MILLER, LTD.**
10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Tel: (702) 382-4804
Fax: (702) 382-4805

*Attorneys for Plaintiff* SWITCH, LTD.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SWITCH, LTD. a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-02651-GMN-VCF<br><br>**DECLARATION OF SAMUEL CASTOR IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Samuel Castor, declare under penalty of perjury under the laws of the United States that the following is true and correct.

1. I am the Executive Vice President of Policy and Deputy General Counsel for Plaintiff Switch, LTD, in the above captioned matter. I am over the age of 21, under no disability, and am competent to testify to the matters contained in this declaration. I make this declaration in support of Switch's Motion for Preliminary Injunction ("Motion").

2. Switch brought this action against Defendants after learning that Defendants had advised and consulted with Aligned Data Centers, LLC ("Aligned") in the construction and

1

operation of data centers employing and infringing Switch's proprietary technology.

3. I am informed and believe that on or about May 2011 and again in August 2015, Switch permitted Stephen Fairfax to conduct and in-depth investigation of Switch's facilities.

4. Defendants, having worked with Switch on behalf of a mutual client, eBay, were given extraordinary access to all of Switch's designs, including extremely sensitive trade secret information and documentation, plans, schematics, and blueprints, operational schedules, and trade secrets under non-disclosure agreements not to ever disclose the same.

5. Central to Switch's innovative technologies are founder Rob Roy's designs. Switch's novel technology and trade secrets has allowed Switch to build and operate its data centers dramatically more cost efficiently than its competitors.

6. I am informed and believe that included among these novel technologies and trade secrets are the following that we set forth in the Complaint in this matter:

- "Electrical and mechanical 'one-lines'" (*Complaint* at ¶11);
- "Operational routines" (*id.* at ¶19);
- "electrical designs" (*id.*);
- "hot aisle containment technology" not covered by published patents (*id.*)
- "cooling and power redundancy designs" (*id.* at ¶23);
- "trade secrets [that] have allowed Switch to provide power to all of its clients, without interruption, for over 15 years" (*id.*);
- "trade secrets [that] allow Switch to achieve a best monthly average power usage effectiveness below 1.1 PUE" (*id.* at ¶24);
- Patent pending claims that were unpublished during the pendency of the patent application process (*Id.* at ¶16);
- Methodology to "deploy up to 50 kilowatts of power per cabinet" without overheating (*id.* at ¶25-26);
- Methodology to deliver "10-times the amount of power otherwise delivered to a competitor's environment without overheating (*id.* at ¶27);
- Systems to provide "100% power delivery and steady temperature control" (*id.*);
- "all of Switch's designs" (*id.* at ¶31);

2

- "extremely sensitive . . . documentation, plans, schematics, and blueprints" (*id.*);
- "operational schedules" (*id.*);
- "the physical infrastructure and layout of the Switch facility" (*id.* ¶¶42, 57);
- "the cabinet layout and configuration" (*id.*);
- "novel cooling designs [not covered by published patents]" and "associated cooling systems" (*id.*);
- "the electrical configuration and pathways" (*id.*);
- "the interplay of various Switch technology and components" (*id.*);
- "operations of the data center unique to Switch" (*id.*)

7. The creation and development of these trade secrets over the past decade together with the manner in which they are incorporated as part of the overall design and operation of Switch's data centers cost Switch and its investors millions of dollars and countless thousands of hours of work and innovation.

8. As acknowledged by third parties that have assessed Switch's data centers as superior to those built by Apple, Google, Facebook, Amazon, Microsoft, and other technology giants (s*ee* http://www.greenpeace.org /international/en/publications/Campaign-reports/Climate-Reports/clicking-clean-2017/; s*ee also* http://datacenterfrontier.com/top-10-cloud-campuses/), the interaction, integration and use of these trade secrets have set Switch apart and above its peers as a leader in the data colocation industry.

9. Aligned is a direct competitor of Switch. Both companies seek the same national clients for their services, an it is not uncommon for such national clients to visit several different data center providers in different states before entering into a contract.

10. This is evidenced by the August 7, 2017, "Statement of [Redacted] Tour Guest", a true and correct copy of which is attached to the Reply in Support of Plaintiff's Motion for Preliminary Injunction as Exhibit 2. That statement from a Switch security manager, reports that a national potential Switch client not only visited Switch's data center in Reno but had also visited an Arizona data center as a potential colocation data center cite.

3

11. That potential client then noted that the data center in Arizona "looked just like Switch in its caging and cooling". The security manager understood the caging and cooling reference as a comparision to Switch's "proprietary hot aisle containment technology known as TSCIF."

12. As part of my job duties I make it a practice to be aware of any competing data centers employing any technology similar to or employing elements of Switch's "hot aisle containment technology." The only facility of which I am aware in Arizona that has "caging and cooling" that would look "just like Switch" is Align's Arizona data center.

13. This is because, as set forth in the Complaint and the Motion, Aligned's data centers copy Switch's designs and incorporate Switch's trade secrets.

14. In addition, as a direct competitor of Switch, Aligned is actively promoting as its own designs the trade secreted designs of Switch and is touting Fairfax's expertise in the construction of its data centers to attract and sell its services to potential clients of Switch.

15. These activities have already impacted Switch's current business negotiations with significant clients, and will continue to do so.

Dated: December 12, 2017

*/s/ Sam Castor*
Samuel Castor

4

# EXHIBIT 2

# EXHIBIT 2

Date:   August 7, 2017

To:     File

From:   Mark Crosby

Re:     Statement of Uber Security Tour Guest

---

On the afternoon of Thursday, August 3rd, 2017, Switch Security Manager Michael Smith and I, conducted a security tour for two Uber employees, Steven Lacy, and Reynaldo Perez as part of an assessment project of potential data centers in consideration for colocation services.  After the tour, one of the tour guests, Steven Lacy, commented to me that he had visited another data center in Arizona as part of his company's assessment project. He said the Arizona data center looked just like Switch in its caging and cooling.  The conversation at that point was brief, as the guest was departing the Tahoe-Reno 1 facility.  I did not have the opportunity to probe the comment further at that time.

My impression was that he was referring to our proprietary hot aisle containment technology known as TSCIF, and our proprietary cooling systems.  The following morning, August 4th, 2017, I contacted Chief Security Officer, Joe McDonald to advise him of this comment.  I was directed to contact in-house counsel and inform them of the conversation.