WILLIAM R. URGA (SBN 1195)
wru@juwlaw.com
**JOLLEY URGA WOODBURY & HOLTHUS**
330 S. Rampart Boulevard, Suite 380
Las Vegas, Nevada 89145
Telephone:     (702) 699-7500
Facsimile:     (702) 699-7555

MICHAEL A. BERTA (*pro hac vice* forthcoming)
michael.berta@arnoldporter.com
JOSEPH FARRIS (*pro hac vice* forthcoming)
joseph.farris@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone:     (415) 471-3100
Facsimile:     (415) 471-3400

*Attorneys for Third Party*
*JONES LANG LASALLE, INC.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada limited liability company,<br><br>        Plaintiff,<br><br>   vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive,<br><br>        Defendants. | Case No. 2:17-cv-02651-GMN-EJY<br><br>**DECLARATION OF MICHAEL A. BERTA IN SUPPORT OF JONES LANGE LASALLE, INC.'S OPPOSITION TO PLAINTIFF SWITCH, LTD.'S MOTION TO COMPEL THIRD PARTY JONES LANG LASALLE TO PROVIDE REQUESTED DOCUMENTS** |

I, Michael Berta, declare as follows:

1.      I am an attorney at Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") and am licensed to practice law in California.  My *Verified Petition* to practice before this Court is forthcoming, and I will be practicing in Nevada under the supervision of local counsel William Urga, a good-standing member of the Nevada State Bar.  I am counsel for third party Jones Lang Lasalle Inc. ("JLL Inc.") in this matter.  I have personal knowledge of the facts stated herein, and I make this declaration in support of Jones Lang LaSalle, Inc.'s Opposition to Switch, Ltd.'s Motion to Compel Documents (the "Motion").

2.      A true and correct copy of Plaintiff's Complaint for Patent Infringement in Case No. 2:17-cv-00574 (E.D. Tex.) (the "Patent Action") is attached hereto as **Exhibit A**.

3.      A true and correct copy of Defendant Aligned Data Centers, LLC's Answer to Plaintiff's Complaint for Patent Infringement and Counterclaims in the Patent Action is attached hereto as **Exhibit B**.

4.      A true and correct copy of an Order n dated July 9, 2018 dismissing all claims with prejudice in the Patent Action is attached hereto as **Exhibit C**.

5.      A true and correct copy of a print-out of the LinkedIn profile for Sam Castor, Executive Vice President of Policy at Switch and counsel of record in this action, which was retrieved at my direction on April 2, 2020 from https://www.linkedin.com/in/samcastor/ is attached hereto as **Exhibit D**.

6.      A true and correct copy of Defendants' Request for a Pretrial Conference and Submission of Protective Order in the present action (Dkt. No. 48) is attached hereto as **Exhibit E**.

7.      A true and correct copy of the Declaration Of Ronald D. Green In Support Of Defendants' Request For A Pretrial Conference And Submission Of Proposed Protective Order in the present action (Dkt. No. 48-2) is attached hereto as **Exhibit F**.

8.      A true and correct copy of Non-party Jones Lang Lasalle Incorporated's Objections To Subpoena To Produce Documents, Information, Or Objects Or Permit Inspection of Premises In A Civil Case served on September 29, 2019, pursuant to the agreement of the parties is attached hereto as **Exhibit G**.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.      In October 2019, I participated in a telephonic meet and confer with Sam Castor about JLL Inc.'s Objections to Switch's Subpoena.  During that call, Mr. Castor stated that a purpose of the Subpoena was to seek evidence because he believed that JLL Inc. could be liable for "contributory patent infringement."

10.      From October 30, 2019 to November 4, 2019, counsel for the parties exchanged a series of emails following up on the telephonic meet and confer.  The final email in that exchange was an email from my colleague Joseph Farris to Mr. Castor on November 4, 2019 at 3:47pm.  Mr. Castor did not respond to that email.  A true and correct copy of that email exchange is attached hereto as **Exhibit H**.

11.      JLL Inc. did not hear from Switch about the Subpoena again until March 13, 2020, when a paralegal working under the direction of Switch's counsel emailed JLL Inc. and stated that Switch intended to file the Motion to Compel on March 17, 2020, and provided a draft of the Motion to Compel for the first time.

12.      Attached hereto as **Exhibit I** is a true and correct copy of a March 18, 2020 letter that I sent to Switch's counsel Sam Castor on in response to Switch's March 13, 2020 email.

13.      Attached hereto as **Exhibit J** is a true and correct copy of email correspondence between counsel for Switch and JLL Inc. from March 13, 2020 to March 20, 2020.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of April, 2020, in Orinda, California.


_____
                    */s/ Michael Berta*
MICHAEL A. BERTA

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SWITCH, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2:17-cv-00574 |
| | § | |
| ALIGNED DATA CENTERS LLC and | § | |
| MTECHNOLOGY INC. | § | <u>JURY TRIAL DEMANDED</u> |
| | § | |
| | § | |
| Defendants. | § | |

## <u>PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT</u>

1.     Switch, Ltd. ("Switch") is a global technology solutions corporation whose core business is the design, construction, and operation of data centers: the infrastructure that powers the internet.  With its innovative, patented technology—technology that provides innovative cooling, resiliency, and efficiency for data centers—Switch has emerged as an industry leader.  Aligned Data Centers LLC ("Aligned") has begun using Switch's technology to attempt to compete with Switch.  Switch brings this action to bring an end to Aligned's infringement of Switch's patents.

2.     Switch also brings this action to hold MTechnology Inc. ("MTechnology") accountable for its role in inducing Aligned's infringement.  Mr. Stephen Fairfax, as President of MTechnology, was given wide access to assess Switch's data center facilities in 2011 and in early 2015.  Switch maintains military-grade security and only granted access to Mr. Fairfax at the request of a Switch customer. Mr. Fairfax agreed to keep the information in strict confidence and signed several confidentiality agreements.

3. In 2011, under a confidentiality agreement, Mr. Fairfax then toured and inspected Switch's facility and spent hours conversing with Mr. Rob Roy—Switch's founder, inventor and CEO—regarding Switch's technology, designs, and business model. Mr. Fairfax praised Switch as uniquely innovative.

4. Despite his assurances and obligations to maintain what he learned from Switch and Mr. Roy in confidence, Mr. Fairfax unlawfully abused Switch's trust and violated his confidentiality agreements.

5. In as early as 2013, without Switch's knowledge or consent, Aligned hired Mr. Fairfax to begin designing data centers. The technology deployed in these facilities mimics—if not mirrors—Switch's technology.

6. Aligned has publicly promoted Mr. Fairfax's integral involvement with a promotional video on their website, and Mr. Fairfax himself has said he was invited to develop designs for Aligned Data Centers at the "blank page stage."[1] Aligned and MTechnology (together, "Defendants") have also begun promoting technology invented and patented by Switch as available at Aligned Data Centers. Aligned is currently using Switch's technology to attract clients for its Arizona and Texas facilities. To promote these facilities, the Defendants are touting the same efficiency and scalability benefits that are available in Switch's data center facilities and that would be much more difficult to obtain but for use of Switch's technology. In doing so, the Defendants are unlawfully and intentionally infringing Switch's patents, unfairly forcing Switch to compete with its own technology, and causing significant, irreparable harm to Switch.

---

[1] *See* https://www.youtube.com/watch?v=KZRwktOCvdo (last visited Aug. 6, 2017).

7.     Even the untrained eye can appreciate Aligned's infringement when Switch's technology, known as the Switch T-SCIF® (a "Thermal Separate Compartment in Facility"), is viewed side-by-side with Aligned's "Customer Pod".  Switch provides the following comparisons for the Court's convenience:

**Switch's T-SCIF**
Side View

**Aligned's "Customer Pod"**
Side View




**Switch's T-SCIF**
Front View

**Aligned's "Customer Pod"**
Front View



**Switch's T-SCIF**
Top View Showing the Heat Shield

**Aligned's "Customer Pod"**
Top View Showing the Heat Shield




## THE PARTIES

8.  Plaintiff Switch, Ltd. is a limited liability company organized and existing under the laws of the State of Nevada, and maintains its principal place of business at 7135 S. Decatur Blvd in Las Vegas, Nevada 89118.

9.  Defendant Aligned Data Centers LLC is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Aligned Data Centers LLC's principal place of business is located at 60 Backus Avenue, Danbury, Connecticut 06810.

10. Defendant MTechnology Inc. is a Massachusetts corporation organized and existing under the laws of the State of Massachusetts. MTechnology Inc.'s principal place of business is 2 Central St. Saxonville, Massachusetts 01701.

## JURISDICTION AND VENUE

11. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12. This Court has personal jurisdiction over Defendants. Aligned Data Centers LLC conducts business and has committed acts of patent infringement and has induced acts of patent infringement by others in this district.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, Aligned Data Centers LLC has committed acts of infringement in this district and has a regular and established place of business in this district. Specifically, Aligned has a large data center facility located at 2800 Summit Ave., Plano TX 75074. Thus, Aligned has a physical presence in the district. It also touts its presence in the district on, for example, its website. It receives benefits from its location in the district by, for

example, selling the use of its facility to customers. It has targeted interactions with the district by, for example, hiring employees, entering into contracts for use of its facility located in the district, and promoting the benefits of its location in the district.

14. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to MTechnology Inc. because MTechnology has committed acts of infringement in this district as described below. Additionally, MTechnology has a regular and established place of business in the district. MTechnology, through at least its President Steve Fairfax, had a "seat at the table" in the design of Aligned Data Center's data centers during the very beginning of the design process, including at the Plano data center location. MTechnology was physically in the district at least during the construction phase of Aligned's Plano data center. MTechnology benefitted significantly—via either revenue, potential ownership, or otherwise—from its work in connection with the design of the Plano data center. MTechnology also benefited from its use of the data center in the district as its own marketing tool. MTechnology also has targeted interactions with the district. For example, MTechnology did a reliability study of the Plano facility. MTechnology has performed checks and likely will continue to perform periodic checks on Aligned Data Centers LLC's facility in the district. Additionally and relatedly, given MTechnology's continued marketing of Aligned Data Centers LLC, including their facility in the district, it is also likely that MTechnology maintains ongoing contractual relationships with at least Aligned related to its facility in the district.

## **PATENTS-IN-SUIT**

15. On December 6, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,072,780 (the "'780 patent") entitled "Integrated Wiring System and Thermal Shield Support Apparatus for a Data Center," attached as Exhibit A.

16.   Switch owns all rights, title, and interest in and to the '780 patent and possesses all rights of recovery.

17.   On May 15, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,180,495 (the "'495 patent") entitled "Air Handling Control System for a Data Center," attached as Exhibit B.

18.   Switch owns all rights, title, and interest in and to the '495 patent and possesses all rights of recovery.

19.   On April 11, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,622,389 (the "'389 patent") entitled "Electronic Equipment Data Center and Server Co-Location Facility Configurations and Method of Using the Same," attached as Exhibit C.

20.   Switch owns all rights, title, and interest in and to the '389 patent and possesses all rights of recovery.

## **GENERAL ALLEGATIONS**

### **I.     Switch's Innovative Technology**

21.   Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

22.   Switch designs, constructs, and operates the physical infrastructure that cools, powers, protects and connects the internet.

23.   Switch's designs have allowed Switch to become known as one of the best in the industry at building and operating data center technology ecosystems.

24.   Switch has received various awards for Rob Roy's inventions, including being ranked as the World's No. 1 cloud campus by industry publication Data Center Frontier.[2]  Switch

---

[2] *See* http://datacenterfrontier.com/top-10-cloud-campuses/.

was ranked above Google, Amazon, Apple, Microsoft, Facebook, DuPont Fabors, Digital Realty, the NSA, and Equinix.

25. Switch's customers include Intel, Amazon, Microsoft, Disney, Sony, Fox, Machine Zone, and hundreds more. A partial list of Switch's customers is available at http://www.switch.com/clients/.

26. At the heart of Switch's innovative technologies are Rob Roy's inventions including, but not limited to, Switch's patented hot aisle containment technology and multi-mode cooling technologies. The heat containment technology is known in the industry as the Switch T-SCIF (the "T-SCIF Technology").

27. Computer servers necessary to power the internet consume immense amounts of power. This power consumption generates heat. The problems in efficiently and effectively dealing with this heat have been long-felt in the industry and have proven to be a limiting factor in data center operation.

28. Switch's T-SCIF Technology allows for greater efficiencies and greater computer-server density use by containing up to 100% of the heated air emitted by servers and channeling that heat directly to Switch's cooling technology systems.

29. In a traditional data center, a single server cabinet may consume 3-5 kilowatts of power. However, Switch's T-SCIF Technology permits its customers to deploy up to 50 kilowatts of power.

30. Said differently, Switch's modular technologies allow customers to consume 10 times the amount of power that may be consumed in a traditional environment without overheating their equipment or the data center. Switch's technologies have allowed Switch to fully utilize its data center floor space and has helped customers reduce their costs for data center

deployment, all while delivering maximum power delivery and steady temperature and humidity control. All of this is provided in a modular fashion.

31. Based on Switch's unique approach to data center technology, Switch has been able to operate its data centers more efficiently than its competitors and has solved one of the biggest threats to data center efficiency: containing and channeling server heat. Switch's patented and patent-pending technology allow Switch to achieve a best monthly average power usage effectiveness (an industry term often referred to as "PUE") below 1.1, a feat that is unique in the colocation data center industry.[3]

32. In addition to offering unique cooling efficiencies, Switch's technology has permitted Switch to provide steady cooling and power to all of its clients *without interruption* for over 15 years. Although the electric utility may lose power, Switch's designs ensure that a customer will not exceed key temperature thresholds or lose power.

33. Switch offers unique, heat containment data center services because Switch's heat containment technologies allow customers to consume more power in a given space. This in turn allows customers to reduce their overall data center floor space need and save on the overall cost of data center space.

## II. Aligned's Unauthorized Infringement

34. Switch recently learned of Aligned's unauthorized infringement of Switch's patented designs and technology. Upon further investigation, Switch discovered that Mr. Fairfax was instrumental in the design of the Aligned Data Centers in Plano, Texas and Phoenix, Arizona, and the associated technology, from the beginning.

---

[3] *See* https://www.switch.com/sustainability/#sustainable-by-design.

35.     On July 21, 2017, Switch sent correspondence to the CEO of Aligned Data Centers, Mr.
Andrew Schaap.  Switch expressed its curiosity at Aligned's data center designs and
extended an invitation to dialogue and seek a business resolution. A copy of the
correspondence is attached as Exhibit D.

36.     Switch did not hear back from Mr. Schaap, and has yet to hear from him.

37.     After further investigation, and as the facts became even more clear that Mr. Fairfax helped
design Aligned's data centers, Switch sent a litigation hold letter to Mr. Fairfax and to the
CTO of Aligned Data Centers, Mr. Jakob Carnemark on July 27, 2017, a copy of which is
attached as Exhibit E.

38.     Switch did not hear back from either Mr. Fairfax or Mr. Carnemark until it received a
threatening correspondence from Aligned's outside counsel on August 2, 2017.  A copy of
this correspondence is attached as Exhibit F.

39.     In its August 2 letter, Aligned insisted that Switch had "been communicating with potential
customers and with data center brokers, including third parties in San Francisco, CA, and
asserting that Aligned infringes Switch's patents" and demanded that Switch, within two
days, respond to its letter and agree to issue "corrective statements."[4]

40.     In view of Aligned's threatening letter and decision to interface via outside litigation
counsel, all while faced with growing irreparable harm from Aligned's continued
infringement, Switch filed the instant suit.

### III.     Aligned's Data Centers

41.     Aligned recently opened data centers in two markets, namely Plano, Texas and Phoenix,
Arizona.   Aligned builds their facilities in a modular fashion, like Switch, to match

---

[4] See Exhibit F, pg. 2-3.

construction costs with customer demand. Aligned has provided an image of the anticipated build-out of its first data center, located in Plano Texas, in its online marketing materials, *see*, *e.g.*:

**Aligned Plano Texas Rendering**          **Plano Texas Google Earth Image**

          

42. However, as evidenced by the above satellite image of Aligned's Plano facility, which depicts empty dirt lots next to the facility, Aligned might not have fully constructed its Plano facility. Rather, it appears that Aligned is waiting to finish the facility while it actively pursues customers and promotes Switch's technology as its own to support the continued construction of its facilities.

43. Aligned's plans to unlawfully promote Switch's technology as its own are not isolated to its current, infringing data centers. Aligned is advertising it will eventually operate in six markets: Plano, Texas; Phoenix, Arizona; Northern California; Northern Virginia; Northern New Jersey; and Chicago, Illinois.

44. Nor is Aligned bashful in how it uses others' technology. Keith Dines, Director of Aligned Data Centers, explains on the Aligned website: "If there is new technology that will improve efficiency or lower the cost to operate our data centers, we will embrace it whole-heartedly."[5]

---

[5] *See* https://www.youtube.com/watch?v=fvlMKfZU9OI.

### IV.    Stephen Fairfax

45.    Around May 2011, Stephen Fairfax was given an in-depth tour of Switch facilities.  He was also given very unique and special access to all of Switch's designs.  Mr. Fairfax was permitted this unique access for a very limited purpose.  Namely, he had been retained by one of Switch's clients to conduct an in-depth audit of the Switch technology to provide an independent assessment of Switch's technology.  Mr. Fairfax was given access to all of Switch's designs, including extremely sensitive documentation, plans, schematics, blueprints, and operational schedules so that he might complete his review.

46.    Prior to granting Mr. Fairfax access to any Switch facility or information, Mr. Fairfax was required to sign a comprehensive Non-Disclosure Agreement (the "2011 NDA"). Before being granted access to Switch's protected materials and the environment within the data center, Mr. Fairfax and MTechnology committed to keep confidential any Confidential Information (as defined in the 2011 NDA).

