1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MICHAEL A. BERTA (admitted *pro hac vice*)
michael.berta@arnoldporter.com
JOSEPH FARRIS (admitted *pro hac vice*)
joseph.farris@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, California  94111
Telephone:     (415) 471-3100
Facsimile:      (415) 471-3400

WILLIAM R. URGA (SBN 1195)
wru@juwlaw.com
**JOLLEY URGA WOODBURY & HOLTHUS**
330 S. Rampart Boulevard, Suite 380
Las Vegas, Nevada  89145
Telephone:     (702) 699-7500
Facsimile:      (702) 699-7555

*Attorneys for Third Parties*
**ALIGNED DATA CENTERS, LLC and**
**ALIGNED ENERGY HOLDINGS, LP**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive,<br><br>                    Defendants. | Case No. 2:17-cv-02651-GMN-EJY<br><br>**DECLARATION OF JOSEPH FARRIS IN SUPPORT OF MOTION FOR PROTECTIVE ORDER BY ALIGNED DATA CENTERS, LLC AND ALIGNED ENERGY HOLDINGS, LP REGARDING SUBPOENA FOR DEPOSITION OF JAKOB CARNEMARK** |

I, Joseph Farris, declare as follows:

1.      I am an attorney at Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") and am licensed to practice law in California.  My *Verified Petition* to practice before this Court has been granted, and I will be practicing in Nevada under the supervision of local counsel William Urga, a good-standing member of the Nevada State Bar.  I am counsel for third parties Aligned Data Centers, LLC and Aligned Energy Holdings, LP ("Aligned") in this matter.  I have personal knowledge of the facts stated herein, and I make this declaration in support of the Motion for Protective Order by Aligned Data Centers, LLC And Aligned Energy Holdings, LP Regarding Subpoena for Deposition of Jakob Carnemark (the "Motion").

2.      Attached hereto as **Exhibit A** is Plaintiff's Complaint for Patent Infringement in Case No. 2:17-cv-00574 (E.D. Tex.) (the "Patent Action").

3.      Attached here as **Exhibit B** is the Joint Motion to Dismiss in the Patent Action.

4.      On or around June 29, 2020, Switch served a Subpoena To Testify at Deposition in Civil Action directed at Mr. Carnemark and setting a deposition on July 21, 2020 in Dallas, Texas.  Pursuant to agreement, Switch has since served three "Amended Notices of Deposition" to allow the parties time to meet and confer concerning the Subpoena and deposition.  The Subpoena and the three Amended Notices are attached as **Exhibits C-1, C-2, C-3, and C-4**.

5.      On July 9, Aligned provided responses and objections to the Subpoena in a letter to counsel for Switch.  Attached hereto as **Exhibit D** is a copy of the letter.

6.      I met and conferred with Sam Castor via email and two telephone conferences about Aligned's objections.  Attached hereto as Exhibits **E-1, E-2, and E-3** are copies of the emails containing the substantive written correspondence reflecting the parties efforts to meet and confer.

7.      During the first telephone conference, Mr. Castor stated that he was entitled to take the deposition because Switch had a "right to choose its counsel" and because using outside counsel would impose an undue burden on Switch due to the attorneys' fees that Switch would incur if it were to use outside counsel.  Mr. Castor further stated that Switch had previously obtained court orders allowing him to take depositions as in-house counsel in similar cases.  I requested that Switch provide copies of any such court orders.

8.     Attached hereto as **Exhibits F-1, F-2, and F-3** is the opening brief, opposition brief, and reply for Defendants' Motion to Exclude Plaintiff's Inside Counsel Sam Castor from Taking and Defending Depositions in *Switch, Ltd. v. Uptime Institute, LLC, et al.*, No. 2:19-cv-00631-GMN-NJK (D. Nev.) (the "Switch-Uptime Action").  Switch provided Aligned with its opposition brief to this motion as an attachment to the email from Tanya Paonessa dated July 30.

9.     I reviewed the docket in the Uptime Case, which reflected that the Court had never ruled on the Motion for Protective Order and that Switch voluntarily dismissed its claims on May 14, 2020.

10.     I met and conferred in a second telephone conference with Mr. Castor, in which I informed him that we disagreed with Switch's assessment of the case law, and again offered to allow the deposition subject to the protections Aligned was requesting.

11.     At no point during the meet and confer process, including after Aligned notified Switch that it would be moving for a protective order, did Switch state that it intended to have one of its outside law firms withdraw from the case.

12.     Attached hereto as **Exhibit G** is a copy of Sam Castor's LinkedIn profile, as it appeared on April 1, 2020.

13.     Attached hereto as **Exhibit H** is a screenshot of Sam Castor's biography from Switch.com, as it appeared on September 16, 2020 at https://www.switch.com/executive-team/.

14.     Attached hereto **Exhibit I** is a printout of a press release from Switch dated March 29, 2018 entitled "Munters Joins Switch's Data Center Patent Licensing Program" which was available at https://www.switch.com/munters-joins-switchs-data-center-patent-licensing-program/.

15.     During a meet and confer telephone call, I asked if Sam Castor would also be designated as a corporate witness for Switch under Fed. R. Civ. P. 30(b)(6) and Mr. Castor said that it was possible that he would, but that would not be acting as trial counsel if so because that would violate Nevada's Professional Rules of Conduct.

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct to the best of my knowledge.

3

4    Executed this 16th day of September, 2020 in San Francisco, California.

5

6                                                  _____/s/ Joseph Farris_____
                                                        JOSEPH FARRIS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARRIS DECL. ISO MTN FOR PROTECTIVE ORDER RE CARNEMARK DEPO.        No. 2:17-cv-02651-GMN-EJY

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SWITCH, LTD., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 2:17-cv-00574** |
| | § | |
| ALIGNED DATA CENTERS LLC and | § | |
| MTECHNOLOGY INC. | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

1. Switch, Ltd. ("Switch") is a global technology solutions corporation whose core business is the design, construction, and operation of data centers: the infrastructure that powers the internet. With its innovative, patented technology—technology that provides innovative cooling, resiliency, and efficiency for data centers—Switch has emerged as an industry leader. Aligned Data Centers LLC ("Aligned") has begun using Switch's technology to attempt to compete with Switch. Switch brings this action to bring an end to Aligned's infringement of Switch's patents.

2. Switch also brings this action to hold MTechnology Inc. ("MTechnology") accountable for its role in inducing Aligned's infringement. Mr. Stephen Fairfax, as President of MTechnology, was given wide access to assess Switch's data center facilities in 2011 and in early 2015. Switch maintains military-grade security and only granted access to Mr. Fairfax at the request of a Switch customer. Mr. Fairfax agreed to keep the information in strict confidence and signed several confidentiality agreements.

3. In 2011, under a confidentiality agreement, Mr. Fairfax then toured and inspected Switch's facility and spent hours conversing with Mr. Rob Roy—Switch's founder, inventor and CEO—regarding Switch's technology, designs, and business model. Mr. Fairfax praised Switch as uniquely innovative.

4. Despite his assurances and obligations to maintain what he learned from Switch and Mr. Roy in confidence, Mr. Fairfax unlawfully abused Switch's trust and violated his confidentiality agreements.

5. In as early as 2013, without Switch's knowledge or consent, Aligned hired Mr. Fairfax to begin designing data centers. The technology deployed in these facilities mimics—if not mirrors—Switch's technology.

6. Aligned has publicly promoted Mr. Fairfax's integral involvement with a promotional video on their website, and Mr. Fairfax himself has said he was invited to develop designs for Aligned Data Centers at the "blank page stage."[1] Aligned and MTechnology (together, "Defendants") have also begun promoting technology invented and patented by Switch as available at Aligned Data Centers. Aligned is currently using Switch's technology to attract clients for its Arizona and Texas facilities. To promote these facilities, the Defendants are touting the same efficiency and scalability benefits that are available in Switch's data center facilities and that would be much more difficult to obtain but for use of Switch's technology. In doing so, the Defendants are unlawfully and intentionally infringing Switch's patents, unfairly forcing Switch to compete with its own technology, and causing significant, irreparable harm to Switch.

---

[1] *See* https://www.youtube.com/watch?v=KZRwktOCvdo (last visited Aug. 6, 2017).

7. Even the untrained eye can appreciate Aligned's infringement when Switch's technology, known as the Switch T-SCIF® (a "Thermal Separate Compartment in Facility"), is viewed side-by-side with Aligned's "Customer Pod".  Switch provides the following comparisons for the Court's convenience:

<div align="center">

**Switch's T-SCIF**
Side View

**Aligned's "Customer Pod"**
Side View

</div>

 

<div align="center">

**Switch's T-SCIF**
Front View

**Aligned's "Customer Pod"**
Front View

</div>



<div align="center">

**Switch's T-SCIF**
Top View Showing the Heat Shield

**Aligned's "Customer Pod"**
Top View Showing the Heat Shield

</div>

 

## THE PARTIES

8.  Plaintiff Switch, Ltd. is a limited liability company organized and existing under the laws of the State of Nevada, and maintains its principal place of business at 7135 S. Decatur Blvd in Las Vegas, Nevada 89118.

9.  Defendant Aligned Data Centers LLC is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Aligned Data Centers LLC's principal place of business is located at 60 Backus Avenue, Danbury, Connecticut 06810.

10. Defendant MTechnology Inc. is a Massachusetts corporation organized and existing under the laws of the State of Massachusetts. MTechnology Inc.'s principal place of business is 2 Central St. Saxonville, Massachusetts 01701.

## JURISDICTION AND VENUE

11. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12. This Court has personal jurisdiction over Defendants. Aligned Data Centers LLC conducts business and has committed acts of patent infringement and has induced acts of patent infringement by others in this district.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, Aligned Data Centers LLC has committed acts of infringement in this district and has a regular and established place of business in this district. Specifically, Aligned has a large data center facility located at 2800 Summit Ave., Plano TX 75074. Thus, Aligned has a physical presence in the district. It also touts its presence in the district on, for example, its website. It receives benefits from its location in the district by, for

example, selling the use of its facility to customers. It has targeted interactions with the district by, for example, hiring employees, entering into contracts for use of its facility located in the district, and promoting the benefits of its location in the district.

14. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to MTechnology Inc. because MTechnology has committed acts of infringement in this district as described below. Additionally, MTechnology has a regular and established place of business in the district. MTechnology, through at least its President Steve Fairfax, had a "seat at the table" in the design of Aligned Data Center's data centers during the very beginning of the design process, including at the Plano data center location. MTechnology was physically in the district at least during the construction phase of Aligned's Plano data center. MTechnology benefitted significantly—via either revenue, potential ownership, or otherwise—from its work in connection with the design of the Plano data center. MTechnology also benefited from its use of the data center in the district as its own marketing tool. MTechnology also has targeted interactions with the district. For example, MTechnology did a reliability study of the Plano facility. MTechnology has performed checks and likely will continue to perform periodic checks on Aligned Data Centers LLC's facility in the district. Additionally and relatedly, given MTechnology's continued marketing of Aligned Data Centers LLC, including their facility in the district, it is also likely that MTechnology maintains ongoing contractual relationships with at least Aligned related to its facility in the district.

**PATENTS-IN-SUIT**

15. On December 6, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,072,780 (the "'780 patent") entitled "Integrated Wiring System and Thermal Shield Support Apparatus for a Data Center," attached as Exhibit A.

16. Switch owns all rights, title, and interest in and to the '780 patent and possesses all rights of recovery.

17. On May 15, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,180,495 (the "'495 patent") entitled "Air Handling Control System for a Data Center," attached as Exhibit B.

18. Switch owns all rights, title, and interest in and to the '495 patent and possesses all rights of recovery.

19. On April 11, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,622,389 (the "'389 patent") entitled "Electronic Equipment Data Center and Server Co-Location Facility Configurations and Method of Using the Same," attached as Exhibit C.

20. Switch owns all rights, title, and interest in and to the '389 patent and possesses all rights of recovery.

## **GENERAL ALLEGATIONS**

### **I.    Switch's Innovative Technology**

21. Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

22. Switch designs, constructs, and operates the physical infrastructure that cools, powers, protects and connects the internet.

23. Switch's designs have allowed Switch to become known as one of the best in the industry at building and operating data center technology ecosystems.

24. Switch has received various awards for Rob Roy's inventions, including being ranked as the World's No. 1 cloud campus by industry publication Data Center Frontier.[2]   Switch

---

[2] *See* http://datacenterfrontier.com/top-10-cloud-campuses/.

was ranked above Google, Amazon, Apple, Microsoft, Facebook, DuPont Fabors, Digital Realty, the NSA, and Equinix.

25. Switch's customers include Intel, Amazon, Microsoft, Disney, Sony, Fox, Machine Zone, and hundreds more. A partial list of Switch's customers is available at http://www.switch.com/clients/.

26. At the heart of Switch's innovative technologies are Rob Roy's inventions including, but not limited to, Switch's patented hot aisle containment technology and multi-mode cooling technologies. The heat containment technology is known in the industry as the Switch T-SCIF (the "T-SCIF Technology").

27. Computer servers necessary to power the internet consume immense amounts of power. This power consumption generates heat. The problems in efficiently and effectively dealing with this heat have been long-felt in the industry and have proven to be a limiting factor in data center operation.

28. Switch's T-SCIF Technology allows for greater efficiencies and greater computer-server density use by containing up to 100% of the heated air emitted by servers and channeling that heat directly to Switch's cooling technology systems.

29. In a traditional data center, a single server cabinet may consume 3-5 kilowatts of power. However, Switch's T-SCIF Technology permits its customers to deploy up to 50 kilowatts of power.

30. Said differently, Switch's modular technologies allow customers to consume 10 times the amount of power that may be consumed in a traditional environment without overheating their equipment or the data center. Switch's technologies have allowed Switch to fully utilize its data center floor space and has helped customers reduce their costs for data center

deployment, all while delivering maximum power delivery and steady temperature and humidity control. All of this is provided in a modular fashion.

31.     Based on Switch's unique approach to data center technology, Switch has been able to operate its data centers more efficiently than its competitors and has solved one of the biggest threats to data center efficiency: containing and channeling server heat. Switch's patented and patent-pending technology allow Switch to achieve a best monthly average power usage effectiveness (an industry term often referred to as "PUE") below 1.1, a feat that is unique in the colocation data center industry.[3]

32.     In addition to offering unique cooling efficiencies, Switch's technology has permitted Switch to provide steady cooling and power to all of its clients *without interruption* for over 15 years. Although the electric utility may lose power, Switch's designs ensure that a customer will not exceed key temperature thresholds or lose power.

33.     Switch offers unique, heat containment data center services because Switch's heat containment technologies allow customers to consume more power in a given space. This in turn allows customers to reduce their overall data center floor space need and save on the overall cost of data center space.

## II.     Aligned's Unauthorized Infringement

34.     Switch recently learned of Aligned's unauthorized infringement of Switch's patented designs and technology. Upon further investigation, Switch discovered that Mr. Fairfax was instrumental in the design of the Aligned Data Centers in Plano, Texas and Phoenix, Arizona, and the associated technology, from the beginning.

---

[3] *See* https://www.switch.com/sustainability/#sustainable-by-design.

-8-

35.     On July 21, 2017, Switch sent correspondence to the CEO of Aligned Data Centers, Mr. Andrew Schaap.  Switch expressed its curiosity at Aligned's data center designs and extended an invitation to dialogue and seek a business resolution. A copy of the correspondence is attached as Exhibit D.

36.     Switch did not hear back from Mr. Schaap, and has yet to hear from him.

37.     After further investigation, and as the facts became even more clear that Mr. Fairfax helped design Aligned's data centers, Switch sent a litigation hold letter to Mr. Fairfax and to the CTO of Aligned Data Centers, Mr. Jakob Carnemark on July 27, 2017, a copy of which is attached as Exhibit E.

38.     Switch did not hear back from either Mr. Fairfax or Mr. Carnemark until it received a threatening correspondence from Aligned's outside counsel on August 2, 2017.  A copy of this correspondence is attached as Exhibit F.

39.     In its August 2 letter, Aligned insisted that Switch had "been communicating with potential customers and with data center brokers, including third parties in San Francisco, CA, and asserting that Aligned infringes Switch's patents" and demanded that Switch, within two days, respond to its letter and agree to issue "corrective statements."[4]

40.     In view of Aligned's threatening letter and decision to interface via outside litigation counsel, all while faced with growing irreparable harm from Aligned's continued infringement, Switch filed the instant suit.

### III.     Aligned's Data Centers

41.     Aligned recently opened data centers in two markets, namely Plano, Texas and Phoenix, Arizona.  Aligned builds their facilities in a modular fashion, like Switch, to match

---

[4] See Exhibit F, pg. 2-3.

construction costs with customer demand. Aligned has provided an image of the anticipated build-out of its first data center, located in Plano Texas, in its online marketing materials, *see*, *e.g.*:

**Aligned Plano Texas Rendering**     **Plano Texas Google Earth Image**

     

42.  However, as evidenced by the above satellite image of Aligned's Plano facility, which depicts empty dirt lots next to the facility, Aligned might not have fully constructed its Plano facility. Rather, it appears that Aligned is waiting to finish the facility while it actively pursues customers and promotes Switch's technology as its own to support the continued construction of its facilities.

43.  Aligned's plans to unlawfully promote Switch's technology as its own are not isolated to its current, infringing data centers. Aligned is advertising it will eventually operate in six markets: Plano, Texas; Phoenix, Arizona; Northern California; Northern Virginia; Northern New Jersey; and Chicago, Illinois.

44.  Nor is Aligned bashful in how it uses others' technology. Keith Dines, Director of Aligned Data Centers, explains on the Aligned website: "If there is new technology that will improve efficiency or lower the cost to operate our data centers, we will embrace it whole-heartedly."[5]

---

[5] *See* https://www.youtube.com/watch?v=fvlMKfZU9OI.

## IV.    Stephen Fairfax

45.    Around May 2011, Stephen Fairfax was given an in-depth tour of Switch facilities.  He was also given very unique and special access to all of Switch's designs.  Mr. Fairfax was permitted this unique access for a very limited purpose.  Namely, he had been retained by one of Switch's clients to conduct an in-depth audit of the Switch technology to provide an independent assessment of Switch's technology.  Mr. Fairfax was given access to all of Switch's designs, including extremely sensitive documentation, plans, schematics, blueprints, and operational schedules so that he might complete his review.

46.    Prior to granting Mr. Fairfax access to any Switch facility or information, Mr. Fairfax was required to sign a comprehensive Non-Disclosure Agreement (the "2011 NDA"). Before being granted access to Switch's protected materials and the environment within the data center, Mr. Fairfax and MTechnology committed to keep confidential any Confidential Information (as defined in the 2011 NDA).

47.    Following the tour and a thorough evaluation of Switch's technology, on May 10, 2011, Mr. Fairfax emailed Switch to express his gratitude for the tour.  He specifically thanked Switch for the "very thorough tour" and the "the generous amount of time Switch's CEO spent discussing the data center, the business model, and a variety of other very interesting topics."[6]

48.    In 2013, Switch's client again asked Mr. Fairfax to tour Switch's facility and evaluate evolutions in Switch's designs.  Mr. Fairfax praised Switch by noting, "[Switch] is an interesting site, unusual architecture, especially the cooling system."[7]

---

[6] See Exhibit G (email dated May 10, 2011 from Defendant Fairfax to Switch).
[7] See Exhibit H (email dated May 24, 2013 from Mr. Fairfax to eBay).

49.     Mr. Fairfax also noted that he had previously spent "over 4 hours one-on-one with Rob Roy during my initial visit," and he stated that "I tried then to assure [Mr. Roy] that I have no interest in building and operating data centers." Nevertheless, Mr. Fairfax stated that a "PRA [private risk assessment] should be informative for him as well as for you, and us."[8]

50.     Around August 2015, again at the request of Switch's client, Mr. Fairfax was once more granted this unique access to Switch under similar circumstances to evaluate new evolutions in Switch's technology. Mr. Fairfax was again required to execute a Non-Disclosure Agreement (the "2015 NDA", together with the 2011 NDA, the "Non-Disclosure Agreements").