47.    Following the tour and a thorough evaluation of Switch's technology, on May 10, 2011, Mr. Fairfax emailed Switch to express his gratitude for the tour.  He specifically thanked Switch for the "very thorough tour" and the "the generous amount of time Switch's CEO spent discussing the data center, the business model, and a variety of other very interesting topics."[6]

48.    In 2013, Switch's client again asked Mr. Fairfax to tour Switch's facility and evaluate evolutions in Switch's designs.  Mr. Fairfax praised Switch by noting, "[Switch] is an interesting site, unusual architecture, especially the cooling system."[7]

---

[6] See Exhibit G (email dated May 10, 2011 from Defendant Fairfax to Switch).
[7] See Exhibit H (email dated May 24, 2013 from Mr. Fairfax to eBay).

49. Mr. Fairfax also noted that he had previously spent "over 4 hours one-on-one with Rob Roy during my initial visit," and he stated that "I tried then to assure [Mr. Roy] that I have no interest in building and operating data centers." Nevertheless, Mr. Fairfax stated that a "PRA [private risk assessment] should be informative for him as well as for you, and us."[8]

50. Around August 2015, again at the request of Switch's client, Mr. Fairfax was once more granted this unique access to Switch under similar circumstances to evaluate new evolutions in Switch's technology. Mr. Fairfax was again required to execute a Non-Disclosure Agreement (the "2015 NDA", together with the 2011 NDA, the "Non-Disclosure Agreements").

51. Under the confidentiality protections of the 2015 NDA, Mr. Fairfax was given the opportunity to inspect, tour, and view: (i) the physical infrastructure and layout of the Switch facility, specifically the cabinet layout and configuration known as Switch's T-SCIF; (ii) Switch's novel cooling designs, specifically the multi-mode exterior wall penetrating HVAC system, the cabinet layout and configuration, as well as other technology unique to Switch and necessary to cool the data center; (iii) the electrical configuration and pathways; (iv) the interplay of various Switch technology and components; and (v) the operations of the data center unique to Switch.

52. Pursuant to the Non-Disclosure Agreements, neither Defendant MTechnology nor Mr. Fairfax were permitted to disclose any confidential information learned during Mr. Fairfax's tour and audit or to use any confidential information for their benefit or the benefit of others. Defendant MTechnology and Mr. Fairfax failed to keep their contractual commitment.

---

[8] See Exhibit H.

-12-

## V.     Relationship between Aligned Data Centers and Stephen Fairfax

53.     Around or before 2015, Stephen Fairfax was introduced to Aligned by Inertech, one of Aligned's subsidiaries.  Mr. Fairfax was retained by Aligned Data Centers and asked to design its data centers.  Mr. Fairfax was instrumental in the design of Aligned's data center technology.  According to Mr. Fairfax, "Aligned was unique in that they approached us while the paper was literally still blank."[9]

54.     Mr. Fairfax was involved at every stage of the design and execution of Aligned's data centers, and is, to this day, highlighted on the Aligned website as a spokesperson promoting the design of Aligned's data centers.

## VI.     Aligned Data Center Design

55.     Based on the completed design of the Aligned data centers, Switch believes that Mr. Fairfax improperly encouraged Aligned to implement Switch's technology in the design and makeup of the Aligned data centers.  As examples, Aligned's facilities mimic: (i) Switch's physical infrastructure, heat containment cabinet layout, and configuration; (ii) the electrical pathway configuration; (iii) the interplay of various component parts; and (iv) the operations of the data center unique to Switch.

56.     It should also be noted that, similar to Switch, Aligned is now claiming a PUE of 1.15 and the ability to reach per cabinet/rack KW consumption of 50 KW.  Switch believes that these PUE and per-rack KW potentials are only be possible through the use of Switch's technologies.

---

[9] *See* https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers.

## <u>COUNT ONE: DIRECT INFRINGEMENT BY ALIGNED DATA CENTERS LLC</u>

57.    Aligned Data Centers LLC has made, makes, has used, uses, has sold, sells, has offered to

sell, and offers to sell infringing data centers.

58.    Aligned's data centers practice at least one claim of the '780 patent.  An example claim,

claim 1, recites:

> An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, and supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned in a two rows and separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

>> a plurality of support brackets disposed along each of the two rows that support the distribution power wires and conduits, the electronic equipment power wires and conduits, and the communication wiring on one side of the plurality of support brackets, and support the thermal shield on another side plurality of support brackets, wherein a portion of each of the support brackets is adapted for connection above the plurality of cabinets, each of the support brackets including, in the portion adapted for connection above the plurality of cabinets:

>> a plurality of tiered ladder rack supports on the one side to establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring, and

>> a plurality of conduit holders disposed on the one side above the plurality of tiered ladder rack supports, each of the conduit holders in each of the plurality of support brackets aligned with corresponding ones of conduit holders in the other plurality of support brackets, for holding a plurality of the distribution power wires and conduits.

59.    As shown in the picture below, Aligned's data centers contain an apparatus with "support

brackets," "cabinets," a "thermal shield," "tiered ladder racks supports," and "conduit

holders" as claimed in the '780 patent:



Source: https://www.youtube.com/watch?v=FrlpEbBo37c at 1:25 (last visited Aug. 6, 2017).



Source: https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:19 (last visited Aug. 6, 2017).

60.     Aligned's data centers infringe at least one claim of the '389 patent. An example claim, claim 1, recites:

An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, for supporting a thermal barrier ceiling, for supporting cool air ductwork and for supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned into two parallel rows that are separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

an interior frame structure that is independent of and not structurally tied to the plurality of cabinets, the interior frame structure including:

a first plurality of vertical support brackets disposed only at ends of the two rows, each vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the first plurality of vertical support brackets each further support portions of the thermal shield on one side of the first plurality of vertical support brackets at a location above a top of the plurality of cabinets, wherein the cabinets positioned in the two parallel rows are separated by the hot aisle area, and wherein a cross sectional area of the hot air containment chamber defined by the thermal shield and parallel with the floor is disposed directly above and encompasses a cross sectional area of the hot aisle area that is located between the two parallel rows of cabinets and is parallel with the floor;

a first horizontal support bracket disposed above a cabinet height that intersects a middle hot aisle portion so that an area on two opposite sides of each hot aisle where the cabinets can be placed does not have any vertical support brackets disposed therein;

a second plurality of horizontal support brackets that are each parallel with the floor, each of the second plurality of horizontal support brackets connecting together two different ones of the first plurality of vertical support brackets and connecting to each of the two different ones of the first plurality of vertical support brackets at a height that is above the cabinet height;

a plurality of tiered ladder rack supports, each connected to another side of at least some of the first plurality of vertical support brackets that is opposite the one side, which establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different

-16-

tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring; and

a second plurality of vertical support brackets disposed in a row, substantially parallel to the two rows, each second vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the second plurality of vertical support brackets each further support portions of the cool air ductwork.

61. As shown in the pictures below, Aligned's data centers contain an apparatus with "vertical support brackets," "horizontal support brackets," "tiered ladder rack supports," a "thermal barrier ceiling" and "thermal shield" as claimed in the '389 patent:



Source: *Aligned Plano: Power and Cooling on Demand*, DataCenter Dynamics, http://www.datacenterdynamics.com/content-tracks/colo-cloud/aligned-plano-power-and-cooling-on-demand/97039.fullarticle (last visited Aug. 7, 2017).



1.15 PUE

0:03 / 0:29

Source: https://www.youtube.com/watch?v=q2nXSUi7Ag8&feature=youtu.be&t=6 at :03 (last visited Aug. 7, 2017).

62.     Aligned's data centers infringe at least one claim of the '495 patent.  An example claim,

claim 1, recites:

An apparatus for cooling electronic equipment contained within a floor of a building, in conjunction with a plurality of air conditioning units that each create cool air and include an exhaust fan and a cooling fan and a plurality of actuators that control a plurality of dampers associated with the plurality of air conditioning units, the apparatus comprising:

a plurality of cabinets disposed on the floor of the building for holding the electronic equipment therein, the plurality of cabinets positioned in a plurality of rows within each of a plurality of cabinet clusters so that the electronic equipment disposed within the cabinets emit heated air from the cabinets in each row of each cabinet cluster toward a central hot air area associated with each cabinet cluster;

a hot air containment chamber disposed within the building over each of the plurality of cabinet clusters that traps the heated air within the central hot air area and causes substantially all the heated air within the central hot air area to rise up within the hot air containment chamber and exit through a hot air escape opening of the associated hot air containment chamber;

-18-

a warm air escape gap disposed within the building and disposed above each of the hot air containment chambers, the warm air escape gap collecting the heated air from each of the hot air containment chambers and feeding the heated air to the air conditioning units, the warm air escape gap being lowerly bounded by a ceiling, wherein the ceiling contains ceiling openings that each align with one of the hot air escape openings in each of the hot air containment chambers;

cool air ducts disposed within the building that deliver the cool air from the plurality of air conditioning units toward a periphery of the plurality of rows of cabinets within each of the plurality of cabinet clusters; and

a control system, the control system comprising:

a plurality of temperature sensors, at least one temperature sensor located inside each of the central hot air areas associated with each cabinet cluster, at least one temperature sensor located outside each of the plurality of cabinet clusters, and at least one temperature sensor located in the warm air escape gap; a plurality of pressure differential sensors, at least one pressure differential sensor located inside each of the plurality of hot air containment chambers, at least one pressure differential sensor located outside each of the plurality of hot air containment chambers, and at least one pressure differential sensor located in the warm air escape gap; and

a computer system, the computer system receiving signals from each of the plurality of temperature sensors and each of the plurality of pressure differential sensors, and providing control signals to control the exhaust fan, the cooling fan, and the plurality of actuators in order to control the temperature of the cooled air and a pressure differential that exists between an area within the hot air containment chamber for each of the cabinet clusters and a different area outside of each of the cabinet clusters.

63.     As shown in the pictures below, Aligned's data centers comprise an apparatus with "cabinets," a "hot air containment chamber," and a "warm air escape gap" as claimed in the '495 patent.



Source: https://www.youtube.com/watch?v=2YnPQ4KmMKU at 0:06 (last visited Aug. 7, 2017).



Source: https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:22 (last visited Aug. 7, 2017).

64. Aligned's data centers also comprise an apparatus with a "control system" as claimed in the '495 patent with its data center infrastructure management (DCIM) software and/or Inertech's controller in conjunction with pressure differential and temperature sensors. *See, e.g.*, Exhibits I-J.

65. For example, Aligned describes its system as one that is a "responsive" cooling system that provides an environment that "dynamically adapts to IT loads."[10]

66. Aligned advertises its "Client Portal" for Data Center Information Management as including information related to "all of the components of your colocation environment, including footprint-level, rack-level, cooling system, and power system performance and utilization."[11]

67. Inertech describes its controller as follows: "When this free-cooling cycle requires assistance, Inertech's controller brings the Danfoss Turbocor compressor online to provide incremental compression." Exhibit K.

## <u>COUNT TWO: INDIRECT INFRINGEMENT BY ALIGNED</u>

68. Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

69. Aligned Data Centers LLC has actual knowledge of the patents-in-suit or was willfully blind to those patents.

70. On July 21, 2017, Switch wrote to Aligned Data Centers informing Aligned of the '780 and '389 patents. The '495 Patent is part of the same patent family.

---

[10] Available at https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:25-1:46 (last visited Aug. 7, 2017).
[11] *See* https://www.aligneddatacenterns.com/whats-inside/client-portal.

71. Aligned Data Centers LLC indirectly infringes the patents-in-suit by inducing infringement by others, such as its customers using the data centers, by, for example, encouraging those customers to use the infringing apparatuses described above.

72. Aligned took the above actions intending to cause infringing acts by others.

73. Aligned was aware of the patents-in-suit and knew that the others' actions, if taken, would constitute infringement of the patents-in-suit. Alternatively, Aligned believed there was a high probability that others would infringe the patents-in-suit but remained willfully blind to the infringing nature of others' actions.

74. Aligned therefore infringes the patents-in-suit under 35 U.S.C. § 271(b).

## COUNT THREE: INDIRECT INFRINGEMENT BY MTECHNOLOGY

75. Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

76. MTechnology had actual knowledge of the patents-in-suit or was willfully blind to those patents.

77. MTechnology President, Stephen Fairfax, toured Switch's Las Vegas facilities once in or near May 2011 and once in or near August 2015. The purpose of these tours was to inspect the facilities on behalf of Switch's largest client.

78. In 2011, in connection with his inspection, Mr. Fairfax was told that there were patents issued and pending on Switch's T-SCIF design.

79. In 2013, Mr. Fairfax specifically praised Switch's cooling system, of which Switch's T-SCIF design is a part. Mr. Fairfax also represented that MTechnology had "no interest in building and operating data centers."

80. In 2015, it was reiterated to Mr. Fairfax that there were patents issued and pending on Switch's T-SCIF design.

81. In Aligned marketing materials, Mr. Fairfax acknowledges that, notwithstanding his exposure to the intricacies of Switch's innovative data center design, he, on behalf of MTechnology, nevertheless had a "seat at the table to participate" in Aligned's design process and that, in fact, Aligned had approached him at the very beginning of the process "while the paper was literally still blank."

82. By participating with Aligned in its design process for these data centers, MTechnology actively induced Aligned's infringement under 35 U.S.C. §271(b).

83. By participating in the design process, MTechnology took action that encouraged Aligned to go forward with a particular, infringing design for its data centers. As described above, making a data center pursuant to that design infringes the patents-in-suit.

84. As such, MTechnology either knew or was willfully blind to the existence of the patents-in-suit.

85. Additionally, MTechnology either knew or was willfully blind to the fact that Aligned's implementation of its data centers would infringe Switch's patents.

86. MTechnology acted intending to encourage that infringing action by Aligned.

87. Additionally, MTechnology continues to publicly promote Aligned's data centers with knowledge of Aligned's infringing data center designs, for example, via internet videos and quotes posted on Aligned's websites. By continuing to promote Aligned's data centers, MTechnology encourages the infringing use of those data centers by Aligned's customers knowing that the use of those centers would constitute infringement of the patents-in-suit or being willfully blind to that infringement.

## **DEMAND FOR JURY TRIAL**

Switch hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

1.  A judgment that Aligned Data Centers LLC has directly infringed the '780, '389, and '495 patents and that Aligned Data Centers LLC induced the infringement of the '780, '389, and '495 patents.

2.  A judgment that MTechnology has induced Align Data Centers LLC's infringement of the '780, '389, and '495 patents and has induced others to infringe the '780, '389, and '495 patents by encouraging the use of Aligned Data Centers LLC's facilities.

3.  A preliminary and permanent injunction preventing Defendants and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and inducing the infringement of the '780, '389, and '495 patents;

4.  A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding to Switch its attorneys' fees incurred in prosecuting this action;

5.  A judgment and order requiring Defendants to pay Switch damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed;

6.  A judgment and order requiring Defendants to pay Switch the costs of this action (including all disbursements);

7.  A judgment and order requiring Defendants to pay Switch pre-judgment and post-judgment interest on the damages awarded;

8.  A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that Switch be awarded an ongoing licensing fee; and Such other and further relief as the Court may deem just and proper.

-24-

DATED: August 7, 2017

Respectfully submitted,

**CALDWELL CASSADY & CURRY P.C.**

Bradley W. Caldwell
Texas State Bar No. 24040630
Email: bcaldwell@caldwellcc.com
John Austin Curry
Texas State Bar No. 24059636
Email: acurry@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

Harry L. Gillam Jr.
State Bar No. 07921800
Melissa R. Smith
State Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

**ATTORNEYS FOR PLAINTIFF
SWITCH, LTD.**

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

SWITCH, LTD.

            Plaintiff,

    v.

ALIGNED DATA CENTERS, LLC and
MTECHNOLOGY, INC.

           Defendants.

CIVIL ACTION NO. 2:17-cv-574-JRG

**JURY TRIAL DEMANDED**

---

**DEFENDANT ALIGNED DATA CENTERS, LLC'S ANSWER TO
PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Aligned Data Centers, LLC ("Aligned") answers the Complaint for Patent Infringement of Plaintiff Switch, Ltd. ("Switch") as follows:

1.      Aligned specifically denies that it has committed any acts of infringement. Aligned is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 1 of the Complaint, and therefore denies them.

2.      Aligned denies the allegations contained in paragraph 2 of the Complaint to the extent and as they relate to Aligned. Moreover, Aligned specifically denies that it has committed any acts of infringement. To the extent the allegations in paragraph 2 of the Complaint are directed to MTechnology, Inc. ("MTechnology"), Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint.

3.      Aligned denies the allegations contained in paragraph 3 of the Complaint to the extent and as they relate to Aligned. Moreover, Aligned specifically denies that it has committed any acts of infringement. To the extent the allegations in paragraph 3 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 of the Complaint.

4.     Aligned denies the allegations contained in paragraph 4 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 4 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Complaint.

5.     Aligned denies the allegations contained in paragraph 5 of the Complaint.

6.     Aligned denies the allegations contained in paragraph 6 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 6 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6 of the Complaint.

7.     Aligned denies the allegations of paragraph 7 of the Complaint and specifically denies that it has committed any acts of infringement.

## THE PARTIES

8.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 of the Complaint.

9.     Aligned admits that it is a Delaware limited liability company and has its principal place of business at 60 Backus Avenue, Danbury, CT.  Aligned denies the remaining allegations of paragraph 9 of the Complaint.

10.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10 of the Complaint.

## JURISDICTION AND VENUE

11.     The allegations in paragraph 11 are legal conclusions to which no answer is required.  To the extent any answer is required, Aligned admits that this action involves the United States patent laws, and that this Court has subject matter jurisdiction over patent law claims.  Aligned denies any remaining allegations in paragraph 11.

12.     The allegations in paragraph 12 are legal conclusions to which no answer is required.  To the extent that any answer is required, Aligned does not contest that there is personal jurisdiction in Texas solely for the purpose of this action.

13.     Aligned admits that it has transacted business in the States of Texas, that it has performed services at the facilities of an affiliate located at 2800 Summit Ave., Plano, Texas 75074, and that venue for this case is governed by 28 U.S.C. § 1400(b).  Aligned denies that venue is convenient in the Eastern District of Texas. Aligned denies the remaining allegations in paragraph 13 of the Complaint, and specifically denies that it has committed any acts of infringement within the Eastern District of Texas, or any other district in Texas, or anywhere else in the world.