51.     Under the confidentiality protections of the 2015 NDA, Mr. Fairfax was given the opportunity to inspect, tour, and view: (i) the physical infrastructure and layout of the Switch facility, specifically the cabinet layout and configuration known as Switch's T-SCIF; (ii) Switch's novel cooling designs, specifically the multi-mode exterior wall penetrating HVAC system, the cabinet layout and configuration, as well as other technology unique to Switch and necessary to cool the data center; (iii) the electrical configuration and pathways; (iv) the interplay of various Switch technology and components; and (v) the operations of the data center unique to Switch.

52.     Pursuant to the Non-Disclosure Agreements, neither Defendant MTechnology nor Mr. Fairfax were permitted to disclose any confidential information learned during Mr. Fairfax's tour and audit or to use any confidential information for their benefit or the benefit of others. Defendant MTechnology and Mr. Fairfax failed to keep their contractual commitment.

---

[8] See Exhibit H.

## V.     Relationship between Aligned Data Centers and Stephen Fairfax

53.     Around or before 2015, Stephen Fairfax was introduced to Aligned by Inertech, one of Aligned's subsidiaries.  Mr. Fairfax was retained by Aligned Data Centers and asked to design its data centers.  Mr. Fairfax was instrumental in the design of Aligned's data center technology.  According to Mr. Fairfax, "Aligned was unique in that they approached us while the paper was literally still blank."[9]

54.     Mr. Fairfax was involved at every stage of the design and execution of Aligned's data centers, and is, to this day, highlighted on the Aligned website as a spokesperson promoting the design of Aligned's data centers.

## VI.     Aligned Data Center Design

55.     Based on the completed design of the Aligned data centers, Switch believes that Mr. Fairfax improperly encouraged Aligned to implement Switch's technology in the design and makeup of the Aligned data centers.  As examples, Aligned's facilities mimic: (i) Switch's physical infrastructure, heat containment cabinet layout, and configuration; (ii) the electrical pathway configuration; (iii) the interplay of various component parts; and (iv) the operations of the data center unique to Switch.

56.     It should also be noted that, similar to Switch, Aligned is now claiming a PUE of 1.15 and the ability to reach per cabinet/rack KW consumption of 50 KW.  Switch believes that these PUE and per-rack KW potentials are only be possible through the use of Switch's technologies.

---

[9] *See* https://www.aligneddatacenters.com/video/steve-fairfax-mtechnology-aligned-data-centers.

## COUNT ONE: DIRECT INFRINGEMENT BY ALIGNED DATA CENTERS LLC

57. Aligned Data Centers LLC has made, makes, has used, uses, has sold, sells, has offered to sell, and offers to sell infringing data centers.

58. Aligned's data centers practice at least one claim of the '780 patent. An example claim, claim 1, recites:

> An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, and supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned in a two rows and separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

>> a plurality of support brackets disposed along each of the two rows that support the distribution power wires and conduits, the electronic equipment power wires and conduits, and the communication wiring on one side of the plurality of support brackets, and support the thermal shield on another side plurality of support brackets, wherein a portion of each of the support brackets is adapted for connection above the plurality of cabinets, each of the support brackets including, in the portion adapted for connection above the plurality of cabinets:

>> a plurality of tiered ladder rack supports on the one side to establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring, and

>> a plurality of conduit holders disposed on the one side above the plurality of tiered ladder rack supports, each of the conduit holders in each of the plurality of support brackets aligned with corresponding ones of conduit holders in the other plurality of support brackets, for holding a plurality of the distribution power wires and conduits.

59. As shown in the picture below, Aligned's data centers contain an apparatus with "support brackets," "cabinets," a "thermal shield," "tiered ladder racks supports," and "conduit holders" as claimed in the '780 patent:

-14-



Source: https://www.youtube.com/watch?v=FrlpEbBo37c at 1:25 (last visited Aug. 6, 2017).



Source: https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:19 (last visited Aug. 6, 2017).

60.     Aligned's data centers infringe at least one claim of the '389 patent.  An example claim, claim 1, recites:

-15-

An apparatus for maintaining a configuration of electronic equipment disposed in a plurality of cabinets, for supporting a thermal shield that defines a hot air containment chamber, for supporting a thermal barrier ceiling, for supporting cool air ductwork and for supporting distribution power wires and conduits, electronic equipment power wires and conduits, and communication wiring, the plurality of cabinets disposed on a floor, the floor being within an internal area of a building, the cabinets positioned into two parallel rows that are separated by a hot aisle area so that the electronic equipment disposed in the plurality of cabinets emit heated air in a predetermined direction toward the hot aisle area between the two rows, the apparatus comprising:

an interior frame structure that is independent of and not structurally tied to the plurality of cabinets, the interior frame structure including:

a first plurality of vertical support brackets disposed only at ends of the two rows, each vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the first plurality of vertical support brackets each further support portions of the thermal shield on one side of the first plurality of vertical support brackets at a location above a top of the plurality of cabinets, wherein the cabinets positioned in the two parallel rows are separated by the hot aisle area, and wherein a cross sectional area of the hot air containment chamber defined by the thermal shield and parallel with the floor is disposed directly above and encompasses a cross sectional area of the hot aisle area that is located between the two parallel rows of cabinets and is parallel with the floor;

a first horizontal support bracket disposed above a cabinet height that intersects a middle hot aisle portion so that an area on two opposite sides of each hot aisle where the cabinets can be placed does not have any vertical support brackets disposed therein;

a second plurality of horizontal support brackets that are each parallel with the floor, each of the second plurality of horizontal support brackets connecting together two different ones of the first plurality of vertical support brackets and connecting to each of the two different ones of the first plurality of vertical support brackets at a height that is above the cabinet height;

a plurality of tiered ladder rack supports, each connected to another side of at least some of the first plurality of vertical support brackets that is opposite the one side, which establish a plurality of different tiers outside of the hot air containment chamber, so that each of the different

-16-

tiers is adapted to hold the electronic equipment power wires and conduits and the communication wiring; and

a second plurality of vertical support brackets disposed in a row, substantially parallel to the two rows, each second vertical support bracket being disposed on the floor at one end and assists in supporting the thermal barrier ceiling at another end, wherein the second plurality of vertical support brackets each further support portions of the cool air ductwork.

61.    As shown in the pictures below, Aligned's data centers contain an apparatus with "vertical support brackets," "horizontal support brackets," "tiered ladder rack supports," a "thermal barrier ceiling" and "thermal shield" as claimed in the '389 patent:



Source: *Aligned Plano: Power and Cooling on Demand*, DataCenter Dynamics, http://www.datacenterdynamics.com/content-tracks/colo-cloud/aligned-plano-power-and-cooling-on-demand/97039.fullarticle (last visited Aug. 7, 2017).



Source: https://www.youtube.com/watch?v=q2nXSUi7Ag8&feature=youtu.be&t=6 at :03 (last visited Aug. 7, 2017).

62.    Aligned's data centers infringe at least one claim of the '495 patent. An example claim,

claim 1, recites:

An apparatus for cooling electronic equipment contained within a floor of a building, in conjunction with a plurality of air conditioning units that each create cool air and include an exhaust fan and a cooling fan and a plurality of actuators that control a plurality of dampers associated with the plurality of air conditioning units, the apparatus comprising:

a plurality of cabinets disposed on the floor of the building for holding the electronic equipment therein, the plurality of cabinets positioned in a plurality of rows within each of a plurality of cabinet clusters so that the electronic equipment disposed within the cabinets emit heated air from the cabinets in each row of each cabinet cluster toward a central hot air area associated with each cabinet cluster;

a hot air containment chamber disposed within the building over each of the plurality of cabinet clusters that traps the heated air within the central hot air area and causes substantially all the heated air within the central hot air area to rise up within the hot air containment chamber and exit through a hot air escape opening of the associated hot air containment chamber;

-18-

a warm air escape gap disposed within the building and disposed above each of the hot air containment chambers, the warm air escape gap collecting the heated air from each of the hot air containment chambers and feeding the heated air to the air conditioning units, the warm air escape gap being lowerly bounded by a ceiling, wherein the ceiling contains ceiling openings that each align with one of the hot air escape openings in each of the hot air containment chambers;

cool air ducts disposed within the building that deliver the cool air from the plurality of air conditioning units toward a periphery of the plurality of rows of cabinets within each of the plurality of cabinet clusters; and

a control system, the control system comprising:

a plurality of temperature sensors, at least one temperature sensor located inside each of the central hot air areas associated with each cabinet cluster, at least one temperature sensor located outside each of the plurality of cabinet clusters, and at least one temperature sensor located in the warm air escape gap; a plurality of pressure differential sensors, at least one pressure differential sensor located inside each of the plurality of hot air containment chambers, at least one pressure differential sensor located outside each of the plurality of hot air containment chambers, and at least one pressure differential sensor located in the warm air escape gap; and

a computer system, the computer system receiving signals from each of the plurality of temperature sensors and each of the plurality of pressure differential sensors, and providing control signals to control the exhaust fan, the cooling fan, and the plurality of actuators in order to control the temperature of the cooled air and a pressure differential that exists between an area within the hot air containment chamber for each of the cabinet clusters and a different area outside of each of the cabinet clusters.

63.     As shown in the pictures below, Aligned's data centers comprise an apparatus with "cabinets," a "hot air containment chamber," and a "warm air escape gap" as claimed in the '495 patent.



Source: https://www.youtube.com/watch?v=2YnPQ4KmMKU at 0:06 (last visited Aug. 7, 2017).



Source: https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:22 (last visited Aug. 7, 2017).

64. Aligned's data centers also comprise an apparatus with a "control system" as claimed in the '495 patent with its data center infrastructure management (DCIM) software and/or Inertech's controller in conjunction with pressure differential and temperature sensors. *See, e.g.*, Exhibits I-J.

65. For example, Aligned describes its system as one that is a "responsive" cooling system that provides an environment that "dynamically adapts to IT loads."[10]

66. Aligned advertises its "Client Portal" for Data Center Information Management as including information related to "all of the components of your colocation environment, including footprint-level, rack-level, cooling system, and power system performance and utilization."[11]

67. Inertech describes its controller as follows: "When this free-cooling cycle requires assistance, Inertech's controller brings the Danfoss Turbocor compressor online to provide incremental compression." Exhibit K.

## COUNT TWO: INDIRECT INFRINGEMENT BY ALIGNED

68. Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

69. Aligned Data Centers LLC has actual knowledge of the patents-in-suit or was willfully blind to those patents.

70. On July 21, 2017, Switch wrote to Aligned Data Centers informing Aligned of the '780 and '389 patents. The '495 Patent is part of the same patent family.

---

[10] Available at https://www.youtube.com/watch?v=KCaPCc6eHpk at 1:25-1:46 (last visited Aug. 7, 2017).
[11] *See* https://www.aligneddatacenterns.com/whats-inside/client-portal.

-21-

71.     Aligned Data Centers LLC indirectly infringes the patents-in-suit by inducing infringement by others, such as its customers using the data centers, by, for example, encouraging those customers to use the infringing apparatuses described above.

72.     Aligned took the above actions intending to cause infringing acts by others.

73.     Aligned was aware of the patents-in-suit and knew that the others' actions, if taken, would constitute infringement of the patents-in-suit.  Alternatively, Aligned believed there was a high probability that others would infringe the patents-in-suit but remained willfully blind to the infringing nature of others' actions.

74.     Aligned therefore infringes the patents-in-suit under 35 U.S.C. § 271(b).

### COUNT THREE: INDIRECT INFRINGEMENT BY MTECHNOLOGY

75.     Switch incorporates by reference the preceding paragraphs as if fully set forth herein.

76.     MTechnology had actual knowledge of the patents-in-suit or was willfully blind to those patents.

77.     MTechnology President, Stephen Fairfax, toured Switch's Las Vegas facilities once in or near May 2011 and once in or near August 2015.  The purpose of these tours was to inspect the facilities on behalf of Switch's largest client.

78.     In 2011, in connection with his inspection, Mr. Fairfax was told that there were patents issued and pending on Switch's T-SCIF design.

79.     In 2013, Mr. Fairfax specifically praised Switch's cooling system, of which Switch's T-SCIF design is a part.  Mr. Fairfax also represented that MTechnology had "no interest in building and operating data centers."

80.     In 2015, it was reiterated to Mr. Fairfax that there were patents issued and pending on Switch's T-SCIF design.

81. In Aligned marketing materials, Mr. Fairfax acknowledges that, notwithstanding his exposure to the intricacies of Switch's innovative data center design, he, on behalf of MTechnology, nevertheless had a "seat at the table to participate" in Aligned's design process and that, in fact, Aligned had approached him at the very beginning of the process "while the paper was literally still blank."

82. By participating with Aligned in its design process for these data centers, MTechnology actively induced Aligned's infringement under 35 U.S.C. §271(b).

83. By participating in the design process, MTechnology took action that encouraged Aligned to go forward with a particular, infringing design for its data centers. As described above, making a data center pursuant to that design infringes the patents-in-suit.

84. As such, MTechnology either knew or was willfully blind to the existence of the patents-in-suit.

85. Additionally, MTechnology either knew or was willfully blind to the fact that Aligned's implementation of its data centers would infringe Switch's patents.

86. MTechnology acted intending to encourage that infringing action by Aligned.

87. Additionally, MTechnology continues to publicly promote Aligned's data centers with knowledge of Aligned's infringing data center designs, for example, via internet videos and quotes posted on Aligned's websites. By continuing to promote Aligned's data centers, MTechnology encourages the infringing use of those data centers by Aligned's customers knowing that the use of those centers would constitute infringement of the patents-in-suit or being willfully blind to that infringement.

## **DEMAND FOR JURY TRIAL**

Switch hereby demands a jury for all issues so triable.

## **PRAYER FOR RELIEF**

1.    A judgment that Aligned Data Centers LLC has directly infringed the '780, '389, and '495 patents and that Aligned Data Centers LLC induced the infringement of the '780, '389, and '495 patents.

2.    A judgment that MTechnology has induced Align Data Centers LLC's infringement of the '780, '389, and '495 patents and has induced others to infringe the '780, '389, and '495 patents by encouraging the use of Aligned Data Centers LLC's facilities.

3.    A preliminary and permanent injunction preventing Defendants and their officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and inducing the infringement of the '780, '389, and '495 patents;

4.    A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding to Switch its attorneys' fees incurred in prosecuting this action;

5.    A judgment and order requiring Defendants to pay Switch damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed;

6.    A judgment and order requiring Defendants to pay Switch the costs of this action (including all disbursements);

7.    A judgment and order requiring Defendants to pay Switch pre-judgment and post-judgment interest on the damages awarded;

8.    A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that Switch be awarded an ongoing licensing fee; and Such other and further relief as the Court may deem just and proper.

-24-

DATED: August 7, 2017

Respectfully submitted,

**CALDWELL CASSADY & CURRY P.C.**

Bradley W. Caldwell
Texas State Bar No. 24040630
Email: bcaldwell@caldwellcc.com
John Austin Curry
Texas State Bar No. 24059636
Email: acurry@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

Harry L. Gillam Jr.
State Bar No. 07921800
Melissa R. Smith
State Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

**ATTORNEYS FOR PLAINTIFF
SWITCH, LTD.**

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| SWITCH, LTD.,<br><br>             Plaintiff,<br><br>v.<br><br>ALIGNED DATA CENTERS LLC and<br>MTECHNOLOGY INC.,<br><br>             Defendants. | CIVIL ACTION NO. 2:17-CV-574-JRG<br><br>**JURY TRIAL DEMANDED** |
| ALIGNED DATA CENTERS, LLC,<br>ALIGNED DATA CENTERS (DFW), LLC,<br>and ALIGNED DATA CENTERS<br>(PHOENIX), LLC,<br>             Counterclaim-Plaintiffs,<br><br>v.<br><br>SWITCH, LTD.,<br>             Counterclaim-Defendant. |  |

## ORDER

Before the Court is the Parties' Joint Motion to Dismiss Pursuant to Rule 41(a)(2) (Dkt. No. 79). Having considered the Joint Motion, the Court finds that the Motion should be and hereby is **GRANTED**. It is **ORDERED** that all claims by Switch against Aligned asserted in Switch Ltd.'s First Amended Complaint (Dkt. No. 57), and all counterclaims by Aligned against Switch asserted in Aligned's Answer and Counterclaims (Dkt. No. 72) to that First Amended Complaint are **DISMISSED WITH PREJUDICE**. The Clerk is directed to **CLOSE** this case.

**So ORDERED and SIGNED this 9th day of July, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# Exhibit C-1

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Nevada

| | |
|---|---|
| SWITCH, LTD. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.    2:17-cv-02651-GMN-VCF |
| STEPHEN FAIRFAX; MTECHNOLOGY, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                        JAKOB CARNEMARK

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: U.S. Legal Support, Inc. <br> 8144 Walnut Hill Lane, Suite 350, Dallas, Texas 75231 | Date and Time: <br> 07/21/2020 9:00 am |
|---|---|

The deposition will be recorded by this method:     Stenographic/Audio/Videotape

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/29/2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s/: Samuel Castor |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Plaintiff
, who issues or requests this subpoena, are:

Samuel Castor, Esq., 7135 South Decatur Blvd., Las Vegas, NV 89118

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   2:17-cv-02651-GMN-VCF

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit C-2

1   SAMUEL CASTOR, ESQ.
    Nevada Bar No. 11532
2   ANNE-MARIE BIRK, ESQ.
    Nevada Bar No. 12330
3   **SWITCH, LTD.**
4   7135 South Decatur Blvd.
    Las Vegas, Nevada 89118
5   Telephone: (702) 444-4111
    policy@switch.com
6
7   MARK A. HUTCHISON
    Nevada Bar No. 4639
8   JACOB A. REYNOLDS
    Nevada Bar No. 10199
9   PIERS R. TUELLER
    Nevada Bar No. 14633
10  **HUTCHISON & STEFFEN, PLLC**
    Peccole Professional Park
11  10080 West Alta Drive, Suite 200
    Las Vegas, Nevada 89145
12  Telephone: (702) 385-2500
    *Attorneys for Plaintiff*
13

14              **UNITED STATES DISTRICT COURT**

15                    **DISTRICT OF NEVADA**

16  SWITCH, LTD., a Nevada limited liability        CASE NO.:    2:17-cv-02651-GMN-VCF
    company,
17                                                  **PLAINTIFF'S AMENDED NOTICE
                    Plaintiff,                      OF DEPOSITION OF JAKOB
18                                                  CARNEMARK**
    vs.
19
20  STEPHEN FAIRFAX; MTECHNOLOGY; and
    DOES 1 through 10; ROE ENTITIES 11 through      Date:      July 27, 2020
21  20, inclusive,                                  Time:      9:00 a.m.
                                                    Location:  Zoom Meeting
22                  Defendants.
23

24          PLEASE TAKE NOTICE that on **July 27, 2020, at 9:00 a.m.** *(previously scheduled for July 21,*

25  *2020, at 9:00 a.m.),* Plaintiff, SWITCH, LTD., by and through its attorneys of record, will take the

26  videotaped    deposition    of    **JAKOB    CARNEMARK**,    via    **Zoom    Meeting,**

27  **https://litigationservices.zoom.us/j/96732619065, Meeting ID: 967 3261 9065, Password:**

28  **203639**. The deposition will be conducted upon oral examination, pursuant to Rule 26 and Rule 30

                                        1

of the Federal Rules of Civil Procedure, before a notary public, or before some other officer authorized by law to administer oaths.

Oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

DATED this 17th day of July, 2020.

SWITCH, LTD.


   /s/:  Samuel Castor
SAMUEL CASTOR, ESQ.
Nevada Bar No. 11532
ANNE-MARIE BIRK, ESQ.
Nevada Bar No. 12330
7135 South Decatur Blvd.
Las Vegas, Nevada 89118

MARK A. HUTCHISON
Nevada Bar No. 4639
JACOB A. REYNOLDS
Nevada Bar No. 10199
PIERS R. TUELLER
Nevada Bar No. 14633
HUTCHISON & STEFFEN, PLLC
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145
*Attorneys for Plaintiff*

2

### CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I hereby certify that on this 17th day of July, 2020, I served a true and correct copy of the above document, entitled **PLAINTIFF'S AMENDED NOTICE OF DEPOSITION OF JAKOB CARNEMARK**, to all parties, who are deemed to have consented to electronic service via their email, as follows:

Marc J. Randazza, Esq.
Ronald D. Green, Esq.
Alex J. Shepard, Esq.
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
ecf@randazza.com
mjr@randazza.com
rdg@randazza.com
ajs@randazza.com
*Attorneys for Defendants*

Michael A. Berta, Esq.
Joseph Farris, Esq.
ARNOLD PORTER
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Michael.Berta@arnoldporter.com
Joseph.Farris@arnoldporter.com
*Attorneys for Jakob Carnemark*

*/s/: Tanya Paonessa*
An agent of SWITCH, LTD.