14.     Aligned denies the allegations contained in paragraph 14 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 14 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14 of the Complaint.

## PATENTS-IN-SUIT

15.     Aligned admits that, according to the face of the patent, U.S. Patent No. 8,072,780 ("'780 patent"), which appears to be attached as an exhibit to the Complaint, is entitled, "Integrate Wiring System and Thermal Shield Support Apparatus for a Data Center" and bears an issue date of December 6, 2011.  Aligned denies that the '780 patent is valid.  Aligned is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 15 of the Complaint, and therefore denies them.

16.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15 of the Complaint, and therefore denies them.

17.     Aligned admits that, according to the face of the patent, U.S. Patent No. 8,180,495 ("'495 patent"), which appears to be attached as an exhibit to the Complaint, is entitled, "Air Handling Control System for a Data Center" and bears an issue date of May 15, 2012.  Aligned

3

denies that the '495 patent is valid. Aligned is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 17 of the Complaint, and therefore denies them.

18.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 18 of the Complaint, and therefore denies them.

19.     Aligned admits that, according to the face of the patent, U.S. Patent No. 9,622,389 ("'389 patent"), which appears to be attached as an exhibit to the Complaint, is entitled, "Electronic Equipment Data Center and Server Co-Location Facility Configurations and Methods of Using the Same" and bears an issue date of April 11, 2017. Aligned denies that the '389 patent is valid. Aligned is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 19 of the Complaint, and therefore denies them.

20.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 20 of the Complaint, and therefore denies them.

<u>**GENERAL ALLEGATIONS**</u>

**I.      Switch's Innovative Technology**

21.     In response to paragraph 21 of the Complaint, Aligned incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

22.     Aligned, on information and belief, denies the allegations of paragraph 22 of the Complaint.

23.     Aligned, on information and belief, denies the allegations of paragraph 23 of the Complaint.

24.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24 of the Complaint, and therefore denies them.

25.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25 of the Complaint, and therefore denies them.

26.     Aligned, on information and belief, denies the allegations of paragraph 26 of the Complaint.

27.     Aligned admits that computer servers consume power and generate heat and that effectively and efficiently removing such heat has been an issue in data center operations.  On information and belief, Aligned denies the remaining allegations of paragraph 27 of the Complaint.

28.     Aligned, on information and belief, denies the allegations of paragraph 28 of the Complaint.

29.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 29 of the Complaint, and therefore denies them.

30.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 30 of the Complaint, and therefore denies them.

31.     Aligned, on information and belief, denies the allegations of paragraph 31 of the Complaint.

32.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32 of the Complaint, and therefore denies them.

33.     Aligned, on information and belief, denies the allegations of paragraph 33 of the Complaint.

## II.     Aligned's Unauthorized Infringement

34.     Aligned denies the allegations contained in paragraph 34 of the Complaint.

35.     Aligned admits that a correspondence dated July 21, 2017 is attached as an exhibit to the Complaint and appears to be from Thomas Morton and addressed to Andrew Schaap, Aligned's CEO.  Aligned denies the remaining allegations of paragraph 35 of the Complaint.

36.     Aligned denies the allegations of paragraph 36 of the Complaint.

37.     Aligned admits that a correspondence dated July 27, 2017 is attached as an exhibit to the Complaint and is addressed to Jakob Carnemark, Aligned's CTO.  Aligned denies the remaining allegations contained in paragraph 37 of the Complaint.

38.     Aligned admits that a correspondence dated August 2, 2017 is attached as an exhibit to the Complaint.  Aligned denies the remaining allegations of paragraph 38 of the Complaint.

39.     Aligned admits that the correspondence dated August 2, 2017, which is attached as an exhibit to the Complaint, states, in part, that "Aligned has recently learned that Switch has been communicating with Aligned's potential customers and with data center brokers, including third parties in San Francisco, CA, and asserting that Aligned infringes Switch patents."  Aligned admits that Switch should be required to issue corrective statements regarding its false assertions, and admits that Switch has not done so.  Aligned denies the remaining allegations of paragraph 39.

40.     Aligned denies the allegation of paragraph 40 of the Complaint.

### III.     Aligned's Data Centers

41.     Aligned admits that its affiliates have data center facilities in Plano, Texas and Phoenix, Arizona.  Aligned denies the characterization in paragraph 41 of the Complaint regarding those data centers and the manner in which Aligned and its affiliates build facilities. Aligned is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 41 of the Complaint, and therefore denies them.

42.     Aligned denies the allegations in paragraph 42 of the Complaint.

43.     Aligned denies the allegations in paragraph 43 of the Complaint and specifically denies that it has committed any acts of infringement.

44.     Aligned admits that at around 2:23 to 2:29 of the video found at, https://www.youtube.com/watch?v=fvlMKfZU9OI, the audio states ". . . if there is new technology that will improve efficiency, or lower the cost to operate our data centers, we will embrace it wholeheartedly."  Aligned denies the remaining allegations of paragraph 44 of the Complaint, and specifically denies that it has committed any acts of infringement.

## IV.     Stephen Fairfax

45.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 45 of the Complaint, and therefore denies them.

46.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 46 of the Complaint, and therefore denies them.

47.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 47 of the Complaint, and therefore denies them.

48.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 48 of the Complaint, and therefore denies them.

49.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49 of the Complaint, and therefore denies them.

50.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 50 of the Complaint, and therefore denies them.

51.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 51 of the Complaint, and therefore denies them.

52.     Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 52 of the Complaint, and therefore denies them.

## V.     Relationship between Aligned Data Centers and Stephen Fairfax

53.     Aligned admits that Mr. Fairfax reviewed and discussed Aligned's data center reliability and that at around 1:09 to 1:13 of the video embedded at https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers, the audio states, ". . . Aligned was unique in that they approached us while the paper was literally still blank."  Aligned denies the remaining allegations in paragraph 53 of the Complaint.

54.     Aligned admits that Mr. Fairfax reviewed and discussed Aligned's data center reliability.  Aligned denies the remaining allegations in paragraph 54 of the Complaint and specifically denies that Mr. Fairfax has or had any participation in developing Aligned's data center cooling technology, designs or execution.

## VI. Aligned Data Center Design

55. Aligned is without information sufficient to form a belief as to the truth of the allegations regarding Switch's belief as set forth in paragraph 55 of the Complaint, and therefore denies them. Aligned denies any remaining allegations of paragraph 55 of the Complaint, and specifically denies that it has committed any acts of infringement.

56. Aligned denies the allegations in paragraph 56 of the Complaint and specifically denies that it has committed any acts of infringement.

## COUNT ONE: DIRECT INFRINGEMENT BY ALIGNED DATA CENTERS LLC

57. Aligned denies the allegations in paragraph 57 of the Complaint, and specifically denies that it has committed any acts of infringement.

58. Aligned specifically denies that it has committed any acts of infringement. Aligned admits that paragraph 58 of the Complaint cites to claim 1 of the '780 patent, which states:

1. An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, and supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned in a two rows and separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

a plurality of support brackets disposed along each of the two rows that support the distribution power wires and conduits, the electronic equipment power wires and conduits, and the communication wiring on one side of the plurality of support brackets, and support the thermal shield on another side plurality of support brackets, wherein a portion of each of the support brackets is adapted for connection above the plurality of cabinets, each of the support brackets including, in the portion adapted for connection above the plurality of cabinets:

a plurality of tiered ladder rack supports on the one side to establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring, and

a plurality of conduit holders disposed on the one side above the plurality of tiered ladder rack supports, each of the conduit holders in each of the plurality of support brackets aligned with corresponding ones of conduit holders in the other

plurality of support brackets, for holding a plurality of the distribution power wires and conduits.

59. Aligned denies the allegations in paragraph 59 of the Complaint, and specifically denies that it has committed any acts of infringement.

60. Aligned specifically denies that it has committed any acts of infringement. Aligned admits that paragraph 60 of the Complaint cites to claim 1 of the '389 patent, which states:

1. An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, for supporting a thermal barrier ceiling, for supporting cool air ductwork and for supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned into two parallel rows that are separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

an interior frame structure that is independent of and not structurally tied to the plurality of cabinets, the interior frame structure including:

a first plurality of vertical support brackets disposed only at ends of the two rows, each vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the first plurality of vertical support brackets each further support portions of the thermal shield on one side of the first plurality of vertical support brackets at a location above a top of the plurality of cabinets, wherein the cabinets positioned in the two parallel rows are separated by the hot aisle area, and wherein a cross sectional area of the hot air containment chamber defined by the thermal shield and parallel with the floor is disposed directly above and encompasses a cross sectional area of the hot aisle area that is located between the two parallel rows of cabinets and is parallel with the floor;

a first horizontal support bracket disposed above a cabinet height that intersects a middle hot aisle portion so that an area on two opposite sides of each hot aisle where the cabinets can be placed does not have any vertical support brackets disposed therein;

a second plurality of horizontal support brackets that are each parallel with the floor, each of the second plurality of horizontal support brackets connecting together two different ones of the first plurality of vertical support brackets and connecting to each of the two different ones of the first plurality of vertical support brackets at a height that is above the cabinet height;

a plurality of tiered ladder rack supports, each connected to another side of at least some of the first plurality of vertical support brackets that is opposite the one side,

which establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring;

and a second plurality of vertical support brackets disposed in a row, substantially parallel to the two rows, each second vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the second plurality of vertical support brackets each further support portions of the cool air ductwork.

61.     Aligned denies the allegations in paragraph 61 of the Complaint, and specifically denies that it has committed any acts of infringement.

62.     Aligned specifically denies that it has committed any acts of infringement. Aligned admits that paragraph 62 of the Complaint cites to claim 1 of the '495 patent, which states:

1. An apparatus for cooling electronic equipment contained within a floor of a building, in conjunction with a plurality of air conditioning units that each create cool air and include an exhaust fan and a cooling fan and a plurality of actuators that control a plurality of dampers associated with the plurality of air conditioning units, the apparatus comprising:

a plurality of cabinets disposed on the floor of the building for holding the electronic equipment therein, the plurality of cabinets positioned in a plurality of rows within each of a plurality of cabinet clusters so that the electronic equipment disposed within the cabinets emit heated air from the cabinets in each row of each cabinet cluster toward a central hot air area associated with each cabinet cluster;

a hot air containment chamber disposed within the building over each of the plurality of cabinet clusters that traps the heated air within the central hot air area and causes substantially all the heated air within the central hot air area to rise up within the hot air containment chamber and exit through a hot air escape opening of the associated hot air containment chamber;

a warm air escape gap disposed within the building and disposed above each of the hot air containment chambers, the warm air escape gap collecting the heated air from each of the hot air containment chambers and feeding the heated air to the air conditioning units, the warm air escape gap being lowerly bounded by a ceiling, wherein the ceiling contains ceiling openings that each align with one of the hot air escape openings in each of the hot air containment chambers;

cool air ducts disposed within the building that deliver the cool air from the plurality of air conditioning units toward a periphery of the plurality of rows of cabinets within each of the plurality of cabinet clusters; and

a control system, the control system comprising:

a plurality of temperature sensors, at least one temperature sensor located inside each of the central hot air areas associated with each cabinet cluster, at least one temperature sensor located outside each of the plurality of cabinet clusters, and at least one temperature sensor located in the warm air escape gap;

a plurality of pressure differential sensors, at least one pressure differential sensor located inside each of the plurality of hot air containment chambers, at least one pressure differential sensor located outside each of the plurality of hot air containment chambers, and at least one pressure differential sensor located in the warm air escape gap; and

a computer system, the computer system receiving signals from each of the plurality of temperature sensors and each of the plurality of pressure differential sensors, and providing control signals to control the exhaust fan, the cooling fan, and the plurality of actuators in order to control the temperature of the cooled air and a pressure differential that exists between an area within the hot air containment chamber for each of the cabinet clusters and a different area outside of each of the cabinet clusters.

63.     Aligned denies the allegations in paragraph 63 of the Complaint, and specifically denies that it has committed any acts of infringement.

64.     Aligned denies the allegations in paragraph 64 of the Complaint, and specifically denies that it has committed any acts of infringement.

65.     Aligned admits making the statements quoted in paragraph 65 of the Complaint, but specifically denies that it has committed any acts of infringement.

66.     Aligned admits making the statements quoted in paragraph 66 of the Complaint, but specifically denies that it has committed any acts of infringement.

67.     Aligned admits making the statements quoted in paragraph 67 of the Complaint, but specifically denies that it has committed any acts of infringement.

## **COUNT TWO:  INDIRECT INFRINGEMENT BY ALIGNED**

68.     In response to paragraph 68 of the Complaint, Aligned incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

69.     Aligned admits that it was first provided notice of the '780 patent and the '389 patent via a correspondence from Thomas Morton at Switch, dated July 21, 2017.  Aligned admits that it had notice of the '495 patent as of the Complaint.  Aligned denies the remaining

allegations in paragraph 69 of the Complaint, and specifically denies that it has committed any acts of infringement.

70.     Aligned admits the correspondence from Thomas Morton at Switch, dated July 21, 2017, identifies the '780 patent and the '389 patent.  Aligned is without information sufficient to form a belief as to the truth of the allegations regarding the remaining allegations in paragraph 70 of the Complaint, and therefore denies them.

71.      Aligned denies the allegations in paragraph 71 of the Complaint, and specifically denies that it has committed any acts of infringement.

72.     Aligned denies the allegations in paragraph 72 of the Complaint, and specifically denies that it has committed any acts of infringement.

73.     Aligned denies the allegations in paragraph 73 of the Complaint, and specifically denies that it has committed any acts of infringement.

74.     Aligned denies the allegations in paragraph 74 of the Complaint, and specifically denies that it has committed any acts of infringement.

### COUNT THREE:  INDIRECT INFRINGEMENT BY MTECHNOLOGY

75.     In response to paragraph 75 of the Complaint, Aligned incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

76.     Aligned denies the allegations contained in paragraph 76 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 76 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 76 of the Complaint.

77.     Aligned denies the allegations contained in paragraph 77 of the Complaint to the extent and as they relate to Aligned.  To the extent the allegations in paragraph 77 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 77 of the Complaint.

78.    Aligned denies the allegations contained in paragraph 78 of the Complaint to the extent and as they relate to Aligned.  To the extent the allegations in paragraph 78 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 78 of the Complaint.

79.    Aligned denies the allegations contained in paragraph 79 of the Complaint to the extent and as they relate to Aligned.  To the extent the allegations in paragraph 79 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 79 of the Complaint.

80.    Aligned denies the allegations contained in paragraph 80 of the Complaint to the extent and as they relate to Aligned.  To the extent the allegations in paragraph 80 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 80 of the Complaint.

81.    Aligned denies the allegations contained in paragraph 81 of the Complaint to the extent and as they relate to Aligned and any allegation that Mr. Fairfax has or had any participation in developing Aligned's data center cooling technology, designs or execution. Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 81 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 81 of the Complaint.

82.    Aligned denies the allegations contained in paragraph 82 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 82 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 82 of the Complaint.

83.    Aligned denies the allegations contained in paragraph 83 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 83 of the Complaint are

directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 83 of the Complaint.

84.     Aligned denies the allegations contained in paragraph 84 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 84 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 84 of the Complaint.

85.     Aligned denies the allegations contained in paragraph 85 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 85 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 85 of the Complaint.

86.     Aligned denies the allegations contained in paragraph 86 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 86 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 86 of the Complaint.

87.     Aligned denies the allegations contained in paragraph 87 of the Complaint to the extent and as they relate to Aligned.  Moreover, Aligned specifically denies that it has committed any acts of infringement.  To the extent the allegations in paragraph 87 of the Complaint are directed to MTechnology, Aligned is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 87 of the Complaint.

## DEMAND FOR JURY TRIAL

The Complaint does not contain any allegations to admit or deny with respect to Switch's request for a trial by jury of any issues so triable by right.  Aligned demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

These paragraphs set forth the statement of relief requested by Switch to which no response is required. Aligned denies that Switch is entitled to any of the requested relief and denies any allegations therein.

## **AFFIRMATIVE DEFENSES**

Aligned alleges and asserts the following defenses, affirmative or otherwise, without assuming any burden of proof that it would not otherwise have. In addition to the affirmative defenses described below and subject to its responses above, Aligned specifically reserves all rights to allege additional defenses, affirmative or otherwise, that become known through the course of discovery.

### **FIRST AFFIRMATIVE DEFENSE**

### **FAILURE TO STATE A CLAIM**

The Complaint fails to state a claim upon which relief can be granted because, *inter alia*, the Complaint does not plausibly state a claim of infringement for which relief can be granted.

### **SECOND AFFIRMATIVE DEFENSE**

### **NON-INFRINGEMENT**

For at least the reasons set forth in response to Count One of the Complaint, Aligned does not infringe and has not infringed (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the Patents-In-Suit.

### **THIRD AFFIRMATIVE DEFENSE**

### **INVALIDITY**

The claims of the Patents-In-Suit are invalid under 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112. Aligned reserves the right to identify and rely upon prior art that may be discovered as discovery progresses in this action.

## FOURTH AFFIRMATIVE DEFENSE

## BAR TO DAMAGES

Switch's claims for damages are barred, in whole or in part, under 35 U.S.C. §§ 287 and/or 288.

## FIFTH AFFIRMATIVE DEFENSE

## NO INJUNCTIVE RELIEF

Switch's claim for injunctive relief is barred because any alleged injury to Switch is not immediate or irreparable, and Switch has an adequate remedy at law for any alleged injury.

## RESERVATION OF DEFENSES

Aligned reserves all affirmative defenses under Federal Rule of Civil Procedure 8(c), the patent laws, and any other defenses available at law or in equity that now exist or in the future may be available based on discovery or any other factual investigation concerning this action.