3

# Exhibit C-3

1  SAMUEL CASTOR, ESQ.
   Nevada Bar No. 11532
2  ANNE-MARIE BIRK, ESQ.
   Nevada Bar No. 12330
3  **SWITCH, LTD.**
4  7135 South Decatur Blvd.
   Las Vegas, Nevada 89118
5  Telephone: (702) 444-4111
   policy@switch.com
6
   MARK A. HUTCHISON
7  Nevada Bar No. 4639
   JACOB A. REYNOLDS
8  Nevada Bar No. 10199
   PIERS R. TUELLER
9  Nevada Bar No. 14633
10 **HUTCHISON & STEFFEN, PLLC**
   Peccole Professional Park
11 10080 West Alta Drive, Suite 200
   Las Vegas, Nevada 89145
12 Telephone: (702) 385-2500
   *Attorneys for Plaintiff*

13

14                **UNITED STATES DISTRICT COURT**

15                    **DISTRICT OF NEVADA**

16 | SWITCH, LTD., a Nevada limited liability company, | CASE NO.:   2:17-cv-02651-GMN-VCF |
   | Plaintiff, | **PLAINTIFF'S SECOND AMENDED NOTICE OF DEPOSITION OF JAKOB CARNEMARK** |
   | vs. | |
   | STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive, | Date:        TBD |
   | Defendants. | Time:        TBD |
   | | Location:   Zoom Meeting (Details TBD) |

24          PLEASE TAKE NOTICE that on a **date to be determined** *(previously scheduled for July 27,*

25 *2020, at 9:00 a.m.)*, Plaintiff, SWITCH, LTD., by and through its attorneys of record, will take the

26 videotaped deposition of **JAKOB CARNEMARK**, via Zoom Meeting. The deposition will be

27 conducted upon oral examination, pursuant to Rule 26 and Rule 30 of the Federal Rules of Civil

28 Procedure, before a notary public, or before some other officer authorized by law to administer oaths.

1

Oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

DATED this 23rd day of July, 2020.

**SWITCH, LTD.**


_/s/: Samuel Castor_
SAMUEL CASTOR, ESQ.
Nevada Bar No. 11532
ANNE-MARIE BIRK, ESQ.
Nevada Bar No. 12330
7135 South Decatur Blvd.
Las Vegas, Nevada 89118

MARK A. HUTCHISON
Nevada Bar No. 4639
JACOB A. REYNOLDS
Nevada Bar No. 10199
PIERS R. TUELLER
Nevada Bar No. 14633
**HUTCHISON & STEFFEN, PLLC**
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145
_Attorneys for Plaintiff_

2

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I hereby certify that on this 23rd day of July, 2020, I served a true and correct copy of the above document, entitled **PLAINTIFF'S SECOND AMENDED NOTICE OF DEPOSITION OF JAKOB CARNEMARK**, to all parties, who are deemed to have consented to electronic service via their email, as follows:

Marc J. Randazza, Esq.
Ronald D. Green, Esq.
Alex J. Shepard, Esq.
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
ecf@randazza.com
mjr@randazza.com
rdg@randazza.com
ajs@randazza.com
*Attorneys for Defendants*

Michael A. Berta, Esq.
Joseph Farris, Esq.
ARNOLD PORTER
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Michael.Berta@arnoldporter.com
Joseph.Farris@arnoldporter.com
*Attorneys for Jakob Carnemark*


/s/: Tanya Paonessa
An agent of SWITCH, LTD.

3

# Exhibit C-4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SAMUEL CASTOR, ESQ.
Nevada Bar No. 11532
ANNE-MARIE BIRK, ESQ.
Nevada Bar No. 12330
**SWITCH, LTD.**
7135 South Decatur Blvd.
Las Vegas, Nevada 89118
Telephone: (702) 444-4111
policy@switch.com

MARK A. HUTCHISON
Nevada Bar No. 4639
JACOB A. REYNOLDS
Nevada Bar No. 10199
PIERS R. TUELLER
Nevada Bar No. 14633
**HUTCHISON & STEFFEN, PLLC**
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145
Telephone: (702) 385-2500
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| SWITCH, LTD., a Nevada limited liability company, | CASE NO.:    2:17-cv-02651-GMN-VCF |
|---|---|
| Plaintiff, | **PLAINTIFF'S THIRD AMENDED NOTICE OF DEPOSITION OF JAKOB CARNEMARK** |
| vs. | |
| STEPHEN FAIRFAX; MTECHNOLOGY; and DOES 1 through 10; ROE ENTITIES 11 through 20, inclusive, | Date:       September 23, 2020 Time:       10:00 a.m. Location:   Zoom Meeting |
| Defendants. | |

PLEASE TAKE NOTICE that on **September 23, 2020, at 10:00 a.m.**, Plaintiff, SWITCH, LTD., by and through its attorneys of record, will take the videotaped deposition of **JAKOB CARNEMARK**, via Zoom Meeting, https://litigationservices.zoom.us/j/95685224128, Meeting ID: 956 8522 4128, Passcode: 464654. The deposition will be conducted upon oral examination,

1

pursuant to Rule 26 and Rule 30 of the Federal Rules of Civil Procedure, before a notary public, or before some other officer authorized by law to administer oaths.

Oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

DATED this 2nd day of September, 2020.

SWITCH, LTD.


  _/s/: Samuel Castor_
SAMUEL CASTOR, ESQ.
Nevada Bar No. 11532
ANNE-MARIE BIRK, ESQ.
Nevada Bar No. 12330
7135 South Decatur Blvd.
Las Vegas, Nevada 89118

MARK A. HUTCHISON
Nevada Bar No. 4639
JACOB A. REYNOLDS
Nevada Bar No. 10199
PIERS R. TUELLER
Nevada Bar No. 14633
**HUTCHISON & STEFFEN, PLLC**
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145
_Attorneys for Plaintiff_

2

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I hereby certify that on this 2nd day of September, 2020, I served a true and correct copy of the above document, entitled **PLAINTIFF'S THIRD AMENDED NOTICE OF DEPOSITION OF JAKOB CARNEMARK**, to all parties, who are deemed to have consented to electronic service via their email, as follows:

Marc J. Randazza, Esq.
Ronald D. Green, Esq.
Alex J. Shepard, Esq.
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
ecf@randazza.com
mjr@randazza.com
rdg@randazza.com
ajs@randazza.com
*Attorneys for Defendants*

Michael A. Berta, Esq.
Joseph Farris, Esq.
ARNOLD PORTER
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Michael.Berta@arnoldporter.com
Joseph.Farris@arnoldporter.com
*Attorneys for Jakob Carnemark*

_/s/: Tanya Paonessa_
An agent of SWITCH, LTD.

3

# Exhibit D

# Arnold&Porter

**Michael A. Berta**
+1 415.471.3277 Direct
Michael.Berta@arnoldporter.com

July 9, 2020

<u>Via E-Mail and Federal Express</u>

Samuel Castor, Esq.
Switch, Ltd.
7135 South Decatur Blvd.
Las Vegas, Nevada  89118

   Re: *Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.*,
      2:17-cv-02651-GMN-VCF

Mr. Castor,

   As you know, we represent Aligned Data Centers, LLC and Aligned Energy Holdings, LP (collectively, "Aligned").  We are in receipt of a Subpoena dated June 29, 2020 issued in the above-captioned matter for a deposition under Fed. R. Civ. P. 45 of Aligned's co-founder and director Mr. Jakob Carnemark ("Subpoena").  Arnold & Porter will be representing Mr. Carnemark in this matter.  In this letter, we provide our objections and responses to the Subpoena on behalf of both Aligned and Mr. Carnemark.

   **Protection of Aligned Confidential Information and Trade Secrets**.  First, Aligned and Mr. Carnemark object to the Subpoena on the grounds that a deposition of Mr. Carnemark concerning the subject matter of this lawsuit would improperly disclose Aligned confidential information and trade secrets to Switch, Ltd. ("Switch"), which is a competitor of Aligned.  Fed. R. Civ. P. 45(d)(3).  Specifically, the parties object to the deposition being conducted by you personally (or in your presence), as Switch's in-house policy personnel and a member of its executive team.

   The Stipulated Protective Order ("SPO") in this action (ECF No. 64) does not provide adequate assurances that Aligned confidential information will not be disclosed to Switch because Switch has not retained outside legal counsel in this matter, and the SPO specifically allows disclosure of information designated as "HIGHLY CONFIDENTIAL" (the most protective designation under the SPO) to you personally as "Counsel."  As Switch's Executive Vice President of Policy, you are a member of the company's executive leadership team and are involved in competitive decision making. This is confirmed by your own statements concerning your wide-ranging responsibilities at Switch.  For example, on your LinkedIn profile (attached to this letter for reference), you claim to "assist[] Switch in all things legal, including energy sustainability, contract negotiation, intellectual property litigation and prosecution, protection and licensing,

# Arnold&Porter

Samuel Castor. Esq.
July 9, 2020
Page 2

telecom, power and air quality regulatory compliance, human resource policy, strategy, legislative policy, complete commercial transactions, and litigation." You also state that you have "negotiated billions of dollars in thousands of contracts for telecom, power, and colocation deals (including multi-million a month contracts with Fortune 100 companies, governments and agencies)." These types of responsibilities make clear that you have a role at the company where you would be in a position to take advantage of knowledge of Aligned confidential information and trade secrets to gain an unfair competitive advantage in future business dealings. As such, documents containing Aligned confidential information and trade secrets cannot be disclosed to you, even subject to the other restrictions in the SPO.

Aligned and Mr. Carnemark would be willing to withdraw this objection to the deposition on the following conditions: (i) Switch must retain outside legal counsel to conduct the deposition; (ii) no Switch employee, including yourself, may be present during the deposition or view a live transcript, and (iii) before the transcript is disclosed to you or any Switch personnel, Aligned will be afforded a reasonable time to review the transcript and make appropriate confidentiality designations consistent with the SPO with the addition of a special designation for "OUTSIDE COUNSEL EYES ONLY" information, which would not permit disclosure of Aligned's confidential and trade secret information to you or other Switch personnel. If this is agreeable in principle, we can provide a proposed stipulation.

**Improper Purpose / Undue Burden**. Aligned further objects to the Subpoena as being served for an improper purpose and imposing an undue burden on Mr. Carnemark and Aligned. Fed. R. Civ. P. 26; 45(d)(3). As we have previously communicated to you, Switch is improperly seeking third party discovery in its trade secret case against the Defendants to develop claims for "patent infringement" against Aligned, and is also seeking information that is not proportional to the needs of its case against Defendants by way of a deposition of a director of a third party.

To the extent that Switch does not resolve the objections concerning the confidentiality of the deposition set forth above, Aligned and Mr. Carnemark reserve their right to have the Subpoena quashed on that basis as well. However, in the spirit of compromise, if the objections regarding confidentiality are sufficiently addressed, (and subject to the resolution of the other objections concerning depositions logistics below), Aligned and Mr. Carnemark would be generally willing to allow the deposition to proceed. We would still need to discuss how to limit the scope of the deposition to preclude questions concerning patent infringement, but we believe the parties would be able to reach agreement on that if the confidentiality objection is resolved.

# Arnold&Porter

Samuel Castor. Esq.
July 9, 2020
Page 3

     **Objections to Location, Manner, and Time of Deposition.**  Aligned and Mr. Carnemark also object to the location, manner, and time of the deposition, as currently noticed.  Based on its face, the Subpoena appears to seek Mr. Carnemark's presence at an in-person deposition in Dallas, Texas.  First, Mr. Carnemark's residence and office is in Connecticut, and he therefore objects to the notice as setting an improper location for compliance.  Fed. R. Civ. P. 45(c)(1), (d)(3)(ii).

     Moreover, Mr. Carnemark objects to the manner of the noticed deposition to the extent it seeks an in-person deposition as imposing an undue burden based on the serious safety issues associated with travel and in-person depositions in light of the ongoing public health emergency posed by the COVID-19 pandemic.  Fed. R. Civ. P. 45(d).  Mr. Carnemark is willing to appear by video for a remote deposition, which he would attend from a location of his choosing with adequate facilities and which would be attended in-person solely by counsel for Aligned.  We are happy to work with you to set up the specific logistics and technology to facilitate that.

     Finally, Mr. Carnemark is not available on the noticed date of Tuesday, July 21, 2020; however, he can be available for a remote deposition on all the terms set forth above on Wednesday, July 22, 2020.

     We look forward to your response.

               Sincerely,

               Michael A. Berta

cc:    Tanya Paonessa (via email only - *tpaonessa@switch.com*)
       Policy (via email only - *policy@switch.com*)

# Sam Castor

Executive Vice President of Policy

Las Vegas, Nevada Area

## Contact

www.linkedin.com/in/samcastor
(LinkedIn)
www.supernap.com (Company)
www.innevation.com (Company)
www.switch.com (Company)

## Top Skills

Intellectual Property

Telecommunications

Civil Litigation

## Languages

English (Native or Bilingual)

Romanian (Professional Working)

## Certifications

Communications Law Institute
(2009) CUA

## Honors-Awards

The Extra Mile Award

## Publications

Three Solid Tips to Avoid
Embarrasing Yourself When
Claiming Internet Copyright
Infringement

Utah's Child Protection Registry
Act: Protecting Children, Parents
and . . . Pornographers?: Allowing
States to Participate In Balancing
First Amendment Protections with
Parental Rights To Privacy and
Sovereignty in the Home.

## Summary

I am a solutions finder, bridge builder and aggressive optimist.
I specialize in conflict resolution, with karma based negotiation.
Over the last ten (10) years, I have negotiated billions of dollars
in thousands of contracts for telecom, power, and colocation
deals (including multi-million a month contracts with Fortune 100
companies, governments and agencies).  I resolved 24+ trademark
conflicts in Switch's favor, in 2018-2019 alone.  As a member of
Switch's energy and sustainability team, I help blaze a trail for
Switch to secure 100% renewable energy for all of its data centers,
worldwide.

Specialties: Intellectual Property, Colocation, Telecom, Energy,
Transactional, Entrepreneurial, Litigation, Regulatory, Trademarks,
Copyrights

_____

## Experience

### Switch

9 years 5 months

**Executive Vice President of Policy**
January 2017 - Present (3 years 7 months)
Las Vegas, Nevada Area

**Associate General Counsel, VP**
March 2011 - January 2017 (5 years 11 months)
Las Vegas, Nevada area

I assist Switch in all things legal, including energy sustainability, contract
negotiation, intellectual property litigation and prosecution, protection and
licensing, telecom, power and air quality regulatory compliance, human
resource policy, strategy, legislative policy, complete commercial transactions,
and litigation.

### The Rob Roy Innevation Center

Director of InNEVation

October 2011 - October 2013 (2 years 1 month)
Las Vegas, Nevada Area

Privileged to be involved with Switch's karma driven efforts to diversify Nevada's economic landscape by empowering innovation and encouraging companies to relocate to Nevada.  www.inNEVation.com

## Alverson, Taylor
Associate
June 2009 - March 2011 (1 year 10 months)

Litigated medical malpractice/negligence suits while defending local hospitals, doctors, and businesses.

## Office of Science and Technology - EOP (White House)
Law Clerk - Policy Analyst Intern
August 2008 - March 2009 (8 months)

Under Presidents Bush and Obama, I researched and assisted in the drafting of internet and communication policy.  Specifically, I assisted in the refinement of policies regarding telecommunications, ICANN and online child protection laws with various federal agencies, including the Department of Justice, the Department of Agriculture, the Federal Communications Commission, and the Department of Commerce.  I also handled all Freedom of Information Act requests for the Office.

## U.S. District Court, District of Nevada
Legal Extern
May 2008 - August 2008 (4 months)

Assisted Judge George and his career law clerks with criminal and civil case loads, legal research and order drafting, for cases ranging from the Fair Credit Reporting Act to Native American Contract law.

## Akin Gump et. al. LLP
Law Clerk
January 2008 - May 2008 (5 months)

Handled emerging broadcast, wireless, radio and the Internet (i.e. Child Online Privacy Protection Act compliance) regulatory issues for Disney, Cox, Samsung etc.  Maintained FCC license tickler.

## Mobile Statellite Ventures
Legal Intern
August 2007 - December 2007 (5 months)

Participated in International Telecommunications Union (ITU) and World Radio Conference (WRC) preparation meetings. Compiled and summarized FCC Notice of Inquiry (NOI), Notice of Proposed Rule Making (NPRM) comments, and participating WRC country proposals.  Plan to research and write trade journal language for professional publication regarding hybrid satellite and terrestrial cell phone technology and its role in the telecom industry and in the WRC.

US Dept. of Agriculture
Law Clerk
April 2007 - August 2007 (5 months)

Office of the Assistant Administrator – Telecom
Compiled and summarized comments and draft responses for proposed rule 7 C.F.R. §1738 governing rural broadband loans; loans intended to increase rural broadband service via multiple technologies in an attempt to raise the United States' internet access.  Drafted responses to FCC NOIs and NPRMs.

Senator Orrin Hatch
Staff Assistant / L.C.
August 2005 - February 2006 (7 months)

Staff Assistant / Legislative Correspondent
Drafted hundreds of letters for Senator Hatch concerning a myriad of federal issues in response to constituent inquiry. Handled incoming calls, specifically regarding the Supreme Court nomination hearings of Chief Justice Roberts and Justice Alito, and the hurricane Katrina/Rita disasters. Assisted in web-site content maintenance.

Federal Communications Commission
Intern
May 2005 - August 2005 (4 months)

International Bureau Intern
One of two interns awarded a scholarship for the 1st month's performance and educational excellence.  Assisted in publication and implementation of a Public Hearing regarding satellite industry rule making. Drafted press releases concerning frequency regulation and policy shifts. Organized and researched outreach content for bureau web-site. Attended and participated in policy, media and ITU meetings.

_____

# Education

The Catholic University of America, Columbus School of Law

J.D. Cum Laude, Communications Law · (2006 - 2009)

Brigham Young University

B.A., Communications · (1999 - 2005)

Provo High School

Honors Highschool, General Studies · (1994 - 1998)

# Exhibit E-1

**Farris, Joseph**

| | |
|---|---|
| **From:** | Sam Castor <sam@switch.com> |
| **Sent:** | Monday, August 3, 2020 1:21 PM |
| **To:** | Farris, Joseph; Tanya Paonessa |
| **Cc:** | Policy; Emily Shaevitz; Berta, Michael A.; Johnson, Andrew C. |
| **Subject:** | Re: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al. |

External E-mail

We've always resolved it before final order because the case law is clear; to save the other side the cost/embarrassment of a final order.



**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o +1 (702) 444-4102
m +1 (702) 371-0724
e sam@switch.com
+ Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** "Farris, Joseph" <Joseph.Farris@arnoldporter.com>
**Date:** Monday, August 3, 2020 at 11:27 AM
**To:** Tanya Paonessa <tpaonessa@switch.com>
**Cc:** Policy <policy@switch.com>, Samuel Castor <sam@switch.com>, Emily Shaevitz <eshaevitz@switch.com>, "Berta, Michael A." <Michael.Berta@arnoldporter.com>, "Johnson, Andrew C." <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

> CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

---

Hi Tanya,

Thank you for providing Switch's Opposition brief from the motion to exclude Mr. Castor from taking or defending deposition in the Uptime case. On the call, Mr. Castor said that Switch had obtained previous court orders allowing him to take a deposition as in-house counsel in comparable cases, which Switch would provide for our consideration. But the document you sent is just an Opposition brief, and it appears from the docket in that case that the court never ruled on it. Can you clarify if Switch is going to provide any court orders relevant to this issue? It would be helpful if we review any such orders in advance in of the next call.

Thank you,

1

Joe

_____

Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Thursday, July 30, 2020 10:32 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Cc:** Policy <policy@switch.com>; Sam Castor <sam@switch.com>; Emily Shaevitz <eshaevitz@switch.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

Mr. Farris,

As promised, attached is a copy of the Opposition we filed in another matter regarding the in-house counsel issue.