## COUNTERCLAIMS

Counterclaim-plaintiffs Aligned Data Centers, LLC ("Aligned Data Centers"); Aligned Data Centers (DFW), LLC ("ADC DFW") and Aligned Data Centers (Phoenix), LLC ("ADC Phoenix") (collectively, "Aligned") hereby plead the following counterclaims against Counterclaim-defendant Switch, Ltd. ("Switch"), and alleges as follows:

## THE PARTIES

1.      Aligned Data Centers is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 60 Backus Ave., Danbury, CT 06810.

2.      ADC Phoenix is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business located at 2500 West Union Hills Drive, Phoenix, Arizona 85027.

3.      ADC DFW is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business located at 2800 Summit Ave., Plano, TX 75074.

4.      Switch is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business located at 7135 South Decatur Boulevard, Las Vegas, Nevada 89118.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action and the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., and the Patent Act of the United States, 35 U.S.C. §§ 1 et seq.  Aligned seeks a declaration from this Court that its business, its data centers, and the technology, methods, processes, and apparatuses deployed therein do not infringe any valid claim of U.S. Patent Nos. 8,072,780 ("'780 patent"), 8,180,495 ("'495 patent"), and 9,622,389 ("'389 patent") (collectively, "Patents-In-Suit").  Aligned further seeks a declaration from this Court that the Patents-in-Suit are invalid.

17

6.      This Court also has subject matter jurisdiction over this action and the matters pleaded herein under 28 U.S.C. § 1331 because this action arises under the Lanham Act, 15 U.S.C. §§ 1051 et seq.  Aligned alleges that Switch's communications with a potential Aligned customer that is based in California and Switch's communications to others prior to filing this suit constitute unfair competition under applicable federal law.

7.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Aligned's claims for relief under Texas state law.

8.      This Court has personal jurisdiction over Switch as a result of Switch having filed its claims in this district.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) as a result of Switch having filed its claims in this district.

## GENERAL ALLEGATIONS

### Background

10.      Aligned, together with its affiliated entities, is an industry-recognized leading developer of differentiated technology and a provider of data centers and data center services.  It has 60 U.S. and foreign patents and pending patent applications for its mechanical, electrical and design innovations.  Its foundational cooling technology patent applications were accepted into the USPTO's selective "Green Technology Pilot Program" for accelerated review and several patents were issued in 2012 under that program.  Recently, it received an Edison Award in 2016 and has been independently evaluated by MTechnology as the most reliable it has ever assessed. Numerous engineering firms have recognized the novelty of its cooling technology.  (*See, e.g.*, Norman Disney Young Report on the Inertech system, dated December 13, 2012.)

11.      Switch is also a provider of data centers and data center services.

12.      Aligned and Switch are competitors in the field of data center services and, as a result, compete for many of the same customers.

13.     Prior to initiation of this suit, Aligned and, on information and belief, Switch were seeking to execute a contract to provide data center services to a third-party customer located in San Francisco, California (the "California customer").

## The Patents-In-Suit

14.     The '780 patent is entitled, "Integrated Wiring System and Thermal Shield Support Apparatus for a Data Center," was filed on March 30, 2009, and issued on December 6, 2011.  The abstract of the '780 patent states, "Described herein is an integrated data center that provides for efficient cooling, as well as efficient wire routing, and in particular a support for a thermal shield, distribution wiring, as well as cabinet cluster wiring."  The figure on the face of the '780 patent is as follows:



15.     The '389 patent is entitled, "Electronic Equipment Data Center and Server Co-location Facility Configurations and Method of Using the Same," was filed on March 18, 2014, and issued on April 11, 2017.  The abstract of the '389 patent states, "Described herein is an integrated data center that provides for efficient cooling, as well as efficient wire routing, and in particular a configuration in which electronic equipment cabinets are arranged in rows within thermal compartments where the cabinets may be rolled in and out of place as required and a frame supports thermal shields of the thermal compartment."  The figure on the face of the '389 patent is as follows:



16.     The '495 patent is entitled, "Air Handling Control System for a Data Center," was filed on March 30, 2009, and issued on May 15, 2012.  The abstract of the '495 patent states, "Described herein is an integrated data center that provides for efficient cooling, as well as efficient wire routing, and in particular a control system for controlling the temperature and pressure within the data center."  The figure on the face of the '495 patent is as follows:



17.     As acknowledged in the specification of the Patents-In-Suit, a well-known aspect to the design of data center facilities is "to have the electronic equipment placed into rows, and

further to have parallel rows of equipment configured back-to back so that each row of equipment generally forces the heat from the electronic equipment toward a similar area, known as a hot aisle, as that aisle generally contains warmer air that results from the forced heat from the electronics equipment.   In front of the equipment is thus established a cold aisle."  (D.I. 1-1 ('780 patent) at col. 1:49-57; D.I. 1-2 ('495 patent) at col. 1:47-55; D.I. 1-3 ('389 patent) at col. 1:53-61.)   One of the elements the Patents-In-Suit describes and claims as a point of novelty in its system is the use of a thermal shield that defines a hot air containment chamber for compartmentalizing server heat in the hot aisle.  (*See generally* D.I. 1-1, 1-2, 1-3.)  Yet, such shields and chambers have existed in the prior art well before the priority dates of the Patents-In-Suit.

18.     For example, upon information and belief, "Hot Aisle Containment Systems" have been publicly disclosed since at least 2003.  (*See* U.S. Patent No. 6,859,366 (Fink).) Companies such as APC have used such systems and ducted air cooling systems that Switch's technology appears derivative of since at least 2006.  (*See* J. Niemann, APC Application Note #92:  Best Practices for Designing Data Centers with InfraStruXure InRow RC (2006).)  Such hot aisle containment systems can be added to the hot aisle to improve the predictability of its cooling systems, reduce the opportunity for hot air to mix with the room, and improve the sphere of influence of its cooling systems.  (*Id.* at 6.)  APC's hot aisle containment system is made up of roof panels and door kits disposed between two rows of servers for thermal compartmentalization of the heat generated in the hot aisle.  (*Id*. at 6-7.)

19.     In order to ensure that there is adequate cooling capacity for the containment system, APC publishes best practices and factors to consider in designing a solution with hot aisle containment.  (*Id.*)  APC further explains, "The Hot Aisle Containment System" encloses an aisle to collect and cool equipment exhaust, making it available for cool air intakes.  This creates a self-contained system capable of supporting high power density loads." (*See* APC Hot Aisle Containment System, Installation Guide (2005) at 3.)

20.     Beyond the general prior art idea of hot air in aisles of computer equipment, Switch's patent claims at issue are directed to tiered configurations for brackets and rack supports – *i.e.*, the physical mounting for components and wiring racks.  An example of the claimed tiered rack supports is shown in Figure 6A of the '780 and '495 patents:



(*See, e.g.*, D.I. 1-1, Fig 6A, claim 1; D.I. 1-2, Fig. 6A.)  Setting up tiers for electronic components or wiring is not novel, inventive, non-obvious or patentably distinct.  Nor is using brackets to support tiers, or using cable trays to support cables, and further evidentiary support for the non-novel and obvious nature of the asserted claims is likely to be identified after a reasonable opportunity for further investigation and discovery.

### Switch's Accusations Against Aligned

21.     On July 21, 2017, Switch sent a letter to Aligned's Chief Executive Officer, Mr. Andrew Schaap.  (D.I. 1-4.)

22.     Switch's letter purported to be "curious" about the "customer pod" designs in Aligned's data centers.  Switch admitted that it did not have a basis to claim infringement regarding Aligned's proprietary technology, instead stating that it had a "need to evaluate **whether** Aligned Data Center's current facilities or advertised prototypes **may** read on Switch's patents," noting that it had "***questions as to what extent***" there might be any similarity between the competing technologies.

23.     Switch's letter was carefully worded to avoid any accusation or allegation—either express or implied—of patent infringement.  Instead, Switch's letter merely asserts Switch's ownership of the Patents-In-Suit, expresses only a curiosity about the makeup of the "customer pod" designs, requests more information from Aligned regarding Aligned's data centers and "customer pod" designs, and admits to the need to still evaluate Aligned's current facilities to investigate potential unauthorized practice of Switch's patents.  (*See id.*)

24.     Switch's letter invited Mr. Schaap to contact Switch's president, Mr. Thomas Morton, "to avoid error and build a positive relationship."  (*Id.*)  Switch closes its letter "in the spirit of openness and hope for an expedient and amicable resolution."  (*Id.*)

### Switch's Interference With Aligned's Business

25.     Switch's letter was, at best, a purposeful misdirection.  At the same time that it sent a letter of 'curiosity' to Aligned that essentially admitted that it did not have a basis to claim infringement, on information and belief, Switch communicated with a potential customer for whom both Aligned and Switch were vigorously competing, and represented to the customer that Aligned was infringing Switch's patents.  On information and belief, Switch made this representation to the customer, for which it admitted to Aligned that it did not have a basis, for the purpose of seeking to prevent the customer from awarding the pending contract to Aligned instead of Switch.

26.     On information and belief, Switch has repeated its assertions of patent infringement regarding Aligned that Switch admitted it did not have a basis for to other industry participants, seeking to harm Aligned's reputation in the industry and harm Aligned's ability to compete with Switch for business.

27.     Switch admittedly published these statements without adequate knowledge of or investigation into whether or not Aligned's products and services actually infringed any of the Patents-In-Suit.

28.     On information and belief, Switch undertook this conduct with respect to the California customer with the intent to unfairly influence the competition between Aligned and

Switch for the California customer's business and not in an attempt to enforce or assert any rights that Switch may or may not have in the Patents-In-Suit.

29.  On or about July 27, 2017, the California customer notified Aligned of Switch's communications regarding Aligned's alleged infringement of the Patents-In-Suit. This negatively affected Aligned's business prospects with respect to the California customer.

30.  On August 2, 2017, Aligned's outside counsel sent a letter to Switch in response to Switch's July 21 letter, informing Switch that Aligned did not infringe any of the Patents-In-Suit and providing specific examples of non-infringement. (*See* D.I. 1-6.)

31.  Aligned's August 2nd letter further informed Switch that Aligned was aware of the patent infringement accusations Switch made to the California customer and demanded that Switch cease and desist from making such statements due to the direct harm those statements have on Aligned's current and future economic opportunity

32.  Switch did not reply to the August 2nd letter from Aligned's outside counsel.

33.  Instead, five days later, on August 7, 2017, Switch filed the instant suit against Aligned in this Court alleging infringement of the Patents-In-Suit.

34.  On information and belief, Switch appears to have filed the instant action in an effort to shield itself from liability after the fact for its wrongful conduct against Aligned involving at least the California customer.

## <u>COUNT I</u>

### <u>(Declaratory Judgment Of Non-Infringement Of The '780 Patent)</u>

35.  Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-34 above as if fully set forth herein.

36.  Aligned does not infringe and has not infringement (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the '780 patent.

37.  An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '780 patent.

38.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

39.     The Complaint alleges that Aligned infringes claim 1 of the '780 patent.  Claim 1 is the only independent claim of the '780 patent and recites:

> 1.  An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, and supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned in a two rows and separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:
>
>> a plurality of support brackets disposed along each of the two rows that support the distribution power wires and conduits, the electronic equipment power wires and conduits, and the communication wiring on one side of the plurality of support brackets, and support the thermal shield on another side plurality of support brackets, wherein a portion of each of the support brackets is adapted for connection above the plurality of cabinets, each of the support brackets including, in the portion adapted for connection above the plurality of cabinets:
>>
>> a plurality of tiered ladder rack supports on the one side to establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring, and
>>
>> a plurality of conduit holders disposed on the one side above the plurality of tiered ladder rack supports, each of the conduit holders in each of the plurality of support brackets aligned with corresponding ones of conduit holders in the other plurality of support brackets, for holding a plurality of the distribution power wires and conduits.

40.     In the Complaint, Switch sets forth only a single paragraph as its statement of alleged infringement of the '780 patent entitling it to relief.  (D.I. 1, ¶ 59.)  In that paragraph, Switch shows only two pictures of Aligned's system and then alleges that Aligned data centers contain "an apparatus with "support brackets," "cabinets," a thermal shield," "tiered ladder racks supports," and "conduit holders" as claimed in the '780 patent."  (D.I. 1, ¶ 59.)

41.     The plain language of claim 1 (reproduced above in paragraph 39), however, requires significantly more than the mere existence of those components in an accused system.

In fact, even assuming that all those components existed in Aligned systems – which they do not – that alone is insufficient to prove infringement of each and every limitation set forth in claim 1 of the '780 patent.

42.    Switch's Complaint fails to set forth a basis for its claim of infringement – it merely parrots certain specific structures listed in claim 1 that Switch does not and cannot claim that it invented.  Switch's lack of a basis to claim infringement is confirmed by its July 21, 2017 correspondence to Aligned identifying the '780 patent, wherein Switch admittedly lacked sufficient information to allege infringement and specifically avoided making any allegation that Aligned infringed a Switch patent.  (*See*  D.I. 1-4.)

43.    The Aligned systems operate and are designed using innovative technologies, particularly for efficiently removing server heat, that are entirely distinct from that which is embodied in the '780 patent.  And, as clearly shown in the cited pictures in Switch's Complaint and as explained below, Switch is, or should have been aware, that Aligned systems do not contain at least the components called out in paragraph 59 of the Complaint in the manner and orientation required for the apparatus of claim 1 of the '780 patent.  Switch's claim of infringement in the Complaint that relies on evidence that undisputedly establishes non-infringement is groundless, and is evidence of a lack of good faith.

44.    Because claim 1 is the sole independent claim of the '780 patent, if Aligned does not meet even a single limitation of claim 1, it cannot infringe claim 1 and cannot infringe any of the remaining claims in the '780 patent.

45.    Aligned does not infringe claim 1 (or any other claim) of the '780 patent.  As one example of why Switch's claim of infringement of the '780 patent cannot be correct, claim 1 of the '780 patent requires "support brackets disposed along each of the two rows that support distribution power wires and conduits, the electronic equipment power wires and conduits, and the communication wiring on one side of the plurality of support brackets, and support the thermal shield on another side [of the] plurality of support brackets."

26

46.     However, as clearly illustrated in the very images that Switch submitted with its Complaint, there are no such support brackets as required by the claim.  First, as the images depict, the communication wiring exists on a single layer IT cable tray on the outside of the polycarbonate hard windows and the tray itself is suspended using support bars attached to the building ceiling grid Aligned installs.  The support bars could not possibly support any "thermal shield" as required by the claim, since they are only attached to the tray.  Nor do the support bars support any electronic power wiring as required by the claim since, as clearly depicted in the pictures Switch submits, power is supplied through a system such as a Starline® Track Busway system (first introduced in 1987) that runs down the inside of the aisle (and, as depicted, on the opposite side of the polycarbonate windows and nowhere near the cable trays or their support bars).  Because the single tray support bars only support the IT cable tray, they do not and cannot support anything on "another side," as claim 1 requires.  Nor is there a thermal shield as claimed in the '780 patent.  Switch's own submitted evidence establishes that Aligned's depicted system cannot meet the asserted claim.



*See, e.g.,* Complaint, ¶ 61
(citing http://www.datacenterdynamics.com/content-tracks/colo-cloud/aligned-plano-power-andcooling-on-demand/97039.fullarticle)



*See, e.g.*, Complaint, ¶ 61
(citing video at https://www.youtube.com/watch?v=q2nXSUi7Ag8)

47.     The above is not the only reason that Switch's claim of infringement is objectively baseless.  The depicted Aligned system also, and independently, does not contain the "plurality of tiered ladder rack supports on the one side to establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring," as also required by claim 1 of the '780 patent.

48.     As clearly illustrated in the images in paragraph 46 above, which are the images that Switch submitted in its Complaint, there is only a single IT cable tray (on each side of the hot aisle row) that is suspended and kept in place by support bars attached to the building ceiling grid system.  The trays themselves, which support only network communication wiring, are not "ladder rack" supports, nor are they "tiered."  Furthermore, the depicted Aligned system runs its power wires and conduits *through* the hot aisle via busways, not along the outside of the hot aisle together with the communication wiring, as claim 1 requires.

49.     Additionally, the Aligned system does not contain "a plurality of conduit holders disposed on the one side above the plurality of tiered ladder rack supports, each of the conduit

28

holders in each of the plurality of support brackets aligned with corresponding ones of conduit holders in the other plurality of support brackets, for holding a plurality of the distribution power wires and conduits", as recited in claim 1 of the '780 patent.

50. As shown below in the images from a video clip cited in the Complaint as evidence of alleged infringement, the Aligned system runs the server power lines and their conduits through the hot aisle. Claim 1, however, requires that such conduit holders be on the same side as (and above) the support structure for the communication wiring. And, according to the claim, the support structure is required to be on the outside of the claimed "hot air containment chamber."



See, e.g., Complaint, ¶ 61
(citing video at https://www.youtube.com/watch?v=q2nXSUi7Ag8)

51. Switch's claim of infringement of claim 1 of the '780 Patent is demonstrably incorrect based on the very images and documents that Switch itself submitted in its Complaint. Because, under prevailing law, Switch's basis for its claim of infringement is required to be set forth in the Complaint, the Complaint is evidence that Switch does not have a good faith basis to

claim infringement, and did not have a good faith basis to represent to Aligned's prospective customer that Aligned infringes any Switch patents. Aligned seeks a declaration that it does not infringe and has not infringed (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the '780 patent.

## COUNT II

### (Declaratory Judgment Of Invalidity Of The '780 Patent)

52.     Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-51 above as if fully set forth herein.

53.     The claims of the Patent-in-Suit are invalid under 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112. Aligned reserves the right to identify and rely upon prior art that may be discovered as discovery progresses in this action.

54.     An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '780 patent.

55.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

56.     Aligned therefore seeks a declaration that the '780 patent is invalid for failing to comply with one or more of the requirements set forth in 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT III

### (Declaratory Judgement of Non-Infringement Of The '389 Patent)

57.     Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-56 above as if fully set forth herein.

58.     Aligned does not infringe and has not infringement (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the '389 patent.