We would like to schedule a follow-up call with you. I've copied Emily herein to provide you with dates of availability.

Thank you,
Tanya




**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Tanya Paonessa
**Sent:** Thursday, July 23, 2020 3:57 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Emily Shaevitz <eshaevitz@switch.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

Joe,

Per our conversation this morning, attached is an Amended Notice setting Mr. Carnemark's deposition for a date to be determined.

Thank you,
Tanya

---

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Tuesday, July 21, 2020 5:01 PM
**To:** Tanya Paonessa <tpaonessa@switch.com>; Emily Shaevitz <eshaevitz@switch.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

---

Tanya,

We received the Amended Deposition Notice that you emailed to us last week.  We appreciate Switch's willingness to conduct the deposition via Zoom, however the new noticed date of July 27 does not provide sufficient notice and we cannot make Mr. Carnemark available on that day.  We believe that Mr. Carnemark will have availability to be deposed on a mutually agreeable day later in that same week of July 27 however, provided that we are able to reach a resolution on the remaining objections to the Subpoena that we asserted in our letter.  We look forward to meeting and conferring with you about all of those issue on Thursday.

Thank you,
-Joe

_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Friday, July 17, 2020 11:50 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

Mr. Farris,

Attached please find an Amended Notice for the deposition of Mr. Carnemark. We are amending so as to allow time for a conversation between Mr. Castor and yourself.

Thank you,

Tanya

**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Friday, July 17, 2020 10:27 AM
**To:** Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

> **CAUTION:** This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

---

10:30am-11:30am that day is great.  Thanks, Emily.

We just need invitations for Mike Berta and me on our side.

---

**From:** Emily Shaevitz <eshaevitz@switch.com>
**Sent:** Friday, July 17, 2020 10:05 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

You bet.  We can be available 10:30am-11:30 am PST or 2:00pm-3:30pm PST.

Thank you,
Emily



**EMILY SHAEVITZ**
EXECUTIVE ASSISTANT/PARALEGAL

o  +1 (702) 479-4992
m  +1 (702) 780-9694
e  eshaevitz@switch.com

+ Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Friday, July 17, 2020 9:54 AM
**To:** Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

<div style="background:black;color:white">

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

</div>

---

Hi Emily,

Thanks for your email and offer to set up the call.  I don't think we can make any of those times, but could be available on Thursday 7/23.  Are there any times that your side is available to discuss that day?

-Joe

_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Emily Shaevitz <eshaevitz@switch.com>
**Sent:** Thursday, July 16, 2020 1:08 PM
**To:** Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

Good afternoon,

May I please set up a call to discuss this matter?  We can be available at the following times:

Monday, July 21st 10:30am-11:30am PST or 2:00pm-5:00pm PST
Wednesday, July 22nd 11:00am-11:30am PST or 2:00pm-3:00pm PST

Upon your reply I will circulate a calendar invite.

Thank you,
Emily



**EMILY SHAEVITZ**
EXECUTIVE ASSISTANT/PARALEGAL

o +1 (702) 479-4992
m +1 (702) 780-9694
e eshaevitz@switch.com
+ Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Rustice, Jane <Jane.Rustice@arnoldporter.com>
**Sent:** Thursday, July 9, 2020 12:09 PM
**To:** Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

| CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe. |
|---|

---

Mr. Castor, please find attached correspondence dated today in the above-referenced matter.  A hard copy will follow via overnight delivery.

_____
**Jane Rustice**
Working ARC Supervisor

**Arnold&Porter**

Three Embarcadero Center | 10th Floor
San Francisco | CA 94111-4024
T: +1 415.471.3261 | F: +1 415.471.3400
Jane.Rustice@arnoldporter.com | www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by

unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# Exhibit E-2

## Farris, Joseph

| | |
|---|---|
| **From:** | Sam Castor <sam@switch.com> |
| **Sent:** | Friday, August 21, 2020 5:12 PM |
| **To:** | Farris, Joseph |
| **Cc:** | Anne-Marie Birk; Policy; Johnson, Andrew C.; Berta, Michael A. |
| **Subject:** | Re: ALIGNED Deposition...Switch v. Fairfax/MTech |

<span style="border:1px solid red; padding:2px;">External E-mail</span>

Thanks for letting me know Joe. And thanks for the chat.

It's not as you suggest. I am not general counsel. I am litigation counsel. We have offered to take a number of accommodations, firewalls, protective orders, and insulation of the data. The law clearly supports this approach. Discovery is prudent based on the facts, including discovery responses and Aligned publicity.

We'll proceed as I have outlined, and seek costs and fees consistent with Local Rules given the extra work this will cause all of us.



**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o +1 (702) 444-4102
m +1 (702) 371-0724
e sam@switch.com
+ Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** "Farris, Joseph" <Joseph.Farris@arnoldporter.com>
**Date:** Friday, August 21, 2020 at 3:20 PM
**To:** Samuel Castor <sam@switch.com>
**Cc:** Anne-Marie Birk <abirk@switch.com>, Policy <policy@switch.com>, "Johnson, Andrew C." <Andrew.Johnson@arnoldporter.com>, "Berta, Michael A." <Michael.Berta@arnoldporter.com>
**Subject:** RE: ALIGNED Deposition...Switch v. Fairfax/MTech

<div style="background:black; color:white; padding:8px;">CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.</div>

Sam,

In Aligned's view, its willingness to allow Switch to take Mr. Carnemark's deposition is in fact a compromise position, given that Switch is a direct competitor and there is no evidence that Aligned was involved any alleged trade secret

misappropriation.  We think we would have been justified in objecting to the deposition altogether, but have offered to provide the deposition as a compromise, subject only to reasonable stipulations that are directed at protecting Aligned's confidential information.   If Switch's position remains that its General Counsel is the only person that can take the deposition and thereafter must have full access to the transcript, we don't have a further compromise position we can offer in light of our client's serious concerns about this.

-Joe

_____
Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Thursday, August 20, 2020 4:12 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Cc:** Anne-Marie Birk <abirk@switch.com>; Policy <policy@switch.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Subject:** Re: ALIGNED Deposition...Switch v. Fairfax/MTech

External E-mail

Joseph,

This is not a compromise, but simply a reiteration of your prior positions. We have continually tried to be creative with you, provided supportive case law, and now had several discussions on this. I'm open to another discussion, but your position is untenable. Even as I write this email as lead litigation counsel for Switch (without outside counsel), I am again demonstrating role, my position, and my right to represent my client as is their wish.

I appreciate your civility and as such, invite you to please reconsider. If you don't agree to allowing me to take the deposition, or propose an alternative (rather than simply reiterating your position), I will have little choice but to file a Motion to Compel.



**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**From:** "Farris, Joseph" <Joseph.Farris@arnoldporter.com>
**Date:** Thursday, August 20, 2020 at 3:59 PM
**To:** Samuel Castor <sam@switch.com>
**Cc:** Anne-Marie Birk <abirk@switch.com>, Policy <policy@switch.com>, "Johnson, Andrew C."
<Andrew.Johnson@arnoldporter.com>, "Berta, Michael A." <Michael.Berta@arnoldporter.com>
**Subject:** RE: ALIGNED Deposition...Switch v. Fairfax/MTech

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Sam,

Thank you for the call yesterday to discuss this.  As an initial point, I want to clarify that the call concerned only the single noticed deposition of Jakob Carnemark at Aligned, and not depositions of JLL personnel as stated throughout your email.  We've set forth and discussed Aligned's objections to that deposition previously, and I won't recap those objections and discussions in full here.  In short, Aligned remains willing to offer Mr. Carnemark for a deposition subject to Switch addressing two remaining objections:  (i) the deposition must conducted by **outside counsel** and with sufficient protections for Aligned confidential information and trade secrets for the transcript and (ii) the scope of the deposition should be **limited to the current trade secret case** (e.g. it cannot concern the dismissed patent infringement claims or current competitive issues concerning the industry or current/prospective customers).

While we appreciate that your email below is directed at the confidentiality issue, the stipulations that you have proposed would not sufficiently address Aligned's concerns (and indeed, do not seem to impose any materially different limitations than those that the existing protective order already provides).  Switch and Aligned compete with each other directly and the General Counsel of Switch should not be permitted to personally conduct this deposition, which is sure to involve competitively sensitive information.  The deposition must be conducted by Switch's outside counsel of record in this matter and Aligned must have the ability to thereafter limit the disclosure of appropriate portions of the transcript to outside counsel.

As we've said before, if we can resolve the confidentiality concern, we would be willing to proceed with the deposition by outside counsel, subject to an agreement that Aligned can object to certain questions as outside the scope of relevance and decline to answer.  If this matter goes to motion practice instead, we will file a cross-motion on the issue of scope as well, in order to have all issues resolved at once.

We think the limitations that we've asked for are more than reasonable, especially given the overall position of this case.  From Aligned's perspective, the dispute between Switch and Fairfax about his nearly-decade old visit to Switch's facility should have resolved long ago.  The patent claims filed against Aligned were dropped quite some time ago, and we don't understand why this case has not been dropped as well and instead continues to be extended.  There has never been any evidence to support a trade secret claim against Aligned.

If you would like to discuss this again, or would like to proceed with the deposition in a manner consistent with what we've proposed, please let us know.

Regards,
Joe

_____
Joseph Farris
**Arnold & Porter**

3

Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Sam Castor <sam@switch.com>
**Sent:** Wednesday, August 19, 2020 3:24 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>
**Cc:** Anne-Marie Birk <abirk@switch.com>; Policy <policy@switch.com>
**Subject:** JLL Depositions...Switch v. Fairfax/MTech

External E-mail

Joe,

Thank you for the discussion.  As discussed, Mr. Castor has led all litigation for Switch for almost a decade. He has unique education, skill and technical knowledge, and it is Switch's decision who it uses as litigation counsel. We do not view outside counsel as a substitute given the uniquely technical nature of the services, and the claims at play.

To appease any lingering concerns you have, and as is consistent with our internal litigation practices, we propose the following:

1. All data and discovery materials produced by JLL in relation to the deposition will be maintained in a Litigation Team only file, and only shared beyond the litigation team with JLL's written consent.  Again, please note the Switch Litigation team is a five-member subset of the Switch Legal team.
2. Any exhibits or portions of the deposition transcript you designate as AEO will not be discussed with anyone outside the Litigation Team, unless the designation is later removed.
3. We will view JLL as being a party to the protective order.
4. Mr. Castor and Ms. Birk are willing to sign an affirmative attestation regarding the foregoing and attach it as an Exhibit to the protective order.

Please let me know if this works for you or if we need to go to the Court for resolution. Our goal is to mitigate any unreasonable burden, and preserve judicial economy. We appreciate you reaching for the same goal.

Thanks again,

**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102

4

m +1 (702) 371-0724
e sam@switch.com
+ Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# Exhibit E-3

**Farris, Joseph**

| | |
|---|---|
| **From:** | Sam Castor <sam@switch.com> |
| **Sent:** | Tuesday, September 8, 2020 2:47 PM |
| **To:** | Farris, Joseph |
| **Cc:** | Policy; Tanya Paonessa; Berta, Michael A.; Johnson, Andrew C. |
| **Subject:** | Re: Switch v. Stephen Fairfax, et al. |

External E-mail

Hi Joseph,

Thanks for the heads up. I do still plan to take it personally. As discussed, I'm the most qualified, and we've taken every step (and more) necessary to ensure we comply with current law. We'll await your filing. Happy to have another discussion to avoid filings. We reserve the right to seek attorneys' fees.



**SAM CASTOR**
EVP OF POLICY
DEPUTY GENERAL COUNSEL

o  +1 (702) 444-4102
m +1 (702) 371-0724
e  sam@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**From:** "Farris, Joseph" <Joseph.Farris@arnoldporter.com>
**Date:** Tuesday, September 8, 2020 at 2:22 PM
**To:** Samuel Castor <sam@switch.com>
**Cc:** Policy <policy@switch.com>, Tanya Paonessa <tpaonessa@switch.com>, "Berta, Michael A." <Michael.Berta@arnoldporter.com>, "Johnson, Andrew C." <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch v. Stephen Fairfax, et al.

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Hi Sam,

I hope your team had a nice holiday weekend.  We received the Amended Notice of the Deposition of Mr. Carnemark that Ms. Paonessa emailed us last week.  Can you please confirm that your position has not changed since we last spoke, and that you still intend to personally take that deposition?   As we have discussed and met and conferred about, if that is the case, Aligned maintains its objection to you personally taking the deposition, and will be filing a motion for protective order rather than making Mr. Carnemark on that day.

Thanks,
Joe
_____

Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Wednesday, September 2, 2020 2:53 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Cc:** Policy <policy@switch.com>
**Subject:** Switch v. Stephen Fairfax, et al.

External E-mail

Counsel,

Attached please find Plaintiff's Third Amended Notice of Deposition of Jakob Carnemark. Please note that we are willing to reschedule to a mutually-convenient date.

Thank you,
Tanya



**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# Exhibit F-1

Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (Telephone)
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park, 1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500 (Telephone)
Email: jennifer.insley-pruitt@dechert.com
*Attorneys for Defendants and Counterclaim Plaintiffs*

Chad R. Fears, Esq.
Nevada Bar No. 6970
Joshua D. Cools, Esq.
Nevada Bar No. 11941
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102
702-805-0290 (Telephone)
Email: cfears@efstriallaw.com
Email: jcools@efstriallaw.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>UPTIME INSTITUTE, LLC, a Delaware limited liability company; and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC, a Delaware limited liability company,<br><br>    Defendants. | **Case No. 2:19-cv-00631-GMN-NJK**<br><br>**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S INSIDE COUNSEL SAMUEL CASTOR FROM TAKING AND DEFENDING DEPOSITIONS** |

    Defendants Uptime Institute, LLC and Uptime Institute Professional Services, LLC, hereby file this Motion to Exclude Plaintiff's Inside Counsel Samuel Castor from Taking and Defending Depositions. This Motion is based on the following Memorandum of Points and Authorities and the pleadings and papers on file.

    Respectfully submitted this 14th day of February, 2020.

**EVANS FEARS & SCHUTTERT LLP**

By: _/s/ Luke M. Reilly_

Chad R. Fears, Esq. (NBN 6970)
Joshua D. Cools, Esq. (NBN 11941)
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102

DECHERT LLP

Diane Siegel Danoff (*pro hac vice*)
Luke M. Reilly (*pro hac vice*)
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104

Jennifer Insley-Pruitt (*pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
*Attorneys for Defendants Uptime*
*Institute, LLC and Uptime Institute*
*Professional Services, LLC*

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF FACTS ............................................................................... 1

III.   ARGUMENT .................................................................................................... 4

     A.     Nevada Rule of Professional Conduct 3.7 Applies to Depositions......................... 4

     B.     Mr. Castor Is a Necessary Fact Witness in This Case, And So Cannot Serve as Deposition Counsel................................................................... 5

IV.   CONCLUSION ................................................................................................. 6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Samuel Castor is the Executive Vice President for Policy at Plaintiff Switch, Ltd. ("Switch") and, by his own admission, is a central fact witness in this case. Mr. Castor concedes that he cannot be trial counsel, but has informed Defendants Uptime Institute, LLC and Uptime Institute Professional Services, LLC (together, "Uptime") that he intends to take and defend, on behalf of Switch, all of the depositions in this case.

Mr. Castor is barred from conducting the depositions by the "witness advocate" rule, Nevada Rule of Professional Conduct 3.7.

### II.   STATEMENT OF FACTS

Defendant Uptime Institute, LLC ("Uptime Institute" or "UI") is a renowned, global, technology agnostic, vendor-neutral educational and standards organization focused on helping data center owners and operators improve the performance, efficiency, availability and reliability of their data centers. D.I. 37, ¶ 16 ("Am. Countercls."). Defendant Uptime Professional Services, LLC ("UIPS") is Uptime Institute's sister company and exclusive licensee in the United States for certifying data center designs, constructed facilities, and ongoing operations pursuant to the requirements of Uptime Institute's TIER Classification System and granting the entities whose design, construction and/or operations meet these standards the right to use the designated TIER Certification Marks to evidence their compliance. Am. Countercls., ¶¶ 26-33.

Uptime and its predecessors in interest have developed, maintained, and promoted a set of proprietary standards for evaluating availability, resiliency, and other attributes of data centers. *Id*. at ¶ 7. These standards, the TIER Classification System, provide a set of design, performance, construction, operations, and reliability criteria to assess and compare data centers in terms of potential and anticipated performance. *Id*. at ¶ 8. The TIER Classification System includes progressive levels designated under the marks TIER I, TIER II, TIER III, and TIER IV. *Id*. Uptime's certifications are so well known and respected that they are often prominently featured in data centers' business promotion and advertising materials, including on websites, press releases, and sales presentations, particularly for the most demanding certification level awarded

by Uptime: TIER IV GOLD certification. *Id.* at ¶ 30. Using this system, Uptime has awarded over 1,296 TIER certifications to data center owners and operators in over 90 countries. *Id.* at ¶ 9.

Switch designs, builds, and operates data centers. D.I. 44, ¶ 16 ("2d. Am. Compl."). Switch itself, like many other companies, has sought and obtained certification of its data centers from UIPS, only some of the more than 150 TIER certifications issued in the United States alone. 2d Am. Compl. ¶¶ 36-38; Am. Countercls. ¶ 42. However, subsequently, Switch created its own supposed standard, called the standard TIER 5, and obtained federal trademark registration of that mark and a related mark. 2d Am. Compl. ¶¶ 87, 89; Ex. A[1] (the "Switch Tier 5 Website"; http://www.switch.com/tier-5) at 2. In 2015, Uptime Institute filed petitions to cancel those registrations in the Trademark Trial and Appeal Board ("TTAB"). See Compl., D.I. 1 ¶ 77. Those proceedings are in their final, "trial" phase. *See Uptime Inst., LLC v. Switch, Ltd*., Canc. No. 92062895 (T.T.A.B.), D.I. Nos. 42-50, 63-69.

Switch filed this action in federal court on April 11, 2019, alleging tortious interference, deceptive trade practices, and trademark claims. *See* D.I. 1. On November 15, 2019, Uptime filed counterclaims against Switch, claiming violations of the Lanham Act for trademark infringement, unfair competition, and false advertising, as well as seeking cancellation of certain registered trademarks belonging to Switch. *See* Am. Countercls. On February 4, 2020, Switch filed its Second Amended Complaint, adding antitrust allegations and amending certain other counts.

Switch's counsel of record in this action are its outside counsel, James Boyle and Joanna Myers, and two individual lawyers who work at Switch, Samuel D. Castor and Anne-Marie Birk. *See, e.g.* 2d Am. Compl. at 31.

Both Mr. Boyle and Ms. Myers are members of the State Bar of Nevada and are permitted to practice in this Court. *See* Ex. R (James D. Boyle biography, https://nevadafirm.com/portfolio/james-d-boyle/) at 1; Ex. S (Joanna Myers biography, https://nevadafirm.com/portfolio/joanna-m-myers/) at 1. They have been counsel of record from

---

[1] All exhibit references are to exhibits to Uptime's contemporaneously-filed Motion for Protective Order.

the start of the case, and were the sole counsel of record on the Complaint.

Mr. Castor is the Executive Vice President of Policy at Switch, a position he has held since 2017.  Ex. B (Sam Castor Linkedin Profile; https://www.linkedin.com/in/samcastor) at 2; Ex. C (Switch Executive Team Website; https://www.switch.com/executive-team/) at 30 (adding secondary title of Deputy General Counsel, which is not on his LinkedIn profile).  He previously served as Switch's Associate General Counsel, VP.  *Id.*  Mr. Castor also serves as the President and Director of the Data Center Standards Foundation, which Switch created.  Switch describes the foundation on its website as its effort "to create a new, independent, non-profit standards body for the data center industry," which it claims "will enable data center users, owners, and operators to self-assess the rating of their data centers, clearly represent and warrant that rating, and have an independent third-party audit verify that assessment."  Ex. E (Data Center Standards Foundation Entity Information, Nevada Secretary of State eSOS, https://esos.nv.gov/EntitySearch/BusinessInformation) at 3; Switch Tier 5 Website at 5; *see also* Am. Countercls. at ¶¶ 93-94.

Mr. Castor is the sole individual at Switch who has supplied information for Switch's responses to Uptime's First Set of Interrogatories and sole signatory on the Verification for those responses.  Ex. F (Pl./Counter-Def. Switch Ltd.'s 2d Supplemental Answers to Defs.' 1st Set of Interrogs.) at 20-21, 23.  He states that he provided the information in the interrogatory responses solely in his capacity as the Executive Vice President of Policy at Switch.