59.     An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '389 patent.

60.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

61.     The Complaint alleges that Aligned infringes claim 1 of the '389 patent.  Claim 1 recites:

1. An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, for supporting a thermal barrier ceiling, for supporting cool air ductwork and for supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned into two parallel rows that are separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

an interior frame structure that is independent of and not structurally tied to the plurality of cabinets, the interior frame structure including:

a first plurality of vertical support brackets disposed only at ends of the two rows, each vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the first plurality of vertical support brackets each further support portions of the thermal shield on one side of the first plurality of vertical support brackets at a location above a top of the plurality of cabinets, wherein the cabinets positioned in the two parallel rows are separated by the hot aisle area, and wherein a cross sectional area of the hot air containment chamber defined by the thermal shield and parallel with the floor is disposed directly above and encompasses a cross sectional area of the hot aisle area that is located between the two parallel rows of cabinets and is parallel with the floor;

a first horizontal support bracket disposed above a cabinet height that intersects a middle hot aisle portion so that an area on two opposite sides of each hot aisle where the cabinets can be placed does not have any vertical support brackets disposed therein;

a second plurality of horizontal support brackets that are each parallel with the floor, each of the second plurality of horizontal support brackets connecting together two different ones of the first plurality of vertical support brackets and connecting to each of the two different ones of the first plurality of vertical support brackets at a height that is above the cabinet height;

a plurality of tiered ladder rack supports, each connected to another side of at least some of the first plurality of vertical support brackets that is opposite the one side, which establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring;

and a second plurality of vertical support brackets disposed in a row, substantially parallel to the two rows, each second vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the second plurality of vertical support brackets each further support portions of the cool air ductwork.

62. In the Complaint, Switch sets forth only a single paragraph as its statement of alleged infringement of the '389 patent entitling it to relief. (D.I. 1, ¶ 61.) In that paragraph, Switch shows only two still pictures from videos of Aligned's system and then alleges that Aligned data centers contain "an apparatus with "vertical support brackets," "horizontal support brackets," "tiered ladder rack supports," a "thermal barrier ceiling" and "thermal shield" as claimed in the '389 patent." (D.I. 1, ¶ 61.)

63. The plain language of claim 1 (reproduced above in paragraph 61), however, requires significantly more than the mere existence of those components in an accused system. In fact, even assuming that all those components existed in Aligned systems – which they do not – that alone is insufficient to prove infringement of each and every limitation set forth in claim 1 of the '389 patent.

64. Switch's Complaint fails to set forth a basis for its claim of infringement – it merely parrots certain specific structures listed in claim 1 that Switch does not and cannot claim that it invented. Switch's lack of a basis to claim infringement is confirmed by its July 21, 2017 correspondence to Aligned identifying the '389 patent, wherein Switch admittedly lacked sufficient information to allege infringement and specifically avoided making any allegation that Aligned infringed and Switch patent. (*See* D.I. 1-4.)

65. The Aligned systems operate and are designed using innovative technologies, particularly for high efficiency cooling of data center servers, that are entirely distinct from that which is embodied in the '389 patent. And, as clearly shown in the pictures cited in Switch's Complaint and as explained below, Switch is, or should have been aware, that Aligned systems do not contain at least the components called out in paragraph 61 of the Complaint in the manner and orientation required for the apparatus of claim 1 of the '389 patent. Switch's claim of

infringement in the Complaint that relies on evidence that undisputedly establishes non-infringement is groundless, and is evidence of a lack of good faith.

66.     The '389 has two independent claims:  claims 1 and 10.  Claim 10 is a method claim that recites similar and many of the same limitations of the apparatus claimed in claim 1. For at least the same reasons explained below with respect to claim 1 of the '389 patent, Aligned systems do not infringe independent claim 10.  And, if Aligned's systems do not meet even a single limitation of the two independent claims, they cannot infringe any of the remaining claims in the '389 patent.

67.     Aligned does not infringe claim 1, or any other claim, of the '389 patent.  For example, the Aligned system does not contain "a thermal shield that defines a hot air containment chamber" or "a thermal barrier ceiling", as recited in claim 1 of the '389 patent.

68.     As shown in the following images, which Switch relies upon in its Complaint as evidence of alleged infringement, the Aligned system uses an innovative and unique patented system that does not utilize thermal shields that define a hot air containment chamber or a thermal barrier ceiling.  Rather, the Aligned system uses a closed-loop distribution system that pumps refrigerant to the microchannel coils above each rack to remove heat directly at the rack level.  In other words, the cooling system at the top of the hot aisle cannot be a thermal barrier ceiling as it functions to remove heat entirely at the server racks via refrigerant circulating through microchannel coils above the server racks.  And, the polycarbonate hard containment windows are not thermal shields, nor do they function as thermal shields according to the '389 patent.



*See, e.g.*, Complaint, ¶ 63
(citing video at https://www.youtube.com/watch?v=2YnPQ4KmMKU)



*See, e.g.*, Complaint, ¶ 63
(citing video at https://www.youtube.com/watch?v=KCaPCc6eHpk)

34

69.     Moreover, the Aligned system does not contain "cool air ductwork" as recited in claim 1 of the '389 patent.  Rather, Aligned uses an innovative approach to remove heat directly at the source (*e.g.*, the server racks) by circulating refrigerant through microchannel coils placed directly above the server racks, rather than the less efficient method of removing heat by transporting hot and cold air through ducts and/or plenums in a duct distribution system.  This is a fundamental competitive difference between Aligned's novel solution and systems, such as Switch's, that rely on conventional techniques.

70.     As explained and shown in the images in paragraph 68 above, the Aligned system does not utilize cool air or cool air ducting to remove heat from the hot aisle.  Rather, as explained, the system uses refrigerant pumped to microchannel coils to directly remove heat between the server rows.  Indeed, at 1:22 to 1:29 of the video found at https://www.youtube.com/watch?v=KCaPCc6eHpk, which is cited in the Complaint, it is explained that, "rather than pushing cold air in," Aligned's "cooling system removes heat instead."

71.     Additionally, the Aligned system does not contain "a plurality of tiered ladder rack supports, each connected to another side of at least of the first plurality of vertical support brackets that is opposite the one side, which establish a plurality of different tiers outside the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring", as recited in claim 1 of the '389 patent.

72.     As shown below, there is only a single IT cable tray (on each side of the hot aisle row) that is suspended and kept in place by support bars attached to the building ceiling grid system.  The trays themselves, which support only network communication wiring, are neither multiple "ladder rack" supports connected to one side of vertical support brackets, nor are they "tiered."  Furthermore, the Aligned system runs its power wires and conduits *through* the hot aisle via busways, not along the outside of the hot aisle together with the communication wiring.



*See, e.g.,* Complaint, ¶ 61
(citing http://www.datacenterdynamics.com/content-tracks/colo-cloud/aligned-plano-power-andcooling-on-demand/97039.fullarticle)



*See, e.g.,* Complaint, ¶ 61
(citing video at https://www.youtube.com/watch?v=q2nXSUi7Ag8)



See, e.g., Complaint, ¶ 61
(citing video at https://www.youtube.com/watch?v=q2nXSUi7Ag8)

73.     Switch's claim of infringement of claim 1 of the '389 Patent is demonstrably incorrect based on the very images and documents that Switch itself submitted in its Complaint. Because, under prevailing law, Switch's basis for its claim of infringement is required to be set forth in the Complaint, the Complaint is evidence that Switch does not have a good faith basis to claim infringement, and did not have a good faith basis to represent to Aligned's prospective customer that Aligned infringes any Switch patents.  Aligned seeks a declaration that it does not infringe and has not infringed (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the '389 patent.

## COUNT IV

### (Declaratory Judgment Of Invalidity Of The '389 Patent)

74.     Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-73 above as if fully set forth herein.

75.     The claims of the Patent-in-Suit are invalid under 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112.  Aligned reserves the right to identify and rely upon prior art that may be discovered as discovery progresses in this action.

76.     An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '389 patent.

77.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

78.     Aligned therefore seeks a declaration that the '389 patent is invalid for failing to comply with one or more of the requirements set forth in 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT V

### (Declaratory Judgement of Non-Infringement Of The '495 Patent)

79.     Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-78 above as if fully set forth herein.

80.     Aligned does not infringe and has not infringement (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim fo the '495 patent.

81.     An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '495 patent.

82.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

83.     The Complaint alleges that Aligned infringes claim 1 of the '495 patent.  Claim 1 recites:

1. An apparatus for cooling electronic equipment contained within a floor of a building, in conjunction with a plurality of air conditioning units that each create cool air and include an exhaust fan and a cooling fan and a plurality of actuators that control a plurality of dampers associated with the plurality of air conditioning units, the apparatus comprising:

a plurality of cabinets disposed on the floor of the building for holding the electronic equipment therein, the plurality of cabinets positioned in a plurality of rows within each of a plurality of cabinet clusters so that the electronic equipment disposed within the cabinets emit heated air from the cabinets in each row of each cabinet cluster toward a central hot air area associated with each cabinet cluster;

a hot air containment chamber disposed within the building over each of the plurality of cabinet clusters that traps the heated air within the central hot air area and causes substantially all the heated air within the central hot air area to rise up within the hot air containment chamber and exit through a hot air escape opening of the associated hot air containment chamber;

a warm air escape gap disposed within the building and disposed above each of the hot air containment chambers, the warm air escape gap collecting the heated air from each of the hot air containment chambers and feeding the heated air to the air conditioning units, the warm air escape gap being lowerly bounded by a ceiling, wherein the ceiling contains ceiling openings that each align with one of the hot air escape openings in each of the hot air containment chambers;

cool air ducts disposed within the building that deliver the cool air from the plurality of air conditioning units toward a periphery of the plurality of rows of cabinets within each of the plurality of cabinet clusters; and

a control system, the control system comprising:

> a plurality of temperature sensors, at least one temperature sensor located inside each of the central hot air areas associated with each cabinet cluster, at least one temperature sensor located outside each of the plurality of cabinet clusters, and at least one temperature sensor located in the warm air escape gap;

> a plurality of pressure differential sensors, at least one pressure differential sensor located inside each of the plurality of hot air containment chambers, at least one pressure differential sensor located outside each of the plurality of hot air containment chambers, and at least one pressure differential sensor located in the warm air escape gap; and

> a computer system, the computer system receiving signals from each of the plurality of temperature sensors and each of the plurality of pressure differential sensors, and providing control signals to control the exhaust fan, the cooling fan, and the plurality of actuators in order to control the temperature of the cooled air and a pressure differential that exists between an area within the hot air containment chamber for each of the cabinet clusters and a different area outside of each of the cabinet clusters.

84.    In the Complaint, Switch sets forth only a single paragraph as its statement of alleged infringement of the '495 patent entitling it to relief.  (D.I. 1, ¶ 63.)  In that paragraph, Switch shows only two still pictures from videos of Aligned's system and then alleges that

Aligned data centers contain "an apparatus with "cabinets," a "hot air containment chamber," and a "warm air escape gap" as claimed in the '495 patent."  (D.I. 1, ¶ 63.)

85.     The plain language of claim 1 (reproduced above in paragraph 83), however, requires significantly more than the mere existence of those components in an accused system. In fact, even assuming that all those components existed in Aligned systems – which they do not – that alone is insufficient to prove infringement of each and every limitation set forth in claim 1 of the '495 patent.

86.     Switch's Complaint fails to set forth a basis for its claim of infringement – it merely parrots certain specific structures listed in claim 1 that Switch does not and cannot claim that it invented.  Switch's lack of a basis to claim infringement is confirmed by its July 21, 2017 correspondence to Aligned, in which Switch did not even identify the '495 patent at all.  (*See* D.I. 1-4.)

87.     The Aligned systems operate and are designed using innovative technologies, particularly highly-efficient cooling systems that, among other things, absorb heat at its source using a refrigerant flowing through microchannel coils placed above the server racks and transport the heated refrigerant to a refrigerant-to-water heat exchanger, where heat is removed from the refrigerant.  Aligned's innovative technologies are entirely distinct from that which is embodied in the '495 patent.  And, as clearly shown in the pictures cited in Switch's Complaint and as explained below, Switch is, or should have been aware, that Aligned systems do not contain at least the components called out in paragraph 63 of the Complaint in the manner and orientation required for the apparatus of claim 1 of the '495 patent.  Switch's claim of infringement in the Complaint that relies on evidence that undisputedly establishes non-infringement is groundless, and is evidence of a lack of good faith.

88.     The '495 has two independent claims:  claims 1 and 21.  Claim 21 is an apparatus claim that recites many of the same limitations of the apparatus claimed in claim 1.  And, for at least the same reasons explained below with respect to claim 1 of the '495 patent, Aligned systems do not infringe independent claim 21.  And, if Aligned systems do not meet even a

single limitation of the two independent claims, they cannot infringe any of the remaining

dependent claims in the '495 patent.

89.     Aligned does not infringe claim 1, or any other claim, of the '495 patent.  For

example, the Aligned system does not contain "a warm air escape gap disposed within the

building and disposed above each of the hot air containment chambers, the warm air escape gap

collecting the heated air from each of the hot air containment chambers and feeding the heated

air to the air conditioning units, the warm air escape gap being lowerly bounded by a ceiling,

wherein the ceiling contains ceiling openings that each align with one of the hot air escape

openings in each of the hot air containment chambers", as recited in claim 1 of the '495 patent.

90.     As shown in the following images, which Switch relies upon in its Complaint as

evidence of alleged infringement, the Aligned system uses a refrigerant distribution system at the

top of the hot aisle that distributes refrigerant to microchannel coils above each rack to remove

heat directly at the rack level.  In other words, the system does not emit hot air or require the use

of a warm air escape gap that is disposed anywhere at the top of the system.  The system is

simply not designed to collect and "trap" heated air from anywhere in the hot aisle and then feed

such heated air to air conditioning units.  In fact, because heat is transferred to refrigerant

directly at the rack level using microchannel coils, no hot air containment chamber with "hot air

escape openings" is necessary.  And, it follows then that there is no building openings that align

with a hot air escape opening in a hot air containment chamber.



*See, e.g.,* Complaint, ¶ 63
(citing video at https://www.youtube.com/watch?v=KCaPCc6eHpk)



*See, e.g.,* Complaint, ¶ 63
(citing video at https://www.youtube.com/watch?v=2YnPQ4KmMKU)

91.     Moreover, the Aligned system does not contain "cool air ducts disposed within the building that deliver the cool air from the plurality of air conditioning units toward a periphery of the plurality of rows of cabinets within each of the plurality of cabinet clusters", as recited in claim 1 of the '495 patent.

92. As explained and shown in the images in paragraph 68 and 90 above, the Aligned system does not utilize cool air or cool air ducting to remove heat from the hot aisle. Rather, as explained, the Aligned system uses refrigerant and microchannel coils placed above server racks to remove heat between the server rows. Indeed, at 1:22 to 1:29 of the video found at https://www.youtube.com/watch?v=KCaPCc6eHpk, which is cited in the Complaint, it is explained that, "rather than pushing cold air in," Aligned's "cooling system removes heat instead."

93. The Aligned system also does not have "pressure differential sensors" as required by claim 1. Switch appears to be aware that Aligned does not use "pressure differential sensors," because Switch conspicuously does not point to any document or statement providing any evidence of any "pressure differential sensors" in Aligned's systems. *See* (D.I. 1, ¶¶ 64-67.)

94. Switch's claim of infringement of claim 1 of the '495 Patent is demonstrably incorrect based on the images and documents that Switch submitted in its Complaint. Because, under prevailing law, Switch's basis for its claim of infringement is required to be set forth in the Complaint, the Complaint is evidence that Switch does not have a good faith basis to claim infringement, and did not have a good faith basis to represent to Aligned's prospective customer that Aligned infringes any Switch patents. Aligned seeks a declaration that it does not infringe and has not infringed (whether directly, contributorily, or by inducement) literally or under the doctrine of equivalents any valid claim of the '495 patent.

<u>COUNT VI</u>

<u>(Declaratory Judgment Of Invalidity Of The '495 Patent)</u>

95. Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-94 above as if fully set forth herein.

96. The claims of the Patent-in-Suit are invalid under 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112. Aligned reserves the right to identify and rely upon prior art that may be discovered as discovery progresses in this action.

97.     An actual controversy exists between Aligned and Switch based on Switch having filed its Complaint against Aligned alleging infringement of the '495 patent.

98.     Aligned has been injured and damaged by Switch filing its Complaint asserting a patent that Aligned does not infringe.

99.     Aligned therefore seeks a declaration that the '495 patent is invalid for failing to comply with one or more of the requirements set forth in 35 U.S.C. § 101 *et seq.*, including one or more of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT VII

### (Violation of Lanham Act § 43(a))

100.     Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-99 above as if fully set forth herein.

101.     On information and belief, Switch made false and misleading statements to the California customer regarding Aligned's products and services in the course of a competitive bidding process between Aligned and Switch for the California customer's business.  Switch made such statements in an attempt to promote Switch's products and services over Aligned's products and services.

102.     On information and belief, Switch's statements were likely to deceive and actually did deceive the California customer into believing that Aligned's products and services infringe the Patents-In-Suit.

103.     On information and belief, Switch's statements were material to the decision to be made by the California customer Switch and Aligned and were likely to influence the California customer into purchasing data center services from an entity other than Aligned.

104.     On information and belief, Switch, a Nevada-based company, placed these false statements into interstate commerce when it directed them at the California customer from Switch's Nevada headquarters.

105.     Switch's statements to the California customer and others that Aligned infringes the Patents-In-Suit were and are objectively baseless.  Contemporaneous with its claims to others

that Aligned infringed Switch's patents, Switch admitted to Aligned that it did not have sufficient information to claim that Aligned infringed any Switch patent. When Aligned confronted Switch regarding its tortious conduct, Aligned provided to Switch a detailed statement regarding multiple specific required elements of Switch's patents that are not present in Aligned data center systems. Nevertheless, after receipt of this information, Switch continued to interfere with Aligned's business and also did not deny that it had previously made statements to others, including Aligned's prospective customer, baselessly claiming that Aligned infringed Switch patents.