Uptime's counsel communicated and negotiated with Switch's outside counsel, Mr. Boyle, and not Mr. Castor, for the first seven months of this case, until November 2019.  Mr. Castor was only one of a long laundry list of people (including all counsel of record) copied on email communications.  Declaration of Diane Siegel Danoff ("Danoff Decl.") ¶ 3.  That was true as late as early November 2019, when the parties made final arrangements for the first and only deposition that has taken place to date in this litigation (the deposition of a non-party, in Hawaii). *Id.*  Accordingly, at the deposition venue, Uptime's counsel was surprised to see that Mr. Castor, and not Mr. Boyle, had traveled to Hawaii to conduct the deposition on behalf of Switch.  *Id.*

Upon return to the mainland, the parties had extensive discussions and correspondence

1   regarding the Protective Order and the conduct of future depositions.  Uptime maintained that,

2   due to Mr. Castor's position as a fact witness in this case, he is barred from taking or defending

3   depositions in this litigation, pursuant to Nevada Rule of Professional Conduct 3.7.  *See, e.g.* Ex.

4   M (December 19, 2019 Email from D.S. Danoff to S. Castor); Ex. N (January 7, 2020 Letter from

5   D.S. Danoff to S. Castor).  Mr. Castor conceded that he cannot and will not serve as trial counsel.

6   Ex. O (January 7, 2019 Letter from S. Castor to D.S. Danoff) at 1. Nevertheless, Mr. Castor

7   insisted that he is able to take witness depositions in this litigation.  *See, e.g. id.*; Ex. G.

8       Accordingly, Uptime filed the present motion to exclude Switch's inside counsel Mr.

9   Castor from taking or defending depositions in this case.

10  **III.    ARGUMENT**

11      Mr. Castor is a necessary, key fact witness in this case.  That fact prevents Mr. Castor

12  from serving as trial counsel, under Nevada Rule of Professional Conduct 3.7, as even he agrees.

13  The same rule precludes him from serving as deposition counsel.

14      **A.    Nevada Rule of Professional Conduct 3.7 Applies to Depositions**

15      Nevada Rule of Professional Conduct 3.7[2] provides that "A lawyer shall not advocate at a

16  trial in which the lawyer is likely to be a necessary witness."  Rule 3.7 "is meant to eliminate any

17  confusion and prejudice that could result if an attorney appears before a jury as an advocate and

18  as a witness."  *DiMartino v. Eighth Judicial Dist. Court*, 119 Nev. 119, 122 (2003).  "The jury

19  must not learn of the lawyer's dual role."  *Ahern Rentals, Inc. v. Lexington Ins. Co.*, No. 2:09-cv-

20  00679-LDG-RJJ, 2011 WL 13302279, at *2 (D. Nev. Mar. 3, 2011).

21      The prospect of a deposition being read or played to a jury effectively means that a

22  witness-advocate who defends or takes the deposition would be appearing before a jury as an

23  advocate, via the deposition.  Accordingly, as this Court has recognized, Rule 3.7 means that a

24  lawyer who is likely to be a necessary witness may not conduct depositions in the case.  For

25  example, in *Ahern Rentals*, the Court granted an emergency motion to disqualify Plaintiff's

26  _____

27  [2] Pursuant to LR IA 11-7(a), "[a]n attorney admitted to practice under any of these rules must adhere to the standards of conduct prescribed by the Model Rules of Professional conduct as adopted and amended from time to time by the Supreme Court of Nevada, except as these standards may be modified by this court." In other words, this district court has made the Nevada Rules of Professional Conduct applicable to attorneys practicing herein. *See United States v. Kincade*, Case No. 2:15-cr-00071-JAD-GWF, 2016 WL 4577006, *2 (D. Nev. Sept. 1, 2016).

28

counsel from taking and defending depositions where counsel was found to be a necessary witness for the underlying insurance dispute.  2011 WL 13302279 at *1.  The Court noted that the attorneys' "participation in depositions will lead to confusion and prejudice at trial if the jury becomes aware of his dual role as witness and advocate."  *Id.* at *3.  Allowing counsel to take the depositions of witnesses "regarding matters he participated in creates a risk that [the attorney] will insert his own testimony or will 'argue his own veracity' during the course of the deposition.  Careful questioning and redaction would not be sufficient safeguards against such risk.  Because he is a witness himself, [the attorney's] own understanding and opinion of the events will inevitably color the deposition, whether intentional or not."  *Id.* at *4.

Moreover, the Court noted that, where the party had already retained additional counsel, there will be "minimal hardship."  *Id.  See also World Youth Day, Inc. v. Famous Artists Merch. Exch., Inc.*, 866 F. Supp. 1297, 1302 (D. Colo. 1994) (interpreting parallel rule in Colorado to disqualify attorney from taking or defending depositions, noting that "the testimony from oral depositions in this case cannot easily be taken and read into evidence without revealing [the attorney's] identity as the deposing attorney…WYD could suffer prejudice and the trial tainted by jury confusion if [the attorney] is allowed take or defend depositions in this case").

### B.  Mr. Castor Is a Necessary Fact Witness in This Case, And So Cannot Serve as Deposition Counsel

Switch has represented that all information responsive to Switch's First Set of Interrogatories was supplied solely by Mr. Castor "[t]estifying solely in his capacity as Executive Vice President of Policy."  Ex. F at 20-21.  Furthermore, Switch's responses to Uptime's interrogatories identify no other individual at Switch who provided information.  Mr. Castor is a necessary witness, as he has conceded, and, pursuant to the Nevada Rules of Professional Conduct, Mr. Castor cannot serve as an advocate at any trial in this case.  *See* Nev. R. Prof'l Conduct 3.7.  As explained above, that bar includes serving as deposition counsel

Rule 3.7 provides for only three exceptions: where the testimony relates to an uncontested issue, where the testimony relates to the nature of legal services rendered in the case, or where disqualification of the lawyer would work substantial hardship on the client.  *Id.*   None of Rule

3.7's exceptions are applicable in this case.  Mr. Castor's testimony will not be on uncontested issues or the nature of legal services rendered in this case.  Nor would disqualification of Mr. Castor as deposition counsel work substantial hardship on Switch.  On the contrary, Switch is necessarily already planning for counsel other than Mr. Castor to serve as its trial counsel.  That counsel (presumably Switch's current outside counsel of record, who have been on the case from the start) can also serve as advocates in depositions.

Mr. Castor's taking or defending of depositions will create a potential for jury confusion and prejudice to Uptime.  Portions of these depositions may be shown to the jury in an eventual trial, and therefore Mr. Castor's "participation in depositions will lead to confusion and prejudice at trial if the jury becomes aware of his dual role as witness and advocate." *Id*. at *3.  Additionally, the witness in a deposition "may refer to [Mr. Castor's] participation in an event, which would reveal his dual role and cause confusion." *Talbot v. Sentinel Ins. Co.*, No. 2:11-cv-01766-KJD-CWH, 2012 WL 13103528, at * (D. Nev. Sept. 24, 2012) (granting motion to preclude counsel from taking and defending depositions where counsel was a necessary witness).  There is a further risk that Mr. Castor "will insert his own testimony or will 'argue his own veracity' during the course of the deposition." *Ahern Rentals*, 2011 WL 13302279, at *4.  "Careful questioning and redaction would not be sufficient safeguards against such risk.  Finally, because he is a witness himself, [Mr. Castor's] own understanding and opinion of the events will inevitably color the deposition, whether intentional or not." *Id*.

In short, the Nevada Rules of Professional Conduct bar Mr. Castor from serving as deposition counsel in this case.

## IV. CONCLUSION

For the reasons stated above, the Court should grant Uptime's Motion and exclude Switch's inside counsel Samuel Castor from taking or defending any depositions in this litigation.

Respectfully submitted this 14th day of February, 2020.

1

**EVANS FEARS & SCHUTTERT LLP**

2

By: _/s/ Luke M. Reilly_
    Chad R. Fears, Esq. (NBN 6970)

3
    Joshua D. Cools, Esq. (NBN 11941)
    2300 West Sahara Avenue, Suite 950

4
    Las Vegas, Nevada 89102

5
    DECHERT LLP

6
    Diane Siegel Danoff (*pro hac vice*)
    Luke M. Reilly (*pro hac vice*)

7
    Cira Centre
    2929 Arch Street

8
    Philadelphia, Pennsylvania 19104

9
    Jennifer Insley-Pruitt (*pro hac vice*)
    Three Bryant Park

10
    1095 Avenue of the Americas
    New York, New York 10036

11
*Attorneys for Defendants Uptime Institute,*
*LLC and Uptime Institute Professional*

12
*Services, LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S INSIDE COUNSEL SAMUEL CASTOR FROM TAKING AND DEFENDING DEPOSITIONS** was electronically served on counsel of record this 14th day of February, 2020, PT, using the Court's CM/ECF System.

_/s/ Luke M. Reilly_

Luke M. Reilly

# Exhibit F-2

**Johnson, Andrew C.**

| | |
|---|---|
| **From:** | Tanya Paonessa <tpaonessa@switch.com> |
| **Sent:** | Thursday, July 30, 2020 10:32 AM |
| **To:** | Farris, Joseph; Berta, Michael A.; Johnson, Andrew C. |
| **Cc:** | Policy; Sam Castor; Emily Shaevitz |
| **Subject:** | RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al. |
| **Attachments:** | 56. Switch_Opps to Defs' Mtn to Exclude SC_Filed 3.24.20.pdf |

External E-mail

Mr. Farris,

As promised, attached is a copy of the Opposition we filed in another matter regarding the in-house counsel issue.

We would like to schedule a follow-up call with you. I've copied Emily herein to provide you with dates of availability.

Thank you,
Tanya



**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card
We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Tanya Paonessa
**Sent:** Thursday, July 23, 2020 3:57 PM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Emily Shaevitz <eshaevitz@switch.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

Joe,

Per our conversation this morning, attached is an Amended Notice setting Mr. Carnemark's deposition for a date to be determined.

Thank you,
Tanya

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Tuesday, July 21, 2020 5:01 PM
**To:** Tanya Paonessa <tpaonessa@switch.com>; Emily Shaevitz <eshaevitz@switch.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

> CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Tanya,

We received the Amended Deposition Notice that you emailed to us last week.  We appreciate Switch's willingness to conduct the deposition via Zoom, however the new noticed date of July 27 does not provide sufficient notice and we cannot make Mr. Carnemark available on that day.  We believe that Mr. Carnemark will have availability to be deposed on a mutually agreeable day later in that same week of July 27 however, provided that we are able to reach a resolution on the remaining objections to the Subpoena that we asserted in our letter.  We look forward to meeting and conferring with you about all of those issue on Thursday.

Thank you,
-Joe

_____

Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

---

**From:** Tanya Paonessa <tpaonessa@switch.com>
**Sent:** Friday, July 17, 2020 11:50 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

Mr. Farris,

Attached please find an Amended Notice for the deposition of Mr. Carnemark. We are amending so as to allow time for a conversation between Mr. Castor and yourself.

Thank you,
Tanya

**TANYA PAONESSA**
LITIGATION PARALEGAL

o  +1 (702) 522-3086
m  702-370-6247
e  tpaonessa@switch.com
+  Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Friday, July 17, 2020 10:27 AM
**To:** Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

> CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

10:30am-11:30am that day is great.  Thanks, Emily.

We just need invitations for Mike Berta and me on our side.

---

**From:** Emily Shaevitz <eshaevitz@switch.com>
**Sent:** Friday, July 17, 2020 10:05 AM
**To:** Farris, Joseph <Joseph.Farris@arnoldporter.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

You bet.  We can be available 10:30am-11:30 am PST or 2:00pm-3:30pm PST.

Thank you,
Emily

**EMILY SHAEVITZ**
EXECUTIVE ASSISTANT/PARALEGAL

o  +1 (702) 479-4992
m  +1 (702) 780-9694
e  eshaevitz@switch.com
+  Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

**From:** Farris, Joseph <Joseph.Farris@arnoldporter.com>
**Sent:** Friday, July 17, 2020 9:54 AM
**To:** Emily Shaevitz <eshaevitz@switch.com>; Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

Hi Emily,

Thanks for your email and offer to set up the call.  I don't think we can make any of those times, but could be available on Thursday 7/23.  Are there any times that your side is available to discuss that day?

-Joe

_____

Joseph Farris
**Arnold & Porter**
Three Embarcadero Center | 10th Floor | San Francisco | CA 94111-4024
T: +1 415.471.3454 | F: +1 415.471.3400
joseph.farris@arnoldporter.com | www.arnoldporter.com

**From:** Emily Shaevitz <eshaevitz@switch.com>
**Sent:** Thursday, July 16, 2020 1:08 PM
**To:** Rustice, Jane <Jane.Rustice@arnoldporter.com>; Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** RE: Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

External E-mail

Good afternoon,

May I please set up a call to discuss this matter?  We can be available at the following times:

Monday, July 21st 10:30am-11:30am PST or 2:00pm-5:00pm PST
Wednesday, July 22nd 11:00am-11:30am PST or 2:00pm-3:00pm PST

Upon your reply I will circulate a calendar invite.

Thank you,
Emily

**EMILY SHAEVITZ**
EXECUTIVE ASSISTANT/PARALEGAL

o  +1 (702) 479-4992
m +1 (702) 780-9694
e  eshaevitz@switch.com
+  Switch e-card

We use e-cards to reduce waste of natural resources and promote sustainability.

---

**From:** Rustice, Jane <Jane.Rustice@arnoldporter.com>
**Sent:** Thursday, July 9, 2020 12:09 PM
**To:** Sam Castor <sam@switch.com>; Tanya Paonessa <tpaonessa@switch.com>; Policy <policy@switch.com>
**Cc:** Berta, Michael A. <Michael.Berta@arnoldporter.com>; Farris, Joseph <Joseph.Farris@arnoldporter.com>; Johnson, Andrew C. <Andrew.Johnson@arnoldporter.com>
**Subject:** Switch, Ltd. v. Stephen Fairfax; MTechnology, et al.

CAUTION: This email originated from outside of the organization. Do not follow guidance, click links, or open attachments unless you recognize the sender and know the content is safe.

---

Mr. Castor, please find attached correspondence dated today in the above-referenced matter.  A hard copy will follow via overnight delivery.

_____
**Jane Rustice**
Working ARC Supervisor

**Arnold&Porter**
Three Embarcadero Center | 10th Floor
San Francisco | CA 94111-4024
T: +1 415.471.3261 | F: +1 415.471.3400
Jane.Rustice@arnoldporter.com | www.arnoldporter.com

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

**CONFIDENTIAL INFORMATION**

This email message, its chain, and any attachments: (a) may include proprietary information, trade secrets, pending patents, confidential information and/or other protected information ("Confidential Information") which are hereby labeled as "Confidential" for protection purposes, (b) is sent to you in confidence with a reasonable expectation of privacy, (c) may be protected by confidentiality agreements requiring this notice and/or identification, and (d) is not intended for transmission to, or receipt by unauthorized persons. Your retention or possession will be viewed as your consent to the foregoing and covenant to comply with Switch's then current acceptable use policy available at www.switch.com/aup. If you are not the intended recipient, (i) please notify the sender immediately by telephone or by replying to this message and (ii) then delete this message, any attachments, chains, copies or portions from your system(s). Retention of this email and the associated data constitutes valid consideration and your consent, agreement and covenant to abide by the foregoing terms.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

SAMUEL D. CASTOR, ESQ. (NBN 11532)
ANNE-MARIE BIRK, ESQ. (NBN 12330)
Email: policy@switch.com
SWITCH, LTD.
7135 South Decatur Ave.
Las Vegas, Nevada 89118
Telephone: 702/444-4111

JAMES D. BOYLE, ESQ. (NBN 08384)
E-mail: jboyle@nevadafirm.com
JOANNA M. MYERS, ESQ. (NBN 12048)
E-mail: jmyers@nevadafirm.com
JESSICA M. LUJAN, ESQ. (NBN 14913)
E-mail: jlujan@nevadafirm.com
HOLLEY DRIGGS WALCH
FINE PUZEY STEIN & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308

*Attorneys for Plaintiff /Counter-Defendant
Switch, Ltd.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada corporation,<br><br>    Plaintiff/Counter-Defendant,<br><br>  v.<br><br>UPTIME INSTITUTE, LLC, a Delaware limited liability company; and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC, a Delaware limited liability company,<br><br>    Defendants/Counterclaimants. | CASE NO.:   2:19-cv-00631-GMN-NJK<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S INSIDE COUNSEL SAMUEL CASTOR FROM TAKING AND DEFENDING DEPOSITIONS [DKT #46]** |

Plaintiff SWITCH, LTD. (hereinafter "Switch"), by and through its counsel of record hereby opposes Defendants UPTIME INSTITUTE, LLC, and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC's ("Uptime") Motion to Exclude Plaintiff's Inside Counsel Samuel Castor from Taking and Defending Depositions [Dkt. #46].

///

- 1 -

This Opposition is made and based on the following memorandum of points and authorities, the papers and pleadings on file herein, the Declaration of Samuel Castor (attached as **Exhibit A**) and any such oral argument as this Court may permit.

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

</div>

**I.      INTRODUCTION**

This is simple issue: does a client have the right to choose his or her counsel? Absent compelling reasons to the contrary, the answer is yes. In its Motion, Uptime attempts to persuade this Court that, Switch should be deprived of the unique expertise and involvement of Mr. Castor (Switch's lead litigation counsel for ten years), because Opposing Counsel should be able to veto who is able to take and defend depositions. In addition to this, in light Defendant's the Motion for Protective Order [Dkt. #45], this Motion is duplicative and wasteful. Such wasteful filings call into question the true motive of this motion.

**II.     RELEVANT BACKGROUND**

Mr. Castor was hired by Switch on March 21, 2011 as Associate General Counsel. Since that time, Mr. has received multiple promotions as a result of his strong performance. However, every one of these promotions has kept Mr. Castor within the Switch legal department. At no point did Mr. Castor work as a decision maker within the sales or business section, but instead now as EVP of Policy and Deputy General Counsel, Mr. Castor oversees all conflict-based interactions for Switch. To wit, Mr. Castor oversees all litigation, intellectual property advancement prosecution and all regulatory compliance for Switch.

As this Court is aware, a parallel matter was initially before the Trademark, Trial, and Appeal board. This parallel involved the exact same parties, similar issues, and many of the same deponents. During the course of this matter a significant number of depositions were taken. In one form or another, Mr. Castor has directed every one of those depositions including taking several depositions. In spite of simultaneously taking several depositions and serving as the corporate representative deponent in the TTAB matter, at no time has Uptime Institute ever objected to Mr. Castor's appearance or direct involvement. It was not until months after Mr. Castor took the first deposition in this matter, and the protective order negotiations stalled that Uptime first raised its

1    alleged concerns with Mr. Castor's leadership in this case. Such a delayed reaction suggests that
2    Uptime is more concerned with depriving Switch of its most experienced, qualified litigation
3    counsel, than advancing some true concern. That the instant motion is more about securing
4    strategic advantage over Switch, than some alleged need to protect Uptime's interests.

5    **III.    ARGUMENT**

6            The case law is clear that an attorney's role as in-house counsel "cannot alone create [a]
7    probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial
8    of access." *See U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed Cir. 1984). In reliance on
9    that precedence, the Court in *Sanofi-Aventis U.S. LLC v. Breckenridge Pharm., Inc.*, Civil Action
10   No. 15-289 (MAS)(LHG), 2016 U.S. Dist. LEXIS 8129 (D.N.J. Jan. 25, 2016) found that in-house
11   counsel *should* be permitted full access to materials marked confidential and highly confidential.
12   *See id.* (emphasis added). Defendant in *Breckenridge* cites *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D.
13   55, 56 (D.D.C. 2007) as the court granted access to highly confidential documents to in-house
14   counsel who had asserted that they had an expertise that outside counsel did not share. The courts
15   apply a two-step analysis, which consists of (1) assessing "[w]hether an unacceptable opportunity
16   for inadvertent disclosure exists"; and (2) consideration of "an attorney's involvement in
17   'competitive decisionmaking,'" such as pricing, product design, etc. *Id. a*t 1468 n.3. *See also,*
18   *Warner Chilcott Laboratories Ireland Ltd. v. Impax Labs., Inc.*, Civ. No. 08-6304, 2009 WL
19   36227947, at *2 (D.N.J. Oct. 29, 2009); *Affymetrix, Inc. v. Illumina, Inc.*, Civ. No. 04-901, 2005
20   WL 1801683, at *2 (D. Del. July 28, 2005); and *Carpenter Tech. Corp. v. Armco, Inc.*, 132 F.R.D.
21   24, 27 (E.D. Pa. 1990).