106. Rather than correct its misstatements, Switch then filed this lawsuit. On information and belief, Switch filed its lawsuit after Switch had already made objectively baseless claims to others regarding alleged infringement by Aligned. As set forth in detail above, Switch's lawsuit confirms that Switch did not have a basis to claim infringement when it interfered with Aligned's business opportunities, because the evidence cited in Switch's lawsuit establishes that Aligned does not infringe any asserted claim of any Switch patent.

107. On information and belief, Switch has made its allegations that Aligned infringes the Patents-In-Suit in bad faith because Switch knows that Aligned does not infringe the Patents-In-Suit and/or that the Patents-In-Suit are invalid.

108. On information and belief, Switch made these false statements to the California customer and others not to assert or enforce any property rights it may have in the Patents-In-Suit, but to injure free and fair competition between Aligned and Switch for the California customer's business.

109. Aligned is subject to actual or probable injury from Switch's false statements to the California customer and others due to the likelihood of those statements to cause the California customer and others to unfairly devalue Aligned during competition for the California customer's business.

## COUNT VIII

### (Tortious Interference With Prospective Business Relations)

110.    Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-109 above as if fully set forth herein.

111.    Prior to the commencement of the present suit by Switch, Aligned had contemplated a contract of economic benefit with the California customer concerning the purchase of data center services from Aligned.

112.    On information and belief, Switch was aware of that contemplated contract.

113.    On information and belief, Switch intentionally and improperly interfered with Aligned's contemplated contract of economic benefit by communicating with the California customer that Aligned infringed the Patents-In-Suit and by filing this lawsuit on August 7, 2017.

114.    On information and belief, Switch's conduct with respect to the California customer was independently wrongful and tortious under both federal and state law.

115.    Aligned has suffered a loss of business and prospective economic advantage as a direct result of Switch's conduct toward Aligned and the California customer.

116.    On information and belief, Switch's allegations that Aligned infringes valid and enforceable claims of the Patents-In-Suit are objectively baseless.  Switch lacks a good faith belief that Aligned infringes any valid and/or enforceable claims of the Patents-In-Suit, particularly in view of admissions to that effect in Switch's correspondence to Aligned on July 21, 2017.

117.    Switch, by way of its unlawful acts, seeks economic gain by improperly attempting to enforce patents known to Switch to be not infringed by Aligned and to be invalid and/or unenforceable.

118.    On information and belief, Switch has derived, received, and will continue to derive and receive gains, profits, and advantages from the aforementioned acts of tortious interference in an amount which is not presently known to Aligned.  By reason of these acts, Aligned is entitled to an award of damages in an amount to be proven at trial.

46

## COUNT IX

### (Business Disparagement)

119.    Aligned restates and incorporates by reference each and every allegation contained in paragraphs 1-118 above as if fully set forth herein.

120.    On information and belief, Switch orally published statements to the California customer, its agents, representatives, attorneys, and/or employees and other persons in the data center industry (e.g., consultants and brokers) regarding Aligned's alleged infringement of the Patents-In-Suit that were disparaging to Aligned and Aligned's business.

121.    On information and belief, Switch's statements to the California customer and others that Aligned infringes valid and enforceable claims of the Patents-In-Suit were false and objectively baseless.

122.    On information and belief, Switch lacks a good faith belief that Aligned infringes valid and enforceable claims of the Patents-In-Suit, particularly in view of admissions to that effect in Switch's correspondence to Aligned on July 21, 2017.

123.    On information and belief, Switch acted with malice when making its statements to the California customer and others because Switch knew its statements were false or acted with reckless disregard to the truth or falsity of those statements.

124.    On information and belief, Switch acted with ill will towards Aligned, intending to interfere with and damage Aligned's economic interests with respect to the California customer and other business opportunities.

125.    On information and belief, Switch will make similar disparaging statements to Aligned's other current or potential customers unless and until this Court enjoins Switch from doing so.

126.    On information and belief, Switch has derived, received, and will continue to derive and receive gains, profits, and advantages from the aforementioned acts of business disparagement in an amount which is not presently known to Aligned.  By reason of these acts, Aligned is entitled to an award of damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Aligned prays for judgment as follows:

(1)  For a declaration that the manufacture, use, offer for sale, sale, and/or importation of Aligned's data center systems, have not infringed, do not infringe, and will not infringe any valid claim of the Patents-In-Suit;

(2)  For a declaration that the Patents-In-Suit are invalid;

(3)  That an injunction be issued enjoining Switch and its agents, representatives, attorneys, employees, and those persons in active concert or participation with them who receive actual notice herefrom from threatening or initiating further infringement litigation against Aligned or its customers, dealers, suppliers, or any prospective or present sellers, dealers, distributors, or customers of Aligned, based on their manufacture, use, offer for sale, sale, and/or importation of Aligned systems, or charging them either orally or in writing with infringement of the Patents-In-Suit, based on their manufacture, use, offer for sale, sale, and/or importation of Aligned systems;

(4)  That an injunction be issued enjoining Switch and its agents, representatives, attorneys, employees, and those persons in active concert or participation with them who receive actual notice herefrom from making false claims and/or disparaging remarks, orally or in writing, about Aligned to data center brokers or consultants or potential Aligned customers regarding alleged infringement of the Patents-In-Suit;

(5)  For damages for Switch's violation of Lanham Act § 43(a) in an amount to be proven at trial;

(6)  For damages for Switch's tortious interference with Aligned's prospective business relations in an amount to be proven at trial;

(7)  For damages for Switch's disparagement of Aligned's business in an amount to be proven at trial;

(8)  That this case be adjudged to be an exceptional case under at least 35 U.S.C. § 285, and that the Court award Aligned its attorneys' fees and costs; and

(9)     That the Court award all other and further relief as it deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Aligned hereby requests a trial by jury of all issues so triable.

Dated: August 16, 2017                              Respectfully submitted by:

                                                    */s/ Michael E. Jones*
                                                    Michael E. Jones
                                                    SBN: 10929400
                                                    POTTER MINTON, PC
                                                    110 North College, Suite 500
                                                    Tyler, Texas 75702
                                                    Tel: 903-597-8311
                                                    Fax: 903-531-3939
                                                    mikejones@potterminton.com

                                                    Michael A. Berta
                                                    Michael.berta@apks.com
                                                    ARNOLD & PORTER
                                                    KAYE SCHOLER LLP
                                                    Three Embarcadero Center
                                                    10th Floor
                                                    San Francisco, CA 94111-4024
                                                    Tel: 415-471-3277

                                                    Nicholas Lee
                                                    Nicholas.lee@apks.com
                                                    ARNOLD & PORTER
                                                    KAYE SCHOLER LLP
                                                    777 South Figueroa Street
                                                    44th Floor
                                                    Los Angeles, CA 90017-5844
                                                    Tel: 213-243-4156

                                                    ATTORNEYS FOR DEFENDANT
                                                    ALIGNED DATA CENTERS, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 16, 2017, a true and correct copy of the foregoing was served to the parties counsel of record via electronic mail pursuant to Local Rule CV-5(d).

*/s/ Michael E. Jones*

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| SWITCH, LTD.,<br>           Plaintiff,<br><br>v.<br><br>ALIGNED DATA CENTERS LLC and<br>MTECHNOLOGY INC.,<br><br>           Defendants.<br><br>_____<br>ALIGNED DATA CENTERS, LLC,<br>ALIGNED DATA CENTERS (DFW), LLC,<br>and ALIGNED DATA CENTERS<br>(PHOENIX), LLC,<br>           Counterclaim-Plaintiffs,<br><br>v.<br><br>SWITCH, LTD.,<br>           Counterclaim-Defendant. | CIVIL ACTION NO. 2:17-CV-574-JRG<br><br>**JURY TRIAL DEMANDED** |

## ORDER

Before the Court is the Parties' Joint Motion to Dismiss Pursuant to Rule 41(a)(2) (Dkt. No. 79). Having considered the Joint Motion, the Court finds that the Motion should be and hereby is **GRANTED**. It is **ORDERED** that all claims by Switch against Aligned asserted in Switch Ltd.'s First Amended Complaint (Dkt. No. 57), and all counterclaims by Aligned against Switch asserted in Aligned's Answer and Counterclaims (Dkt. No. 72) to that First Amended Complaint are **DISMISSED WITH PREJUDICE**. The Clerk is directed to **CLOSE** this case.

**So ORDERED and SIGNED this 9th day of July, 2018.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# Exhibit D

# Sam Castor

**Executive Vice President of Policy**

Las Vegas, Nevada Area

## Contact

www.linkedin.com/in/samcastor
(LinkedIn)
www.supernap.com (Company)
www.innevation.com (Company)
www.switch.com (Company)

## Top Skills

Intellectual Property

Telecommunications

Civil Litigation

## Languages

Romanian

## Certifications

Communications Law Institute
(2009) CUA

## Honors-Awards

The Extra Mile Award

## Publications

Utah's Child Protection Registry
Act: Protecting Children, Parents
and . . . Pornographers?: Allowing
States to Participate In Balancing
First Amendment Protections with
Parental Rights To Privacy and
Sovereignty in the Home.

Three Solid Tips to Avoid
Embarrasing Yourself When
Claiming Internet Copyright
Infringement

## Summary

I am a solutions finder, bridge builder and aggressive optimist.
I specialize in conflict resolution, with karma based negotiation.
Over the last ten (10) years, I have negotiated several hundreds
of telecom, power, and colocation deals, and multi-million a month
contracts with Fortune 100 companies, governments and agencies. I
resolved 15 trademark conflicts to Switch's favor, in 2018 alone. As
a member of Switch's energy and sustainability team, I help blaze a
trail for Switch to secure 100% renewable energy for all of its data
centers, worldwide.

Specialties: Intellectual Property, Colocation, Telecom, Energy,
Transactional, Entrepreneurial, Litigation, Regulatory, Trademarks,
Copyrights

———

## Experience

**Switch**
9 years 2 months

Executive Vice President of Policy
January 2017 - Present (3 years 4 months)
Las Vegas, Nevada Area

Associate General Counsel, VP
March 2011 - January 2017 (5 years 11 months)
Las Vegas, Nevada area

I assist Switch in all things legal, including energy sustainability, contract
negotiation, intellectual property litigation and prosecution, protection and
licensing, telecom, power and air quality regulatory compliance, human
resource policy, strategy, legislative policy, complete commercial transactions,
and litigation.

**The Rob Roy Innevation Center**
Director of InNEVation
October 2011 - October 2013 (2 years 1 month)

Las Vegas, Nevada Area

Privileged to be involved with Switch's karma driven efforts to diversify Nevada's economic landscape by empowering innovation and encouraging companies to relocate to Nevada.  www.inNEVation.com

### Alverson, Taylor
Associate
June 2009 - March 2011 (1 year 10 months)

Litigated medical malpractice/negligence suits while defending local hospitals, doctors, and businesses.

### Office of Science and Technology - EOP (White House)
Law Clerk - Policy Analyst Intern
August 2008 - March 2009 (8 months)

Under Presidents Bush and Obama, I researched and assisted in the drafting of internet and communication policy.  Specifically, I assisted in the refinement of policies regarding telecommunications, ICANN and online child protection laws with various federal agencies, including the Department of Justice, the Department of Agriculture, the Federal Communications Commission, and the Department of Commerce.  I also handled all Freedom of Information Act requests for the Office.

### U.S. District Court, District of Nevada
Legal Extern
May 2008 - August 2008 (4 months)

Assisted Judge George and his career law clerks with criminal and civil case loads, legal research and order drafting, for cases ranging from the Fair Credit Reporting Act to Native American Contract law.

### Akin Gump et. al. LLP
Law Clerk
January 2008 - May 2008 (5 months)

Handled emerging broadcast, wireless, radio and the Internet (i.e. Child Online Privacy Protection Act compliance) regulatory issues for Disney, Cox, Samsung etc.  Maintained FCC license tickler.

### Mobile Statellite Ventures
Legal Intern
August 2007 - December 2007 (5 months)

Participated in International Telecommunications Union (ITU) and World Radio Conference (WRC) preparation meetings. Compiled and summarized FCC Notice of Inquiry (NOI), Notice of Proposed Rule Making (NPRM) comments, and participating WRC country proposals.  Plan to research and write trade journal language for professional publication regarding hybrid satellite and terrestrial cell phone technology and its role in the telecom industry and in the WRC.

## US Dept. of Agriculture
Law Clerk
April 2007 - August 2007 (5 months)

Office of the Assistant Administrator – Telecom
Compiled and summarized comments and draft responses for proposed rule 7 C.F.R. §1738 governing rural broadband loans; loans intended to increase rural broadband service via multiple technologies in an attempt to raise the United States' internet access.  Drafted responses to FCC NOIs and NPRMs.

## Senator Orrin Hatch
Staff Assistant / L.C.
August 2005 - February 2006 (7 months)

Staff Assistant / Legislative Correspondent
Drafted hundreds of letters for Senator Hatch concerning a myriad of federal issues in response to constituent inquiry. Handled incoming calls, specifically regarding the Supreme Court nomination hearings of Chief Justice Roberts and Justice Alito, and the hurricane Katrina/Rita disasters. Assisted in web-site content maintenance.

## Federal Communications Commission
Intern
May 2005 - August 2005 (4 months)

International Bureau Intern
One of two interns awarded a scholarship for the 1st month's performance and educational excellence.  Assisted in publication and implementation of a Public Hearing regarding satellite industry rule making. Drafted press releases concerning frequency regulation and policy shifts. Organized and researched outreach content for bureau web-site. Attended and participated in policy, media and ITU meetings.

———

# Education

The Catholic University of America, Columbus School of Law

J.D. Cum Laude, Communications Law · (2006 - 2009)

Brigham Young University

B.A., Communications · (1999 - 2005)

Provo High School

Honors Highschool, General Studies · (1994 - 1998)

# Exhibit E

Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
**Randazza Legal Group, PLLC**
4035 S. El Capitan Way
Las Vegas, NV 89147
Telephone: 702-420-2001
Facsimile: 305-437-7662
ecf@randazza.com

*Attorneys for Defendants,*
*Stephen Fairfax and MTechnology*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD.,<br>a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY;<br>DOES 1 through 10; and ROE ENTITIES 11<br>through 20, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-2651<br><br>**DEFENDANTS' REQUEST FOR A PRETRIAL CONFERENCE AND SUBMISSION OF PROPOSED PROTECTIVE ORDER** |

# DEFENDANTS' REQUEST FOR A PRETRIAL CONFERENCE AND SUBMISSION OF PROPOSED PROTECTIVE ORDER

Defendants Stephen Fairfax and MTechnology hereby request that this Court conduct a pretrial conference with respect to the parties' competing proposed Protective Orders pursuant to LR 16-2. Counsel for the parties are unable to agree upon certain provisions of the Protective Order, and Defendants have concerns regarding the ways Plaintiff intends to use documents that Defendants designate as "Highly Confidential." For this Court's convenience, Defendants' proposed Protective Order is attached hereto as **Exhibit A**.

The parties have conducted at least two meet and confer conferences (on August 23, 2019 and August 29, 2019)[1] with general counsel for Switch, Ltd. ("Switch") to attempt to resolve their dispute. (*See* Declaration of Ronald Green, at ¶ 4. Attached hereto as **Exhibit B**.) Neither conference was successful at resolving the parties' differences with respect to the language of the eventual Protective Order in this case. (*See id*. at ¶ 5.) Court intervention is required.

Regarding Defendants' concerns regarding Switch's use of documents obtained in discovery, the majority of the documents Plaintiff Switch is requesting in this litigation are sensitive documents containing the trade secrets and detailed design information of its biggest competitors. Switch has already informed Plaintiffs and their counsel that it intends to use discovery in this case for the improper purpose of "patent litigation" against at least one of those competitors. The rest of the information about other competitors appears to be an attempt to use the discovery process in lieu of industrial espionage.

[1] Defendants' counsel has additionally engaged in at least two discussions regarding the Protective Order with Piers Tueller, an attorney with Hutchison & Steffan that Switch has hired to interface with Defense counsel on discovery issues but will apparently not be appearing in this case. Because he has not made an appearance, Defense counsel has asserted that Mr. Tueller does not have the ability to conduct meet and confer conferences as required by this Court's rules.

Switch should not be permitted to use discovery in this case to either fish for claims against third parties or to simply gain trade secrets that it could not otherwise obtain.

Switch additionally insisted upon editing the categories of documents that Defendants may choose to designate as "Highly Confidential." Among the documents that Switch insists Defendants cannot designate as "Highly Confidential" are documents that Defendants created or received pursuant to non-disclosure agreements. Again, many of these documents relate to Switch's primary competitors, and Defendants are convinced (by Switch's own words) that Switch intends to use them for improper purposes not related to this litigation.

Switch has not been shy about its intent to use documents obtained in discovery in this case against its competitors. It refused to include language in the Protective Order that the parties are not allowed to use "Confidential" or "Highly Confidential" material "to compete with the other Party or any third party" or "to damage a Party's relationship with any third party" or "to gain a competitive advantage over the other Party… or any third party." (*See* Defendants' Proposed Protective Order, attached as Exhibit A.) Moreover, the draft Protective Order it submitted to this Court openly acknowledges that Switch is using this case to obtain information about Aligned Data Centers, one of its primary competitors – which is not a party to this litigation.  Switch previously filed suit against Aligned Data Centers in the U.S. District Court for the Eastern District of Texas. That action was dismissed with prejudice, leaving this suit as Switch's only way to obtain information about Aligned's data centers – but with its claims dismissed with prejudice, it is unclear why Switch would even *logically* be able to defend its desire to delve into Aligned's trade secrets.  It most cannot justify this *legally*.