22           Further, the Court in *Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577,
23   1580 (Fed. Cir. 1991) reversed a lower court's denial of confidential access to in-house counsel.
24   The Federal Circuit reasoned that "to be denied access to confidential information merely because
25   they have regular 'contact' with those who are involved in competitive decision making . . . would
26   disqualify almost all in-house counsel and thus effectively constitute the very per se rule we
27   rejected in *U.S. Steel*." *Id.*
28   ///

Surprisingly, despite the clear case law, Opposing counsel's use of case law in this matter is misleading. Although they cite to the *DiMartino* matter as a decision supporting their position, the Supreme Court clearly took the ***opposite*** position in that matter stating that:

> "First, the rule does **not** mandate complete disqualification of an attorney who may be called as a witness; by its plain terms, SCR 178 simply prohibits the attorney from appearing as trial counsel. In most jurisdictions, a lawyer who is likely to be a necessary witness may still represent a client in the pretrial stage. Some courts, however, have disqualified counsel in the pretrial stage. We believe the majority approach is the better reasoned one. Because the rule is meant to eliminate any confusion and prejudice that could result if an attorney appears before a jury as an advocate and as a witness, pretrial disqualification generally is not necessary. The case may not go to trial, other evidence may be available in place of the attorney's testimony or the attorney's client might prefer to have the attorney as an advocate rather than a witness.

*DiMartino v. Eighth Judicial Dist. Court*, 119 Nev. 119, 122 (2003) (emphasis added). Given that the Nevada Supreme Court has expressed a clear preference to not disqualify counsel pre-trial, and there are other options than excluding Mr. Castor as counsel, Uptime's Motion should be denied.

**1. Excluding Mr. Castor is improper, because Mr. Castor is not a necessary witness.**

Despite the clear standard that an attorney should only be disqualified at trial if they are a *necessary* witness, Defendant addresses whether Mr. Castor is in fact a "necessary witness". It is true that Mr. Castor has served previously as a 30(b)(6) witness/corporate representative witness in other matters. But as has been previously communicated to opposing counsel, there are other individuals who could serve in that capacity from Switch. Thus, Mr. Castor is not acting as a necessary witness, but instead as a corporate representative.

Additionally, as set forth in the Opposition to the Motion for Protective Order [Dkt. #55], Mr. Castor does not have nor is he engaged in competitive decision-making authority at Switch; that is left to the C-level suite. There is no risk of inadvertent disclosure, because the files will be kept from competitive decision maker access.

Finally, pursuant to Rule 3.7, Mr. Castor cannot act as trial counsel if he also acts as a witness, absent certain exceptions. Given this, should Mr. Castor act as a witness in this matter, he will not act as trial counsel. Therefore, Defendant's motion is misplaced and should be denied.

///

**2. Depriving Switch of Mr. Castor's Ability to Take and Participate in Depositions is unnecessary and would be prejudicial to Switch.**

In a repeat of its *ad hominem* attacks against Mr. Castor in its Motion for Protective Order [Dkt. #45], Uptime also suggests that Mr. Castor should be denied access to confidential information because he will act as a conduit of confidential information. This decision of representation is a client's, and not one that should be left in the hands of the opposing party. To exclude a client's preferred litigation counsel, Uptime must meet an extremely high standard.

As noted below, Mr. Castor should not be denied access to confidential or highly confidential information because (i) he has been specially trained[1] in the technology at issue in this dispute; (ii) Switch has outlined in the protective order measures it will take to prevent inadvertent disclosure such as a firewall, and segregation of data per the proposed protective order, making it clear there is no likelihood of unacceptable opportunity for inadvertent disclosure; and (iii) Mr. Castor does *not* engage in competitive decision making such as pricing or product design.

**(i) Mr. Castor is Specially Trained and Uniquely Qualified as In-House Litigation Counsel for Switch and Depriving Switch of His Advocacy would be prejudicial to Switch.**

As with any other client, Switch has the right to choose its litigation counsel and an attorney's role as in-house counsel "cannot alone create [a] probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access." *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed Cir. 1984). Here, Switch has chosen Mr. Castor to lead this litigation given his extensive expertise and experience consistent with the ruling in supporting in-house counsel involvement in *Breckenridge* cites *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 56 (D.D.C. 2007) where the court granted access to highly confidential documents to in-house counsel who had asserted that they had an expertise that outside counsel did not share.

///

---

[1] As set forth in his declaration, Mr. Castor has a certificate in Communications Law Institute from the Catholic University of America, Columbus School of Law, has worked in the White House under two administrations, in the Federal Communications Commission, and USDA handling telecommunications matters. His expertise is not only unique locally, or regionally, but nationally. See **Exhibit A**, ¶ 3.

From the beginning of this matter, Mr. Castor has served as lead litigation counsel. While outside counsel has been utilized to a certain extent, Switch has relied on Mr. Castor given his unique and hyper-specialized expertise in telecom, colocation, power, and digital markets; central to a trademark dispute. Since learning of his knowledge and experience during the initial deposition in this matter, Uptime's counsel has *now* moved to have Switch's litigation counsel, Mr. Castor and Anne-Marie Birk excluded from confidential and highly confidential discovery.

It should be noted that Uptime was well aware that in-house litigation counsel for Switch (Mr. Castor and Ms. Birk) have been taking and defending depositions (and have done so throughout but had no issue with that until *after* they faced Mr. Castor at the first deposition in this case. Simply put, this attempt by Uptime to remove Mr. Castor and Ms. Birk is merely a litigation tactic to gain a strategic advantage and prejudice Switch.

Uptime's Motion is a veiled attempt at handicapping Switch's litigation in this matter because of Mr. Castor's expertise. As the managing attorney over all Switch litigation, Mr. Castor has taken countless depositions during his roughly ten-year career at Switch. He is looked to by his clients as an expert in technology-related litigation because of his extensive legal training and experience in technology policy, having graduated with a specialty in telecommunications law in Washington D.C., from the Catholic University Columbus School of Law – Communications Law Institute. Outside counsel does not have this level of expertise.

The technology infrastructure industry, which incorporates data center, telecommunications, power, and security services into a holistic product for a client, is an extremely technical and nuanced industry[2]. To preclude Mr. Castor from having access to confidential and highly confidential materials would prevent Switch from conducting the full – highly nuanced and technical – legal analysis necessary to evaluate the claims Switch has put forth;

---

[2] *See* Federal Orders in this jurisdiction where courts have found the national data center market to be multi-layered, complicated and inherently global: Findings of Fact and Order for Permanent Injunction, filed May 7, 2019, in *Switch, Ltd. v. Switch, Inc.*, Case No. 2;18-cv-00738-KJD-CWH, Order Granting Stipulation for Entry of Permanent Injunction filed February 29, 2016, in *Switch, Ltd., et al. v. Firespotter Labs, et al.*, Case No. 2:14-cv-01727-APG-NJK, and Findings of Fact and Order for Permanent Injunction filed June 18, 2019, in *Switch, Ltd. v. L&I LV Enterprise, Inc., et al.*, Case No. 2:19-cv-00787-JCM-NJK, attached to Plaintiff's Opposition to Motion for Protective Order [Dkt. #55-5].

specifically of trade mark dispute and anti-trust.

A trademark dispute inherently revolves around whether there is a likelihood of confusion of the services. As such, a technical analysis of the services is critical to adequate representation for Switch in this matter. For example, this matter will hinge on the categories of services Uptime purports as fundamental to its "Tier Topology" and inherent in the same will be an analysis of the difference between a tri-redundant electrical design v. a system plus system design, or a concurrently maintainable versus a fault tolerant system. Mr. Castor is not only conversant but proficient in these nuances and many more (e.g. the difference between a POTS system and a VOIP system, or a SIP system). Uptime has its own resident experts to support its allegations regarding the nature of the services it provides and yet seems intent on depriving Switch of its resident in-house litigation expertise. Such blatant attempts at prejudicing an opponent without cause is unwarranted and should be denied.

### (ii) Given the Safeguards Implemented, there is No Likelihood of Unacceptable Opportunity for Inadvertent Disclosure.

To meet the high standard of depriving Switch of its in-house litigation counsel at depositions (or at trial), Uptime must prove that there is an unacceptable opportunity for inadvertent disclosure of the confidential or highly confidential information that will be disclosed in discovery (e.g. pricing and product details). Switch has outlined in the protective order drafts, the measures it has taken historically many times before (and will take here again) to prevent inadvertent disclosure of any confidential or highly confidential information.

As Deputy General Counsel and EVP of Policy, Mr. Castor leads the Policy arm of the Switch Legal Department. The Policy team oversees all adversarial or administrative matters (e.g. litigation, regulatory compliance at the federal level like FCC, FERC and at the local level like the Public Utilities Commission of Nevada, Michigan Public Service Commission, and various air quality divisions). In that capacity, Mr. Castor is routinely required to segregate and protect confidential and highly confidential discovery or data. As such, he has taken all necessary measures to protect against the potential of inadvertent disclosure.

///

For example, physically, the legal department and Mr. Castor's office are located in a separate administrative building apart from Switch's C-suite and decision makers' offices in another building in the Switch campus. Digitally, Switch has a firewall and segregation of data for its litigation files per the proposed protective order. These files are not accessible by Switch's decision makers or non-Legal staff.

Additionally, Switch is willing to accommodate Uptime delivering the files being encrypted or password protected. Confidential or highly confidential materials are labeled and placed in a folder properly titled (e.g. Legal Access Only or AEO/Attorneys Eyes Only). If particularly sensitive, the materials can be preserved digitally only and not printed to further limit unauthorized circulation. The same rules will apply during depositions.

Again, over the last decade, Mr. Castor has led all such in-house litigation efforts, and has proactively and prophylactically educated Switch's C-level staff that there are materials and data that Mr. Castor or his Policy Team will obtain that cannot be discussed, shared, or commented on, in any litigation.

Both Mr. Castor and Ms. Birk are acutely aware of their professional Rule 11 obligations as officers of the court. They have also volunteered to personally attest to the protective order, affirming their awareness of and compliance with the same, and duty to not be a conduit of information to decision makers. Mr. Castor has maintained this level of careful and professional separation on all confidential litigation matters since 2011. Mr. Castor has led all litigation at Switch for almost 10 years. He led the underlying TTAB litigation opposite Uptime prior to the filing of this matter. He conducted several depositions in the underlying TTAB matter and conducted the first deposition in this case to which Uptime did not object. To deny Mr. Castor access to discovery would prejudice Switch, cause undue hardship, and impair Switch's ability to have open and informed discussions with Uptime.

As such, there is no possibility of inadvertent disclosure, and his role as litigation counsel is prudent, appropriate, and lawful. All such efforts make it clear there is no likelihood of unacceptable opportunity for inadvertent disclosure. On the contrary, Switch has historically – and is willing here – to take steps above and beyond a traditional firewall segregation, which is the rule

1    for avoiding conflicts or preventing unauthorized access in law firms. As such, it is unreasonable

2    to exclude Switch's preferred and highly specialized in-house litigation counsel from accessing all

3    discovery or conducting depositions.

4         Defendant refused these offers of assurance. This alone suggests Defendant's motive with

5    the instant motion is not protective, but strategic. Defendant's goal is to impair Switch's ability to

6    effectively represent itself, not protect against inadvertent disclosure.

7         **(iii)**    **Mr. Castor Does Not Engage in Competitive Decision Making.**

8         Lastly, neither Mr. Castor nor Ms. Birk engage in competitive decision making at Switch.

9    It is true that Mr. Castor reports to Switch's Chief Legal Officer and Chief Executive Officer. And

10   it is true that Mr. Castor has helped organize the Data Center Standards Foundation at the direction

11   of Switch's CEO, Mr. Roy. This is why Mr. Castor's name appears as a legal placeholder for each

12   and every position for that nascent non-profit. However, as was communicated to Defendants, Mr.

13   Castor does not have decision-making authority or the ability to direct the activities of the yet to

14   function, non-profit entity let alone "pricing or product design" *Breckenridge* cites *Intervet, Inc.*

15   *v. Merial Ltd.*, 241 F.R.D. 55, 56 (D.D.C. 2007). On the contrary, Mr. Castor simply acted in a

16   legal role of filing the paperwork to reserve the name. See **Exhibit A, ¶** 5.

17        There have been numerous meet and confer conferences regarding this topic. When Mr.

18   Castor was transparent with Defendants' counsel about these matters, all issues boiled down to

19   one central concern: Defendants don't like the fact that Mr. Castor has interaction with the CEO

20   of the company, Rob Roy. Yet, as the Federal Circuit explained in *Matsushita Elec. Indus. Co.,*

21   *Ltd. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) "to be denied access to confidential

22   information merely because they have regular 'contact' with those who are involved in competitive

23   decisionmaking . . . would disqualify almost all in-house counsel and thus effectively constitute

24   the very per se rule we rejected in *U.S. Steel*." *Id.*

25        As stated previously and consistent with the above case law, Mr. Castor does <u>not</u> have

26   competitive decision-making authority at Switch; that is left to the C-level suite. See **Exhibit A**, ¶

27   6. There is no risk of inadvertent disclosure, because the files will be kept from competitive

28   decision maker access. See **Exhibit A**, ¶7. Therefore, depriving Switch of Mr. Castor's advocacy

1  would be extremely prejudicial to Switch.

2  **IV.     CONCLUSION**

3          Based on the foregoing, Switch respectfully requests that the Court deny Defendants'

4  Motion to Exclude Plaintiff's Inside Counsel Samuel Castor from Taking and Defending

5  Depositions.

6          DATED this 24th day of March, 2020.

7                                            **SWITCH, LTD.**

8

9                                            _/s/:  Samuel Castor_

10                                           SAMUEL D. CASTOR, ESQ (NBN 11532)
                                             ANNE-MARIE BIRK, ESQ. (NBN 12330)
11                                           7135 South Decatur Blvd.
                                             Las Vegas, Nevada 89118
12
                                             JAMES D. BOYLE, ESQ. (NBN 08384)
13                                           JOANNA M. MYERS, ESQ. (NBN 12048)
                                             JESSICA M. LUJAN, ESQ. (NBN 14913)
14                                           **HOLLEY DRIGGS WALCH**
                                             **FINE PUZEY STEIN & THOMPSON**
15                                           400 South Fourth Street, Third Floor
                                             Las Vegas, Nevada 89101
16
                                             _Attorneys for Plaintiff / Counter-Defendant_
17                                           _Switch, Ltd._

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I hereby certify that on this 24th day of March, 2020, I served a true and correct copy of the above document, entitled **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S INSIDE COUNSEL SAMUEL CASTOR FROM TAKING AND DEFENDING DEPOSITIONS [DKT #46]**, via the Court's electronic filing/service system (CM/ECF) to all parties on the current service list, as follows:

Chad R. Fears, Esq.
Nevada Bar No. 6970
Joshua D. Cools, Esq.
Nevada Bar No. 11941
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102
Email: cfears@efstriallaw.com
Email: jcools@efstriallaw.com

Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Email: jennifer.insley-pruitt@dechert.com

*/s/: Tanya Paonessa*
An agent of SWITCH, LTD.

Exhibit A

**DECLARATION OF SAMUEL CASTOR, ESQ., IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S INSIDE COUNSEL SAMUEL CASTOR FROM TAKING AND DEFENDING DEPOSITIONS**

I, Samuel Castor, declare under penalty of perjury as follows:

1.      I am over the age of eighteen (18) and competent to testify as to the matters stated herein, which are stated upon personal knowledge except for those matters stated upon information and belief, if any, and as for those matters I believe them to be true.

2.      I am EVP of Policy and Deputy General Counsel for Switch, Ltd. I am admitted within all courts within Nevada, and can testify as to the matters set forth in this statement.

3.      I have a certificate in Communications Law Institute from the Catholic University of America, Columbus School of Law, has worked in the White House under two administrations, in the Federal Communications Commission, and USDA handling telecommunications matters. His expertise is not only unique locally, or regionally, but nationally.

4.      This Declaration is made in support of Plaintiff's Opposition to Defendants' Motion to Exclude Plaintiff's Inside Counsel Samuel Castor from Taking and Defending Depositions.

5.      I do not engage in competitive decision making at Switch. I report to Switch's Chief Legal Officer and Chief Executive Officer and have helped organize the Data Center Standards Foundation at the direction of Switch's CEO, Mr. Roy. This is why my name appears as a legal placeholder for each and every position for that nascent non-profit. I do not have decision-making authority or the ability to direct the activities of the yet to function, non-profit entity let alone "pricing or product design." On the contrary, I simply acted in a legal role of filing the paperwork to reserve the name.

6.      I do not have competitive decision-making authority at Switch; that is left to the C-level suite.

///

///

///

7.     There is no risk of inadvertent disclosure, because the files are kept from competitive decision maker access.

DATED this 24th day of March, 2020.

/s/: Samuel Castor
SAMUEL CASTOR

# Exhibit F-3

Diane Siegel Danoff (admitted *pro hac vice*)
Luke M. Reilly (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (Telephone)
Email: diane.danoff@dechert.com
Email: luke.reilly@dechert.com

Jennifer Insley-Pruitt (admitted *pro hac vice*)
DECHERT LLP
Three Bryant Park, 1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500 (Telephone)
Email: jennifer.insley-pruitt@dechert.com
*Attorneys for Defendants and Counterclaim Plaintiffs*

Chad R. Fears, Esq.
Nevada Bar No. 6970
Joshua D. Cools, Esq.
Nevada Bar No. 11941
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 950
Las Vegas, Nevada 89102
702-805-0290 (Telephone)
Email: cfears@efstriallaw.com
Email: jcools@efstriallaw.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>UPTIME INSTITUTE, LLC, a Delaware limited liability company; and UPTIME INSTITUTE PROFESSIONAL SERVICES, LLC, a Delaware limited liability company,<br><br>Defendants. | **Case No. 2:19-cv-00631-GMN-NJK**<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT .................................................................................................. 3

     A.     "Outside Attorneys' Eyes Only" Protection is Required ..................... 3

         1.     Even the case law cited by Switch supports an OAEO category based on the role of Switch's inside counsel ................... 3

         2.     The alleged prejudice to Switch does not require elimination of the OAEO category....................................................................... 7

               a.     Switch would not be unduly prejudiced due to any loss of Mr. Castor's legal expertise ......................... 7

               b.     Switch would not be unduly prejudiced due to any loss of Mr. Castor's industry knowledge ..................... 8

               c.     Switch's past deposition-taking weighs in favor of, not against, an OAEO provision ......................... 8

         3.     Switch's past violations of the TTAB protective order are alone sufficient justification for an OAEO provision ........................... 9

         4.     Switch's aggressive, negative advertising against competitors further heightens the risk of disclosure of highly confidential information.................................................................................. 10

     B.     Switch Should Not Be Allowed to Disclose Uptime's Confidential Information to Experts from Other Data Center Entities .................... 11

III.   CONCLUSION ............................................................................................ 12

## I.       INTRODUCTION

In their opening brief (D.I. 45, "Uptime Br."), Defendants Uptime Institute, LLC and Uptime Institute Professional Services, LLC (together, "Uptime") explained the need for an Outside Attorneys' Eyes Only ("OAEO") category in the protective order, pointing particularly to: (1) the roles of in-house counsel at Plaintiff Switch, Ltd. ("Switch"), Sam Castor, as not only a litigation manager, but also a direct advisor to the CEO of Switch and as President of Switch's Data Center Standards Foundation; (2) the fact that Mr. Castor and his deputy, Anne-Marie Birk, violated protective order confidentiality requirements by authorizing the release of Uptime deposition transcripts that Uptime had designated as confidential, without Uptime's knowledge or consent; and (3) Switch's unusually aggressive, negative marketing about particular competitors. In its opposition brief (D.I. 55, "Switch Br."), Switch does not deny any of these points.