During a meet and confer conference held between Sam Castor, counsel for Switch, and Marc Randazza and Ronald Green, counsel for Defendants, on

**Defendants' Request for a Pretrial Conference and Submission of Proposed Protective**

August 29, 2019, Mr. Castor said on two separate occasions that Switch needed discovery in this case to "substantiate" its "anticipated claims" ef against Aligned. (*See id*. at ¶ 6.) When Defense counsel informed him that it was improper for him to use discovery in this case to target third parties, Mr. Castor attempted to justify Switch's intentions by misrepresenting that Switch had dismissed its claims against Aligned <u>without</u> prejudice and that it was refiling its suit against Aligned shortly. (*See id*. at ¶ 7.) In fact, all of the claims in that case were dismissed <u>with</u> prejudice. (*See* Order dismissing Case No. 2:17-CV-574-JRG, attached as **Exhibit C**.)

In any event, if Switch wishes to sue Aligned (or any other party) the way to do that is to sue that third party and seek discovery in that action. Federal claims against Defendants are not to be used as a quasi "pure bill of discovery" action against another party. However, the fact that Switch is admitting to this abuse of process seems to illuminate the reason that this action was filed in the first place. This is ostensibly a trade secret case – yet after nearly two years since the filing of this case, Defendants have yet to learn precisely what trade secrets were allegedly misappropriated.

LR 16-2 permits any party to request a pre-trial conference to expedite disposition of any case. Here, the parties have been discussing the language of a Protective Order for approximately two months. With a deadline for expert discovery approaching in October of 2019, the parties need to resolve this issue, and Defendants request that they be given the opportunity to discuss their issues with Switch's proposed Protective Order prior to the Court's ruling upon which of the competing Protective Orders will control discovery in this case.

Dated: September 3, 2019.                    Respectfully submitted,

**Defendants' Request for a Pretrial Conference and Submission of Proposed Protective**

/s/ Marc J. Randazza

Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
**Randazza Legal Group, PLLC**
4035 S. El Capitan Way
Las Vegas, NV 89147

*Attorneys for Defendants*
*Stephen Fairfax and MTechnology*

**Defendants' Request for a Pretrial Conference and Submission of Proposed Protective**

Case No. 2:17-cv-2651

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 3, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document being served via electronic mail and U.S. Mail to the attorneys listed below:

Anne-Marie Birk, Esq.
Samuel Castor, Esq.
**SWITCH, LTD.**
7135 S. Decatur Blvd.
Las Vegas, NV 89118
sam@switch.com
scastor@switchlv.com
abirk@switch.com

F. Christopher Austin, Esq.
**WEIDE & MILLER, LTD.**
10655 W. Park Run Drive, Suite 100
Las Vegas, NV 89144
caustin@weidemiller.com

*Attorney for Plaintiff, Switch, Ltd.*

Respectfully Submitted,

Crystal Sabala
Employee,
Randazza Legal Group, PLLC

Defendants' Request for a Pretrial Conference and Submission of Proposed Protective

# Exhibit F

Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
**RANDAZZA LEGAL GROUP, PLLC**
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

*Attorneys for Defendants*
*Stephen Fairfax and MTechnology*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD.,<br>a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY;<br>DOES 1 through 10; and ROE ENTITIES 11<br>through 20, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-02651-GMN-VCF<br><br>**DECLARATION OF RONALD D. GREEN** |

I, Ronald D. Green, Jr., under penalty of perjury, hereby declare as follows:

1.     I am a partner at the law firm Randazza Legal Group, PLLC and counsel for Defendants MTechnology ("MTech") and Stephen Fairfax in the above-referenced matter.

2.     I am over the age of 18 and I make the statements in this declaration pursuant to my own first-hand knowledge and would be competent to testify to the statements made therein.

3.      Plaintiff Switch, Ltd. ("Switch") and Defendants MTech and Mr. Fairfax differ on the appropriate contents of the eventual protective order that will govern this case.

4.      The parties have attempted in good faith to resolve these differences by conducting two meet and confer conferences on August 23, 2019 and August 29, 2019.

5.      Despite these attempts, the parties have been unable to resolve their differences, necessitating the intervention of this Court.

6.      During the meet and confer conference on August 29, 2019, Sam Castor, in-house counsel for Switch, said on two separate occasions that Switch needed discovery in this case to "substantiate" its anticipated claims against Aligned Data Centers, one of Switch's primary competitors.

7.      Mr. Castor additionally misrepresented that Switch had dismissed its claims against Aligned Data Centers in the U.S. District Court for the Eastern District of Texas without prejudice. However, those claims were dismissed with prejudice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  3rd day of September, 2019.

                                        /s/ Ronald D. Green
                                        Ronald D. Green. Esq.

# Exhibit G

1  ARNOLD & PORTER KAYE SCHOLER LLP
   MICHAEL A. BERTA (No. 194650)
2  michael.berta@arnoldporter.com
   Three Embarcadero Center, 10th Floor
3  San Francisco, CA 94111-4024
   Telephone:   415.471.3100
4  Facsimile:   415.471.3400

5  Attorneys for Non-Party
   JONES LANG LASALLE INCORPORATED
6

7

8

9                 UNITED STATES DISTRICT COURT

10                        FOR THE

11                  DISTRICT OF NEVADA

12

13  SWITCH, LTD.,                          No. 2:17-cv-02651-GMN-VCF

14              Plaintiff,                  **NON-PARTY JONES LANG
                                            LASALLE INCORPORATED'S
15      v.                                  OBJECTIONS TO SUBPOENA TO
                                            PRODUCE DOCUMENTS,
16  STEPHEN FAIRFAX; MTECHNOLOGY, et        INFORMATION, OR OBJECTS OR
    al.,                                    PERMIT INSPECTION OF
17                                          PREMISES IN A CIVIL ACTION**
                Defendants.                 [Fed. R. Civ. P. 45]
18

19

20

21

22

23

24

25

26

27

28

   JONES LANG LASALE INCORPORATED'S OBJS. TO SUBPOENA  2:17-cv-02651-GMN-VCF

1    Pursuant to Rule 45 of the Federal Rules of Civil Procedure, JONES LANG LASALLE

2    INCORPORATED ("JLL"), a non-party to the above action, makes the following objections to a

3    subpoena (the "Subpoena") dated July 19, 2019 in the above-captioned matter.

4

5    **GENERAL OBJECTIONS**

6    1.    JLL objects to the subpoena as unduly burdensome because JLL's burden and

7    expense is significantly greater than any benefit to the subpoenaing party for any issue relevant to

8    this matter.  Rule 26(b)(2)(C)(iii).  The Subpoena contains seven broad document requests that

9    would require costly and time-consuming searches and review of electronic databases over a period

10   of eight years for information in wide-ranging categories that is not reasonably targeted to seek

11   relevant information.

12   2.    JLL objects to the Subpoena because it would require the disclosure of JLL

13   confidential information and/or trade secrets.  Rule 45(c)(3)(B)(i).  Disclosure of such confidential

14   information and/or trade secrets would cause irreparable injury to JLL, including substantial harm to

15   JLL's competitive position.

16   3.    JLL objects to each and every Request to the extent that it seeks documents or

17   information protected by any applicable privilege or protection, including, without limitation, the

18   attorney-client privilege and work product doctrine.  JLL objects to identifying or logging such

19   privileged and/or protected documents as doing so would be unduly burdensome, oppressive and

20   expensive.  Rule 26(b)(2)(C)(iii).

21   4.    JLL further objects to each and every Request to the extent that it seeks documents or

22   information that can be obtained from other sources or in other manners, including from other

23   parties to this matter, without imposing the undue burden and expense on JLL reflected by the

24   Subpoena.

25   5.    JLL objects to all Definitions, Instructions and Requests to the extent they are vague,

26   ambiguous and/or confusing in that they fail to describe with reasonable particularity the

27   information sought.

28

-1-

6.    JLL objects to the Subpoena to the extent it assigns "Definitions" to terms that are vague, ambiguous, or inconsistent with the ordinary meaning of those terms, including You/Your, Switch, Stephen Fairfax, MTechnology, Aligned, Aligned Energy, Intertech, Uber, eBay, and PayPal.

7.    JLL objects to the Subpoena to the extent it provides "Instructions" to the extent they seek to impose requirements beyond what is allowed under the Federal Rules of Civil Procedure and other applicable rules.

8.    JLL objects to the Subpoena as not allowing a reasonable amount of time to respond by on the scope of the information purportedly sought.

9.    JLL has not been served with any applicable pleadings and orders in the action. Any objections and substantive responses provided to the Subpoena are based on information presently available to JLL based on the scope of the subpoena and time allowed for response. As a result, JLL reserves the right to amend and/or supplement its objections to the Subpoena based upon further review of the pleadings and orders in the action.

## SPECIFIC OBJECTIONS TO SUBPOENA FOR DOCUMENTS

**REQUEST NO. 1**:

All communications with any employee, officer, or representative of MTechnology, including Stephen Fairfax, including but not limited to, emails to or from addresses ending with the address "@mtechnology.net") from January 1, 2011 to present, regarding Switch.

**RESPONSE TO REQUEST NO. 1**:

Incorporating herein and reasserting the General Objections above, JLL objects to this Request on the grounds that it seeks discovery that is properly obtained from the parties to this action. JLL objects to this Request on the grounds that it expressly calls for the production of confidential and trade secret information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly burdensome. JLL is willing to meet and confer regarding this request.

**REQUEST NO. 2**:

All communications with any employee, officer, or representative of Inertech from January 1, 2011 to present, regarding Switch.

-2-

1   **RESPONSE TO REQUEST NO. 2**:

2        Incorporating herein and reasserting the General Objections above, JLL objects to this

3   Request on the grounds that it expressly calls for the production of confidential and trade secret

4   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

5   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

6   under Rule 45 and 26.

7   **REQUEST NO. 3**:

8        All communications with any employee, officer, or representative of Uber from January 1,

9   2011 to present, regarding Switch.

10   **RESPONSE TO REQUEST NO. 3**:

11        Incorporating herein and reasserting the General Objections above, JLL objects to this

12   Request on the grounds that it expressly calls for the production of confidential and trade secret

13   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

14   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

15   under Rule 45 and 26.

16   **REQUEST NO. 4**:

17        All communications with any employee, officer, or representative of eBay from January 1,

18   2011 to present, regarding Switch.

19   **RESPONSE TO REQUEST NO. 4**:

20        Incorporating herein and reasserting the General Objections above, JLL objects to this

21   Request on the grounds that it expressly calls for the production of confidential and trade secret

22   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

23   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

24   under Rule 45 and 26.

25   **REQUEST NO. 5**:

26        All communications with any employee, officer, or representative of PayPal from January 1,

27   2011 to present, regarding Switch.

28

1   **RESPONSE TO REQUEST NO. 5**:

2        Incorporating herein and reasserting the General Objections above, JLL objects to this

3   Request on the grounds that it expressly calls for the production of confidential and trade secret

4   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

5   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

6   under Rule 45 and 26.

7   **REQUEST NO. 6**:

8        All communications with any employee, officer, or representative of Aligned from

9   January 1, 2011 to present, regarding Switch.

10   **RESPONSE TO REQUEST NO. 6**:

11        Incorporating herein and reasserting the General Objections above, JLL objects to this

12   Request on the grounds that it expressly calls for the production of confidential and trade secret

13   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

14   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

15   under Rule 45 and 26.

16   **REQUEST NO. 7**:

17        All communications with any employee, officer, or representative of Aligned Energy from

18   January 1, 2011 to present, regarding Uber.

19   **RESPONSE TO REQUEST NO. 7**:

20        Incorporating herein and reasserting the General Objections above, JLL objects to this

21   Request on the grounds that it expressly calls for the production of confidential and trade secret

22   information, it is not reasonably limited in time or in subject matter, and, for that reason, is unduly

23   burdensome.  JLL objects that this discovery appears to be for an improper purpose and is improper

24   under Rule 45 and 26.

25

26

27

28

1  Dated:  September 19, 2019.

2                                                ARNOLD & PORTER KAYE SCHOLER, LLP

3

4

5                                                By: _____

6                                                       MICHAEL A. BERTA
                                                       Attorneys for Non-Party JONES LANG
                                                       LASALE INCORPORATED

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

I, Alaina Austin, declare:

3

I am a resident of the State of California and over the age of eighteen years and not a

4

party to the within-entitled action; my business address is Three Embarcadero Center,

5

Tenth Floor, San Francisco, California 94111-4024.  On September 19, 2019, I served the

6

following document(s) described as:  **NON-PARTY JONES LANG LASALLE**

7

**INCORPORATED'S OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS,**

8

**INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN**

9

**A CIVIL ACTION**

10

☐   by transmitting via facsimile the document(s) listed above to the fax
number(s) set forth below on this date before 5:00 p.m.

11

12

☐   by placing the document(s) listed above in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California
addressed as set forth below.

13

14

☐   by transmitting via email the document(s) listed above to the email address(es)
set forth below on this date.

15

16

☒   by placing the document(s) listed above in a sealed Federal Express envelope
and affixing a pre-paid air bill, and causing the envelope to be delivered to a
Federal Express agent for delivery.

17

18

☐   by personally delivering the document(s) listed above to the person(s) at the
address(es) set forth below.

19

20

Sam Castor, Esq.
7135 South Decatur Blvd.
Los Vegas, NV  89118

21

22

Attorney for Plaintiff
SWITCH, LTD.

23

24

I am readily familiar with the firm's practice of collection and processing

25

correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal

26

Service on that same day with postage thereon fully prepaid in the ordinary course of

27

business.  I am aware that on motion of the party served, service is presumed invalid if

28

1   postal cancellation date or postage meter date is more than one day after date of deposit for

2   mailing in affidavit.

3       I declare under penalty of perjury under the laws of the United States that the

4   foregoing is true and correct.  Executed at San Francisco, California on September 19, 2019.

Alaina Austin

# Exhibit H

**Johnson, Andrew C.**

| | |
|---|---|
| **From:** | Farris, Joseph |
| **Sent:** | <mark>Monday, November 4, 2019 3:47 PM</mark> |
| **To:** | Sam Castor |
| **Cc:** | Jacob A. Reynolds; Anne-Marie Birk; Tanya Paonessa; Feather Lake; Kevin Everage; Emily Shaevitz; Berta, Michael A. |
| **Subject:** | RE: Switch subpoena of JLL (Fairfax) |

Counsel,

Thank you for your correspondence. It confirms what was discussed at the meet and confer, which is that Switch is seeking information through third party discovery unrelated to the claims pleaded in the underlying matter versus Mr. Fairfax. Discovery into an alleged current "nexus" between JLL, Aligned, and Mr. Fairfax bears no relation to the claim against Mr. Fairfax that he disclosed alleged trade secret information to Aligned seven years ago before that same information became public in Switch patent filings. Consistent with this, you have been unable to state any basis as to how JLL has anything to do with that alleged incident or disclosure. Nor do you plead any such facts regarding how JLL could have been involved in any such incident in the complaint against Mr. Fairfax.

Rather, as you confirmed, you are seeking discovery related to a patent infringement matter against Aligned, based on your speculation that JLL may have liability for "contributory patent infringement" in that matter. As was discussed, JLL disagrees with that claim. More importantly, however, that patent case against Aligned was dismissed. And it has nothing to do with this matter. It is therefore plain that this subpoena was not served for a proper purpose and violates Rule 26.

JLL also understands that Switch has openly stated that it using third party discovery in this case to look for evidence that it can use to support possible patent claims against third parties. As Defendants wrote in their Request for a Pretrial Conference (ECF No. 48 at 2): "Switch has already informed Plaintiffs [sic] and their counsel that it intends to use discovery in this case for the improper purposes of 'patent litigation' against at least one of those competitors." According to the Defendants, you personally stated that Switch needed that third party discovery to "substantiate" "anticipated claims" against Aligned on two separate occasions. *Id.* at 4.

In light of your previous statements and those facts, during our meet and confer I asked you to explain why the discovery was sought for a proper purposes, but you could not. Rather, you again confirmed that the purpose of the discovery was test whether JLL might have liability to Switch. Nor do you identify a proper purpose for the subpoena in your email below, which does not even attempt to articulate how the information sought relates to your theory of the case against the Defendants. It is not nearly enough to make the utterly non-specific assertion there is a "clear nexus" or that JLL "involved in the facts of the case," as you do below.

Finally, your email does not accurately reflect the meet and confer conversation as to why the subpoena is improper. JLL is not objecting because it is "afraid" that Switch will "sue [it] too." You were informed that there is caselaw that quite clearly establishes that third party discovery is not meant to be a means to investigate possible claims against third parties. That is an accurate statement of the law, and I'm surprised if you would contend otherwise. *See, e.g., Farmer v. Senior Home Companions of Indiana, Inc.*, No. 1:08-CV-

0379-DFH-JMS, 2009 WL 564193, at *3 (S.D. Ind. Mar. 5, 2009) ("[I]t is improper to use third-party discovery . . . as a vehicle for Plaintiff to pursue other potential claims. 'The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery,* not to find out if it has any basis for a claim.'") (citing *Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery,* not to find out if it has any basis for a claim . . . . While the expression 'fishing expedition' has been generally denigrated as a reason for objecting to discovery, in some situations, such as the one at hand, it remains apt.").

Finally, in a review of the docket in the Switch/Fairfax matter, it is clear that Plaintiff has not sought or obtained any discovery from the Defendants in the actual matter.  This is quite far from the situation as you represented it in the meet and confer.  Given the significant expense entailed by searches through company email and the fact that Switch has not actually sought and obtained any of this discovery from the parties in the case, this burden should not fall on JLL as third party.  In addition, here, the discovery to JLL almost exclusively seeks information about Aligned which, as JLL understands it, is a direct competitor to Switch.  The fact that Switch is seeking current correspondence between JLL and its customer, which has nothing conceivable to do with some alleged act by Mr. Fairfax almost ten years ago, raises the inference that Switch is seeking sensitive competitive information for an improper purpose.  The fact that Switch internal corporate officers are directly seeking this information only heightens the risk.

Based on the foregoing, I don't know if further discussion of this matter is necessary, but we can be available if you think there is more to say about your basis for believing that the subpoena is proper.