Instead, Switch emphasizes that Mr. Castor is allegedly not himself the decision-maker and that Switch has taken "all necessary measures to protect against the potential of inadvertent disclosure." (Switch Br. at 8.) However, Mr. Castor reports directly to the decision-maker and Switch effectively concedes that it has not taken and will not take the most important step it must take in order to avoid the need for an OAEO provision: ending Mr. Castor's involvement in competitive decisionmaking by walling off Mr. Castor and his team from the decision-maker. Hence, pursuant to even the cases cited by Switch, there is an unacceptable opportunity for inadvertent disclosure of Uptime's highly confidential information, warranting the inclusion of an OAEO category in the protective order.

Moreover, whatever precautions Switch has taken to prevent violations of confidentiality requirements have been ineffectual, as Mr. Castor and Ms. Birk have disregarded the confidentiality provisions of protective orders.

In particular, Mr. Castor and Ms. Birk have made available, to a third party without the knowledge or consent of Uptime, transcripts of the depositions of Uptime witnesses designated as confidential in Trademark Trial and Appeal Board ("TTAB") proceedings. Switch does not and cannot deny that it authorized this release of confidential information or that Switch thereby violated the protective order in the TTAB proceedings. Switch wrongfully authorized the release

to a litigant in an unrelated lawsuit to which Uptime is not a party and did so quite recently, in late 2019.

Switch claims now that Mr. Castor and Ms. Birk are well aware of their confidentiality obligations and have "historically" been taking precautions to maintain confidentiality for many years. However, they nonetheless committed at least one "historic" protective order violation in addition to the more recent one described above. When a dispute arose earlier between Uptime Institute, LLC and Switch regarding the confidentiality designations made by Uptime, Switch never filed a motion challenging the designations and instead simply declared it would treat the documents as unprotected. Switch thus forced Uptime to seek relief from the TTAB to prevent disclosure by Switch. Uptime did so and prevailed in its attempt to retain the confidentiality designations. However, Uptime's motion should not have been necessary. Switch should have honored the protective order requirements in the first place.

Switch also contends that an OAEO provision would unduly prejudice Switch by depriving the company of Mr. Castor's alleged "telecommunications law" and industry expertise. However, there are no telecommunications law issues in this case, and Switch already has outside counsel of record with noted expertise in the issues which *are* at the center of this case. Moreover, even with an OEAO category, Switch's outside counsel may continue to consult with Mr. Castor without disclosing OAEO information, just as outside counsel in many cases commonly consult with "resident experts" at their clients despite AEO or OAEO provisions in protective orders. In any event, Switch and and Uptime have proceeded by agreement under a protective order with an OAEO provision in the abovementioned TTAB proceedings, and should do so again in this litigation.

Allowing Switch's inside counsel access to Uptime's highly confidential documents would create an unacceptable opportunity for inadvertent disclosure or other use of Uptime's highly confidential information. An OAEO category would prevent the problem.

On the second issue, relating to the subject of disclosures to third party experts, Switch's counter-proposal is unacceptable. Switch's lopsided proposed protective order would broadly bar Uptime from disclosure of Switch's confidential information to experts hired from a wide variety

of industries, including the data center industry, but allow Switch to disclose Uptime's confidential information to virtually any expert from those industries.  Furthermore, the potential disclosures by Switch would pose a substantial risk to Uptime and its customers.  Switch has requested from Uptime confidential information about Uptime and about Uptime's customers, who are Switch's competitor data center operators, and about Uptime itself.

Therefore, Uptime's motion should be granted and its proposed form of Protective Order should be entered.

## II.    ARGUMENT

### A.    "Outside Attorneys' Eyes Only" Protection is Required

#### 1.    Even the case law cited by Switch supports an OAEO category based on the role of Switch's inside counsel

In carefully worded denials, Switch states that Mr. Castor does not "engage in" competitive decisionmaking, reasoning that Mr. Castor is (allegedly) not the decision-maker.  *See* Switch Br. at 6, 10.  But the issue is not whether inside counsel personally makes the decisions.  Rather, as the Ninth Circuit explained in *Brown Bag Software v. Symantec Corp.*, the question is "whether in-house counsel was **involved** in competitive decisionmaking," one example of which is "advising on decisions…made in light of similar or corresponding information about a competitor."  960 F.2d 1465, 1470 (9th Cir. 1992) (emphasis added and internal quotations omitted); *see also U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 fn. 3 (Fed. Cir. 1984).

Switch's implied argument that OAEO protection is necessary only if inside counsel *makes* the competitive decisions flies in the face of well-established law.  The court in *Matsushita Elec. Indus. Co. v. U.S.*, 929 F.2d 1577 (Fed. Cir. 1991), a case heralded by Switch, looks to "advice and participation in competitive decisionmaking."  *Matsushita Elec. Indus. Co. v. U.S.*, 929 F.2d 1577, 1580 (Fed. Cir. 1991).  Switch also contends that Mr. Castor is not involved in "pricing and product design," picking up on language from *Matsushita* (Switch Br. at 10), but the Federal Circuit has made clear that those activities are merely *examples* of the many activities that might implicate or involve competitive decisionmaking.  *See In re Deutsche Bank Trust Co. Am.*, 605 F.3d 1373, 1379 (Fed. Cir. 2010) (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465,

- 3 -

1468 n. 3 (Fed. Cir. 1984) and noting that pricing and product design are "only two of the activities that might implicate or involve competitive decisionmaking" and that attorneys involved in patent prosecution may be involved in competitive decisionmaking where they are "obtaining disclosure materials for new inventions and inventions under development, investigating prior art relating to those inventions, making strategic decisions on the type and scope of patent protection that might be available or worth pursuing for such inventions, writing, reviewing, or approving new applications or continuations-in-part of applications to cover those inventions, or strategically amending or surrendering claim scope during prosecution").

As the Ninth Circuit concluded in *Brown Bag,* an OAEO provision is justified when the in-house lawyer's job would necessarily entail advice in areas related to the confidential information. The court held that "the magistrate reasonably concluded that Brown Bag's counsel's employment would necessarily entail advising his employer in areas relating to Symantec's trade secrets," noting that "[k]nowledge of Symantec's trade secrets would place in-house counsel in the 'untenable position' of having to refuse his employer legal advice on a host of contract, employment, and competitive marketing decisions lest he improperly or indirectly reveal Symantec's trade secrets." *Brown Bag*, 960 F.2d at 1471.

The same logic applies to Mr. Castor's situation. Mr. Castor manages Switch's litigation activity, including trademark prosecution and enforcement. *See* Switch Br. at 9; Uptime Br. at 4; Ex. B[1] at 1 (Mr. Castor's LinkedIn profile, claiming he has "resolved 15 trademark conflicts in Switch's favor, in 2018 alone"). He also is the President and only officeholder of the Data Center Standards Foundation, an entity poised to compete with Uptime in the field of data center certifications. Uptime Brief at 4. Mr. Castor claims in his declaration, however implausibly, that he "do[es] not have decision-making authority or the ability to direct the activities of" the Data Center Standards Foundation. Decl. of Samuel Castor ("Castor Decl."), D.I. 55-1 at ¶ 5. However, even if so, he concedes that he reports directly to Switch's CEO and "helped organize the Data Center Standards Foundation at the direction of Switch's CEO, Mr. Roy." Accordingly,

---

[1] All references to any exhibits lettered A-U refer to exhibits Uptime's Motion for Protective Order, D.I. 45. References to exhibits lettered V-X refer to exhibits to this reply brief.

1    the absence of an OAEO category would put Mr. Castor in precisely the sort of "untenable

2    position" which requires an OAEO category under the Ninth Circuit's holding in *Brown Bag*.

3        The cases cited by Switch itself compel the conclusion that an OAEO provision is

4    justified due to Switch's failure to wall off its in-house counsel from its alleged decision-makers.

5        Switch cites to *Sanofi-Aventis U.S. LLC v. Breckenridge Pharmaceutical, Inc.* for its

6    holding permitting in-house counsel access to confidential materials in that case.  C.A. Nos. 15-

7    289 (MAS)(LHG), 15-1836 (MAS)(LHG), 2016 WL 308795 (D.N.J. Jan. 25, 2016); *see* Switch

8    Br. at 5.  But the court's decision in *Sanofi* was expressly and primarily based on the fact that

9    inside counsel was "ethically walled off from all competitive decisionmaking." Id. at *1.  Inside

10   counsel in that case was "not involved in pricing, product design, patent prosecution, or deciding

11   for which brand-name drug Breckenridge will submit ANDA applications," nor was he "involved

12   in determining which companies Breckenridge will partner with."  *Id.*  In contrast, Mr. Castor is

13   centrally involved in trademark prosecution for Switch, engages in attacks on competitors whom

14   Switch contends are misusing the Uptime marks (Uptime Br. at 14-15), acts as EVP of Policy for

15   Switch (Uptime Br. at 4), and has taken on other non-legal roles including organizing the Data

16   Center Standards Foundation at the direction of Switch's CEO. [2]

17       Another case cited by Switch, *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55 (D.D.C. 2007),

18   is even more helpful to Uptime's position.  The court in *Intervet* emphasized that counsel did not

19   personally prosecute or draft patents, *Id*. at 57-58, and that "[i]t has never been suggested in any

20   [other] cases that she has misused or revealed confidential information made available to her."

21   *Id*. at 56.  In contrast, Mr. Castor personally engages in the prosecution of Switch's trademark

22   applications, personally helped organize and is President of the Data Center Standards

23   Foundation, and is the sole signatory and listed person with knowledge on Switch's interrogatory

24   responses.  Even more important, it has been not only "suggested" but proven that Switch's inside

---

[2] Furthermore, the court in *Sanofi-Aventis* described the party's inside counsel as far more "functionally, geographically, and technologically isolated" from the company than Switch's inside counsel are.  *Id*. at *5.  Inside counsel in *Sanofi* worked from his home or the offices of the party's outside counsel, and had no access to the party's networked drives. *Id*. at *1.  In contrast, Mr. Castor works on the same campus as the C-suite of Switch, whom he directly advises, and Switch does not deny that he has access to Switch's networked data drives.

1  counsel authorized the release of confidential transcripts of the depositions of Uptime witnesses

2  in violation of a protective order between the parties in the TTAB. *See* Uptime Br. at 4-5, 13-14.

3  And that violation was not the only violation by Switch's inside counsel, despite Switch's new

4  claim that it has been effectively taking measures for years to prevent inadvertent disclosure of

5  confidential information. *See* discussion below at pp. 9-10.

6      The decision in *Affymetrix, Inc. v. Illumina, Inc.*, yet another case cited by Switch, again

7  turned on effective walling-off. Civ. A. 04-901-JJF, 2005 WL 1801683, at *1 (D. Del. July 28,

8  2005). Both parties sought to exclude the other's inside counsel from access to confidential

9  information. One side's attorney, who was excluded, was involved with settling patent litigation

10  and licensing for the client while the other, who was not excluded, operated as a separate unit

11  who was located in a separate city, maintained separate servers, was prohibited from discussing

12  pricing, product design, or prosecution strategy, and advised solely with regard to current or

13  future litigation. *Id*. at *1-2. Switch does not and cannot contend that its inside counsel,

14  including Mr. Castor, is barred from discussing trademark prosecution, policing, or other relevant

15  issues with his CEO, nor that his roles are purely litigation or that his group is on a separate

16  server, etc.

17      Finally, the court in *Carpenter Technology Corp. v. Armco, Inc.*, another case cited by

18  Switch, *did* restrict certain inside counsel from access to confidential information. 132 F.R.D. 24,

19  28-29 (E.D. Pa. 1990). The court, having "recognized the legitimacy of Armco's concern,"

20  refused to permit the party's Director of Law access to confidential information due to his

21  "authority to initiate and settle litigation as well as execute written contracts and agreements on

22  behalf of the corporation" and his statement only that he has "no *direct* responsibility or

23  authority" over competitive decisions. *Id*. (emphasis added) (noting also that the attorney "is

24  apparently involved in contract negotiations which could involve competitive decisionmaking).

25  That fact pattern is almost identical to the facts of the instant case, thus providing yet more

26  support for the conclusion that OAEO protection is needed.[3]

27   

28  [3] The only case cited by Switch which does not require walling-off for an OAEO category is a
    case that is irrelevant and does not even address the issue. *Warner Chilcott Laboratories Ireland*

### 2. The alleged prejudice to Switch does not require elimination of the OAEO category

Switch claims that it would be unduly prejudiced by OAEO protection because it needs Mr. Castor's allegedly unique expertise in "telecommunications law" and his industry knowledge in this case. *See* Switch Br. at 6-8. However, a protective order with OAEO protection would not unduly prejudice Switch. Switch has competent outside counsel who have been of record in this litigation from the start. In addition, those lawyers, who would have full access to the OAEO information produced by Uptime, could still consult with Mr. Castor on matters within his expertise without revealing or otherwise using the information in the consultations.

Moreover, and in any event, any prejudice would not be undue. Many outside counsel regularly operate under OAEO restrictions, despite the resulting challenges to communicating with their clients. Indeed, both Switch and Uptime did exactly that by agreement in their consolidated TTAB proceedings, which progressed all the way through discovery before being stayed in light of Switch's filing of this federal court lawsuit. *See* Uptime Br., Ex. H.

#### a. Switch would not be unduly prejudiced due to any loss of Mr. Castor's legal expertise

Switch cites Mr. Castor's alleged expertise in "telecommunications law" and "technology-related litigation" to justify the purported need for Mr. Castor to have access to Uptime's OAEO information. But there are no "telecommunications law" issues in this case, and countless attorneys have experience in technology-related litigation, including Switch's two longstanding outside counsel of record in this case.

Most of the claims in this case and the TTAB proceedings relate to the parties' trademark rights, and Switch also alleges breach of contract, deceptive trade practices, and antitrust claims. *See* 2d. Am. Comp., D.I. 44. These are all common, not "hyper-specialized," practice areas.

---

*Ltd. v. Impax Laboratories, Inc.*, C.A. No. 08-6304(WJM), 2009 WL 3627947, at *1 (D.N.J. Oct. 29, 2009), dealt not with an issue of in-house counsel, but rather with a request for a patent prosecution bar. The court rejected the request because it sought "broad, blanket prohibitions applying to any lawyer that views confidential information, regardless of individual circumstances." *Id.* at *3. In contrast, Uptime's request is targeted to two specific inside lawyers for specific, compelling reasons based on their particular circumstances.

Many attorneys have sufficient expertise to represent Switch in this matter, including attorneys other than Mr. Castor who are currently counsel of record for Switch before this Court.

James Boyle and Joanna Myer, the outside counsel who together filed this action and represent Switch in both the TTAB proceedings and this federal court litigation (*See* D.I. 1 at 21 (initial complaint signed by Mr. Boyle), Ex. V (docket sheet for *Uptime Inst., LLC v. Switch, Ltd.*, Canc. No. 92062895 (T.T.A.B.)), tout relevant experience in their biographies. Mr. Boyle's biography states that he "advises clients on intellectual property litigation and dispute resolution as well as brand and IP asset protection" and represents clients in "state and federal trial and appellate courts, the Trademark Trial and Appeal Board …" Uptime Br. Ex. R at 3-4. Similarly, Joanna Myer's biography advertises experience in trademark and other IP cases. Uptime Br. Ex. S at 3-4. Switch does not allege that Mr. Boyle and Ms. Myer, who have been counsel of record since the inception of this case, are not competent or cannot adequately represent Switch's interests in this litigation.

            **b.**      **Switch would not be unduly prejudiced due to any loss of Mr. Castor's industry knowledge**

Switch also claims that Mr. Castor has unique industry knowledge allegedly relevant to this case. Switch Br. at 7. But the same can be said of many, if not most, in-house litigation counsel with respect to litigation to which their clients are a party. Such knowledge does not justify providing inside counsel with access to a litigation adversary's confidential information. Moreover, an OAEO category would not prevent outside counsel from consulting with Mr. Castor regarding the facts at issue, just as many outside counsel consult with "resident experts" at their client to learn about the facts of a given case or the industry of the parties, without disclosing or otherwise using Uptime confidential information. An OAEO designation for highly confidential information will not unduly prejudice Switch; it can remain adequately represented by outside and inside counsel.

            **c.**      **Switch's past deposition-taking weighs in favor of, not against, an OAEO provision**

Switch notes that Mr. Castor took some depositions "in the underlying TTAB matter" (the

consolidated TTAB matter) and took the first and only deposition so far in this federal court case. (Switch Br. at 9)  Switch then complains that it would therefore be unduly prejudicial to deprive Switch of Mr. Castor's continued involvement in depositions.  However, that history, to the extent it is relevant, supports Uptime's position on the OAEO issue.

The parties conducted discovery in the consolidated TTAB matter pursuant to an agreed protective order with the highest level of confidentiality barring access to inside counsel, similar to the OAEO provision Uptime is proposing for this federal court litigation.  *See* Uptime Br., Ex. H at 2 (describing a confidentiality designation of "TRADE SECRET/COMMERCIALLY SENSITIVE").  The parties proceeded all the way through discovery in that matter.  Moreover, Mr. Castor was apparently not the only lawyer capable of conducting depositions on behalf of Uptime, as he took only some depositions and not others.

There has been only one deposition in the federal court case so far, of a retired individual who previously worked for a third party.  That deposition was taken by Mr. Castor, but Switch can easily have a different lawyer conduct the remaining depositions.

### 3. Switch's past violations of the TTAB protective order are alone sufficient justification for an OAEO provision

Switch claims in its opposition brief that it has been taking measures for years to eliminate the risk of inadvertent disclosure of confidential information.  However, those measures have been ineffectual in the face of Mr. Castor's and Ms. Birk's violations of agreed confidentiality requirements in the TTAB protective order between the parties.  *See* Uptime Br. at 13-14.  Those violations alone provide a powerful justification for the OAEO protection that Uptime seeks.

Switch cannot, and does not even attempt to, justify the authorization granted by its in-house counsel in 2019 for the release of confidential deposition transcripts in violation of the TTAB protective order.  Instead, Switch ignores the issue entirely and digs itself further into the hole it created, now citing alleged "measures it has taken historically many times before (and will take here again) to prevent inadvertent disclosure of any confidential or highly confidential information" and claims that "there is no possibility of inadvertent disclosure."  Switch Br. at 8-9. Obviously those measures did not prevent the recent wrongful transcript release authorization by

1    Switch's inside counsel, nor did these "historical" measures prevent an earlier violation by

2    Switch's same inside counsel of the confidentiality provisions of the TTAB protective order.[4]

3    That earlier occasion relates to a provision in the TTAB protective order stating that any

4    party may, up to forty-five days after service of a deposition transcript, designate portions of the

5    transcript confidential. Ex. W, *Uptime Inst., LLC v. Switch, Ltd.*, Canc. No. 92062895

6    (T.T.A.B.), D.I. No. 71 at 9 ("TTAB Order"). Uptime made timely confidentiality designations

7    of certain transcripts in their entirety, and Switch objected to the designations on the grounds that

8    they were too extensive. *Id.* Uptime then provided narrowed designations, but Switch argued

9    that they were late and therefore unacceptable. *See* Ex. X, *Uptime Inst., LLC v. Switch, Ltd.*,

10   Canc. No. 92062895 (T.T.A.B.), D.I. No. 51 at Exhibit L. The TTAB protective order provides

11   that if the parties cannot resolve their differences regarding whether information should be

12   protected under the protective order, then the party challenging the designation may make a

13   motion before the Board to make that challenge. Uptime Br., Ex. H at 8. However, Switch never

14   filed a motion challenging these designations, yet stated that it considered the entirety of the

15   transcripts in question to be unprotected. Ex. X.

16   Switch thus forced Uptime to seek relief from the TTAB to prevent the threatened

17   disclosure by Switch that the TTAB protective order forbade. *See* TTAB Order at 8-11. Uptime

18   won a ruling from the TTAB that its designations had been timely made, and the material retained

19   its protected designation. TTAB Order at 9-10 (holding that "[Switch]'s arguments are not well

20   taken").

21   Switch's request that the Court look to its history in the TTAB litigation only emphasizes

22   why OAEO protection is needed here.