Thanks,
Joe
_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Monday, November 4, 2019 11:47 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Jacob A. Reynolds <JReynolds@hutchlegal.com>; Anne-Marie Birk <abirk@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Feather Lake <feather@switch.com>; Kevin Everage <keverage@switch.com>; Emily Shaevitz <eshaevitz@switch.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Subject:** RE: Switch subpoena of JLL (Fairfax)

External E-mail

Thank you. Just following up.

If I don't get an answer today, we'll proceed with a motion to compel as we have already met and conferred on this.

**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o   +1 (702) 444-4102
m   +1 (702) 371-0724
e   sam@switch.com
+   Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Friday, November 1, 2019 3:49 PM
**To:** Sam Castor <sam@switch.com>
**Cc:** Jacob A. Reynolds <JReynolds@hutchlegal.com>; Anne-Marie Birk <abirk@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Feather Lake <feather@switch.com>; Kevin Everage <keverage@switch.com>; Emily Shaevitz <eshaevitz@switch.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Subject:** RE: Switch subpoena of JLL (Fairfax)

Sam,

Mike is not in the office today.  We're reviewing your email and will get back to you after the weekend.

Thanks,
Joe

_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Thursday, October 31, 2019 10:02 AM
**To:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Jacob A. Reynolds <JReynolds@hutchlegal.com>; Anne-Marie Birk <abirk@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Feather Lake <feather@switch.com>; Kevin Everage <keverage@switch.com>; Emily Shaevitz <eshaevitz@switch.com>
**Subject:** RE: Switch subpoena of JLL (Fairfax)

External E-mail

Michael/Joseph,

I have yet to hear from you.  Please let me know if you agree or disagree by tomorrow.

3

**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m  +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Sam Castor
**Sent:** Wednesday, October 30, 2019 1:57 PM
**To:** 'Michael.Berta@arnoldporter.com' <Michael.Berta@arnoldporter.com>; Joseph.Farris@arnoldporter.com
**Cc:** 'Jacob A. Reynolds' <JReynolds@hutchlegal.com>; Anne-Marie Birk <abirk@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Feather Lake <feather@switch.com>; Kevin Everage <keverage@switch.com>; Emily Shaevitz <eshaevitz@switch.com>
**Subject:** Switch subpoena of JLL (Fairfax)
**Importance:** High

Michael/Joseph,

Thank you for the meet and confer conversation a few days ago.  I look forward to resolving this issue rapidly and efficiently.


1.  **Case Law**

As discussed, I would appreciate you sharing the case law you said you had that supports your contention that it is improper for us to seek discovery from third parties involved in the facts of a case, because "you are afraid we will sue you too." Feel free to correct me if I misunderstood your position, or send along case law that justifies that position.

And again, for clarity, we maintain this is not a "fishing expedition", but rather a reasonable discovery exercise to evaluate what we view as a clear nexus between JLL, Fairfax and Aligned.  Rule 26 of the FRCP is clear.  We are entitled to "obtain discovery regarding any non-privilege matter that is relevant" to our claims. And "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."

Given the relationship between JLL, Fairfax, and Aligned, there is more than a sufficient factual nexus to justify discovery and the reasonableness of our subpoena requests.  **As such, I expect revised responses with all documents by November 30th.**

2.  **Your Non-Responsive Answers to Our Subpoena**

As for the individual requests to which you have refused to provide a single document, my goal is reasonableness and efficiency for both sides.  I am open to exploring search terms, and discussing hit results as long as you get them back to me by November 14th.

For requests 1 through 7, you use the same boilerplate objection that contains essentially four (4) sub parts: (1) "the request seeks discovery that is properly obtained from the parties to this action"; (2) "is not

reasonably limited in time or in subject matter"; (3) "is not reasonably limited in subject matter" and (4) "expressly calls for the production of confidential and trade secret information."  I address each in turn below.

1. The objection that we can "obtain the information from another party" is <u>not</u> a valid objection.  We are entitled to compare and contrast discovery productions to verify accuracy and completeness.  There are also emails/documents only your client would likely have.

2. As for the "reasonably limited in time" objection, such an objection would be appropriate if any of the requests lacked a date reference but these do not.  <u>Each</u> of the requests uses the date range January 1, 2011 to the present.  This is a reasonable date range. It is less than ten years.  And the facts at issue arose in early 2011 and again in 2015 and again in 2018.  Communications between your client and Fairfax, and the other witnesses in this case are presumably ongoing.  Additionally, this matter involves hundreds of millions of dollars of contracts and intellectual property.  As such, we are entitled to this widow, as it is "proportional to the needs of the case".

3. Lastly, the requests are reasonably limited in subject matter. They all pertain to communications between <u>Switch</u> and another entity (namely, Inertech, Uber, eBay, PayPal, Aligned, and Aligned Energy).

4. None of the requests "expressly call for the production of confidential and trade secret information".  However, I am open to you labeling all information that you deem confidential or a trade secret as "Confidential Attorneys Eyes Only" and we will treat it accordingly.  I trust this resolves your concerns.

After our discussion, and reviewing these requests yet again, I am very concerned by these weak responses and I am hard pressed not to argue your objections are waived.  I appreciate we're all human.  And I am seeking production, not a discovery battle.  So I will forestall a motion to compel if I receive revised and complete responses by <u>November 29, 2019</u>.  The requests and your objections are attached and the requests are embedded below for your convenience.  If you would like to provide hit results by <u>November 14th</u>, so we can discuss narrowing of search terms, I am also open to that discussion, provided all production occurs by **November 29, 2019**.

Thank you again.

**DOCUMENTS REQUESTED**
1. All communications with any employee, officer, or representative of MTechnology, including Stephen Fairfax, including but not limited to, emails to or from addressees ending with the address "@mtechnology.net") from January 1, 2011 to present, regarding Switch.
2. All communications with any employee, officer, or representative of **Inertech** from January 1, 2011 to present, regarding **Switch**.
3. All communications with any employee, officer, or representative of **Uber** from January 1, 2011 to present, regarding **Switch**.
4. All communications with any employee, officer, or representative of **eBay** from January 1, 2011 to present, regarding **Switch**.

5.      All communications with any employee, officer, or representative of **PayPal** from January 1, 2011 to present, regarding **Switch**.

6.      All communications with any employee, officer, or representative of **Aligned** from January 1, 2011 to present, regarding **Switch**.

7.      All communications with any employee, officer, or representative of **Aligned Energy** from January 1, 2011 to present, regarding **Switch**.


**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# Exhibit I

# Arnold & Porter

**Michael A. Berta**
+1 415.471.3277 Direct
Michael.Berta@arnoldporter.com

March 18, 2020

<u>**VIA E-MAIL**</u>

Sam Castor
Switch, Ltd.
7135 S. Decatur Blvd.
Las Vegas, NV 89118

   **Re: Switch, Ltd. v. Fairfax, et al.,**

Dear Mr. Castor:

   We represent Jones Lange LaSalle, Inc. ("JLL Inc."). On Friday March 13, we received an email from Ms. Tanya Paonessa of Switch, Ltd. ("Switch") indicating that today Switch intends to file a motion to compel concerning Switch's subpoena to JLL Inc. of July 2019. We were surprised to receive this notice out of nowhere late last week after not hearing a word about this matter from Switch for over four months. As you know, the parties were in the process of meeting and conferring in October and early November 2019 when Switch ceased all communications on the matter. Our records show that our last communication with Switch was an email from our office to you on November 4, 2019, which explained our objections in more detail and offered to continue discussions.[1] At that time, we were expecting Switch to make a proposal to narrow the document requests in the subpoena, but we never received one. Given the current worldwide circumstances, we have not even had the opportunity to fully confer with our client about Switch's renewed request and demand for immediate action.

   As we explained last fall, JLL Inc. has serious concerns about the subpoena, and particularly Switch's expressly-stated improper purpose for issuing the subpoena, which is to investigate "patent litigation" claims against third parties, such as JLL Inc. and its

---

[1] We note that the draft motion to compel attached to Ms. Paonessa's email states that Switch "followed up" on its proposal regarding the use of search terms twice, and that "JLL did not respond," but we have no record of any such communication after our email of November 4, 2019. If you believe that is incorrect, please let us know. (The motion to compel also states that a draft of the motion was provided to us on February 12, 2020, but we have no record of that either.).

# Arnold&Porter

Sam Castor
March 18, 2020
Page 2

customer Aligned Data Centers ("Aligned").[2]  When we outlined those concerns for you
in our last email on the subject, you did not respond or provide any additional
information to address them.

      Switch's trade secret misappropriation claim against Defendants Fairfax and
MTechnology in the present action is based on the allegation that Fairfax/MTechnology
"toured" Switch facilities in 2011 and at that time obtained some unspecified trade
secrets, which were later provided to Aligned at unspecified time(s).  As you know, in
2017, Switch previously sued Aligned for patent infringement (based on patents that
issued in 2011, 2012, and 2017) in the Eastern District of Texas based on the exact same
factual allegations concerning Fairfax making disclosures to Aligned.  Switch voluntarily
dismissed that case after Aligned counterclaimed seeking to invalidate Switch's patents
and asserting separate claims for violation of the Lanham Act, tortious interference, and
business disparagement.

      The sweeping document requests in Switch's subpoena to JLL Inc. clearly reflect
an attempt to get a second bite at the apple in Switch's failed patent litigation against
Aligned.  The requests are not narrowly tailored to seek information relevant to Switch's
*present trade secret case against Fairfax/MTechnology*, which would necessarily involve
information that was specifically disclosed by Fairfax to Aligned and which is also *non-
public* "trade secret" information that was not disclosed in the patents asserted against
Aligned.  The subpoena make no effort to account for those necessary limitations, and
instead makes a blanket demand for production of all of JLL Inc.'s communications with
Defendants and six other third parties "from January 1, 2011 to the present regarding
Switch."

      Further, Switch's draft motion to compel does not indicate that any new
development in the case over the past four months now justifies seeking this information
from JLL Inc. as a third party, rather than from Defendants Fairfax/MTechnology.  Quite
the opposite—Switch simply says that "[d]iscovery from Defendants has proceeded
slowly" and implies that this should somehow excuse it from its obligation to seek
discovery first from Fairfax/MTechnology.  It does not.  Rather, this confirms that the
alleged "nexus" of JLL Inc. to this matter remains purely speculative.

---

[2] As Defendants wrote in their Request for a Pretrial Conference (ECF No. 48 at 2): "Switch has already
informed Plaintiffs [sic] and their counsel that it intends to use discovery in this case for the improper
purposes of 'patent litigation' against at least one of those competitors."  According to the Defendants, you
personally stated that Switch needed that third party discovery to "substantiate" "anticipated claims"
against Aligned on two separate occasions.  *Id.* at 4.

# Arnold&Porter

Sam Castor
March 18, 2020
Page 3

If Switch makes a proposal to narrow the document requests to tailor them to seek properly discoverable information in the trade secret case against Fairfax/MTechnology, we are still willing consider a reasonable compromise to resolve our dispute about the subpoena.  To date, you have ignored our invitation to do that.

Finally, although we would prefer to avoid motion practice concerning the subpoena, in the event it is necessary, please be advised that Switch's draft motion to compel seeks to enforce compliance with the subpoena in the improper court (the District of Nevada).  JLL Inc. is based in Chicago, Illinois and does not regularly transact business in Nevada.  While JLL Inc. does have at least one subsidiary that conducts certain operations in Las Vegas, Nevada, JLL Inc. does not do so itself.  As such, the location for compliance specified in the subpoena is improper.  FRCP 45(c)(2)(A).  Should Switch proceed with filing a motion to compel compliance with the subpoena, the proper court to hear the motion would be the Northern District of Illinois, which should have been the location for compliance specified in the subpoena.  FRCP 45(d).

Please let us know when you are available to discuss the matters addressed in this letter directly to see if the parties can reach a resolution.

Sincerely,

Michael A. Berta

# Exhibit J

**Johnson, Andrew C.**

| | |
|---|---|
| **From:** | Farris, Joseph |
| **Sent:** | Friday, March 20, 2020 1:51 PM |
| **To:** | Sam Castor |
| **Cc:** | Tanya Paonessa; Policy; Berta, Michael A. |
| **Subject:** | RE: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL |

Sam,

We fail to see how the delay of over four months without hearing a word from your side or your claimed lack of progress taking discovery from the defendants is JLL Inc.'s responsibility as a third party.

As the party propounding a subpoena to a third party, Switch needs to show that the subpoena is tailored to seek relevant information.  As we've explained multiple times, Switch has not done so.  In fact, the draft motion to compel reflects nothing but sheer speculation that Fairfax/MTechnology may have disclosed some undefined trade secret information to JLL Inc.'s business partners.  This confirms that JLL Inc. is rightly concerned about the improper purpose of the subpoena.

These concerns are only heightened because the requests for all information "regarding Switch" clearly call for the production confidential information related to at least Aligned Data Centers—a company that is directly competitive to Switch by Switch's own admissions in its pleadings, and which Switch has unsuccessfully sued before in another litigation that you personally directed.  And given that the Protective Order in this case expressly allows disclosure of all information to you, it does not mitigate any of JLL's concerns.

Your continued focus on demanding search term results ignores all of these concerns, and is not productive.  If Switch insists upon filing a motion compel after months of silence, without ever having provided a substantive response to JLL Inc.'s concerns, it is your prerogative, but we believe Switch should instead make a propose to narrow the subpoena.  Per our letter, if you do file such a motion, the proper court is the Northern District of Illinois.

Thanks,
Joe

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Wednesday, March 18, 2020 5:39 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>; Berta, Michael A.
<Michael.Berta@arnoldporter.com>
**Subject:** Re: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

External E-mail

Joseph,

Your last response to us was that you were simply refusing to provide anything. The delay is due to your non-responsiveness and  other discovery not progressing in this matter, including from the defendants.

Please provide responses by this Friday or we will file a motion to compel. A simple, "it's too broad and we're not going to answer" response (like the first time) is not going to work here. We've already had repeated substantive discussion.

1

Absent at least search term results and some production, we will file the motion to compel.

Sent from my phone - please excuse brevity and typos.



**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

On Mar 18, 2020, at 2:18 PM, Farris, Joseph <Joseph.Farris@arnoldporter.com> wrote:

> CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Ms. Paonessa,

Please see a letter from Mr. Berta to Sam Castor's attention attached, in response to your email from last Friday.

Thanks,
Joe
_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Friday, March 13, 2020 6:13 PM
**To:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Policy <policy@switch.com>
**Subject:** Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

External E-mail

Counsel,

Attached please find our Motion to Compel. Please be advised that we will proceed with filing on Wednesday, March 18th, if we do not hear from you.

Thank you,

<image001.jpg>

**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

<2020.03.18 Berta Ltr to Castor re Subpoena.pdf>

**Johnson, Andrew C.**

---

| Subject: | RE: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL |
|---|---|

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Friday, March 20, 2020 5:56 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Subject:** Re: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

External E-mail

Joseph,

We have sufficient of evidence of JLL's activity in Nevada. The proper venue is NV.

We have clarified the scope in discussions. It's not overbroad. It is tailored. And it is reasonable.  I recognize it is a little crazy right now. I empathize with that. And you're refusal to comply existed LONG before the current events.

I hope you and your family are ok, and please understand that given your approach, we're filing the motion to compel.

**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** "Farris, Joseph" <Joseph.Farris@arnoldporter.com>
**Date:** Friday, March 20, 2020 at 1:51 PM
**To:** Samuel Castor <sam@switch.com>
**Cc:** Tanya Paonessa <tpaonessa@switch.com>, Policy <policy@switch.com>, "Berta, Michael A." <Michael.Berta@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

---

Sam,

1

We fail to see how the delay of over four months without hearing a word from your side or your claimed lack of progress taking discovery from the defendants is JLL Inc.'s responsibility as a third party.

As the party propounding a subpoena to a third party, Switch needs to show that the subpoena is tailored to seek relevant information. As we've explained multiple times, Switch has not done so. In fact, the draft motion to compel reflects nothing but sheer speculation that Fairfax/MTechnology may have disclosed some undefined trade secret information to JLL Inc.'s business partners. This confirms that JLL Inc. is rightly concerned about the improper purpose of the subpoena.

These concerns are only heightened because the requests for all information "regarding Switch" clearly call for the production confidential information related to at least Aligned Data Centers—a company that is directly competitive to Switch by Switch's own admissions in its pleadings, and which Switch has unsuccessfully sued before in another litigation that you personally directed. And given that the Protective Order in this case expressly allows disclosure of all information to you, it does not mitigate any of JLL's concerns.

Your continued focus on demanding search term results ignores all of these concerns, and is not productive. If Switch insists upon filing a motion compel after months of silence, without ever having provided a substantive response to JLL Inc.'s concerns, it is your prerogative, but we believe Switch should instead make a propose to narrow the subpoena. Per our letter, if you do file such a motion, the proper court is the Northern District of Illinois.

Thanks,
Joe

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Wednesday, March 18, 2020 5:39 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Subject:** Re: Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

External E-mail

Joseph,

Your last response to us was that you were simply refusing to provide anything. The delay is due to your non-responsiveness and  other discovery not progressing in this matter, including from the defendants.

Please provide responses by this Friday or we will file a motion to compel. A simple, "it's too broad and we're not going to answer" response (like the first time) is not going to work here. We've already had repeated substantive discussion.

Absent at least search term results and some production, we will file the motion to compel.


Sent from my phone - please excuse brevity and typos.




**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

On Mar 18, 2020, at 2:18 PM, Farris, Joseph <Joseph.Farris@arnoldporter.com> wrote:

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Ms. Paonessa,

Please see a letter from Mr. Berta to Sam Castor's attention attached, in response to your email from last Friday.

Thanks,
Joe
_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Friday, March 13, 2020 6:13 PM
**To:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Policy <policy@switch.com>
**Subject:** Switch, Ltd. v. Stephen Fairfax, et al. - Subpoena DT to JLL

External E-mail

Counsel,

Attached please find our Motion to Compel. Please be advised that we will proceed with filing on Wednesday, March 18th, if we do not hear from you.

Thank you,

<image001.jpg>  **TANYA PAONESSA**

LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com
<2020.03.18 Berta Ltr to Castor re Subpoena.pdf>

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com