**4.      Switch's aggressive, negative advertising against competitors further
heightens the risk of disclosure of highly confidential information**

25   Switch does not even attempt to respond to Uptime's argument that Switch's aggressive,

_____

27   [4] Switch is represented by the same outside counsel and inside counsel in both the TTAB
proceedings and this federal court action. Uptime has different outside counsel in the two
28   matters.

negative and disparaging advertising about its competitors increases the risk to Uptime and its customers if Uptime were to produce its highly confidential information (including information about Switch's direct data center competitors) without the benefit of an OAEO designation. *See* [Uptime moving brief ]at 14-16, describing and picturing Switch's anonymous "Liar West" website and referencing Mr. Castor's letter to the Nevada Attorney General urging action against Switch's direct competitor.

### B.    Switch Should Not Be Allowed to Disclose Uptime's Confidential Information to Experts from Other Data Center Entities

The parties also disagree regarding another aspect of the protective order:  the restrictions on disclosure of confidential information to outside experts.  Switch proposes a lopsided, illogical approach which would unfairly cripple Uptime's ability to hire an effective expert from the data center industry, while leaving Switch free to hire (and share Uptime's confidential information with) virtually anyone in the data center industry.  Moreover, by allowing Switch to to share that information, Switch's proposal would be competitively dangerous to not only Uptime but its customers, who are competitors of Switch.

Switch's proposed protective order would broadly *bar Uptime* from disclosure of Switch's confidential information to potential experts who work in the data center industry (and numerous other industries), but unfairly *allow Switch* to disclose Uptime's confidential information to almost every potential expert from *all* of those industries.  Moreover, Switch has requested from Uptime competitively sensitive, confidential information about Uptime and about Uptime's customers, who are Switch's competitor data center operators, and about Uptime itself. Disclosures of that information by Switch in turn, without OEAO protection, to experts who work for Uptime's customers in the data center industry, would , for example, give a person who works for one data center competitively sensitive information about another competitive data center. Accordingly, the prohibition in the protective order should instead be reciprocal on both sides, at least with respect to the data center industry, as Uptime has proposed.

Switch insists disingenuously that its primary goal is "to avoid the risk that Uptime will disclose Switch's confidential information. . . to a competitor 'expert.'"  Switch Br. at 11.  But

1    Uptime's draft protective order bars Uptime from sharing Switch confidential information with

2    experts who work in or for the large number of industries which Switch deems its competitors,

3    including data centers, telecommunications services, and cloud services.  *See* Uptime Br. at 20.

4         Under Switch's proposal, Switch would be allowed to disclose Uptime's information to

5    any expert who does not work for a data center **certification** entity.  There are only a few

6    companies who could conceivably qualify as data certification entities, but millions of data center

7    facilities that are customers or potential customers of Uptime.  Switch seeks to place a huge

8    restriction on Uptime's use of potential expert witnesses while accepting only a virtually

9    nonexistent restriction on its own.

10        Uptime's proposal, by contrast, places the same burden on both sides with respect to

11   disclosures of information within the data center industry.  Uptime's construct also reasonably

12   includes the right for both parties to share with experts from academia or litigation consulting

13   groups and the right for either party to go to the Court for permission to disclose if the opposing

14   party declines to consent.  The Court should adopt Uptime's  proposal.

15   **III.    CONCLUSION**

16        For the reasons stated above and in its moving brief, Uptime respectfully requests that the

17   Court grant Uptime's Motion and enter its proposed form of protective order.

18        Respectfully submitted this 27th day of March, 2020.

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EVANS FEARS & SCHUTTERT LLP**

By: ___/s/ Luke M. Reilly___
    Chad R. Fears, Esq. (NBN 6970)
    Joshua D. Cools, Esq. (NBN 11941)
    2300 West Sahara Avenue, Suite 950
    Las Vegas, Nevada 89102

    DECHERT LLP

    Diane Siegel Danoff (*pro hac vice*)
    Luke M. Reilly (*pro hac vice*)
    Cira Centre
    2929 Arch Street
    Philadelphia, Pennsylvania 19104

    Jennifer Insley-Pruitt (*pro hac vice*)
    Three Bryant Park
    1095 Avenue of the Americas
    New York, New York 10036

*Attorneys for Defendants Uptime Institute,*
*LLC and Uptime Institute Professional*
*Services, LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER** was electronically served on counsel of record this 27th day of March, 2020, using the Court's CM/ECF System.

　　　　　　　　　　　　　　　　　　　　　*/s/ Luke M. Reilly*

　　　　　　　　　　　　　　　　　　　Luke M. Reilly

# Exhibit G

# Sam Castor

Executive Vice President of Policy

Las Vegas, Nevada Area

## Contact

www.linkedin.com/in/samcastor
(LinkedIn)
www.supernap.com (Company)
www.innevation.com (Company)
www.switch.com (Company)

## Top Skills

Intellectual Property

Telecommunications

Civil Litigation

## Languages

Romanian

## Certifications

Communications Law Institute
(2009) CUA

## Honors-Awards

The Extra Mile Award

## Publications

Utah's Child Protection Registry
Act: Protecting Children, Parents
and . . . Pornographers?: Allowing
States to Participate In Balancing
First Amendment Protections with
Parental Rights To Privacy and
Sovereignty in the Home.

Three Solid Tips to Avoid
Embarrasing Yourself When
Claiming Internet Copyright
Infringement

## Summary

I am a solutions finder, bridge builder and aggressive optimist.
I specialize in conflict resolution, with karma based negotiation.
Over the last ten (10) years, I have negotiated several hundreds
of telecom, power, and colocation deals, and multi-million a month
contracts with Fortune 100 companies, governments and agencies. I
resolved 15 trademark conflicts to Switch's favor, in 2018 alone. As
a member of Switch's energy and sustainability team, I help blaze a
trail for Switch to secure 100% renewable energy for all of its data
centers, worldwide.

Specialties: Intellectual Property, Colocation, Telecom, Energy,
Transactional, Entrepreneurial, Litigation, Regulatory, Trademarks,
Copyrights

_____

## Experience

**Switch**
9 years 2 months

Executive Vice President of Policy
January 2017 - Present (3 years 4 months)
Las Vegas, Nevada Area

Associate General Counsel, VP
March 2011 - January 2017 (5 years 11 months)
Las Vegas, Nevada area

I assist Switch in all things legal, including energy sustainability, contract
negotiation, intellectual property litigation and prosecution, protection and
licensing, telecom, power and air quality regulatory compliance, human
resource policy, strategy, legislative policy, complete commercial transactions,
and litigation.

**The Rob Roy Innevation Center**
Director of InNEVation
October 2011 - October 2013 (2 years 1 month)

Las Vegas, Nevada Area

Privileged to be involved with Switch's karma driven efforts to diversify Nevada's economic landscape by empowering innovation and encouraging companies to relocate to Nevada.  www.inNEVation.com

## Alverson, Taylor
Associate
June 2009 - March 2011 (1 year 10 months)

Litigated medical malpractice/negligence suits while defending local hospitals, doctors, and businesses.

## Office of Science and Technology - EOP (White House)
Law Clerk - Policy Analyst Intern
August 2008 - March 2009 (8 months)

Under Presidents Bush and Obama, I researched and assisted in the drafting of internet and communication policy.  Specifically, I assisted in the refinement of policies regarding telecommunications, ICANN and online child protection laws with various federal agencies, including the Department of Justice, the Department of Agriculture, the Federal Communications Commission, and the Department of Commerce.  I also handled all Freedom of Information Act requests for the Office.

## U.S. District Court, District of Nevada
Legal Extern
May 2008 - August 2008 (4 months)

Assisted Judge George and his career law clerks with criminal and civil case loads, legal research and order drafting, for cases ranging from the Fair Credit Reporting Act to Native American Contract law.

## Akin Gump et. al. LLP
Law Clerk
January 2008 - May 2008 (5 months)

Handled emerging broadcast, wireless, radio and the Internet (i.e. Child Online Privacy Protection Act compliance) regulatory issues for Disney, Cox, Samsung etc.  Maintained FCC license tickler.

## Mobile Statellite Ventures
Legal Intern
August 2007 - December 2007 (5 months)

Participated in International Telecommunications Union (ITU) and World Radio Conference (WRC) preparation meetings. Compiled and summarized FCC Notice of Inquiry (NOI), Notice of Proposed Rule Making (NPRM) comments, and participating WRC country proposals.  Plan to research and write trade journal language for professional publication regarding hybrid satellite and terrestrial cell phone technology and its role in the telecom industry and in the WRC.

US Dept. of Agriculture
Law Clerk
April 2007 - August 2007 (5 months)

Office of the Assistant Administrator – Telecom
Compiled and summarized comments and draft responses for proposed rule 7 C.F.R. §1738 governing rural broadband loans; loans intended to increase rural broadband service via multiple technologies in an attempt to raise the United States' internet access.  Drafted responses to FCC NOIs and NPRMs.

Senator Orrin Hatch
Staff Assistant / L.C.
August 2005 - February 2006 (7 months)

Staff Assistant / Legislative Correspondent
Drafted hundreds of letters for Senator Hatch concerning a myriad of federal issues in response to constituent inquiry. Handled incoming calls, specifically regarding the Supreme Court nomination hearings of Chief Justice Roberts and Justice Alito, and the hurricane Katrina/Rita disasters. Assisted in web-site content maintenance.

Federal Communications Commission
Intern
May 2005 - August 2005 (4 months)

International Bureau Intern
One of two interns awarded a scholarship for the 1st month's performance and educational excellence.  Assisted in publication and implementation of a Public Hearing regarding satellite industry rule making. Drafted press releases concerning frequency regulation and policy shifts. Organized and researched outreach content for bureau web-site. Attended and participated in policy, media and ITU meetings.

_____

# Education

The Catholic University of America, Columbus School of Law

J.D. Cum Laude, Communications Law · (2006 - 2009)

Brigham Young University

B.A., Communications · (1999 - 2005)

Provo High School

Honors Highschool, General Studies · (1994 - 1998)

# Exhibit H



GALLERY    PRIME DATA CENTERS    EDGE DATA CENTERS    TELECOM    STORAGE    ROBOTICS    ABOUT    CONTACT

## Sam Castor

### EVP OF POLICY
### DEPUTY GENERAL COUNSEL

As Executive Vice President of Policy, Sam Castor, Esq., manages regulatory, intellectual property and litigation matters and policy.  As a member of the Sustainability Team, he provides legal and policy insight to ensure Switch is 100% renewably powered, world-wide, and drives thoughtful sustainability policy throughout the company's operations, energy procurement, and government and legislative policy.

Sam joined the company as Vice President and Associate General Counsel, assisting Switch with transactional, telecom, legislative, regulatory and litigation matters, and continues to aid the legal team in these matters when needed.

Sam's professional path includes service in all branches of federal government assisting with technology policy, including time under President Obama and President Bush.  He received his undergraduate degree in Communications from Brigham Young University and his law degree from Catholic University of America, with a certificate in Communications Law from the Communications Law Institute.  Sam speaks fluent Romanian and Moldavian after providing two years of service in Eastern Europe.  He is a trap and skeet enthusiast.

Bill Kleyman          Rob Elliott          Heather Ellerbe          Anne-Marie Birk          Jeffery Bryce          Hugo Andraus

# Exhibit I



- GALLERY
  - Photos
  - Videos
- PRIME DATA CENTERS
  - Locations
  - Colocation
  - Build-to-Suit
  - Clients
- EDGE DATA CENTERS
  - Switch EDGE
- TELECOM
  - Switch CONNECT®
  - The CORE Cooperative
- STORAGE
  - Switch VAULT
- ROBOTICS
  - Switch SENTRY
- ABOUT
  - About
  - Rob Roy
  - Executive Team
  - Thought Leadership
  - Social Responsibility
  - Sustainability
  - Testimonials
  - Press Releases
  - Blog
  - Careers
  - Investors
  - Acceptable Use Policy
- CONTACT
  - Schedule a Tour
  - Request a Quote
  - Contact Us

- Tour

- GALLERY
  - Photos
  - Videos
- PRIME DATA CENTERS
  - Locations
  - Colocation
  - Build-to-Suit
  - Clients
- EDGE DATA CENTERS
  - Switch EDGE
- TELECOM
  - Switch CONNECT®
  - The CORE Cooperative
- STORAGE
  - Switch VAULT
- ROBOTICS
  - Switch SENTRY
- ABOUT
  - About
  - Rob Roy
  - Executive Team
  - Thought Leadership
  - Social Responsibility
  - Sustainability
  - Testimonials
  - Press Releases
  - Blog
  - Careers
  - Investors
  - Acceptable Use Policy
- CONTACT
  - Schedule a Tour
  - Request a Quote
  - Contact Us

MENU

Search: [type here and hit enter]

# Munters Joins Switch's Data Center Patent Licensing Program

Press Release - March 29, 2018



Tweet

Like    Share    266 people like this.
Sign Up to see what

LinkedIn

> *Licensing Agreement includes Right to Sell Switch's Highly Efficient, Patented Exterior Wall Penetrating Multi-Mode HVAC to Others*

**LAS VEGAS —** Switch (NYSE: SWCH), the global technology solutions corporation that is powering the future of the connected world®, today announced that Munters has elected to participate in Switch's utility patent licensing program.  Switch's licensing program extends the benefits of its patented Exterior Wall Penetrating Multi-Mode HVAC units known in the industry as the Switch TSC.

Munters, a global leader in energy efficient air treatment and climate solutions, has been one of Switch's leading global suppliers of the patented TSC 500, part of the Switch MOD® facility designs. Munters versatile and rapid response to Switch's requests has set them apart from others. Both parties view the license agreement as an opportunity to explore future strategic customer/vendor opportunities.

"We are excited about the opportunity to further our successful collaboration with Switch," said Neil Yule, President of Munters' Data Center business. "We are very pleased to be able to offer Switch's innovative TSC 500 exterior wall penetrating HVAC units to our clients. It's hard not to admire the efficiencies of the TSC 500 and the striking appearance, iconic to Switch's name and brand."

Rob Roy founder and CEO, began inventing Switch's technologies in 2006. Switch has obtained regular patent allowances from the United States Patent and Trademark Office for Rob Roy's innovative designs. The license with Munters covers issued patent claims for Switch's Exterior Wall Penetrating Multi-Mode HVAC technology as well as Switch's Multi-Cabinet Hot Aisle Containment Chimney Pods and trade secrets related to the same.

"Munters has been a great partner and is well positioned to be a leader in deploying Switch's sustainable solutions to meet the massive growth of the internet of everything," said Switch founder and CEO Rob Roy. "This license to Munters further demonstrates the unique and valuable role Switch's patented technologies can play with leaders in the data center industry."

Historically, licensing of Switch's patents has been reserved exclusively for its customers until Switch began its broader patent licensing program in 2016. Since then, Switch has begun licensing its technology to others, including Schneider Electric and to Berkshire Hathaway's electric utility, NV Energy.

"The licensing of Switch's technology by third parties further validates Rob Roy's inventions and status as one of the world's leading data center designers, with now more than 400 issued and pending patent claims said Sam Castor, executive vice president of policy. "We believe that many companies in the data center industry are using Switch's patented designs without permission and look forward to expanding Switch's licensing portfolio as we evaluate our patent enforcement and licensing options."

**ABOUT Switch**

POWERING THE FUTURE OF THE CONNECTED WORLD®
Switch (NYSE: SWCH), the technology infrastructure corporation headquartered in Las Vegas, is built on the intelligent and sustainable growth of the internet. Switch founder and CEO Rob Roy has developed more than 400 issued and pending patent claims covering data center designs that have manifested into the company's world-renowned data centers and technology solution ecosystems. Visit switch.com for more information.

**ABOUT Munters**

Munters is a global leader in energy efficient air treatment and climate solutions. Using innovative technologies, Munters creates the perfect climate for customers in a wide range of industries, the largest being the food, pharmaceutical and data center sectors. Munters has been defining the future of air treatment since 1955. Today, around 3,800 employees carry out manufacturing and sales in more than 30 countries. Munters reports annual net sales in the region of SEK 7 billion and is listed on Nasdaq Stockholm. For more information, please visit munters.com.

**SOCIALLY SPEAKING**

 Switch　Follow　 670　👤 3,064

Switch (NYSE:SWCH) is a technology infrastructure corporation. The world's highest-rated hyperscale data center campus ecosystems.

 **Switch**　16h

Switch enables compliance for heavily regulated industries with certifications including HIPAA, SSAE 18, SSAE 16, SOC1, SOC2, SOC3, PCI DSS, FEDRAMP, NIST-FISMA, MPAA and more. Take a personalized virtual tour: https://t.co/4dcBrb6HoQ #HealthcareTechnology #DataCenters



↩　⟲ 2　♡ 3　Twitter

 **Switch**　9 Sep

The National Nuclear Security Administration's Nevada National Security Site has secured the future of the Department of Energy/NNSA Emergency Communications Network through a partnership project with @Switch Learn more here: @NNSANevada @NNSANews @ENERGY

Case 2:17-cv-02651-GMN-EJY · Document 96-1 · Filed 09/16/20 · Page 136 of 140

---

 **Switch**   9 Sep

Don't miss the upcoming Data Center Frontier Webinar Series featuring @Switch speakers: EVP of Digital Solutions, Bill Kleyman @QuadStack, EVP of Strategy, Adam Kramer @AdamInNevada and Chief Medical Officer, Dr. Quinn Pauly! https://t.co/yKIFkfog9h @dcfrontier @Tech_Journalism



&#x21a9;   &#x21c4; 3   &#x2665; 1   Twitter

---

**Switch**   8 Sep

The US Department of Energy's National Nuclear Security Administration has shifted its Emergency Communications Network to @Switch. Read the full article here: @dcdnews @NNSANews @NNSANevada

&#x21a9;   &#x21c4; 7   &#x2665; 7   Twitter

---

Switch Retweeted

**NNSA** &#x2714;   3 Sep

#NNSA's dedicated #Emergency #Communications #Network will provide real-time voice, data, and video for managing emergency situations that involve #NNSA assets and interests. @Switch @NNSANevada

https://t.co/neikgxzpWm

Munters Joins Switch's Data Center Patent Licensing Program



↩  ⟲ 6  ♥ 9  Twitter

**Switch** 3 Sep

Switch is purpose-built for healthcare with the most advanced data security, cloud, telecom and digital infrastructure solutions. Watch the full video to learn more: https://t.co/OUYAr6MFAW
#HealthCareTechnology #DataCenters #IoT

Case 2:17-cv-02651-GMN-EJY   Document 96-1   Filed 09/16/20   Page 138 of 140



Switch is an exascale data center.

↩   ⟲ 3   ♡ 5    Twitter

---

**Switch**   3 Sep

PRESS RELEASE - NNSA Aims for Cost Savings by Consolidating Data Center Storage: @NNSANews @NNSANevada



↩   ⟲ 1   ♡ 6    Twitter

---

**Switch**   2 Sep

Switch EVP of Policy & Deputy General Counsel, Sam Castor will participate in Financing Wind North America 2020 during the virtual panel discussion: Corporate Off-Takers: Opening PPAs for All tomorrow at 7:35am PT! #Renewables #RenewableEnergy @awordaboutwind





↩   ⟲ 5   ♡ 10    Twitter

Load More...



A recognized world leader in colocation design, development and mission-critical operations.

- GALLERY
  - Photos
  - Videos
- PRODUCTS
  - Colocation
  - EDGE Data Centers
  - Telecom
  - Storage
  - Robotics
- CONTACT
  - Contact Us
  - Request a Quote
  - Sales Log In
- TOUR
  - Schedule a Tour
- DATA CENTER DESIGNS
  - Rob Roy
  - Patent Book
  - Build-to-Suit
  - Clients
  - GDPR/CCPA Compliance
- LOCATIONS
  - Location Map
  - Switch LAS VEGAS
  - Switch TAHOE RENO
  - Switch GRAND RAPIDS
  - Switch ATLANTA
  - SUPERNAP Italia
  - SUPERNAP Thailand
- SOLUTIONS
  - Switch CONNECT®
  - Switch CLOUD®
  - Switch SAFE®
  - Switch SUPERLOOP®
  - Switched ON®
- ABOUT
  - About
  - Executive Team
  - Thought Leadership
  - Social Responsibility
  - Sustainability
  - Testimonials
  - Press Release
  - Blog
  - Careers

- Investors
- Acceptable Use Policy

Copyright © 2020 Switch. All Rights Reserved.

# Switch



The World's Leading Data Center Ecosystem https://www.switch.com
Las Vegas Nevada 89118